**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TERMAINE HICKS** | **:** | **CIVIL ACTION** |
| | **:** | |
| **v.** | **:** | **NO.  22-977** |
| | **:** | |
| **CITY OF PHILADELPHIA, MARTIN** | **:** | |
| **VINSON, ROBERT ELLIS, ARTHUR** | **:** | |
| **CAMPBELL, MARK WEBB, MICHAEL** | **:** | |
| **YOUSE, FRANK HOLMES, DOUGLAS** | **:** | |
| **VOGELMAN, KEVIN HODGES,** | **:** | |
| **DUANE WATSON, DENNIS ZUNGOLO,** | **:** | |
| **MARY BRIDGET SMITH** | **:** | |

## <u>MEMORANDUM</u>

**MURPHY, J.**                                                                        **August 16, 2023**

I.      **Introduction**

Termaine Hicks says he spent nineteen years in prison after police officers framed him

for rape.  This is his civil rights case for money damages.  According to the complaint, the story

began early one morning in 2001, when Mr. Hicks was on his way home from a convenience

store.  He heard a woman screaming and went to help.  A bystander had already called 911.

When police officers arrived on the scene, they found Mr. Hicks standing by the victim.  Before

Mr. Hicks could put his hands up, they shot him in the back three times.

Mr. Hicks survived, but lived to face a new ordeal.  He says that to cover up the shooting,

officers planted a gun on him, falsely reported that they saw him raping the victim, and failed to

reveal evidence that could have helped exonerate him.  At the age of twenty-six, with a four-

year-old son, Mr. Hicks was incarcerated and would not leave prison until nineteen years later.

Eventually, exculpatory evidence came to light, and Mr. Hicks was freed.  At the hearing where

his conviction was vacated, the District Attorney's Office admitted that "false testimony was

used and I believe it is impossible to say that that did not contribute to the conviction."

This case challenges the legal system to provide a remedy to someone who spent nineteen years imprisoned after police officers allegedly framed him for a crime he did not commit.  But for now, discovery is ongoing and there is a motion to dismiss on the table.  Defendants seek to eliminate a number of Mr. Hicks's claims: (1) the due process claim for concealing and suppressing exculpatory and impeachment evidence; (2) the Fourteenth Amendment malicious prosecution claim (but not the Fourth Amendment version); (3) all claims against defendants Douglas Vogelman and Kevin Hodges; (4) the civil rights conspiracy claim based on the rights to be free from unreasonable search and seizure, false arrest, and false imprisonment; and (5) the municipal liability claim.

We hold that all of Mr. Hicks's claims can proceed except for his civil rights conspiracy claim based on the right to be free from unreasonable search and seizure, false arrest, and false imprisonment, which he waived.  The remainder of Mr. Hicks's claims will proceed through discovery.

## II.    Factual Allegations

According to the amended complaint — the non-conclusory allegations of which we must accept — Mr. Hicks was walking home from a convenience store in the early morning of November 27, 2001 when he heard a woman screaming from an alley and went to help.  DI 23 ¶¶ 2, 39.  When he arrived, he found a woman who had been the victim of rape.  *Id.* ¶¶ 2, 40. Defendant officers Martin Vinson and Dennis Zungolo were the first officers to arrive on the scene.  *Id.* ¶¶ 2, 43.  Before Mr. Hicks could put his hands up, Mr. Vinson shot Mr. Hicks three times in his back.  *Id.* ¶¶ 2, 46.

Meanwhile, defendant officers Robert Ellis, Duane Watson, Brian Smith, Michael Youse, Frank Holmes, and Kevin Hodges arrived on the scene.  *Id.* ¶¶ 3, 47.  Realizing that Mr. Vinson

2

had shot an innocent man, they concocted a story to justify the shooting and frame Mr. Hicks for the rape. *Id.* ¶¶ 3-4, 53, 65. Mr. Zungolo and Mr. Ellis — who had a history of fabricating evidence — planted a gun on Mr. Hicks. *Id.* ¶¶ 3-4, 47, 56. One of them transferred blood from the victim to the handle of the gun to support the story that Mr. Hicks was the perpetrator. *Id.* ¶ 59. When detectives and officers from the Special Victims Unit (SVU) arrived, several officers who were already at the scene gave false statements to the SVU, including that Mr. Ellis found a gun on Mr. Hicks and that Mr. Hicks had been on top of the victim with his pants down. *Id.* ¶¶ 57-58.

SVU detectives participated in the scheme to frame Mr. Hicks by concealing evidence that pointed to another perpetrator. Defendants Arthur Campbell and Mark Webb, both SVU detectives, saw hospital security camera footage that showed a man in a gray hoodie[1] dragging the victim. *Id.* ¶¶ 27, 57, 61. The footage also showed a parked white van at the loading dock where the victim was raped. *Id.* ¶ 61. Mr. Webb recovered Mr. Hicks's clothing, which included a black leather jacket but no gray hoodie. *Id.* ¶ 63. Even though the hospital security footage undercut the officers' story, Mr. Campbell confiscated the recording and a viewable version of the security footage was not made available to Mr. Hicks and his lawyer until a month after the jury convicted Mr. Hicks. *Id.* ¶ 62.

The supervising officer — defendant Douglas Vogelman — oversaw and participated in the misconduct. Mr. Vogelman was a sergeant at the time of the investigation. *Id.* ¶ 23. He was the first supervisor at the scene, arriving "within minutes" of the shooting, and spoke to officers, including Mr. Vinson. *Id.* ¶ 71. Mr. Vogelman knew the officers' story was "false in material

---

[1] An initial 911 call also described the assailant as wearing a black jacket and gray hoodie. *Id.* ¶¶ 33, 42.

respects" but nonetheless "repeated and amplified their false reports, including in a signed statement." *Id.* ¶ 72.

 To support their false narrative, the officers also misrepresented the victim's account of her rape.  When Mr. Zungolo and Mr. Youse originally interviewed the victim at the scene, she did not give any description of the crime or the assailant.  *Id.* ¶ 75.  By the time she was interviewed by Mr. Campbell and Mr. Webb at the hospital, she was still "obviously confused with limited memory of the attack."  *Id*. ¶ 76.  Mr. Webb and Mr. Campbell suggested to the "disoriented" victim that the attacker was on top of her when the police arrived and then created a "false and fabricated" police report that said the victim had volunteered this information.  *Id.* ¶¶ 78-79.

Officers memorialized these and other fabrications in a series of false reports and statements.  *Id.* ¶ 65-70.  For instance, officers falsely reported Mr. Hicks was on top of the victim and in the act of raping her when police arrived, *id.* ¶ 66, Mr. Hicks was wearing a gray hoodie, *id.* ¶ 67, and that a gun had been recovered from Mr. Hicks, *id.* ¶ 69, often in signed statements.  Mr. Vinson said that Mr. Hicks lunged at him, struck him, pulled out a gun and pointed it at him before he shot Mr. Hicks in the front of his body.  *Id.* ¶¶ 4, 88.  Mr. Hodges "falsely reported" (albeit not in signed statements) that Mr. Hicks was in the act of raping the victim when police arrived and that a gun had been recovered from Mr. Hicks.  *Id.* ¶¶ 66, 69.

Mr. Hicks was convicted of crimes including rape on November 8, 2002, after the prosecution relied "exclusively on the false evidence Defendants fabricated and planted against Mr. Hicks."  *Id.* ¶¶ 88, 89, 94.  This included officers' false signed reports and accounts, which they repeated at trial.  *Id.*  Mr. Hicks was twenty-six years old with a four-year-old son when he was arrested.  *Id.* ¶¶ 8, 37, 64.  He remained incarcerated for nineteen years.  *Id.* ¶ 64.

Mr. Hicks always maintained his innocence.  *Id.* ¶ 99.  Years later, DNA evidence "conclusively excluded" Mr. Hicks as the source of the DNA on the victim.  *Id.* ¶ 104. Additionally, a forensic pathologist retained by the Innocence Project concluded that there was no evidence that Mr. Hicks was shot in the front of his body, as officers claimed.  *Id.* ¶¶ 107-108. This was further confirmed by the Chief Medical Examiner for the City of Philadelphia.  *Id.* ¶ 108.

Mr. Hicks filed a second amended petition for post-conviction relief based on this new information on December 8, 2020.  *Id.* ¶ 109.  The Commonwealth asked the Court of Common Pleas of Philadelphia County to vacate Mr. Hicks's sentence, grant him a new trial, and dismiss the charges *nolle prosequi*.  *Id.* ¶ 110.  On December 16, 2020, the court granted the motion for a new trial and the motion for *nolle prosequi*, vacating Mr. Hicks's conviction.  *Id.* ¶ 112.  At the hearing, the District Attorney's Office stated "false testimony was used and I believe that it is impossible to say that that did not contribute to the conviction."  *Id.* ¶¶ 7, 112.

Mr. Hicks contends that what happened to him was not an "isolated incident" but rather part of a policy, practice, or custom within the Philadelphia Police Department of misconduct in felony investigations, including the planting of firearms and the fabrication of evidence.  *Id.* ¶¶ 115, 130.  Defendant officers Mr. Ellis, Mr. Watson, and Mr. Youse made false claims or engaged in misconduct in other cases.  *Id.* ¶¶ 116-126.  Mr. Ellis has been the subject of at least 58 complaints, 13 of which occurred prior to Mr. Hicks's arrest.  *Id.* ¶ 145.  He had a "reputation for planting evidence and assaulting people."  *Id.* ¶ 116.  For instance, Mr. Ellis "falsely claimed" he found two guns and a bullet in the possession of a man he pulled over during a traffic stop but was never reprimanded for his "lies" after the man was acquitted on retrial.  *Id.* ¶¶ 117-120.  At the time of the amended complaint, Mr. Watson was subject to perjury charges

after surveillance video contradicted his account of his arrest of five people.  *Id.* ¶ 125.  Mr. Youse was found to have made a false entry in a departmental record by Internal Affairs and received an eight-day suspension.  *Id.* ¶ 126.

Mr. Hicks also draws our attention to, among other allegations: three court orders in the 1980s enjoining the Philadelphia Police Department ("PPD") from violating individuals' rights, *id.* ¶ 131; a narcotics squad in the 39th Police District in Philadelphia that engaged in "widespread unconstitutional practices" in the 1980s and 1990s, including fabricating warrants and other allegations of criminal conduct and planting evidence, *id.* ¶ 132; a consent decree resulting from an NAACP class action suit requiring "wide ranging reforms" in the PPD, *id.* ¶ 133; and the resulting Integrity and Accountability Office ("IAO"), created to identify and remedy misconduct in the PPD, *id.* ¶ 137.  Monitoring reports issued in the 1990s focused on the "code of silence" within the police department, including stating that "officers subject to disciplinary investigations habitually lied to cover up their own misconduct" and "the continuous failure to prevent the coverup of officer wrongdoing communicated the message to rank-and-file officers that their misconduct would be tolerated."  *Id.* ¶¶ 133-34.  Further, in 1999, the Philadelphia City Paper published an account of the "failure" of the Internal Affairs Division to investigate allegations of misconduct made by a high-ranking union official about a traffic stop. *Id.* ¶ 135.  When questioned about the lack of finding misconduct, the head of the PPD officers' union said that officers "begin to figure that [the top brass doesn't] follow the rules, so why should I?"  *Id.*  Only eight months before Mr. Hicks's arrest, the IAO released a report about deficiencies in the disciplinary system.  *Id.* ¶ 138.  The Mayor of Philadelphia then established a Task Force on Police Discipline which described the disciplinary code as "seriously deficient." *Id.* ¶¶ 138-39.  Another IAO report in 2003 noted that "close to one-half of the officers,

supervisors, and commanders who were found by the Internal Affairs Bureau to have violated Departmental policies, or engaged in serious misconduct, were never formally disciplined." *Id.* ¶ 140.

### III.   Defendants' Partial Motion to Dismiss

Mr. Hicks sued Mr. Vinson, Mr. Ellis, Mr. Zungolo, Mr. Watson, Mr. Youse, Mr. Holmes, Mr. Campbell, Mr. Webb, Mr. Vogelman, Mr. Hodges, Mary Bridget Smith,[2] and the City of Philadelphia (collectively "defendants") under 42 U.S.C. § 1983 and Pennsylvania law for violating his rights.  DI 23.  Relevant to defendants' partial motion to dismiss, Mr. Hicks asserts claims under § 1983 against the individual defendants for: deprivation of liberty without due process of law and denial of a fair trial by intentionally concealing and deliberately suppressing material exculpatory and impeachment evidence (Count II), malicious prosecution in violation of the Fourth and Fourteenth Amendments (Count III), and civil rights conspiracy (Count IV).  He also asserts municipal liability claim against the City (Count V).

Defendants move to dismiss most of those claims, as well as all claims against Mr. Vogelman and Mr. Hodges.  *See* DI 23, DI 26.  Our analysis will follow along with the way defendants ordered their motion.  First, defendants characterize Count II as alleging a *Brady* violation, even though it is not "explicitly labeled as such."  DI 26 at 5.  Because defendants argue that this right was not clearly established with respect to police officers until 2005 — after Mr. Hicks's prosecution — they contend individual defendant police officers are entitled to qualified immunity on this claim.  DI 26 at 5, DI 23 ¶ 94.  Second, defendants seek to dismiss the portion of Count III that asserts a Fourteenth Amendment malicious prosecution claim.  DI at 5-

---

[2] Mary Bridget Smith is the personal representative of the estate of Brian Smith, one of the officers who arrived on the scene.  DI 23 ¶¶ 3, 20, 47.

6.  Defendants argue that this right was not (and is still not) clearly established and therefore the officers are entitled to qualified immunity on this claim.[3]  *Id.*  Third, defendants argue that all claims against Mr. Vogelman and Mr. Hodges should be dismissed because Mr. Hicks fails to sufficiently allege they were personally involved in the misconduct.  *Id.* at 6-7.  Fourth, defendants move to dismiss any portion of the civil rights conspiracy claim that is based on underlying claims of unreasonable search and seizure, false arrest, and false imprisonment.  *Id.* at 7-10.  They argue these claims are barred by the applicable statute of limitations.  *Id.*

Additionally, defendants argue that Mr. Hicks has not sufficiently pled facts to support his municipal liability (*Monell*) claim.  DI 26 at 10-14.  And that Mr. Hicks has not shown a causal connection between the City's action (or inaction) and Mr. Hicks's injury.  *Id.*  Defendants generally accuse Mr. Hicks of "simply throw[ing] every complaint against the wall,"[4] which is "not the standard under which municipal liability claims are to be analyzed." *Id.* at 12.  Alternatively, defendants argue Mr. Hicks cannot proceed on any of his claims against the City that are not "clearly established."  *Id.* at 14-15.

Mr. Hicks responds to each of these arguments.  DI 29.  First, Mr. Hicks argues that *Brady* obligations clearly applied to police officers prior to the events in this case.  *Id.* at 5-7.  Regardless, he argues Count II is broader than a *Brady* violation and should be allowed to proceed on this basis.  *Id.*  Second, Mr. Hicks argues both that a Fourteenth Amendment right to be free from malicious prosecution was clearly established and that it is sufficient for such a right to be established under the Fourth Amendment.  *Id.* at 7.  Third, Mr. Hicks argues that he

---

[3] Defendants do not move to dismiss the portion of Count III that relies on the Fourth Amendment.

[4] A comprehensive motion to dismiss, much of which is fact-bound and offers little prospect of constraining the scope of discovery, also invites that characterization.

adequately pled the personal involvement of Mr. Vogelman and Mr. Hodges, who perpetuated "key fabrications" that contributed to the "web of lies" resulting in Mr. Hicks's wrongful conviction. *Id.* 8-9. Fourth, Mr. Hicks clarified in his response that his civil rights conspiracy claim is not based on unreasonable search and seizure, false arrest, or false imprisonment. *Id.* at 2, n.1.

Finally, Mr. Hicks argues his *Monell* claim is "amply pleaded" and should be able to proceed either because the City had an unconstitutional custom of serious misconduct in felony investigations, including fabricating inculpatory evidence, or, alternatively, that the City failed to properly train, supervise, and/or discipline officers. DI 29 at 9-14. Additionally, he argues that the City is not entitled to qualified immunity and therefore an inquiry into whether the underlying rights are "clearly established" is misplaced. DI 29 at 14-15.

We have jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a).

## IV.   <u>Standard of Review</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Klotz v. Celentano Stadtmauer and Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021) (quoting *Ashcroft*, 556 U.S. at 678).

Evaluating a motion to dismiss for failure to state a claim for relief involves a "three-step process." *Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 327 (3d Cir. 2022) (citing

*Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016)).  "The first step in that process requires an articulation of the elements of the claim." *Id.*  The second step involves "disregarding any 'formulaic recitation of the elements of a . . . claim or other legal conclusion,'" *id.* (quoting *Connelly*, 809 F.3d at 789), and allegations that are "so threadbare or speculative that they fail to cross the line between conclusory and the factual," *id.* at 328 (quoting *Connelly*, 809 F.3d at 790).  The third step involves taking the remaining allegations and "assuming their veracity, construing them in the light most favorable to the plaintiff, and drawing all reasonable inferences in their plaintiff's favor."  *Id.* (citing *Connelly*, 809 F.3d at 787, 790).

## V.   <u>Analysis</u>

A.   <u>At this stage of the litigation, defendant officers are not entitled to qualified immunity on Mr. Hicks's Fourteenth Amendment malicious prosecution claim or on his claim for concealing and suppressing evidence.</u>

Qualified immunity shields government officials from personal liability unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  *See George v. Rehiel*, 738 F.3d 562, 571-72 (3d Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Overcoming qualified immunity requires plaintiffs to show that defendants: "(1) violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the time of the challenged conduct."  *Id.* at 572 (internal quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).  Moreover, questions of qualified immunity "must be resolved at the earliest possible stage of the litigation."  *Id.* at 571 (quoting *Miller v. Clinton County*, 544 F.3d 542, 547 (3d Cir. 2008)).  Here, defendants argue that qualified immunity shields the individual officers from claims based on withholding evidence and malicious prosecution under the Fourteenth Amendment.  DI 26 at 4.

1. <u>At this stage, qualified immunity does not attach to Mr. Hicks's claim for concealing and suppressing exculpatory and impeachment evidence</u>

Defendants seek to dismiss Count II[5] on the basis that it alleges a *Brady*[6] violation.  DI 26 at 5.  They argue this right was not clearly established as applied to police officers at the time of the alleged misconduct and therefore defendant officers are entitled to qualified immunity.  *Id.* Defendants argue that the Third Circuit did not clearly establish that *Brady* obligations apply to police officers until its decision in *Gibson v. Superintendent of New Jersey Department of Law and Public Safety – Division of Police*, 411 F.3d 427, 443 (3d Cir. 2005) (overruled on other grounds).[7]  In *Gibson*, the Third Circuit held that "[a]lthough Brady places the ultimate duty of disclosure on the prosecutor, it would be anomalous to say that police officers are not liable when they affirmatively conceal material evidence from the prosecutor."  *Id.*  However, Mr. Hicks argues that the right was clearly established many years prior in *Kyles v. Whitley*, 514 U.S. 419, 437 (1995), when the Supreme Court stated that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the

---

[5] It is unclear whether defendants seek to dismiss Count II in its entirety or only the portions of Count II that relate to *Brady* violations.  In their motion to dismiss, defendants say Count II "alleges a Brady violation" though it is "not explicitly labeled as such."  DI 26 at 5. They further argue that "[d]efendant [o]fficers are entitled to qualified immunity and dismissal of this claim," suggesting they seek to dismiss all of Count II.  *Id.*  However, in their reply brief, defendants seemingly walk back this position, stating "[t]o the extent Plaintiff is making a deliberate suppression of evidence claim, [d]efendants acknowledge that such a claim survives a motion to dismiss, but [p]laintiff's *Brady* claim for failing to disclose exculpatory or impeachment evidence is still subject to dismissal because qualified immunity attaches."  DI 30 at 3-4.  To err on the side of caution, we will analyze Count II in its entirety.

[6] In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

[7] In order to determine whether a right is "clearly established," the Third Circuit looks to "factually analogous Supreme Court precedent, as well as binding opinions from [their] own Court."  *Peroza-Benitz v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021).

case, including the police."[8]   This timing makes a difference for Mr. Hicks because he was

convicted in 2002 — placing the alleged misconduct between *Kyles* and *Gibson*.   DI 23 ¶¶ 27,

64, 94.

Several district courts in the Third Circuit have concluded *Brady* obligations did not

clearly apply to police officers until after the *Gibson* decision.   *See, e.g.*, *Ogrod v. City of

Philadelphia*, 598 F. Supp. 3d 253, 267-68 (E.D. Pa. 2022); *Swainson v. City of Philadelphia*,

No. 22-2163, 2023 WL 144283, at *3 (E.D. Pa. Jan. 10, 2023); *Outlaw v. City of Philadelphia*,

No. 21-1290, 2021 WL 3471168, at *5-6 (E.D. Pa. Aug. 6, 2021); *Lewis v. City of Philadelphia*,

No. 19-2847, 2020 WL 1683451, at *8-10 (E.D. Pa. Apr. 6, 2020); *Gilyard v. Dusak,* No. 16-

2986, 2018 WL 2144183, at *4-5 (E.D. Pa. May 8, 2018).   But not all.   *See Pierre v. Treasury

Dep't*, No. 18-3443, 2019 WL 2121369, at *6 (D.N.J. May 14, 2019) (declining to apply

qualified immunity to plaintiff's claims with respect to *Brady* violations because they occurred in

1996, after the Supreme Court's decision in *Kyles*); *Thomas v. City of Philadelphia*, 290 F. Supp.

3d 371, 384 (E.D. Pa. 2018) (citation omitted) (noting that police officers' Brady obligations

"became clearly established in 1995, when the Supreme Court decided *Kyles v. Whitley*");

*Thorpe v. City of Philadelphia*, No. 19-5094, 2020 WL 5217396, at *11 (E.D. Pa. Sept. 1, 2020)

("A police officer's *Brady* obligations have been clearly established since 1995.").

Mr. Hicks argues that the Third Circuit's decision in *Dennis v. City of Philadelphia*, 19

F.4th 279, 290 (3d Cir. 2021) made clear that *Brady* obligations applied to police officers in

_____

[8] Additionally, in *Smith v. Holtz*, 210 F.3d 186, 197 n.14 (3d Cir. 2000) (citation
omitted), the Third Circuit stated "we will nonetheless assume for the purposes of this appeal
that investigating police officers also have an affirmative duty to disclose exculpatory evidence
to an accused if only by informing the prosecutor that the evidence exists. We will further
assume that a 1983 claim alleging a due process violation under *Brady* can, therefore, be asserted
against police officers."

1995.  We do not read *Dennis* with such certainty.  In *Dennis*, the Third Circuit explained that
"*Gibson* stated that the Supreme Court did not settle the principal that evidence in the hands of
police could be imputed to the prosecutor until 1995, when it decided *Kyles v. Whitley*."  *Id.*  The
Third Circuit's observation squares regardless of whether police officers — as opposed to
prosecutors — were liable for *Brady* violations.  Further, the *Gibson* decision being discussed
sends mixed signals about when this right was clearly established, stating both that evidence in
the hands of the police "could be imputed to the prosecutor" in 1995 and that "the related duty of
the police to disclose information to the prosecutor was not widely addressed until later."
*Gibson*, 411 F.3d at 443-44.

    We decline to wade into these uncertain waters at this stage because it is sufficient to
conclude that Mr. Hicks brings more than a veiled *Brady* claim.  Rather, Mr. Hicks more broadly
asserts officers denied his right to due process and to a fair trial by "concealing and/or
suppressing relevant material evidence as part of a larger scheme" to frame him for rape.
*Dennis*, 19 F.4th at 291; DI 23 ¶ 157 (similar allegation).[9]  As in *Dennis*, the allegations
implicate the right to a fair trial, which was "crystal clear" at the time of officers' alleged
misconduct.  *See Alicea v. City of Philadelphia*, No. 22-3437, 2022 WL 17477143, at *4 (E.D.
Pa. Dec. 6, 2022); *Dennis*, 19 F.4th at 289-92.  To "recharacterize" Mr. Hicks's claim as merely
a *Brady* claim would "run afoul of the longstanding principle that the plaintiff, as the master of
his complaint, is free to choose between legal theories, and a defendant cannot create a cause of
action from the fact pattern on behalf of the plaintiff."  *Id.* at 291.  While qualified immunity
"may shield defendants . . . to the extent that [Count II] makes a *Brady* claim, it does not protect

---

[9] Mr. Hicks alleges defendant officers violated his right to "due process of law and to a
fair trial by intentionally concealing and deliberately suppressing exculpatory evidence and/or
violating their duties under *Brady v. Maryland* and its progeny."  DI 23 ¶ 157.

against a deliberate suppression of evidence claim and may proceed on that basis." *Alicea*, 2022 WL 17477143, at *4; *Swainson*, 2023 WL 144283, at *4.

2. <u>Mr. Hicks's Fourteenth Amendment malicious prosecution claim will also proceed through discovery</u>

Defendants also seek to dismiss Mr. Hicks's Fourteenth Amendment malicious prosecution claim.[10] DI 26 at 5-6. They argue that the existence of this right "remains an unsettled area of law" and therefore officers are entitled to qualified immunity. *Id.* Mr. Hicks counters that any reasonable officer would have known that the alleged conduct violated the Fourteenth Amendment after *Torres v. McLaughlin*, 163 F.3d 169 (3d Cir. 1998), and, regardless, it is the right (i.e., malicious prosecution) that must be clearly established for the purposes of qualified immunity, not the source of the right (i.e., the Fourth or Fourteenth Amendment). DI 29 at 7.

Malicious prosecution certainly sounds like the deprivation of liberty without due process of law. But, the Third Circuit has not explicitly answered the question of whether there is a right to be free from malicious prosecution under the Fourteenth Amendment. The confusion traces back at least to the Supreme Court's decision in *Albright v. Oliver*, 510 U.S. 266, 275 (1994), which held there is no right to be free from malicious prosecution under the *substantive* due process clause of the Fourteenth Amendment. However, the petitioner in *Albright* did not bring a *procedural* due process claim under the Fourteenth Amendment. *Id.* at 271. Four years later, the Third Circuit seemed to imply that a malicious prosecution claim may be brought only under the Fourth Amendment. *Gallo v. City of Philadelphia*, 161 F.3d 217, 222 (3d Cir. 1998) (stating that "*Albright* implies that prosecution without probable cause is not, in and of itself, a

---

[10] Defendants do not seek to dismiss Mr. Hicks's Fourth Amendment malicious prosecution claim, so this claim will proceed to discovery. DI 26 at 5-6; DI 23 ¶ 159.

constitutional tort" and instead "the constitutional violation is the deprivation of liberty accompanying prosecution").  The following month, the Third Circuit explained that "we do not read *Albright* to hold that a malicious prosecution claim can only be based in a Fourth Amendment violation" and specifically that a malicious prosecution claim may include conduct that violates the "procedural due process clause."[11]  *Torres*, 163 F.3d at 173; *see also Washington v. Hanshaw*, 552 F. App'x. 169, 174 n.3 (3d Cir. 2014) ("Our cases interpreting Albright have suggested that § 1983 malicious prosecution claims may be predicated on constitutional provisions other than the Fourth Amendment, such as procedural due process.")

The Third Circuit's observations stand to reason.  The Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  Due process is "flexible and calls for such procedural protections as the particular situation demands."  *Morrisey v. Brewer*, 408 U.S. 471, 481 (1972).[12]  It is difficult to understand how process can be due when that process comprises malicious prosecution.  *See Allen v. New Jersey State Police*, 974 F.3d 497, 502 (3d Cir. 2020) (explaining that malicious prosecution protects the rights of individuals to be free from prosecution without probable cause)[13]; *see also Wallace v. Kato*, 549 U.S. 384, 390 (2007) (malicious prosecution "remedies

---

[11] Bear in mind that plaintiff's claim in *Torres* was based on the Fourth Amendment — not the Fourteenth.  163 F.3d at 172.

[12] The procedural due process clause encompasses a variety of rights recognized by courts.  For instance, in the context of parole revocation, individuals are entitled to written notice of the claimed violations, disclosure of evidence against them, the opportunity to be head in person and to present evidence, the right to cross-examine adverse witnesses, a neutral and detached hearing body, and a written statement of the reasons for revoking parole.  *Morrissey*, 408 U.S. at 489.

[13] The elements of a malicious prosecution claim under § 1983 are: "(1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a

detention accompanied, not by the absence of legal process, but by wrongful institution of legal process").

All that said, we cannot bring the Fourth-versus-Fourteenth Amendment issue into clear focus at this stage, without the benefit of the full picture of what misconduct occurred and how it affected Mr. Hicks's legal process.  And the difference may be more than nominal, because the Fourteenth Amendment could encompass more time than the Fourth — namely misdeeds that occur during and after trial.  *See Halsey v. Pfeiffer*, 750 F.3d 273, 291 (3d Cir. 2014).  Mr. Hicks's allegations underscore why a malicious prosecution claim could be well grounded in the procedural due process clause of the Fourteenth Amendment.  He alleges that officers not only fabricated evidence at the scene, but also perpetuated the frame-up through the trial.  DI 23 ¶ 89. *See also Crosland v. City of Philadelphia*, No. 22-2416, 2023 WL 3898855, at *8 (E.D. Pa. June 8, 2023) (noting that this temporal distinction provides "significant theoretical support" for the right's existence under the Fourteenth Amendment).  We therefore cannot agree that malicious prosecution claims under the Fourteenth Amendment are "categorically unavailable."  *Lewis*, 2020 WL 1683451, at *5.

However, this does not end the inquiry.  Overcoming qualified immunity requires that the right be "clearly established at the time of the challenged conduct."  *George*, 738 F.3d at 579. District courts in this circuit grappling with whether Fourteenth Amendment malicious prosecution claims can proceed have called the legal landscape "complicated," *Lewis*, 2020 WL 1683451, at *5, a "close question," *Thomas*, 290 F. Supp. 3d at 380, and "murky," *Crosland*,

---

purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding."  *Allen*, 974 F.3d at 502.

2023 WL 3898855, at *8.  And murky, close questions are the lifeblood of a qualified immunity

defense.  To wit, some courts have held that because the Third Circuit has supposedly sent mixed

signals about whether malicious prosecution belongs under the Fourteenth Amendment, the right

is not "clearly established" for the purposes of qualified immunity.  *See e.g. Lewis*, 2020 WL

1683451, at *5-8; *Thomas*, 290 F. Supp. 3d at 380-83. *But see Crosland*, 2023 WL 3898855, at

*8-10 (finding that the malicious prosecution claim can proceed under the Fourteenth

Amendment, but because the events at issue in the case took place before the legal landscape

shifted after *Albright*).  That may be so.  But once again, at this stage, the analysis is overly

hypothetical — and potentially moot — depending on the factual grounding of the malicious

prosecution claims.  Nor does the issue appear to affect materially the scope of discovery.  We

will deny the motion to dismiss the Fourteenth Amendment malicious prosecution claim against

individual officers.[14]

### B.  Mr. Hicks adequately alleged personal involvement of Mr. Vogelman and Mr. Hodges

Defendants seek to dismiss claims against Mr. Vogelman and Mr. Hodges.  DI 26 at 6-7.

They argue Mr. Hicks failed to adequately plead that they were personally involved in the

wrongdoing.  *Id.*  Personal involvement is a requirement because liability in a civil rights action

cannot be predicated only on *respondeat superior*.  *Rode v. Dellarciprete*, 845 F.2d 1195, 1207

(3d Cir. 1988) (but it can be shown through "personal direction" or "actual knowledge and

acquiescence").

---

[14] Mr. Hicks also argues that the establishment of the *right* is what matters for purposes of qualified immunity, not the *source of the right*.  *See Thomas*, 290 F. Supp. 3d at 382-83; *Alicea*, 2022 WL 1747714, at *4; *Swainson*, 2023 WL 144283, at *4.  This argument has not gotten traction in other district courts, but need not be resolved at this stage because the Fourteenth Amendment malicious prosecution claim will pass through discovery.

Here, the amended complaint goes far enough to get past the pleadings stage. Several key allegations follow. Mr. Hodges arrived on the scene shortly after Mr. Hicks was shot. DI 23 ¶¶ 3, 47. He "falsely reported" that Mr. Hicks was on top of the victim and in the act of raping her when police arrived and that a gun had been recovered from Mr. Hicks. *Id.* ¶¶ 66, 69. Mr. Vogelman arrived, spoke to officers, and despite knowing that the officers' story was "false in material respects" and aware that officers were "coordinating false accounts," "repeated and amplified their false reports, including in a signed statement." *Id.* ¶¶ 71, 72. That is enough. These individuals' involvement far exceeded that of the Governor and Attorney General in *Rode*. 845 F.2d at 1197, 1208. Rather, Mr. Hicks's allegations against Mr. Vogelman and Mr. Hodges more closely mirror cases in which courts have found sufficient allegations of officers' personal involvement. *See Wright v. City of Philadelphia*, 229 F. Supp. 3d 322, 337-38 (E.D. Pa. 2017) (detectives who took witness statements implicating the plaintiff in a rape and murder were plausibly "personally involved in the alleged conspiracy" to frame plaintiff, as was lead investigator who oversaw the activities); *see also Alicea*, 2022 WL 17477143, at *3 (finding personal involvement when a Sergeant and Lieutenant allegedly were aware of exculpatory evidence and failed to take action preventing malicious prosecution); *Crosland*, 2023 WL 3898855, at *10 (finding personal involvement when officers ignored other suspects, knew of or should have known that a statement was false, and nonetheless concealed this information). Mr. Hicks's claims against Mr. Vogelman and Mr. Hodges can therefore proceed to discovery.

C.   <u>Mr. Hicks waived any civil rights conspiracy claim based on the underlying rights to be free from unreasonable search and seizure, false arrest, and false imprisonment.</u>

Mr. Hicks asserts that defendant officers acted "in concert in order to deprive Mr. Hicks of his clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of

liberty without due process of law, and to a fair trial." DI 23 ¶ 162.  Defendants move to dismiss the portion of the civil conspiracy claim that is based on unreasonable search and seizure, false arrest, and false imprisonment, arguing that these claims are time-barred by the statute of limitations.  DI 26 at 7-10.  Defendants do not seek to dismiss the civil rights conspiracy claim based on any other rights.  *Id.*

In his opposition, Mr. Hicks states in a footnote that defendants "spend four pages seeking to dismiss a claim Plaintiff is not bringing" and that "his conspiracy claim is based on the same constitutional violations as the remainder of his Complaint: malicious prosecution, fabrication of evidence and suppression of exculpatory evidence, which Defendants concede are timely." DI 19 at 2 (citation omitted).  Taking Mr. Hicks at his word, we deem any civil conspiracy claim based on unreasonable searches and seizures, false arrest, or false imprisonment to be waived.  The remainder of the civil conspiracy claim will proceed to discovery.

### D.  Mr. Hicks's *Monell* claim is adequately pled

Defendants seek to dismiss Mr. Hicks's municipal liability claim in its entirety, arguing that Mr. Hicks has not sufficiently pled facts to support his claim.  DI 26 at 10-14.  A municipality may be liable under § 1983 "when execution of a government's policy or custom" inflicts a § 1983 injury.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  Such a *Monell* claim may proceed in two ways: (1) "A plaintiff may put forth that an unconstitutional policy or custom of the municipality that led to his or her injuries," or (2) "they were caused by a failure or inadequacy by the municipality that 'reflects a deliberate or conscious choice.'" *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (citing *Estate of Roman v. City of Newark,* 930 F.3d 798, 798 (3d Cir. 2019)).

To rely on a "custom" under the first *Forrest* pathway, Mr. Hicks "must evince a given course of conduct so well-settled and permanent as to virtually constitute law." *Id.* at 106.  Mr. Hicks must also allege that the custom was the "proximate cause" of his injuries.  *Estate of Roman,* 914 F.3d at 798 (quoting *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996)).  This requires an "affirmative link" between the custom and the constitutional violation alleged, which in turn occurs when the City knew of "similar unlawful conduct in the past, . . . failed to take precautions against future violations, and that [its] failure, at least in party, led to [his] injury." *Id.* (quoting *Bielevicz v. Dubinon*, 915 F.2d at 845, 850-51 (3d Cir. 1990)).

For a "failure or inadequacy" claim under the second *Forrest* pathway, Mr. Hicks must demonstrate the municipality's actions amount to "deliberate indifference."  *Forrest*, 930 F.3d at 106.  This consists of showing: "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights."  *Id.* (citing *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999).  The second pathway includes failure to train, supervise, and discipline claims.  *Id.* at 105.

Here, Mr. Hicks proceeds on both pathways.  He asserts that the City has a "custom of unconstitutional misconduct in felony investigations, including fabricating inculpatory evidence."  DI 23 ¶ 130; DI 29 at 13.  He also alleges the City "with deliberate indifference, failed to properly train, supervise and/or discipline officers."  DI 23 ¶ 167; DI 19 at 10.

The amended complaint, while not a detailed roadmap, is adequate on both theories of municipal liability.  In *Estate of Roman*, plaintiff adequately pled a custom of unconstitutional arrest practices by pointing to complaints against officers accused of conducting inappropriate searches and arrests, a press release that noted a federal monitor would oversee police

department reforms in areas including searches and arrests, a consent decree that prohibited relying on false information to justify a warrantless search or arrest, and a Newark Star Ledger article that noted the city was under the supervision of a federal monitor.  914 F.3d at 793; *see also Alicea*, 2022 WL 17477143, at *5 (denying a motion to dismiss allegations that the city has a custom of acquiescing to unconstitutional actions when plaintiff cited to newspaper articles, government investigations, and numerous cases of police misconduct).

Similarly, Mr. Hicks alleges a number of instances in which individual officers — particularly Mr. Ellis — fabricated information, DI 23 ¶¶ 116-126, a consent decree that led to monitoring reports which specifically referenced a "code of silence" allowing misconduct to flourish, *id.* at ¶ 133-34, a narcotics squad that engaged in "fabrication of search and arrest warrants and other false allegations," *id.* at ¶ 132, and a Philadelphia City Paper publication that discussed the failure of the Internal Affairs Division to address allegations of misconduct, *id.* ¶ 135.  Moreover, Mr. Hicks adequately alleges this unconstitutional custom is causally linked to his constitutional deprivation.  The alleged custom of allowing officers to engage in misconduct — including fabricating evidence — without taking appropriate steps to prevent future violations plausibly led to Mr. Hicks's injury.  *See Estate of Roman*, 914 F.3d at 798.

Mr. Hicks has also stated a viable *Monell* claim under a failure or inadequacy theory. Mr. Hicks's complaint includes allegations of incidents of police misconduct, the 39th District narcotics squad scandal, the class action lawsuit brought by the NAACP, and the Integrity and Accountability Officer.  DI 23 ¶ 115-147.  Additionally, many of Mr. Hicks's allegations are specific to officer discipline and supervision.  He alleges monitoring reports showed "officers subject to disciplinary investigations habitually lied to cover up their own misconduct" and noted "the continuous failure to prevent the coverup of officer wrongdoing communicated the message

to rank-and-file officers that their misconduct would be tolerated." *Id.* ¶ 134.  In the Philadelphia

City Paper publication about the "failure" of the Internal Affairs Division to investigate

allegations of misconduct, the head of the PPD officers' union noted that officers "begin to

figure that [the top brass doesn't] follow the rules, so why should I?" *Id.* ¶ 135.  Only eight

months before Mr. Hicks's arrest, the Integrity and Accountability Office released a report about

deficiencies in the disciplinary system.  *Id.* ¶ 138.  This led Philadelphia's mayor to release a

Task Force on Police Discipline which described the disciplinary code as "seriously deficient."

*Id.* ¶ 138-39.  Another IAO report in 2003 noted that about one half of the officers, supervisors,

and commanders found to have violated internal departmental policies, or who engaged in

serious misconduct, were never formally disciplined.  *Id.* ¶ 140.  Mr. Hicks therefore alleges the

City knew or "should have known" about officer misconduct and its choice not to address this

problem amounted to deliberate indifference.  Under this set of facts, it is plausible that police

officers without a deficient training, supervision, or disciplinary system would not have violated

Mr. Hicks's constitutional rights.

     Our conclusion is also consistent with decisions from the Third Circuit and other courts

in this district.  *See Estate of Roman*, 914 F.3d at 799-80 (finding that a newspaper article with a

statement from the head of the police union about a lack of training, a consent decree that noted

officers were not well-trained, and the general lack of discipline officers received supported

plaintiff's claims supported a failure or inadequacy claim); *Thomas v. City of Philadelphia*, No.

17-4196, 2019 WL 4039575 (E.D. Pa. Aug. 27, 2019) (denying summary judgment on facts

including many of the same allegations as here); *Alicea*, 2022 WL 17477143, at *6 (finding

plaintiffs could proceed on a deliberate indifference theory, in part, because the number of

complaints reasonably showed the City was "aware of the misbehavior yet made a deliberate

choice to allow it to continue"); *Giddings v. City of Philadelphia*, No. 21-4206, 2022 WL 1567320, at *5 (E.D. Pa May 17, 2022) (finding the need for a better disciplinary process was clear given that officers who rarely, if at all, face discipline for misconduct will be more likely to commit constitutional violations).

Defendants criticize the *Monell* allegations — not unreasonably — but discovery is the appropriate vehicle to sort out those disputes. *See 3909 Realty LLC v. City of Philadelphia*, No. 21-0030, 2021 WL 234929, at *4 (E.D. Pa. June 8, 2021) ("*Monell* liability is generally not amenable to resolution at the pleading stage, as it requires a plaintiff to plead facts outside his or her personal knowledge. Resolution of the ultimate merits of a *Monell* claim usually requires examination of matters beyond the pleading, a task which cannot be undertaken in the context of a motion to dismiss."); *Ramos-Vazquez v. PrimeCare Med., Inc*., No. 09-00364, 2010 WL 3855546, at *9 (E.D. Pa. Sept. 30, 2010) (finding that a person alleging inadequate medical treatment during incarceration should not be expected to articulate which specific policy, procedure or custom resulted in violations or which entity formulated the police at the motion to dismiss stage); *Simpson v. Ferry*, 202 F. Supp. 3d 444, 456 (E.D. Pa. 2016) (quoting *Connelly*, 809 F.3d at 790) (noting that at this stage of litigation plaintiff enjoys a "highly favorable standard of review").

We therefore hold that Mr. Hicks's *Monell* claim can proceed on either theory he advances.[15]

---

[15] Defendants argue, in the alternative, that the City "should not have to answer for any theories of liability that rely on a right not clearly established." DI 26 at 14-15. This argument is unripe since we are not today dismissing any claim under qualified immunity. In any event, it is unclear whether the constitutional right at issue must be "clearly established" for *Monell* liability to attach. *See Maldonado v. City of Philadelphia*, No. 22-3473, 2023 4685967, at *10 n.12 (E.D. Pa. July 21, 2023).

## VI.  Conclusion

For the reasons outlined above, we hold the following:

- Defendants' motion to dismiss Count II (42 U.S.C. § 1983 deprivation of liberty without due process of law and denial of a fair trial by intentionally concealing and deliberately suppressing material exculpatory and impeachment evidence) is **DENIED**.
- Defendants' partial motion to dismiss Count III (42 U.S.C. § 1983 malicious prosecution under the Fourteenth amendment) is **DENIED**.
- Defendants' partial motion to dismiss Count IV (42 U.S.C. § 1983 civil rights conspiracy to violate the rights to be free from unreasonable search and seizure, false arrest, and false imprisonment) is **GRANTED** insofar as Mr. Hicks waived a civil right conspiracy claim based on these underlying rights. The remainder of Count IV (civil rights conspiracy based on the right to be free from malicious prosecution, deprivation of liberty without due process of law, and to a fair trial) will proceed to discovery.
- Defendants' motion to dismiss Count V (42 U.S.C. § 1983 municipal liability) is **DENIED**.
- Defendants' motion to dismiss claims related to Mr. Vogelman and Hodges is **DENIED**.