

One South Broad Street | Suite 1810 | Philadelphia, PA 19107
215.496.9373 Office | 215.496.9419 Fax
www.azlawllc.com

September 24, 2024

**VIA Electronic Filing**

**The Chambers of the Honorable Judge John F. Murphy**
3809 U.S. Courthouse
Courtroom 3-B
601 Market Street
Philadelphia, PA 19106

> **Re:** **Hicks v. The City of Philadelphia, *et al.* (22-cv-00977)**
> **Concerns Arising from the Testing of Plaintiff's Forensic**
> **Audio/Video/Image Consultants**

Dear Judge Murphy:

Please allow this letter to serve as a formal response to Your Honor's September 24, 2024 Orders (ECF Nos. 194 and 196), requesting that Benjamin Jackal and Aleena Sorathia (the "Undersigned") provide a full explanation of the community concerns that arose during Plaintiff's forensic audio/video/image consultants testing in the early morning hours of September 23, 2024.

At the outset, it should be clear that the testing in question was conducted by Plaintiff, not Defendants. The Undersigned were shocked by the testing conducted by Plaintiff's expert and approved by Plaintiff's counsel. In their implementation of the testing and response to resident concerns, Plaintiff's counsel and experts demonstrated a lack of professionalism and lack of concern, ignoring the traumatic impact this testing would have on the residents of the neighborhood. .[1]

By way of background and context, as part of its investigation, the Defendants retained Dr. Durand Begault, an acoustics expert, to determine the veracity of Plaintiff Termaine Hicks' ("Plaintiff") claim that he heard the rape victim's screams from two blocks away. In April, Dr. Begault conducted an acoustics test at the scene of the rape at the time of the rape (5:00 AM), which involved using a ***siren*** chirp as a proxy for a woman's scream and testing its audibility from the location Plaintiff claimed he heard it. Not only was the siren used because it accurately reflected the decibel and frequency of an average woman's scream, but it was also specifically chosen to address the concerns of playing a scream in a

---

[1]     The undersigned recorded a video of the testing, which they will share with the Court upon request.

Letter to the Honorable John F. Murphy
September 24, 2024
Page 2 of 5

residential neighborhood at 5:00 a.m. This testing, as expected, was largely uneventful, with one neighbor across the street complaining about the noise level, but no apparent concern about the siren itself.

After receiving our expert report, Plaintiff obtained their own experts: Bruce E. Koenig and Douglas S. Lacey (the "Rebuttal Experts"). The parties worked collaboratively to schedule a time for Plaintiff to conduct their testing, as required by their Rebuttal Experts. The City of Philadelphia (the "City"), despite no obligation to do so, coordinated with the Philadelphia Police Department to arrange for police officers to be stationed at the area where Plaintiff intended to conduct their testing, at the Plaintiff's request.  Plaintiff specified that "the police would need to ensure no sirens are sounded in the area for the duration of the test." *See* E-mail from Plaintiff's Counsel, attached as Exhibit A.

Plaintiff's testing was scheduled to move forward on September 23, 2024, beginning at approximately 5:00 a.m. Unbeknownst to the Defendants, Plaintiff's testing including playing a loop of three distinct female screams, amplified by speakers (the "Scream Loop"), dozens of times for over an hour in a densely populated part of South Philadelphia. (Plaintiff's speaker was directly across the street from more than two dozen rowhomes). Quickly after Plaintiff's testing began, residents from the homes nearby approached the police officers and confronted the individual that Plaintiff had retained to play the sound (the "Production Tech").[2] The Scream Loop was being transmitted from 15th Street, on the block between Mifflin and McKean Streets. At this time, only a paralegal from Plaintiff's legal team (Alfred Taylor) was present at the location where the Scream Loop was being transmitted.

After the first Scream Loop played, the Undersigned walked towards at the intersection of 15th and Snyder Streets in South Philadelphia, where Plaintiff's counsel: Katrina Rogachevsky and the Rebuttal Experts were calculating the audibility of the Scream Loop. Ms. Rogachevsky advised the Undersigned that a few neighbors had approached the police officers, Mr. Taylor, and the Production Tech with concerns. Both Ms. Rogachevsky and Mr. Taylor advised the Undersigned that, as representatives of the City, the Undersigned should be responsible for handling statements to the public, and did not accompany the Undersigned to explain their own testing.

The Undersigned proceed back to the where the sound was being transmitted. As soon as we arrived, multiple women expressed horror that anyone could play such terrifying screams so loudly in a neighborhood, especially right next to a daycare. At least 6 separate

---

[2]     It is our understanding that the individual worked for a production company: D24K.



Letter to the Honorable John F. Murphy
September 24, 2024
Page 3 of 5

individuals questioned the Undersigned about a test being conducted by *Plaintiff's counsel* and *Plaintiff's counsel was not present*. After a few minutes, Mr. Taylor left the Production Tech to play the sounds alone, and joined Ms. Rogachevsky on Snyder Street, two blocks from where the neighbors were expressing their concerns, leaving it to Defendants' counsel alone to explain.

This left only the Undersigned, several police officers (some of whom responded after receiving 911 calls about a woman screaming in the area), and the Production Tech at the location where the sounds were being transmitted. Multiple individuals inquired as to why such a test was being conducted, and the Undersigned explained that a party suing the City was conducting a test to determine whether a sound could be heard from two blocks away. Multiple individuals expressed that the Scream Loop was incredibly upsetting and requested that the sounds stop immediately. They inquired as to why someone would use the sound of scream. The Undersigned apologized for the disruption and advised that the Scream Loop would be terminated as soon as Plaintiff's testing was concluded.

When some residents tried to confront the Production Tech, police officers intervened and diffused the confrontations. Because of the police officers, Plaintiff was able to complete his testing. Many individuals inquired as to the underlying case, expressed concerns that such a loud sound over such a large loudspeaker could not be "scientifically valid," and asked for the Undersigned to identify themselves and advise as to whom they could direct their concerns. The Undersigned identified themselves and advised the neighbors to contact us and ensured them that we would forward along their concerns to the City Solicitor's Office. One officer told a resident she could direct her concerns to the captain of the 1st Police District.

Again, no one from Plaintiff's counsel's office was willing to be present for, let alone listen to and address the neighbors' concerns, even though the testing being conducted was directed and coordinated by Plaintiff's counsel's office. One individual asked whether there was a judge assigned to this case, and the Undersigned provided Judge Murphy's name. ***At no point in time did the Undersigned advise anyone that Judge Murphy was aware of the test, much less that he had approved it .***

Finally, the Undersigned approached Ms. Rogachevsky and advised that the testing must be concluded by 6:30 a.m., as the daycare next to where the Production Tech was playing the sound would be opening at this time. Plaintiff's testing did not conclude until 6:32 a.m., over one hour after it started. Plaintiff's Production Tech, Ms. Rogachevsky, Mr. Taylor, and the Rebuttal Experts quickly packed their things and left. They left in such a hurry that they even left behind equipment that the Undersigned had to alert them to come back to get.



Letter to the Honorable John F. Murphy
September 24, 2024
Page 4 of 5


The Undersigned remained in the area well after this time, as many residents were still upset and expressing concerns. The Undersigned advised the residents to voice their concerns and provided their contact information for the residents to do so. The Undersigned, as well as the City Solicitor herself: Renee Garcia, received multiple emails from residents of the area expressing their concerns. In addition to the volume and time of the testing and the lack of advanced notice, these residents explained that Plaintiff's use of a recording of a woman screaming was particularly distressing. Ms. Garcia provided the following response to the residents' e-mails:

> Dear [name of resident]:
>
> I want to start by apologizing for what you and your neighbors experienced this morning. I fully understand your concerns and how disruptive and upsetting this must have been.
>
> I do want to explain that the testing being conducted was not being performed by, or at the request of, the City. The testing was conducted by an expert retained by the person suing the City. As such, we had limited control over the conditions of the testing. I raise this not to excuse what happened, but to provide context as to why the individuals representing the City on location did not shut down the testing immediately.
>
> That being said, the City should have insisted that the expert provide a much more detailed proposal for the scope and conditions of the testing that was to be performed for our review. We could have then sought court intervention if necessary. We have certainly learned lessons from this experience, and once again apologize that it was at the expense of you and your neighbors.
>
> Thank you for raising this issue with our office - we will do better going forward. Please feel free to reach out to Danielle Walsh, Chief Deputy City Solicitor of the Civil Rights Unit with any questions.
>
> Sincerely,
>
> Renee Garcia



Letter to the Honorable John F. Murphy
September 24, 2024
Page 5 of 5


Should the Court have any additional questions regarding the early morning of September 23, 2024, the Undersigned welcome the opportunity to discuss them with Court in more detail.


<div style="margin-left: 40%;">

Very truly yours,

___/s/ Aleena Y. Sorathia___
Aleena Y. Sorathia
**Ahmad Zaffarese LLC**

___/s/ Benjamin Jackal___
Benjamin Jackal
Deputy City Solicitor
**The City of Philadelphia Law Department**

</div>

AHMAD ZAFFARESE
LLC

# Exhibit A

 Outlook

---

## Hicks v City of Philadelphia, et al.: PPD Authorization Request for Audio Study

**From** Katrina Rogachevsky <katrina@nsbhf.com>
**Date** Tue 8/13/2024 10:27 AM
**To**   Aleena Sorathia <asorathia@azlawllc.com>; Samuel Ritterman <sritterman@azlawllc.com>; Joseph Zaffarese
         <jzaffarese@azlawllc.com>; DeRose, John <jderose@clarkhill.com>; kgriffin@clarkhill.com
         <kgriffin@clarkhill.com>; Danielle Walsh <Danielle.Walsh@phila.gov>; Ben Jackal <Ben.Jackal@phila.gov>;
         Raymond Escobar <Raymond.Escobar@phila.gov>
**Cc**   Jonathan Feinberg <jfeinberg@krlawphila.com>; Grace Harris <gharris@krlawphila.com>; Angeline Etienne
         <aetienne@krlawphila.com>; NSB Hicks Case Team <hickscaseteam@nsbhf.com>

---

**External Email Notice. This email comes from outside of City government. Do not click on links or open attachments unless you recognize the sender.**

---

Ben and Ray,

Our rebuttal expert needs to conduct an audio study of the area surrounding the scene, and to that end, we need to seek PPD authorization. The test needs to be conducted at the same time as the crime, approximately 5:00 am, and the police would need to ensure no sirens are sounded in the area for the duration of the test.

Please let us know the timeline for seeking this authorization, and whether the request is approved.

Thank you,
Katrina

--
Katrina C. Rogachevsky
Staff Attorney
Neufeld Scheck Brustin Hoffmann & Freudenberger, LLP
200 Varick Street, Suite 800
New York, NY 10014
Office: (212) 965-9081
Fax: (212) 965-9084
katrina@nsbhf.com
www.nsbhf.com
Pronouns: she/her