

September 25, 2024

**Via Electronic Filing**
The Chambers of the Honorable Judge John F. Murphy
3809 U.S. Courthouse
Courtroom 3-B
601 Market Street
Philadelphia, PA 19106

**Re:** *Hicks v. City of Philadelphia, et al.* **(22-cv-00977)**

Counsel writes in response to defense counsel's September 24, 2024 letter (Dkt. 197) and this Court's subsequent Order to Show Cause (Dkt. 198). First and most important, we sincerely apologize to the Court for the impact of our rebuttal study on area residents resulting in the communications the Court has received. As discussed below, defense counsel's characterizations about what occurred are largely inaccurate. And to address the Court's specific question, no one working for Plaintiff's counsel told anyone in the community that the Court had authorized the study; indeed, we do not believe anyone working for Plaintiff's counsel ever mentioned the Court or Your Honor's name.[1] But Plaintiff's counsel did not appreciate the impact of the study on the community or the impact that it could have on trauma victims—although in hindsight we should have. And we undoubtedly should have taken additional measures to ensure that our coordination with the Philadelphia Police Department (PPD) to authorize the study would include advanced notification to residents. Plaintiff's counsel would be happy to respond to the community members who have reached out to the Court to apologize or conduct any other measures that would aid the Court or help ameliorate the impact on residents.[2]

Second, Defendants make a number of inaccurate statements in their letter about lawyer Katrina Rogachevsky and paralegal Alfred Taylor, who were present with our expert during the study.[3] The allegations of unprofessionalism lodged at Mr. Taylor and Ms. Rogachevsky are

---

[1] *See* Ex. 7 (Decl. of Katrina C. Rogachevsky); Ex. 8 (Decl. of Alfred Taylor); Ex. 9 (Decl. of Bruce E. Koenig); Ex. 10 (Decl. of Douglas S. Lacey); Ex. 11 (Decl. of Gregory Lundmark).

[2] Counsel have received media inquiries regarding this issue and have provided the following statement: "We conducted a test in connection with an important civil rights case and did not intend to cause harm to anybody. We understand why residents are upset, and we want to sincerely apologize to the community and anybody affected. We feel terrible about the negative impact on the community. We cannot talk with more specificity about the details given ongoing litigation."

[3] For example, Plaintiff's counsel never requested any defense counsel be present for the test, only that a police presence be provided by the City. Certain defense counsel chose to attend, but no one working for Plaintiff's counsel ever told them that they should be responsible for

entirely unwarranted, as reflected by the fact that neither defense counsel raised them at the time. To be abundantly clear, the author of this letter, Emma Freudenberger, was the lawyer in charge of the study—not Ms. Rogachevsky or Mr. Taylor. Indeed, I had planned to be present for the audio testing, which was initially scheduled for early September, but had to be rescheduled due to scheduling conflicts with the City's police liaison and was difficult to coordinate given the need for police presence and our expert's schedule. Because I was defending a deposition in the Hicks matter scheduled for the same day, I did not travel to Philadelphia to attend the study in person; likewise, the senior colleague most involved with the study was out of the country on the rescheduled date. However, I was on the phone and in charge at all times during the study; anything Ms. Rogachevsky or Mr. Taylor did was at my direction.

In order to address the Court's inquiry as to why Plaintiff should not be precluded from introducing the results of the study, it is necessary to provide some detailed context regarding how the audibility of a woman's screams became a factual issue in this case and, further, why Plaintiff has a significant evidentiary need to introduce scientific evidence on this issue. Defense counsel have made clear that they intend to defend this case by arguing that Mr. Hicks is guilty of raping W.L. even despite recent DNA testing to the contrary. W.L. at her deposition testified that she was rushing down 15th street toward McKean when a man grabbed her, and she started screaming as loud as she could. Ex. 1 (W.L. Dep.), 18:24–20:14. Mr. Hicks has consistently testified that he heard W.L.'s screams and proceeded to the alley where he encountered W.L. after her attacker fled.

We had not intended to conduct any audio study as part of our expert disclosures in this case. However, on July 10, 2024, counsel for Defendants disclosed an affirmative expert report from Dr. Durand Begault. From that report, Plaintiff learned for the first time that Dr. Begault had conducted an audio study on April 9, 2024, between 5 a.m. and 5:20 a.m., during which "[s]ound level measurements were made using a loudspeaker playing a recording of a police siren, used as a 'proxy' to represent the scream of the victim." Ex. 2 (Begault Report), 2. Based on that experiment, Dr. Begault opined that—given where Mr. Hicks has testified he was when he first heard the screams—"the data indicates that for all measurements, a female scream would not be loud enough to be noticeable, and in most cases was not even detectable, under ideal listening

---

speaking to the public. To the contrary, because the police officer present expressed that he did not know what was going on, Ms. Rogachevsky specifically requested that Mr. Jackal ensure the officer was informed about what was happening and would intervene with citizens who were reacting to the testing. Plaintiff's counsel expected police would have been briefed by the City beforehand regarding what was happening with the study, especially as we understood police had been present when Defendants' expert Dr. Begault conducted his study there in April and given that the City has instructed Plaintiff to communicate with all City employees through its counsel. Unfortunately, it appears they were not, and so the officer (while present in his car) did not initially react to defuse the situation. Once police officers did become involved, Plaintiff's experts paused the testing for at their request so police could speak with residents, which is one reason testing took longer than anticipated.

conditions." *Id.* In other words, Defendants intend to call Dr. Begault to show, based on his purported study results, that Mr. Hicks is lying and it is scientifically impossible for Mr. Hicks to have heard the screams he says he heard.

We believed Dr. Begault's conclusions to be false, grounded in improper mathematical calculations, and based on an unreliable methodology, and, accordingly, contemplated how best to demonstrate that. In August, Plaintiff concluded that a rebuttal study may be necessary, which we understood would require police authorization. Throughout the litigation, we have been specifically directed by counsel for the City that we should not speak directly to any City employees even if they have no role in the litigation. Understanding that we were not permitted to coordinate directly with the police, we sent an email to the City entitled "Hicks v City of Philadelphia, et al.: PPD Authorization Request for Audio Study." Ex. 3 (8.13.2024 Email). At that point, we had not yet determined what form such a rebuttal experiment would take.

The City granted us permission and indicated that they were "coordinating with PPD now to confirm that we can make this happen." *Id.* We thus understood we had secured the necessary authorization to conduct such a study—again, in response to the similar study Defendants had conducted earlier this year—and that if the PPD needed any additional information to help coordinate as they had done when defense counsel conducted their own study, PPD would let us know. Plaintiff never requested that defense counsel be present for the study or take any role in it; we merely, at their direction, conducted all communication with PPD through counsel for the City as PPD's representative. Notably, Defendants' April 9 study was conducted without notice to Plaintiff—meaning that during the study, defense counsel was present but Plaintiff's counsel were not.[4] Any precautions taken at the time of that testing to minimize impact on residents or concerns raised by residents at that time (as alluded to in the email the Court forwarded) are similarly unknown to us.

In the meantime, we requested that Dr. Begault disclose his underlying data so that our expert could review his calculations. Before doing so, on August 29, Dr. Begault served an "errata report," changing a number of figures provided in his supporting table and correcting the only significant calculation included his initial report (his calculation for whether the proxy siren would have been "noticed" by someone at the receiver location placed to approximate where Mr. Hicks was walking), with no explanation provided for why this "noticeability calculation" purportedly changed from 13.1 to 14.1. *See* Ex. 4 (Begault Errata). When Dr. Begault ultimately provided the underlying data files on September 11, our expert closely reviewed his underlying data, scripts, and calculations and determined that Dr. Begault had made a mathematical error when applying the "noticeability" equation he identified in his report. This error was laid out in detail in our rebuttal report, served on September 13, 2024. *See* Ex. 5 (Bek Tek Rep.), Appendix A.

---

[4] Plaintiff's team had no involvement in or knowledge of a test referenced in an attachment to the Court's order as a "test [conducted] over a year ago at the same time and caused outrage." (Dkt. 194 at 2).

3

As our expert concluded: "When the errors above are avoided and the proper mathematical order of operations is followed…the corresponding D'L value comes out to be 17.0, not 14.1, as calculated by Dr. Begault in the revised 'X4 loudest' spreadsheet." *Id.* In other words, by Dr. Begault's own metric, the "siren proxy" he had played during his own study was both audible *and* detectable when his data was properly calculated using the equation he supplied. Given that, Plaintiff's counsel was optimistic that Dr. Begault would concede this error at his deposition.

Our expert also criticized Dr. Begault's use of a siren as a proxy, because "the siren sound is appreciably different than a female scream": it does not sound like a female scream, it has different peak energy than a female scream, and it is not easily discriminated from other background sounds like a female scream. *See* Bek Tek Rep. 2-3. Indeed, Dr. Begault had in an article he previously authored characterized the human scream as unique in "its role to alert others to a situation of calamity," even noting that a "scream is similar to a baby's cry; there is nearly a universally-understood agreement as to its meaning regarding human calamity, and its frequency context seems almost tailored to frequencies of maximal sensitivity." *Forensic Analysis of the Audibility of Female Screams*, *see* Ex. 6 (Begault Art.), 1, 5. For that reason, Dr. Begault concluded in his article that "the level at which a scream might be discriminated from other types of sounds in most contexts is likely not much higher than the level at which it can be detected, due to its unique character." Begault Art. 5. In other words, according to his own article, a scream can be easily heard and differentiated from other sounds, even when the volume of the scream is "not much higher" than the surrounding noise.

Critically, in that article, Dr. Begault discussed a study he conducted in another case where he was "asked to determine the audibility of a human female screaming, from the location of an alleged incident…to a residence in a nearby community." *Id.* at 3. To do so, he developed "an acoustical testing protocol" that involved "loudspeaker playback of a recording of a human female screaming at a calibrated sound pressure level from the source location." *Id.* In other words, in that litigation—when Dr. Begault was asked to test whether a woman's screams were audible at a particular location, the exact same question at issue here—he played an actual recording of a woman screaming at a level of 122-decibels. But here, Dr. Begault chose instead to play a police siren as a "proxy" and to do so at the much-lower decibel levels of 107, 102, and 95. *See* Begault Report 5.

In that earlier case, Dr. Begault not only used a different methodology (i.e., playing an actual recording of a woman screaming), he also used a different metric for determining whether those screams were audible (a simple signal-to-noise ratio) compared to the "D'L noticeability" calculation he is using here. Plaintiff's counsel thus expected that at his deposition Dr. Begault would at least admit, consistent with his own prior testing, that a *woman screaming* at what he described as the average decibel level of 114 dB (or higher) would be audible based on his own results.

On September 16, Plaintiff's counsel deposed Dr. Begault. Defense counsel present for the deposition included Ben Jackal and Raymond Escobar on behalf of the City as well as counsel

4

Katelyn Mays, from Ahmad Zaffarese LLC, and John DeRose. When asked about the demonstrable mathematical error our expert had identified, Dr. Begault denied any error. Instead, he claimed for the first time that he *was not using the equation he included in Appendix A to his report,* and that he was actually using a different equation he had not disclosed in his report and which was not entered into the Excel spreadsheet he had provided of his underlying data. But when asked to explain where certain values included in his Excel table came from, or why the newly disclosed equation did not match what was in the Excel spreadsheet, Dr. Begault could not do so.[5]

At his deposition, Dr. Begault admitted he could have used a recording of a woman screaming for his experiment (as he'd done in the past), but that he did not here. He expressly testified that he made the decision not to use a scream and was never told he could not do so. But despite all the identified flaws in his study design, methodology, and calculations, Dr. Begault nevertheless repeatedly reaffirmed his opinion that W.L.'s scream would not be loud enough to be noticeable to Plaintiff.

Although Plaintiff did—and still does—intend to move under *Daubert* to preclude Dr. Begault's testimony, we realized it would not be possible to wait until after receiving a ruling to conduct our own rebuttal study given the current case deadlines. Plaintiff therefore proceeded with our own study to ensure we could effectively demonstrate that Dr. Begault's opinions are not only unreliable but scientifically false.

To that end, Plaintiff continued to coordinate with the City on the timing of our study and the need for police presence, which the City agreed to provide. Plaintiff's study was modeled on Dr. Begault's own prior study, as laid out in his article *Forensic Analysis of the Audibility of Female Screams*. Plaintiff chose to play audio recordings of a woman screaming (as Dr. Begault did previously) at a decibel level of approximately 122 dB (as Dr. Begault did), with a second set of tests conducted at a decibel level of approximately 114 dB (the average level of a woman screaming according to Dr. Begault).

Defense counsel's representations that they had no notice that we would be using a recording of a woman screaming in our study are inaccurate. For example, during Dr. Begault's deposition, Plaintiff's counsel discussed on the record—with defense counsel present—that our experts intended to conduct this experiment using an actual recording of a woman screaming, and questioned Dr. Begault about that. At no point during or after the deposition did any counsel—including Deputy City Solicitor Jackal—raise an issue regarding this intended methodology, which again was designed based on Dr. Begault's own 2008 experiment. Indeed, Plaintiff's counsel even asked Dr. Begault during his deposition if he had access to the recordings of women screaming that he'd made as part of that prior experiment (which Plaintiff would have used in his experiment). But Dr. Begault testified he looked for them years ago and was unable to locate them.

---

[5] Moreover, when asked if he could provide the Excel data for his original 13.1 "noticeability" calculation—included in his initial Rule 26 report—Dr. Begault testified he could not because he had destroyed that data.

The City subsequently indicated that they were working with a liaison at the PPD and had informed the Lieutenant and Sergeant for the District of the testing. We continued to work through the City Law Department, including confirming on the Friday evening before Monday's testing that police presence was assured, and requesting an earlier arrival time to ensure any issues could be resolved. And we continued to understand that the PPD was following whatever precautions they had taken when defense counsel had conducted a similar study earlier this year, which to our knowledge had not created any significant problems.

Before Monday morning, no counsel was fully aware of how loud the screams would be; indeed, the 120-decibel screams transmitting from the speaker location chosen by Dr. Begault were clearly audible at the location where Mr. Hicks has testified he heard screaming—contrary to Dr. Begault's conclusions. And even using the lower 114-dB average from Dr. Begault's female-scream study, the screams remained audible—not only in person but also through a cell phone held by an individual standing next to the receiver. Although residents were clearly upset, at no point did counsel for the City, counsel for other Defendants, or the PPD officers present request that we cease the study until approximately 6:15 or 6:20 a.m., when Ms. Sorathia informed us that a daycare center nearby opened at 6:30 and requested we conclude by then. We concluded the testing shortly thereafter, at 6:32 a.m.[6]

Following the conclusion of the study, Plaintiff's team remained in the area, packing up the equipment at the receiver location. During this process, Ms. Rogachevsky received a call from defense counsel alerting her that the technician operating the speaker during the study had left behind his portable generator—which had been tucked around a corner so as to minimize any audio interference which its noise might cause. Ms. Rogachevsky immediately walked to the speaker location where Mr. Jackal and Ms. Sorathia were speaking with two PPD officers and waited for the technician to return to pick up the generator. There were no other people present on the street. After packing up the equipment at the receiver location, Mr. Taylor and one of Plaintiff's experts joined Ms. Rogachevsky and all three waited for the technician who soon arrived and retrieved the generator. With no remaining equipment on site, and the only other people present being the two officers and two defense counsel, Plaintiff's team said goodbye and left the area. No residents emerged throughout this time—if they had, Plaintiff's team certainly would have been willing to listen to and address their concerns.

Again, no one working for Plaintiff's counsel made any representations to anyone in the community about Court involvement in or authorization of the study—or, indeed, any mention of the Court at all. We sought and received PPD authorization for the study and followed all direction we received from the PPD while conducting it. We modeled our study on one the defense's own expert had earlier conducted, and our understanding when doing so in this neighborhood was that we were following protocols the defense had used when doing their own experiment in the same neighborhood earlier this year. We feel terrible about the negative impact this had on the

---

[6] As previously discussed, at one point an officer asked that we wait to play the next recording while he was speaking to residents, which we did. We were then given the go ahead to resume.

community and on the Court. But we respectfully submit that there is no basis to preclude the results of this study, which demonstrate forcefully that the conclusion defense expert Dr. Begault has proffered—and the argument defense counsel will attempt to make at trial—is false.

Dated: September 25, 2024                /s/ Emma Freudenberger
                                         Emma Freudenberger*
                                         Amelia Green*
                                         Peter Neufeld*
                                         Mary Katherine McCarthy*
                                         Katrina C. Rogachevsky
                                         Neufeld Scheck Brustin Hoffmann &
                                         Freudenberger, LLP
                                         200 Varick Street, Suite 800
                                         New York, NY 10014
                                         (212) 965-9081
                                         *Attorneys admitted to the Eastern District of
                                         Pennsylvania pro hac vice

                                         Counsel for Plaintiff Termaine Hicks