**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TERMAINE HICKS,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action** |
| | : | **No. 2:22-cv-0977** |
| **CITY OF PHILADELPHIA, et al.,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## DEFENDANTS' JOINT REPLY TO PLAINTIFF'S RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE

On September 24, 2024, this Court issued an order requiring Plaintiff to show cause "why: (1) any evidence or expert testimony relying on the scream test conducted on September 23, 2024 should not be struck and precluded from use in this case; and (2) plaintiff's counsel should not be required to apologize to the residents in the area of 15th Street, on the block between Mifflin and McKean Streets." ECF 198. Plaintiff responded the following day. ECF 199. Because Plaintiff's filing includes misstatements regarding his attorney's conduct, the conduct of defense counsel, and the evidence in this case, Defendants offer the following reply.[1]

Although Plaintiff characterizes Defendants' filing as "largely inaccurate" (ECF 199, 1), he does not—and cannot—dispute the basic facts of the test he conducted. Prior to conducting the scream test on September 23, Plaintiff determined the duration, volume, and timing of the test. Plaintiff chose to use the recording of a woman screaming. Plaintiff declined to provide notice to the community regarding how he planned to conduct the test. It is unclear why Plaintiff now says

---

[1] Defendants reserve the right to raise any objections to the admissibility of Plaintiff's rebuttal experts by the deadline set forth in this Court's August 28, 2024 Order (ECF 193).

"we undoubtedly should have taken additional measures to ensure that our coordination with the Philadelphia Police Department (PPD) to authorize the study would include advanced notification to residents."  ECF 199, 1.  Plaintiff did not need police authorization or assistance to conduct the testing, much less to inform residents about his testing. Indeed, Plaintiff made no requests that the PPD should do anything other than block an area off for testing and not use their own emergency sirens which might interfere with their test (a request the City did not agree to, since these serve legitimate public interests).  It is absurd that, called before the Court to answer for their conduct, Plaintiff's counsel suggests the PPD remains responsible for not taking further initiative on Plaintiff's behalf.

Plaintiff and counsel for the City exchanged numerous e-mails regarding scheduling Plaintiff's testing and arranging for the presence of police officers.  *See* e-mail exchange, attached as Exhibit A.  At no time during this exchange did Plaintiff notify Defendants of his intention to use the recording of a woman screaming to conduct his audio test.  *Id.*  Plaintiff points to his attorneys' discussion "on the record" at Dr. Begault's deposition on September 16, 2024, as putting defendants on notice of his intent to use the recording of a woman's scream to conduct his test. ECF 199, 5.  Plaintiff took approximately seven- and one-half hours to depose Dr. Begault. Whether or not Plaintiff's counsel made such a statement, a stray remark during a day-long deposition plainly did not constitute a reasonable or adequate form of notice of such extreme and inappropriate testing.  Moreover, nothing from these stray remarks could have prepared counsel, police officers, or residents present on the scene of the testing for the loop of screams Plaintiff chose to play on repeat for over an hour. For all defense counsel knew, Plaintiff's "scream" could have been a recording of someone shouting, "NEWSPAPERS FOR SALE," which, for obvious reasons, would cause far less concern than the recording actually used on September 23.

Plaintiff's filing demonstrates his lack of preparation and concern for the neighborhood. He admits "[b]efore Monday morning, no counsel was fully aware of how loud the screams would be."  ECF 199, 6.  Plaintiff thus acknowledges that he selected a recording of a woman screaming and determined that it would be played at high volume but declined to listen to his own recording before playing it in a densely populated neighborhood at 5:20 am.

On the morning of the testing, Plaintiff could have stopped the test at any time as soon as he realized the volume was too high or the use of a recording of a woman screaming was inappropriate.  He chose not to.  Likewise, nothing prevented Plaintiff from speaking to residents at the scene during the testing, explaining the purpose of his test, and apologizing for the disturbance.  Defense counsel, Aleena Sorathia and Benjamin Jackal, were present at the source of the screaming for most of Plaintiff's test and, in fact, addressed the residents' concerns.  They did not witness any similar interaction between Plaintiff's counsel and members of the public.

Plaintiff's attempts to justify his failure to address public concern during his scream test do not make any sense.  He asserts "no one working for Plaintiff's counsel ever told [defense counsel] that they should be responsible for speaking to the public."  ECF 199, 1 n.3.  But continues "Plaintiff's counsel expected police would have been briefed by the City beforehand regarding what was happening with the study."  *Id.*[2]  Plaintiff criticizes the reaction of the police officers at the scene: "[u]nfortunately, it appears [the officers] were not, and so the officer (while present in his car) did not initially react to defuse the situation."  *Id.*  Thus, even though Plaintiff provided no notice of the length of his test, its volume, or his use of a scream, he expected the police and

---

[2]      Whatever subjective expectations Plaintiff's counsel had about the role of the police officers at the scene, those expectations were never communicated to defense counsel.  As defense counsel was unaware of the length, volume, and method of Plaintiff's testing, it is unclear how defense counsel could have "briefed" the officers at the scene and what information they could have conveyed.

defense counsel to address public concern.  In his version, the police and defense counsel are at fault for not anticipating Plaintiff's testing methods ahead of time and reacting to address public concern regarding the scream testing more quickly.

Plaintiff falsely claims he had no knowledge of the details of Defendants' testing.  *See* ECF 199, at p. 3. ("Any precautions taken at the time of that testing to minimize impact on residents or concerns raised by residents at that time (as alluded to in the email the Court forwarded) are similarly unknown to us.").  But that claim is belied by Plaintiff's filing.  *See id.* at 2 ("on July 10, 2024, counsel for Defendants disclosed an affirmative expert report from Dr. Durand Begault. From that report, Plaintiff learned for the first time that Dr. Begault had conducted an audio study on April 9, 2024, between 5 a.m. and 5:20 a.m., during which '[s]ound level measurements were made using a loudspeaker playing a recording of a police siren, used as a 'proxy' to represent the scream of the victim.'").  By the time Plaintiff conducted his test, he had known for months that Dr. Begault's test lasted twenty minutes and did not use the sound of a woman screaming.  It should have been obvious to Plaintiff's counsel that a much shorter test using chirps from a police siren would cause far less disturbance to residents nearby than recordings of a woman screaming.

Finally, there is no place in the discussion of this particular incident for Plaintiff's assertion that Defendants are "defend[ing] this case by arguing that Mr. Hicks is guilty of raping W.L. ***even despite recent DNA testing to the contrary***."[3]  ECF 199, 2 (emphasis added).  As has become a practice of Plaintiff's counsel, they propose their allegations are a foregone conclusion, that should not be subject to adversarial scrutiny; and, as apparent award for their self-declared, summary

---

[3]      Although not relevant to the instant issue, Defendants note that the most recent DNA testing completed on Plaintiff's underwear, which Defendants presume Plaintiff is referring to, was at best *inconclusive* as opposed to exculpatory.

victory in the lawsuit, they are entitled to continued egregious and uncivil litigation behavior throughout it.

On the other hand, the evidence establishing Plaintiff's guilt of assaulting the victim is overwhelming. The victim has consistently maintained that her assailant was on top her of when the police arrived and shot him. Several hours after the attack, the victim told an SVU Detective that the person who attacked her was on top of her when the police arrived. D010547 (attached as Exhibit B). She testified at Plaintiff's criminal trial in 2002 that as her attacker was trying to put his penis inside her "at that point the police arrived." D005892 (attached as Exhibit C). The victim provided the same testimony at her deposition in 2024. *See* Victim's Deposition Testimony, 73:1–2 (attached as Exhibit D) ("He's on the top of me, he -- he hadn't entered yet, and the police arrived."). Plaintiff's self-serving statements notwithstanding, the victim's testimony confirms that there was no other assailant and Plaintiff's identity as the person who assaulted the victim has never been in doubt.[4]

Defendants appreciate Plaintiff's apology and his belated recognition of "the impact of the study on the community or the impact that it could have on trauma victims." ECF 199, at p. 1. But as Defendants have noted, Plaintiff failed to address residents on the scene prior to the Court's entry of an order directing him to explain his conduct and contemplating an apology.[5]

---

[4]    The District Attorney's Office has never claimed that Plaintiff did not commit the rape, even as it agreed to relief in Plaintiff's criminal case. Indeed, after reviewing all of the evidence in the case, the author of an internal memorandum of the District Attorney's Office concluded, "I firmly believe that Termaine Joseph Hicks raped [the victim]." D007466, attached as Exhibit E.

[5]    By contrast, Defense counsel addressed the residents' concerns as the test was occurring. City Solicitor Renee Garcia began responding to residents' emails shortly after 9:00 am on September 24, 2024. She explained why the testing took place, apologized to the community, and took responsibility for the City's failure to anticipate that Plaintiff would use a recording of a woman screaming to conduct his audio test.

For the foregoing reasons, Plaintiff's response to the Court's order to show cause has offered no valid explanation why he conducted a scream test at 5:00 am in a heavily populated neighborhood.  However, the Defendants take no position regarding how the Court should resolve its show cause order.  ECF 198.  The undersigned counsel are prepared to provide any additional information regarding Plaintiff's scream test that would assist the Court with its determination.

Respectfully submitted:

Date:  September 30, 2024

*/s/ Aleena Y. Sorathia*
Aleena Y. Sorathia, Esquire
Attorney ID No: 318994
Ahmad Zaffarese LLC
One South Broad Street, Suite 1810
Philadelphia, PA 19107
215-496-9343
215-496-9419 (fax)
asorathia@azlawllc.com

*Counsel for Defendants Zungolo, Vinson, and Ellis*

*/s/ Benjamin T. Jackal*
Benjamin T. Jackal
Deputy City Solicitor
Attorney Identification No. 319274
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA  19102-1595
(215) 683-5434
ben.jackal@phila.gov

*Counsel for Defendants, the City of Philadelphia, Arthur Campbell, Mark Webb, Frank Holmes, Michael Youse, Douglas Vogelman, and Kevin Hodges.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TERMAINE HICKS,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action** |
| | : | **No. 2:22-cv-0977** |
| **CITY OF PHILADELPHIA, et al.,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## CERTIFICATE OF SERVICE

I hereby certify that on the date below, the foregoing Motion for Leave to File Reply to Plaintiff's Response to Court's Order to Show Cause (ECF 199) was filed via the Court's electronic filing system and is available for viewing and downloading.

Respectfully submitted:

Date:  September 30, 2024

_/s/ Benjamin T. Jackal_____
Benjamin T. Jackal
Deputy City Solicitor
Attorney Identification No. 319274
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA  19102-1595
(215) 683-5434
ben.jackal@phila.gov

*Counsel for Defendants, the City of
Philadelphia, Arthur Campbell, Mark Webb,
Frank Holmes, Michael Youse, Douglas
Vogelman, and Kevin Hodges.*

# Exhibit A
E-Mail Exchange Between Plaintiff and Defendants

 Outlook

---

## Re: Hicks v City of Philadelphia, et al.: PPD Authorization Request for Audio Study

**From** Katrina Rogachevsky <katrina@nsbhf.com>

**Date** Fri 9/20/2024 6:07 PM

**To** Ben Jackal <Ben.Jackal@phila.gov>

**Cc** Danielle Walsh <Danielle.Walsh@phila.gov>; Raymond Escobar <Raymond.Escobar@phila.gov>; Emma
Freudenberger <emma@nsbhf.com>; Aleena Sorathia <asorathia@azlawllc.com>; Samuel Ritterman
<sritterman@azlawllc.com>; Katelyn Mays <kmays@azlawllc.com>; Joseph Zaffarese
<jzaffarese@azlawllc.com>; DeRose, John <jderose@clarkhill.com>; kgriffin@clarkhill.com
<kgriffin@clarkhill.com>; Jonathan Feinberg <jfeinberg@krlawphila.com>; Grace Harris
<gharris@krlawphila.com>; NSB Hicks Case Team <hickscaseteam@nsbhf.com>; Danielle Kaufman-Sedano
<dksedano@krlawphila.com>

---

**External Email Notice. This email comes from outside of City government. Do not click on links or open
attachments unless you recognize the sender.**

---

Hi Ben,

It's important that our expert conduct the study as close to 5am as possible, and the defense's audio
expert conducted his between 5 and 5:20am, so it is apparently possible for a police presence to be on
the scene at that time. If a car is deployed after 5am, it may well be too late for them to be of any use.
Please confirm that as you arranged for your own experiment, you will likewise ensure a car will be
present by 5am.

Thank you,
Katrina

On Fri, Sep 20, 2024 at 5:09 PM Ben Jackal <Ben.Jackal@phila.gov> wrote:

> Katrina,
>
> The District lieutenant and sergeant are aware of the testing and plan to deploy a car to 15th and
> Mifflin between 5:00 am and 6:00 am.
>
> I will plan to be there at 4:45.
>
> Sincerely,
>
> Ben Jackal
>
> ---
>
> **From:** Katrina Rogachevsky <katrina@nsbhf.com>
> **Sent:** Friday, September 20, 2024 4:27:35 PM
> **To:** Ben Jackal <Ben.Jackal@phila.gov>
> **Cc:** Danielle Walsh <Danielle.Walsh@phila.gov>; Raymond Escobar <Raymond.Escobar@phila.gov>; Emma
> Freudenberger <emma@nsbhf.com>; Aleena Sorathia <asorathia@azlawllc.com>; Samuel Ritterman
> <sritterman@azlawllc.com>; Katelyn Mays <kmays@azlawllc.com>; Joseph Zaffarese

<jzaffarese@azlawllc.com>; DeRose, John <jderose@clarkhill.com>; kgriffin@clarkhill.com
<kgriffin@clarkhill.com>; Jonathan Feinberg <jfeinberg@krlawphila.com>; Grace Harris
<gharris@krlawphila.com>; NSB Hicks Case Team <hickscaseteam@nsbhf.com>; Danielle Kaufman-Sedano
<dksedano@krlawphila.com>
**Subject:** Re: Hicks v City of Philadelphia, et al.: PPD Authorization Request for Audio Study

---

**External Email Notice. This email comes from outside of City government. Do not click on links or open attachments unless you recognize the sender.**

---

Hi Ben,

Our expert will be conducting an audio study on Monday as confirmed. Could you please reply to confirm that the police liaison will be in place (around 15th and Snyder) by 4:45am? You can give them my cell phone number in case there are any questions on the morning of: (610) 529-9070. Thank you.

Best,
Katrina

On Thu, Sep 12, 2024 at 7:08 PM Katrina Rogachevsky <katrina@nsbhf.com> wrote:

Ben,

Plaintiff's expert will be conducting our audio study on the 23rd.

Thank you,
Katrina

On Wed, Sep 4, 2024 at 10:50 AM Ben Jackal <Ben.Jackal@phila.gov> wrote:

Katrina,

Our police liaison is available Monday, 9/23. Please let us know if you would like to proceed with your testing on that date.

Sincerely,

Ben Jackal
Deputy City Solicitor
Civil Rights Unit
1515 Arch Street, 14th Floor
Philadelphia, PA 19102-1595
ben.jackal@phila.gov
215-683-5434 (office)

---

**From:** Katrina Rogachevsky <katrina@nsbhf.com>
**Sent:** Tuesday, September 3, 2024 5:58 PM
**To:** Ben Jackal <Ben.Jackal@phila.gov>
**Cc:** Danielle Walsh <Danielle.Walsh@phila.gov>; Raymond Escobar <Raymond.Escobar@phila.gov>; Emma Freudenberger <emma@nsbhf.com>; Aleena Sorathia <asorathia@azlawllc.com>; Samuel Ritterman <sritterman@azlawllc.com>; Katelyn Mays <kmays@azlawllc.com>; Joseph Zaffarese

<jzaffarese@azlawllc.com>; DeRose, John <jderose@clarkhill.com>; kgriffin@clarkhill.com
<kgriffin@clarkhill.com>; Jonathan Feinberg <jfeinberg@krlawphila.com>; Grace Harris
<gharris@krlawphila.com>; Angeline Etienne <aetienne@krlawphila.com>; NSB Hicks Case Team
<hickscaseteam@nsbhf.com>
**Subject:** Re: Hicks v City of Philadelphia, et al.: PPD Authorization Request for Audio Study

> **External Email Notice. This email comes from outside of City government. Do not click on links or open attachments unless you recognize the sender.**

Ben,

Our experts unfortunately cannot make any of those dates work due to other trial and professional commitments. They are available September 23-26. Let us know which of those days would work. Thank you.

Best,
Katrina

On Tue, Sep 3, 2024 at 1:39 PM Ben Jackal <Ben.Jackal@phila.gov> wrote:

Katrina,

Our police liaison is not available this Thursday, 9/5. We can schedule the audio testing for any of the following dates: 9/9, 9/13, 9/16, and 9/20. Given these scheduling constraints, we would be amenable to an extension of the deadline for the responsive report of your audio expert.

Sincerely,

Ben Jackal
Deputy City Solicitor
Civil Rights Unit
1515 Arch Street, 14th Floor
Philadelphia, PA 19102-1595
ben.jackal@phila.gov
215-683-5434 (office)

**From:** Katrina Rogachevsky <katrina@nsbhf.com>
**Sent:** Wednesday, August 28, 2024 9:12 PM
**To:** Danielle Walsh <Danielle.Walsh@phila.gov>
**Cc:** Raymond Escobar <Raymond.Escobar@phila.gov>; Emma Freudenberger <emma@nsbhf.com>;
Aleena Sorathia <asorathia@azlawllc.com>; Samuel Ritterman <sritterman@azlawllc.com>; Joseph
Zaffarese <jzaffarese@azlawllc.com>; DeRose, John <jderose@clarkhill.com>; kgriffin@clarkhill.com
<kgriffin@clarkhill.com>; Ben Jackal <Ben.Jackal@phila.gov>; Jonathan Feinberg
<jfeinberg@krlawphila.com>; Grace Harris <gharris@krlawphila.com>; Angeline Etienne
<aetienne@krlawphila.com>; NSB Hicks Case Team <hickscaseteam@nsbhf.com>
**Subject:** Re: Hicks v City of Philadelphia, et al.: PPD Authorization Request for Audio Study

> **External Email Notice. This email comes from outside of City government. Do not click on links or open attachments unless you recognize the sender.**

Hi Danielle,

Given that our responsive report deadline is only a week later, we would like to move forward with 9/5. We will plan for that date and move forward with our preparations. Please let us know as soon as you are able to confirm.

Best,
Katrina

On Wed, Aug 28, 2024 at 10:52 AM Danielle Walsh <Danielle.Walsh@phila.gov> wrote:

Good morning everyone,

Ray is out of the country this week. From digging in quickly I learned that our police liaison was confirming dates but is now also out on vacation until 9/3. I will try to get in touch with our liaison in the interim but may not have an answer until the 3rd. Would you all want to plan on moving forward on 9/5 with the understanding that I may not have final confirmation until 9/3, or would you prefer to find another time for this to occur?

Apologies for the inconvenience – this is a difficult time with overlapping vacations.

Thanks,

Danielle E. Walsh

Chief Deputy City Solicitor

City of Philadelphia Law Department

Civil Rights Unit

1515 Arch Street, 14th Floor

Philadelphia, PA 19102

(215) 686-0464

(215) 866-6526 (cell)

(215) 683-5299 (fax)

danielle.walsh@phila.gov

**From:** Katrina Rogachevsky <katrina@nsbhf.com>
**Sent:** Wednesday, August 28, 2024 10:28 AM
**To:** Raymond Escobar <Raymond.Escobar@phila.gov>
**Cc:** Emma Freudenberger <emma@nsbhf.com>; Aleena Sorathia <asorathia@azlawllc.com>; Samuel Ritterman <sritterman@azlawllc.com>; Joseph Zaffarese <jzaffarese@azlawllc.com>; DeRose, John <jderose@clarkhill.com>; kgriffin@clarkhill.com; Danielle Walsh <Danielle.Walsh@phila.gov>; Ben Jackal <Ben.Jackal@phila.gov>; Jonathan Feinberg <jfeinberg@krlawphila.com>; Grace Harris <gharris@krlawphila.com>; Angeline Etienne <aetienne@krlawphila.com>; NSB Hicks Case Team <hickscaseteam@nsbhf.com>
**Subject:** Re: Hicks v City of Philadelphia, et al.: PPD Authorization Request for Audio Study

---

> **External Email Notice. This email comes from outside of City government. Do not click on links or open attachments unless you recognize the sender.**

---

Ray,


Our expert needs to confirm their travel plans, given that we are now a week out. Can you confirm either September 4 or 5 for our audio study? Thank you.


Best,

Katrina


On Tue, Aug 20, 2024 at 11:28 AM Raymond Escobar <Raymond.Escobar@phila.gov> wrote:

> Emma:
>
>
> We're working with our police liaison on this. I can tell you now that September 4 or 5 works best.
>
>
> I just want to be clear regarding your request. What we can do for you is ensure that there is an officer or multiple officers along with either Ben or myself on site to ensure that your testing goes smoothly. This is, in part, a residential neighborhood in which you are performing testing at 5 in the morning.

I'll get back to you when I have a more concrete answer in terms of date availability.


- RE

_____

Raymond E. Escobar

Deputy City Solicitor

Law Department, Civil Rights Unit

City of Philadelphia

1515 Arch Street, 14th Floor

Philadelphia, PA 19102-1595

215-683-5217 (direct)

[raymond.escobar@phila.gov](mailto:raymond.escobar@phila.gov)

---

**From:** Emma Freudenberger <[emma@nsbhf.com](mailto:emma@nsbhf.com)>
**Sent:** Monday, August 19, 2024 3:40 PM
**To:** Katrina Rogachevsky <[katrina@nsbhf.com](mailto:katrina@nsbhf.com)>
**Cc:** Raymond Escobar <[Raymond.Escobar@phila.gov](mailto:Raymond.Escobar@phila.gov)>; Aleena Sorathia <[asorathia@azlawllc.com](mailto:asorathia@azlawllc.com)>; Samuel Ritterman <[sritterman@azlawllc.com](mailto:sritterman@azlawllc.com)>; Joseph Zaffarese <[jzaffarese@azlawllc.com](mailto:jzaffarese@azlawllc.com)>; DeRose, John <[jderose@clarkhill.com](mailto:jderose@clarkhill.com)>; [kgriffin@clarkhill.com](mailto:kgriffin@clarkhill.com); Danielle Walsh <[Danielle.Walsh@phila.gov](mailto:Danielle.Walsh@phila.gov)>; Ben Jackal <[Ben.Jackal@phila.gov](mailto:Ben.Jackal@phila.gov)>; Jonathan Feinberg <[jfeinberg@krlawphila.com](mailto:jfeinberg@krlawphila.com)>; Grace Harris <[gharris@krlawphila.com](mailto:gharris@krlawphila.com)>; Angeline Etienne <[aetienne@krlawphila.com](mailto:aetienne@krlawphila.com)>; NSB Hicks Case Team <[hickscaseteam@nsbhf.com](mailto:hickscaseteam@nsbhf.com)>
**Subject:** Re: Hicks v City of Philadelphia, et al.: PPD Authorization Request for Audio Study

> **External Email Notice. This email comes from outside of City government. Do not click on links or open attachments unless you recognize the sender.**

Ray,

Any update on this?

Thanks,

Emma

On Fri, Aug 16, 2024 at 2:42 PM Katrina Rogachevsky <[katrina@nsbhf.com](mailto:katrina@nsbhf.com)> wrote:

> Hi Ray,
>
> Our experts are available to conduct the study September 3, 4, or 5.
>
> Thank you,
>
> Katrina
>
> On Tue, Aug 13, 2024 at 3:31 PM Raymond Escobar <[Raymond.Escobar@phila.gov](mailto:Raymond.Escobar@phila.gov)> wrote:
>
> > Katrina:
> >
> > We are coordinating with PPD now to confirm that we can make this happen. Has your expert provided you with possible dates for testing?
> >
> > - RE
> >
> > _____
> >
> > Raymond E. Escobar
> >
> > Deputy City Solicitor
> >
> > Law Department, Civil Rights Unit
> >
> > City of Philadelphia
> >
> > 1515 Arch Street, 14th Floor
> >
> > Philadelphia, PA 19102-1595
> >
> > 215-683-5217 (direct)
> >
> > [raymond.escobar@phila.gov](mailto:raymond.escobar@phila.gov)

**From:** Katrina Rogachevsky <katrina@nsbhf.com>
**Sent:** Tuesday, August 13, 2024 10:28 AM
**To:** Aleena Sorathia <asorathia@azlawllc.com>; Samuel Ritterman
<sritterman@azlawllc.com>; Joseph Zaffarese <jzaffarese@azlawllc.com>; DeRose, John
<jderose@clarkhill.com>; kgriffin@clarkhill.com; Danielle Walsh <Danielle.Walsh@phila.gov>;
Ben Jackal <Ben.Jackal@phila.gov>; Raymond Escobar <Raymond.Escobar@phila.gov>
**Cc:** Jonathan Feinberg <jfeinberg@krlawphila.com>; Grace Harris <gharris@krlawphila.com>;
Angeline Etienne <aetienne@krlawphila.com>; NSB Hicks Case Team
<hickscaseteam@nsbhf.com>
**Subject:** Hicks v City of Philadelphia, et al.: PPD Authorization Request for Audio Study

---

**External Email Notice. This email comes from outside of City government. Do not click on links or open attachments unless you recognize the sender.**

---

Ben and Ray,

Our rebuttal expert needs to conduct an audio study of the area surrounding the scene, and to that end, we need to seek PPD authorization. The test needs to be conducted at the same time as the crime, approximately 5:00 am, and the police would need to ensure no sirens are sounded in the area for the duration of the test.

Please let us know the timeline for seeking this authorization, and whether the request is approved.

Thank you,

Katrina

--

Katrina C. Rogachevsky

Staff Attorney

Neufeld Scheck Brustin Hoffmann & Freudenberger, LLP

200 Varick Street, Suite 800

New York, NY 10014

Office: (212) 965-9081

Fax: (212) 965-9084

katrina@nsbhf.com

www.nsbhf.com

Pronouns: she/her

# Exhibit B

Victim's Statement to Det. Arthur Campbell

## INVESTIGATION INTERVIEW RECORD

### PHILADELPHIA POLICE DEPARTMENT
### HOMICIDE DIVISION

CASE NUMBER: 01-5027

INTERVIEWER: Campbell #8080

NAME: ▉▉▉▉▉▉▉

AGE: 39   RACE: A/F   DOB: 11-15-62

ADDRESS: ▉▉▉▉▉▉▉

APARTMENT NUMBER:

TELEPHONE NUMBER: ▉▉▉▉▉▉▉

NAME OF EMPLOYMENT/SCHOOL: Dunkin Donuts

SOCIAL SECURITY NUMBER:

ADDRESS OF EMPLOYMENT/SCHOOL: Broad and Snyder

DEPARTMENT:

TELEPHONE NUMBER:

DATES OF PLANNED VACATIONS:

DATES OF PLANNED BUSINESS TRIPS:

NAME OF CLOSE RELATIVE: ▉▉▉▉▉▉  Husband

ADDRESS: ▉▉▉▉▉▉▉

TELEPHONE NUMBER:

PLACE OF INTERVIEW: Jefferson Hospital

DATE: 11-27-01   TIME: 10:05 AM

BROUGHT IN BY: 1st District Police

DATE: 11-27-01   TIME: AM PM

WE ARE QUESTIONING YOU CONCERNING: Rape that occurred on 11-27-01, approximately 5:05 AM 1905 S. 15th St

WARNINGS GIVEN BY:   DATE:   TIME: AM PM

ANSWERS: (1)   (2)   (3)   (4)   (5)   (6)   (7)

Q. ▉▉▉▉▉▉  My name is Detective Campbell from the Special Victims Unit. Can you tell me what happened to you this morning outside 1905 S. 15th St?

A. I left at 5:00 o'clock and locked my door. I walked down Mifflin Street and turned at 15th Street. Then I saw the black guy behind me and I hurried straight down street to the other side of 15th Street by the hospital. I had the spray on my keys, but I didn't get it open when he grabbed me from behind. I say I don't have money, I go to work. Then I screamed. He said; "I don't need your money. Shut up. You want to die? I want you to do something for me." Then I fall down. He knocked me down and grabbed me, and he pulled me. He just hit me with the gun. He beat me with the gun in my face and my head.

RECORD: ☐ Yes  ☐ No

CHECKED BY: X ▉▉▉▉▉▉

D010546  .27.01 - 11:21 AM

REVIEWED BY: ▉▉▉▉▉▉ #865

INVESTIGATION INTERVIEW RECORD
CONTINUATION SHEET

CITY OF PHILADELPHIA

POLICE DEPARTMENT

NAME ▮▮▮▮▮▮▮

PAGE 2

CASE NO. 01-5027

A. CONTINUED... THEN he PULLED ME behiNd The hospiTAL.

Q. WhAT hAppENED AFTER This mAlE pulled you behind The hospiTAL?

A. HE TooK oFF my pANTS whiLE I WAS oN The GRoUNd. HE TooK oFF his pANTS, I ThiNK, ANd LAy dowN oN Top oF ME. HE TRiEd To puT himSELF iN mE, buT I wAS TWiSTiNG ANd iT WAS Too dARK bACK ThERE.

Q. WhEN This mAlE WAS aTTEmpTiNG To puT his pENiS iN you, WhERE WAS ThE GUN?

A. I doN'T KNow. I WAS LAyiNG ThERE ANd I couLdN'T SEE ANyThiNG.

Q. WhEN This mAlE FiRST pulled ThE GUN oN you, did you GET A Good LooK AT iT?

A. No. HE hAd iT AGAiNST my LiPS. I cAN'T RECoGNiZE iT.

Q. WhAT hAppENEd AFTER ThE mAlE couLdN'T puT himSELF iNSidE you?

A. HE WAS holdiNG his pENiS ANd WAS STiLL TRyiNG To puT iT iN mE WhEN poLiCE COME. WhEN poLiCE COME, he TRiEd To RUN buT ThERE WAS No wAy ouT.

X ▮▮▮▮▮▮▮

D.t. ▮▮▮▮ G. ▮▮▮▮ D010547 865

75-483A

INVESTIGATION INTERVIEW RECORD
CONT. . . .

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME ▮▮▮▮▮

PAGE 2

CASE NO. 01-5027

Q. WHEN THE POLICE CAME, did you hear THE OFFICERS OR THE MALE SAY ANYTHING?

A. I WAS STILL ON THE GROUND, AND I WAS CONFUSED. I don'T REMEMBER ANYTHING buT hEARING ShoTs. I don'T KNOW how MANY ShoTs THERE WERE,

Q. WHEN YOU hEARd THE ShoTs, WAS THE MALE STILL NEAR YOU? CoULd YOU STILL SEE him?

A. I WAS STILL ON THE GROUND AND THE MALE WAS behind MY hEAd, SO I CoULdN'T SEE him.

Q Did YOU GET ENOUGh OF A LOOK AT THE bLACK MALE To dESCRibE him?

A. IT WAS Too dARK, AND he WAS bLACK. MAYbE he WAS AFRAId To bE idENTiFiEd. HE WAS bEATiNG WITh THE GuN ANd TELLiNG ME To ShuT uP MY MOUTh, HE CAME AT ME FROM THE RIGhT REAR. THE ONLY TIME he WAS IN THE FRONT OF ME WAS WHEN he WAS ON Top OF ME, AHD IT WAS Too dARK bACK THERE.

Q. Did THE MALE TAKE ANYThing FROM YOU?

A. No. AHd MY KEYS WITh THE SPRAY WAS STiLL IN MY PocKET,

X ▮▮▮▮▮

Det. ▮▮▮▮▮

D0105485

75-483A

INVESTIGATION INTERVIEW RECORD
CONTINUATION SHEET

CITY OF PHILADELPHIA
POLICE DEPARTMENT

NAME ▮▮▮▮▮▮

PAGE 4

CASE NO. 01-5027

Q. DID YOU SEE IF THERE WAS ANYONE ELSE WITH THIS MALE WHEN HE FIRST APPROACHED YOU?

A. WHEN I REALIZED SOMEBODY BEHIND ME, I HURRY. BUT I'M SURE IT WAS ONLY ONE PERSON.

Q. DO YOU GO TO WORK THE SAME WAY EVERY MORNING?

A. YES.

Q. AND DO YOU USUALLY SEE PEOPLE OUT AT THAT TIME OF MORNING?

A. YES, PEOPLE GO TO WORK IN THEIR CARS.

Q. WHAT ARE YOUR INJURIES?

A. LOOSE TEETH, MY LIP IS CUT. I HAVE A BUMP IN FRONT OF MY HEAD, AND THE TOP OF MY HEAD WHERE HE HIT ME WITH THE GUN. I HAVE BRUISES AND SCRATCHES ON MY RIGHT LEG.

Q. IS THERE ANYTHING ELSE YOU CAN THINK OF AT THIS TIME THAT WOULD HELP IN THIS INVESTIGATION?

A. NO.

DETECTIVE MARK WEBB WILL READ YOUR STATEMENT BACK TO YOU. IF THERE ANY MISTAKES, LET HIM KNOW SO THAT THE MISTAKES CAN BE CORRECTED.

X ▮▮▮▮▮▮

D010549

75-483A

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NUMBER |
|---|---|---|

| NAME ▇▇▇▇▇▇▇ | AGE 78 | RACE W/M | INTERVIEWER ERICKSON |
|---|---|---|---|

DOB 5-3-53

| ADDR ▇▇▇▇▇ | APARTMENT NUMBER 2nd Floor | TELEPHONE NUMBER ▇▇▇▇▇ |
|---|---|---|

NAME OF ▇▇▇▇ Self employed

SOCIAL SECURITY NUMBER

| ADDRESS OF EMPLOYMENT/SCHOOL S/A | DEPARTMENT | TELEPHONE NUMBER |
|---|---|---|

DATES OF PLANNED VACATIONS

DATES OF PLANNED BUSINESS TRIPS

NAME OF CLOSE RELATIVE

ADDRESS | TELEPHONE NUMBER

| PLACE OF INTERVIEW | DATE 11-27-01 | TIME 2ºº AM/PM |
|---|---|---|

| BROUGHT IN BY | DATE | TIME AM PM |
|---|---|---|

WE ARE QUESTIONING YOU CONCERNING

| WARNINGS GIVEN BY | DATE | TIME AM PM |
|---|---|---|

| ANSWERS | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|---|

**Q)** I am Det ERICKSON And I am here in Ref. to an incident that happened last night can you tell me what happened?

**A)** I asleep in bed but I was awakened by somebody screaming across the street. I looked out the window and didn't see anyone. I went to get a cup of coffee and I then heard gunshots And the police cars.

**Q)** How long was it between the screams And the gunshots?

**A)** Not long I don't know how the cops got there that fast. But first I heard

| RECORD ☐ Yes ☐ No | CHECKED BY |
|---|---|

REVIEWED BY

D010550

75-483 (Rev. 7/82)

INVESTIGATION INTERVIEW RECORD
CONTINUATION SHEET

CITY OF PHILADELPHIA
POLICE DEPARTMENT

- holloran but I don't Know what was said. I forget that part.

Q) Is there any thing else you can tell Me?

A) No that's about it.

D010551

75-483 A

# Exhibit C
Victim's Trial Testimony

Page 9

[1] you to give up your right to question him
[2] on the issue of his qualifications?
[3]  **THE DEFENDANT**:  No, sir.
[4]  **THE COURT**:  You're doing this of
[5] your own free will?
[6]  **THE DEFENDANT**:  Yes.
[7]  **THE COURT**:  You spoke to your
[8] attorney about this, correct?
[9]  **THE DEFENDANT**:  Yes.
[10]  **THE COURT**:  You're satisfied with
[11] his services?
[12]  **THE DEFENDANT**:  Yes, sir.
[13]  **THE COURT**:  All right, why don't we
[14] get started.
[15]     (At which time, the jury enters the
[16] courtroom.)
[17]  **THE COURT**:  Good morning, ladies
[18] and gentlemen.
[19]     Ms. Murphy.
[20]  **MS. MURPHY**:  Good morning, Your
[21] Honor.
[22]     The Commonwealth calls █████
[23]          - - -
[24]     █████ having been duly
[25] sworn, and testifying through Philip Lai,

Page 10

[1] a court-certified Cantonese Interpreter
[2] who was also duly sworn, was examined and
[3] testified as follows...
[4]          - - -
[5]  **THE COURT**:  Ladies and gentlemen,
[6] it is stipulated, that is, it's agreed by
[7] the defense and the Commonwealth, that
[8] this gentleman is fluent in both
[9] Cantonese, Chinese and English, and that
[10] he is court certified and capable of
[11] performing here as both an interpreter and
[12] a translator for this witness, Ms. █████
[13]     Is that agreed, counsel?
[14]  **MS. MURPHY**:  Yes.
[15]  **MR. NICHOLSON**:  That's correct.
[16]  **THE COURT**:  Mr. Lai and Ms.
[17] oftentimes in a case where someone whose
[18] first language is something other than
[19] English, when he or she has some knowledge
[20] of English, if that person understands the
[21] English question, they are sometimes
[22] likely to start answering the question,
[23] without you first having translated it
[24] into her primary language.
[25]     What I'd like to do, Ms. Murphy, is

Page 11

[1] to use the services of the translator-
[2] interpreter.
[3]     Sir, would you advise Ms. █████ to
[4] wait until you have finished your trans-
[5] lation of the attorneys' questions?
[6]     (At which time, Mr. Lai complies
[7] with the Court's request.)
[8]  **THE WITNESS**:  Yes, I understand.
[9]  **THE COURT**:  Then, you will put the
[10] question to her in Cantonese.  She will
[11] answer you in Cantonese, and you will
[12] articulate her answer in a loud and clear
[13] voice in English.
[14]     Do those ground rules meet with
[15] your approval, Mr. Nicholson?
[16]  **MR. NICHOLSON**:  Yes, they do, Your
[17] Honor.
[18]  **THE COURT**:  Ms. Murphy?
[19]  **MS. MURPHY**:  Yes, Your Honor.
[20]  **THE COURT**:  Let's proceed.
[21]  **MS. MURPHY**:  Thank you.
[22]          - - -
[23]     DIRECT EXAMINATION
[24]          - - -
[25] **BY MS. MURPHY**:

Page 12

[1] **Q.**     Good morning, Ms. █████
[2] Ms. █████ how old are you?
[3] **A.**     Forty years old.
[4] **Q.**     What is your date of birth?
[5] **A.**     1962, November 15th.
[6] **Q.**     Do you live here in Philadelphia?
[7] **A.**     Yes.
[8] **Q.**     Who do you live with here in Philadelphia?
[9] **A.**     My husband and my two children.
[10] **Q.**     How long have you lived in Philadelphia?
[11] **A.**     I came to the United States in 1989.
[12] **Q.**     How long have you lived in Philadelphia?
[13] **A.**     All of 13 years.
[14] **Q.**     Now, in November of 2001, were you work-
[15] ing?
[16] **A.**     Yes.
[17]  **THE COURT**:  Hold on a second.
[18]     (At which time, there is a short
[19] pause in the proceeding.)
[20]  **THE COURT**:  Okay.
[21] **BY MS. MURPHY**:
[22] **Q.**     Where did you work at that time?
[23] **A.**     Dunkin' Donuts.
[24]  **THE COURT**:  Excuse me, ma'am.
[25] I missed the question.  Where did she

Page 13

[1] work at what time?

[2] **MS. MURPHY:** In November of 2001.

[3] **THE COURT:** Okay, why don't you put
[4] forth the question again.

[5] My apologies. I missed the ques-
[6] tion.

[7] **MS. MURPHY:** No problem.

[8] **BY MS. MURPHY:**

[9] **Q.** In November of 2001, were you working at
[10] that time? Did you have a job at that time?

[11] **A.** Yes.

[12] **Q.** Where did you work?

[13] **A.** At Dunkin' Donuts.

[14] **Q.** Where is that Dunkin' Donuts located?

[15] **A.** Broad and Snyder.

[16] **Q.** Did you live in the 1800 block of South
[17] 16th Street in November of 2001?

[18] **A.** Yes.

[19] **THE COURT:** Ms. Murphy, members of
[20] the jury, forgive me.

[21] - - -

[22] AT WHICH TIME, the proceeding
[23] resumes in the Court's chambers and is
[24] **stenographically recorded as follows:**

[25] - - -

Page 14

[1] **THE COURT:** (Turning to the
[2] reporter) I don't want to have to try
[3] this case a second time. Would I look on
[4] there and just tell me if she was sworn
[5] in?

[6] (At which time, the reporter com-
[7] plies with the Court's request and re-
[8] sponds in the affirmative.)

[9] **THE COURT:** All right, let's
[10] proceed.

[11] - - -

[12] AT WHICH TIME, the proceeding
[13] resumes in open court and is stenograph-
[14] **ically recorded as follows:**

[15] - - -

[16] **MS. MURPHY:** May I, Your Honor?

[17] **THE COURT:** Please do.

[18] **MS. MURPHY:** Thank you.

[19] **BY MS. MURPHY:**

[20] **Q.** Ms. ████ how did you get from your home to
[21] work back in November of 2001?

[22] A. I normally go out around 5:00, lock my
[23] door, go along Mifflin Street and turn onto 15th
[24] Street.

[25] **Q.** Did you do that on November 27th, 2001?

Page 15

[1] **A.** Yes.

[2] **Q.** Would you walk with someone or alone?

[3] **A.** By myself.

[4] **Q.** On November 27th, 2001, were you by
[5] yourself?

[6] **A.** Yes.

[7] **Q.** Did something prevent you from getting to
[8] work on November 27th, 2001?

[9] **A.** Yes.

[10] **Q.** Can you tell the jury what happened on
[11] November 27th, 2001?

[12] **A.** On that day, November the 27th, 2001,
[13] I left my house, locked my door and got onto
[14] Mifflin Street. I made a right turn onto 15th
[15] Street.

[16] I saw some people on the street getting to
[17] work. I walked two houses. Then, I felt that
[18] somebody was right behind me.

[19] I turned around and looked, and there was
[20] a black male right behind me with a black jacket.

[21] Then, I hurried across the street.

[22] I know that I have a spray on my key
[23] chain. I tried to take it out, but at that

[24] moment he came on to me and grabbed me with a gun
[25] pointed at my mouth.

Page 16

[1] I told him I didn't have any ████ money on me.

[2] I wo███ a Dunkin' Donuts. He told me that he
[3] didn't need█ y money from me, that he wanted me
[4] to do som███ng for him. ████

[5] I said, "No, no," but he continued to beat
[6] me up with the gun pointed at my mouth. I was
[7] struggling. I wasn't willing to. I said, "No,
[8] no," but he held me tight.

[9] He grabbed me about more than ten houses
[10] away. I fell onto the ground, but he kept dragg-
[11] ing me on. He dragged me into a small alley in
[12] the back of the hospital.

[13] He kept on hitting me, but I was struggl-
[14] ing. At that point, I couldn't scream anymore.

[15] He pulled down my pants. He kept on dragging me
[16] into that alley. Then, he laid on top of me. He
[17] grabbed his penis and tried to put it into me. I
[18] was twisting. I was trying to struggle, but he
[19] used his hand to try to insert it into me.

[20] At that point, the police came.

[21] **Q.** How did you know that the police were
[22] there at that point?

[23] **A.** There were spotlights, and there were cars
[24] around.

[25] **Q.** When the Police Officers got there, what

Page 17

[1] happened?

[2] **A.**   I was scared, I was confused, and I heard

[3] gunshots.

[4] **Q.**   At that point when you were on the ground,

[5] laying on the ground, and this person was on top

[6] of you, were you able to see?

[7] **A.**   No, I didn't see anything.

[8] **Q.**   What kept you from seeing anything?

[9] **A.**   I was scared.

[10] **Q.**   When you were being hit, where on your

[11] body were you being hit?

[12] **A.**   He was punching me in my face and my head.

[13] I was trying to block him with my hand.

[14] **Q.**   Were you able to block him?

[15] **A.**   No.

[16] **Q.**   Do you know what you were being hit with?

[17] **A.**   He also used his gun to hit me.

[18] **Q.**   What other than the gun did he use to hit

[19] you?

[20] **A.**   No.

[21] **Q.**   Let me rephrase that:  Other than the gun,

[22] did he use anything else to hit you?

[23] **A.**   No.

[24] **Q.**   When you say that he was punching you, was

[25] that with his hand?

Page 18

[1] **A.**   Yes.

[2] **Q.**   When you were being hit, were you hit

[3] anywhere else on your body other than your face

[4] and head?

[5] **A.**   No.

[6] **Q.**   After you heard the gunshots, what hap-

[7] pened next?

[8] **A.**   Well, nothing much happened.  I my pants

[9] back on, and the police took me to the hospital.

[10] **Q.**   Did you see who was shot?

[11] **A.**   No, I didn't see.

[12] **Q.**   What hospital did you go to?

[13] **A.**   Jefferson.

[14] **Q.**   Were you treated while you were at

[15] Jefferson?

[16] **A.**   Yes.

[17] **Q.**   How long were you at Jefferson, if you

[18] know?

[19] **A.**   I was in Jefferson about half a day.

[20] **Q.**   How did you get from the scene where this

[21] incident happened to Jefferson?

[22] **A.**   A Policewoman took me there.

[23] **Q.**   Did she stay at the hospital with you?

[24] **A.**   Yes.

[25] **Q.**   Were you able to communicate with this

Page 19

[1] Police Officer?

[2] **A.**   Yes.

[3] **Q.**   Before you left the scene of the incident

[4] and before you got to the hospital, were you able

[5] to communicate with any Police Officers who came

[6] to the scene?

[7] **A.**   No.

[8] **Q.**   What kept you from communicating with the

[9] Police Officers on the scene?

[10] **A.**   I was bleeding, so the Policewoman took me

[11] to the hospital.

[12] **Q.**   I'm sorry.  I didn't understand what you

[13] said.

[14] **THE INTERPRETER**:  She said she was

[15] bleeding.

[16] **BY MS. MURPHY**:

[17] **Q.**   Were you in any pain?

[18] **A.**   Yes.

[19] **Q.**   Where on your body were you in pain?

[20] **A.**   My head and my face.

[21] **Q.**   The person who did this to you, did you

[22] get a good look at this person, other than the

[23] black jacket, and that the person was black and

[24] male?

[25] **A.**   You mean, during the incident?

Page 20

[1] **Q.**   Yes.

[2] **A.**   .

[3] **Q.**   Before you were dragged into that little

[4] alleyway that you described, were you able to get

[5] a good look at this person?

[6] **A.**   No, it was dark.

[7] **Q.**   Did you want this person to put his penis

[8] in you?

[9] **A.**   Of course not.

[10] **Q.**   When you were at the hospital, were you

[11] given any medication?

[12] **A.**   Yes.

[13] **Q.**   While you were at the hospital, did you

[14] give them your clothing?

[15] **A.**   Yes, my underpants and pants, too.

[16] **Q.**   Did any of your family come to the

[17] hospital while you were at Jefferson?

[18] **A.**   Yes, I called my husband when I got to the

[19] hospital.

[20] **Q.**   Did he come to the hospital?

[21] **A.**   Yes.

[22] **Q.**   Did any other family members come to the

[23] hospital?

[24] **A.**   Yes, my sister.

[25] **Q.**   Did Police Officers talk to you while you

## Page 21

[1] were at the hospital?

[2] **A.** Yes.

[3] **Q.** How were you able to communicate with the

[4] Police Officers while you were at the hospital?

[5] **A.** I tried to speak to the Police Officer in

[6] English, but for some of it I depended on another

[7] lady to translated for me.

[8] **Q.** Who was this lady?

[9] **A.** I don't know her, but I guess the staff

[10] called for her to help me out.

[11] **Q.** Did your husband also help you in com-

[12] municating with the police?

[13] **A.** Yes.

[14] **Q.** Other than getting medication, how else

[15] were you treated while you were at the hospital?

[16] **Let me rephrase that**: While you were at

[17] the hospital, other than medication, what medical

[18] treatment did you receive?

[19] **A.** They took the skin from my head and put

[20] stitches on my lips.

[21] **Q.** Did they give you or did they perform a

[22] pelvic examination?

[23] **A.** Yes.

[24] **MS. MURPHY**: I'd ask that this

[25] clothing be marked C-5, please.

## Page 22

[1] **COURT CRIER**: Your Honor, for the

[2] record, we're going to mark the bag

[3] collectively as C-5.

[4] **THE COURT**: Ms. Murphy, we're

[5] marking the bag, and I assume that all of

[6] the contents will be C-5.

[7] **MS. MURPHY**: Yes.

[8] (At which time, Commonwealth

[9] Exhibit C-5 is marked for identification

[10] and given to the witness.)

[11] **BY MS. MURPHY**:

[12] **Q.** Ms. █ do you recognize the clothing

[13] before you that has been marked as C-5?

[14] **A.** Yes.

[15] **Q.** Is that your clothing that you were

[16] wearing on November 27th, 2001?

[17] **A.** Yes.

[18] **Q.** █hat the clothing that you gave to the

[19] hospital personnel or to the Police Officers?

[20] **A.** The █ital staff.

[21] **Q.** Is this the first time that you have seen

[22] that clothing since that day?

[23] **A.** Yes.

[24] **MS. MURPHY**: May I approach for one

[25] minute, Your Honor, please?

## Page 23

[1] **THE COURT**: Go ahead.

[2] (At which time, counsel approaches

[3] the witness.)

[4] **BY MS. MURPHY**:

[5] **Q.** Ms. █ I'm also going to show you what

[6] has been previously marked as C-1t.

[7] **MS. MURPHY**: I think it needs to be

[8] shown to counsel.

[9] (At which time, Mr. Nicholson

[10] examines the exhibit, which is then given

[11] to the witness.)

[12] **BY MS. MURPHY**:

[13] **Q.** Ms. █ do you recognize what is shown in

[14] the photograph marked C-1t?

[15] **A.** My keys.

[16] **Q.** Did you have those keys with you when you

[17] went to the hospital?

[18] **A.** No, they fell. I think that they fell on

[19] to the ground.

[20] **Q.** Who brought them to you?

[21] **A.** My husband.

[22] **MS. MURPHY**: I'd ask that C-1k be

[23] shown to counsel and then to the witness,

[24] please.

[25] (At which time, Mr. Nicholson

## Page 24

[1] examines the exhibit, whic█ then given

[2] to th█tness.)

[3] **BY MS. MURPHY**:

[4] **Q.** Ms. █ I'd ask you █ take a look at the

[5] photograph that has been marked C-1k. Do you

[6] recognize what is shown in that photograph?

[7] **A.** This is where he dragged me to. I thought

[8] at that moment I would die.

[9] **MS. MURPHY**: May I see C-1, I

[10] think, H or E?

[11] **COURT CRIER**: This is E, and this

[12] is H. (Indicating)

[13] **MS. MURPHY**: Thank you.

[14] I'd ask that both of those be shown

[15] to her.

[16] **COURT CRIER**: For the record, this

[17] is E and H that were previously marked.

[18] (At which time, the exhibits are

[19] given to the witness.)

[20] **BY MS. MURPHY**:

[21] **Q.** Ms. █ I'd ask you to take a look at

[22] C-1e and C-1h. First, looking at C-1e, do you

[23] recognize what is shown in that photograph?

[24] **A.** This is a view along 15th Street.

[25] **Q.** Does that photograph fairly show where you

Page 25

[1] were walking when this incident occurred?
[2] **A.**   Yes.
[3] **Q.**   Can you show that photograph to the jury,
[4] please? Just hold it up.
[5] **A.**   (Indicating)
[6] **Q.**   Can you point on that photograph to what
[7] side of the street you were walking at first,
[8] before this person caught up with you?
[9] **A.**   Initially, I turned onto this side of the
[10] street. Then, I saw that there was a guy right
[11] behind me, so I ran across the street to the
[12] other side of the street.
[13] He dragged me along for more than ten
[14] houses.
[15] **Q.**   Taking a look at the photograph --
[16] **MS. MURPHY:** May I approach, Your
[17] Honor?
[18] **THE COURT:** Sure.
[19] (At which time, counsel approaches
[20] the witness.)
[21] **BY MS. MURPHY:**
[22] **Q.**   With the red pen, can you ma___ n the
[23] photograph where you began to where you were when
[24] the person caught up with you?
[25] **A.**   Initially, I was walking along here. I

Page 26

[1] started here. That's where the hospital is.
[2] Then, he dragged me along here. He had a tight
[3] hold on me. (Indicating)
[4] **THE COURT:** Excuse me one second.
[5] I don't know if the jury can hear.
[6] (Turning to the Interpreter) Sir,
[7] if you'll stand in front of the attorneys
[8] and speak to the jury so that they can
[9] hear what you're saying...the attorneys
[10] need to get in there.
[11] (At which time, the interpreter
[12] repositions himself before the jury.)
[13] **THE COURT:** Please continue, Ms.
[14] Murphy.
[15] **BY MS. MURPHY:**
[16] **Q.**   You said that from this point back, that
[17] was what happened. Now, what happened at that
[18] poin___
[19] **A.**   That's where he had a gun pointed at me,
[20] and he had ___ght grip on me. He dragged me
[21] along -- he pulled me along, and there were cars
[22] passing by. Then, at this point, he started
[23] hitting me. (Indicating)
[24] There was an emergency door at this
[25] location. I tried to reach that bell over there,

Page 27

[1] but he had a tight grip on me. I couldn't reach
[2] it. He kept on pulling me along.
[3] At this location, I fell onto the gro_nd.
[4] Then, he got hold of my shirt and dragged me
[5] along, and I completely fell onto the ground at
[6] this point. (Indicating)
[7] **MS. MURPHY:** Just for purposes of
[8] clarity, the witness has picked up C-1h
[9] and has begun drawing on C-1h.
[10] **BY MS. MURPHY:**
[11] **Q.**   You can continue with C-1h.
[12] **A.**   From that point on, he kept dragging me
[13] into that place over there, and he continued to
[14] hit me. I said, "No, no, don't do that." At
[15] that point, I couldn't scream anymore. At that
[16] point, at this place, he pulled my pants off.
[17] (Indicating)
[18] **MS. MURPHY:** Let the record reflect
[19] that the witness is now pointing to C-1k
[20] and has drawn on C-1k with the red pen.
[21] **THE WITNESS:** It's here where he
[22] laid on top of me and put his penis into
[23] me. I was struggling with him, but he
[24] used his hand to insert it into me. At
[25] that point, the police came.

Page 28

[1] **MS. MURPHY:** Tha___ you.
[2] **BY MS. MURPHY:**
[3] **Q.**   Ms. ___ was there anyone in that small
[4] space that ___ saw when th___ person dragged you
[5] into it?
[6] **A.**   No.
[7] **Q.**   When the police got there, where was the
[8] person who did this to you?
[9] **A.**   Right behind me. He stood up and was
[10] right behind me.
[11] **Q.**   When that person stood up, did you see
[12] what happened to that person?
[13] **A.**   I heard gunshots.
[14] **Q.**   Does that mean that you didn't see what
[15] happened to him?
[16] **A.**   I was scared. I was confused.
[17] **Q.**   Now, I'd like to again move forward to
[18] your visit at Jefferson Hospital. Did you have
[19] any continued treatment after you left the
[20] hospital on that day?
[21] **A.**   Yes, I have continuous headaches. So,
[22] they gave me another x-ray.
[23] **Q.**   When did that happen?
[24] **A.**   It was on -- I think maybe two days after.
[25] **Q.**   Did you see your face after this incident?

Page 29

[1] **A.** Yes.

[2] **Q.** What did your face look like after this

[3] incident?

[4] **A.** It was blue. It was bruised. It was

[5] black all over. It was swollen, and my lips were

[6] swollen, too.

[7] **Q.** When did you get a look at your face?

[8] **A.** When I went to the bathroom.

[9] **MS. MURPHY:** I'd ask that these

[10] photographs be marked C-6a through C-6l.

[11] (At which time, Commonwealth

[12] Exhibits C-6a through C-6l are marked for

[13] identification.)

[14] **MS. MURPHY:** The photograph marked

[15] C-6a, I'd ask that it be shown to counsel

[16] and then shown to the witness, please.

[17] (At which time, Mr. Nicholson

[18] examines the exhibit, which is then given

[19] to the witness.)

[20] **BY MS. MURPHY:**

[21] **Q.** Ms. ▮ I'd ask you to take a look at the

[22] photograph that's been marked C-6▮ Does that

[23] photograph fairly show how you looked after this

[24] incident?

[25] **A.** Yes.

Page 30

[1] **Q.** After this incident, did you give a

[2] written statement or did you talk to police where

[3] they wrote a statement out of what happened to

[4] you?

[5] **A.** Yes.

[6] **Q.** Where did that take place?

[7] **A.** When they were taking my pictures.

[8] **Q.** Where did all of that take place?

[9] **A.** In the hospital.

[10] **Q.** At some point, did you come and testify at

[11] a preliminary hearing?

[12] **A.** Yes.

[13] My last question, I believe, to you is:

[14] Did you get a good look at the gun that you were

[15] hit with and that was pointed at you?

[16] **A.** No.

[17] **MS. MURPHY:** Thank you very much,

[18] Ms.▮

[19] **THE COURT:** Excuse me, ma'am.

[20] What ▮ our husband's name?

[21] **THE WITNESS:** Anthony▮

[22] **THE COURT:** May I see counsel

[23] before we commence cross-examination?

[24] (At which time, there is a con-

[25] ference at sidebar off the record.)

Page 31

[1] **BY MS. MURPHY:**

[2] **Q.** Ms. ▮ I have one more question for you:

[3] When you say that he put his peni▮ in you, what

[4] part of your body did he put his penis in?

[5] **A.** My private part.

[6] **Q.** What is your private part called, ma'am?

[7] **A.** I don't understand.

[8] **Q.** I'm asking for the formal name of your

[9] private part. When you say your "private part,"

[10] what are you talking about?

[11] **A.** Just my private part.

[12] **Q.** Where on your body is your private part?

[13] **A.** (Indicating)

[14] **MS. MURPHY:** For the record, the

[15] witness is pointing down in her lap,

[16] between her legs.

[17] **BY MS. MURPHY:**

[18] **Q.** Do you mean the vagina?

[19] **A.** Yes.

[20] **MS. MURPHY:** Thank you.

[21] **THE COURT:** Mr. Nicholson.

[22] **MR. NICHOLSON:** Thank you, Your

[23] Honor.

[24] - - -

[25] CROSS-EXAMINATION

Page 32

[1] - - - ▮

[2] **BY MR. NICHOLSON:**

[3] **Q.** I'm s▮ r. I heard two different names or

[4] pronuncia▮ s. Is it Mrs. ▮ or Mrs. Lai?

[5] **THE INTERPRETER:** My last name is

[6] Lai, L-A-I.

[7] The victim's last name is ▮

[8] L-E-E.

[9] **BY MR. NICHOLSON:**

[10] **Q.** All right, good morning, Ms.▮

[11] When you were on your way to work that

[12] morning, I believe you stated that you had walked

[13] about ten houses past that receiving area of the

[14] hospital.

[15] **THE INTERPRETER:** The interpreter

[16] didn't get your question.

[17] **BY MR. NICHOLSON:**

[18] **Q.** When you went to work that morning, on the

[19] morning of the incident, had you gone ten houses

[20] past the hospital receiving area before you were

[21] grabbed?

[22] **A.** When I made a right turn and then walked

[23] past two or three houses, I could feel that there

[24] was a person right behind me. I turned around

[25] and saw the person, so I hurried across the

Page 33

[1] street to the hospital.

[2] **MR. NICHOLSON**: All right, if I

[3] could approach and point to one of the

[4] pictures?

[5] **THE COURT**: Go right ahead, sir.

[6] (At which time, counsel approaches

[7] the witness.)

[8] **BY MR. NICHOLSON**:

[9] Q. Mrs. ▓ this is, in my hand, Common-

[10] wealth Exhibit C-1e. Do you remember looking at

[11] that before?

[12] A. Yes.

[13] Q. Okay, you wrote or actually marked with

[14] red ink a spot on this photograph which indicated

[15] the spot where you were initially attacked, is

[16] that right?

[17] A. Yes.

[18] Q. All right, that spot that you put on the

[19] photograph, does that represent ten houses down

[20] the street past the area where you were dragged

[21] into?

[22] A. At that point, he had a tight g▓ on me.

[23] Q. But, at that point, do you know how far

[24] from the back of the hospital you were?

[25] A. Between these two spots, there were more

Page 34

[1] than ten houses. (Indicating)

[2] Q. Okay. Thank you.

[3] When you were about ten houses away, and

[4] this person initially attacked you, did you

[5] immediately start to scream?

[6] A. At that point, he had a gun pointed at my

[7] mouth. He asked me, "Do you want to die," or,

[8] "Shut up."

[9] Q. Did you start to scream before that person

[10] started to drag you or force you down towards the

[11] back of the hospital?

[12] A. At that point, yes, I was struggling with

[13] him. I said, "No, no, no," and I tried to push

[14] his gun back, to struggle with him, but he kept

[15] on beating me.

[16] Q. After you started to push his gun away,

[17] did you start screaming?

[18] A. ▓s, I did. I was sick. I was screaming,

[19] "Don't."

[20] Q. This ▓on who attacked you, when he

[21] approached you, did he approach you from behind

[22] you or from either side of you?

[23] A. From behind.

[24] Q. Okay. Then, did that person use one of

[25] his hands to grab you?

Page 35

[1] A. Yes.

[2] Q. Do you know which hand he used at that

[3] point to grab you, the left or the right?

[4] A. His right hand.

[5] Q. Are you certain about that?

[6] A. I was next to the wall.

[7] Q. Okay, you testified at the preliminary

[8] hearing in this case, is that correct?

[9] A. Yes.

[10] Q. Now, do you remember that you testified in

[11] a courtroom on March the 5th of 2002?

[12] A. Yes.

[13] Q. Okay, before we go to that, you had stated

[14] that this person had a gun that he had pointed to

[15] your mouth, is that right?

[16] A. Yes.

[17] Q. Which hand did he use to hold the gun at

[18] that point?

[19] A. He used his left hand.

[20] His right hand had a grip on me.

[21] Q. Now, I'm going to ask you a couple of

[22] **questions about the gun**: At any time, were you

[23] able to see the color of this gun?

[24] A. No, I didn't see it. It was dark out.

[25] No, I don't know what color it was.

Page 36

[1] Q. After he dragged you ▓ to the area where

[2] he se▓lly assaulted you, you said that you

[3] struggled, ▓at right?

[4] A. He k▓ on hitting m▓ntil I was weak,

[5] and then he dragged me into that alley.

[6] Q. All right. So, when you were dragged into

[7] the alley, you were weak. But, when he dragged

[8] you into the alley, were you able to struggle any

[9] further?

[10] A. When he pulled down his pants, he tried to

[11] put his penis into my private part, and I

[12] twisted.

[13] Q. All right, you stated that when you

[14] noticed the lights from the police vehicles, you

[15] were scared and confused, is that right?

[16] A. No, it was from his beating. I thought I

[17] was going to die.

[18] Q. Okay, but you were confused at that point,

[19] is that correct?

[20] A. Yes.

[21] Q. By that point, I take it you were hurt?

[22] You were feeling pain?

[23] A. At that point, I didn't feel any pain.

[24] Q. I take it, by that point, you had tears in

[25] your eyes?

Page 37

[1] **A.** I don't know what was going on with my
[2] face, but I had a lot of bleeding from my face.
[3] **Q.** At that point, when the police arrived,
[4] could you tell us whether or not you were feeling
[5] any pain from the rest of your body?
[6] **A.** I don't know what was going on with me. I
[7] know I was bleeding quite heavily.
[8] **Q.** You don't know what was going on with you?
[9] Is that what you said?
[10] **A.** I didn't know what kind of injury I was
[11] suffering.
[12] **Q.** You also really didn't know or you weren't
[13] certain about what was going on around you, is
[14] that correct?
[15] **A.** Yes, I could see the cops were there.
[16] **MR. NICHOLSON:** I'm sorry, sir. I
[17] didn't hear that last part.
[18] **THE INTERPRETER:** I saw the cops
[19] came.
[20] **MR. NICHOLSON:** I'm having some
[21] problems hearing you, Mr. Lai.
[22] **THE INTERPRETER:** I'll re█████ it:
[23] I saw that the cops came onto the scene.
[24] **MR. NICHOLSON:** Okay.
[25] BY MR. NICHOLSON:

Page 38

[1] **Q.** You said that when the police arrived, the
[2] person who was assaulting you had actually gotten
[3] up?
[4] **A.** When the Police came, he was still on top
[5] of me.
[6] **Q.** Okay, is this something you saw or is this
[7] something you felt, or both?
[8] **A.** Yes, I could see the Police with their
[9] searchlights on.
[10] **Q.** Could see the person, actually see the
[11] person on top of you at that point?
[12] **A.** I didn't see him.
[13] **Q.** You did not see him?
[14] **A.** No.
[15] **THE COURT:** Are you referring to
[16] the person, his entire being or his face?
[17] **THE WITNESS:** I was on the ground.
[18] I did█ see him. He was right there in
[19] front of me. He was holding on to my
[20] face, and I █n't see his face. It was
[21] dark around.
[22] BY MR. NICHOLSON:
[23] **Q.** Well, did you actually see his hand on
[24] your face or did you see some other part of his
[25] body on your face?

Page 39

[1] **A.** He was on top of me, and he had one hand
[2] pushing my head back, because he was much taller.
[3] I was smaller.
[4] **MS. MURPHY:** For the record, the
[5] witness had her hand on her chin and has
[6] her head pushed to the side and the back.
[7] BY MR. NICHOLSON:
[8] **Q.** Now, while that person had your face
[9] pushed to the side and to the back, were your
[10] eyes opened or closed?
[11] **A.** My eyes were open, but it was dark around,
[12] so I couldn't see anything.
[13] **Q.** Now, at that point, the person is holding
[14] your face back. Your eyes are open. You see
[15] nothing but darkness, is that correct?
[16] **A.** Yes.
[17] **Q.** Then, at some point after that, that
[18] person got up off of you, is that correct?
[19] **A.** When the police came, he got up. When
[20] the -- initially, when the police came with their
[21] searchlights on, he was still on top of me. He
[22] said, "Shit," and the police came.
[23] **Q.** Well, I just want to ask this one question
[24] for clarification. I just want to be clear that
[25] when the police arrived, that he was the person

Page 40

[1] attacking you, that his han█ █as on your face and
[2] was █████ing your head back, isn't that correct?
[3] **A.** I don█ █member.
[4] **Q.** All r██, but you do █member around that
[5] point, at that point, that you were confused?
[6] You were scared, and you were in pain, is that
[7] correct?
[8] **A.** I can say that I was confused at that
[9] point.
[10] **Q.** You could say that you were confused?
[11] You have to speak up.
[12] **A.** I was confused at that point.
[13] **Q.** Okay, during this point in time when the
[14] police are there and you confused, you don't
[15] remember, do you, Ms. ████ the Police saying
[16] anything or the person assaulting you saying
[17] anything, do you?
[18] **A.** I heard the Police saying something to
[19] him, but I don't remember what they were saying.
[20] **Q.** All right, do you remember giving a
[21] statement to a Detective Campbell after this
[22] incident?
[23] **A.** Yes.
[24] **Q.** Okay, before testifying in this trial
[25] today, did you have the opportunity to go over

Page 41

[1] that statement?

[2] **A.**   Yes.

[3]     **MR. NICHOLSON**:  Okay, I'm going to

[4] mark for identification this Investigation

[5] Interview Record.  I'd like to mark it

[6] D-1.

[7]     (At which time, Defense Exhibit D-1

[8] is marked for identification and given to

[9] the witness.)

[10] **BY MR. NICHOLSON**:

[11] **Q.**   I take it, Ms. ▮▮ that you cannot read

[12] English, is that right?

[13] **A.**   Yes.

[14] **Q.**   Okay, I'm going to read one of the

[15] questions that was asked of you by the detective,

[16] Detective Campbell, and your response.  Then, I'm

[17] going to ask you whether you remember hearing

[18] that question and giving that answer, okay?

[19] **A.**   Yes.

[20] **Q.**   **Question**:  "When the Police came, did you

[21] hear the officers or the male say anything?"

[22] Your answer was, "I was still on th▮▮

[23] ground, and I was confused.  I don't remember

[24] anything, but hearing shots.  I don't know how

[25] many shots there were."

Page 42

[1] Do you remember hearing that question and

[2] giving that response?

[3] **A.**   Yes.

[4]     **MR. NICHOLSON**:  That's all I have.

[5] Thank you.

[6]     **THE COURT**:  Do you have any

[7] redirect?

[8]     **MS. MURPHY**:  I have no redirect.

[9]     **THE COURT**:  Ms. ▮▮ thank you.

[10]     You may step down.

[11]     (At which time, the witness is

[12] excused.)

[13]     **THE COURT**:  Ms. Murphy.

[14]     **MS. MURPHY**:  Your Honor, I

[15] definitely have more witnesses.  May I

[16] have a comfort break, please?

[17]     **THE COURT**:  We should all take a

[18] com▮▮break.

[19]     **MS. MURPHY**:  Your Honor, in

[20] addition, I ▮▮eve the Interpreter has an

[21] appointment.  He told me that he needed to

[22] leave by 11:30.  May I just let him know

[23] that he can go...unless counsel foresees

[24] recalling this witness within the last

[25] couple of minutes or so?

Page 43

[1]     **MR. NICHOLSON**:  No, I don't.

[2]     **MS. MURPHY**:  Okay.  Thank you.

[3]     (At which time, the jury exits he

[4] courtroom, and the proceeding is

[5] recessed.)

[6]         - - -

[7]     **MS. MURPHY**:  Your Honor, I would

[8] ask that the photographs that have been

[9] marked so far be published to the jury.

[10]     **THE COURT**:  Very well.

[11]     **COURT CRIER**:  Your Honor, that's

[12] C-1e, C-1h, C-1k, C-1t, C-1a, C-1g, C-1s,

[13] C-1w, C-1v and C-6a.

[14]     (At which time, the exhibits are

[15] published to the jury.)

[16]     **THE COURT**:  Okay, Ms. Murphy.

[17]     **MS. MURPHY**:  The Commonwealth calls

[18] Officer Smith.

[19]         - - -

[20]     ...OFFICER BRIAN SMITH, Badge

[21] Number 7341, 1st District, Philadelphia

[22] Police Department, having been duly sworn,

[23] was examined and testified as follows...

[24]         - - -

[25]     **MS. MURPHY**:  May I proceed, Your

Page 44

[1] Honor?

[2]     **THE COURT**:  Yes.

[3]     **MS. MURPHY**:  Thank you.

[4]     -▮▮

[5]     DIRECT EXAMINATION

[6]         - - -

[7] **BY MS. MURPHY**:

[8] **Q.**   Good afternoon, Officer Smith.

[9] **A.**   Good afternoon.

[10] **Q.**   Were you employed as you just described

[11] back on November 27th, 2001?

[12] **A.**   Yes, I was.

[13] **Q.**   You were assigned to the 1st District

[14] then?

[15] **A.**   That's right.

[16] **Q.**   How long have you been a Police Officer?

[17] **A.**   Twenty-five years.

[18] **Q.**   How long have you been at the 1st

[19] District?

[20] **A.**   About a year and a half, I've been back

[21] there.  Prior to that, I was in the 12th District

[22] for five years.

[23] **Q.**   On November 27th, 2001, were you on duty?

[24] **A.**   Yes, I was.

[25] **Q.**   What tour of duty did you have at that

D005899

# Exhibit D
Victim's Deposition Testimony

█████ 2/27/2024

## Page 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL ACTION

-------------------------------
TERMAINE HICKS,              : NO :
                             : 2:22-cv-00977(JFM)
        Plaintiff,           :
                             :
    vs                       :
                             :
CITY OF PHILADELPHIA, and    :
MARTIN VINSON, ROBERT ELLIS, :
DENNIS ZUNGOLO, ARTHUR       :
CAMPBELL, MARK WEBB, MARY    :
BRIDGET SMITH, as personal   :
representative of the ESTATE OF :
BRIAN SMITH, deceased, MICHAEL :
YOUSE, FRANK HOLMES, DOUGLAS :
VOGELMAN, KEVIN HODGES, and  :
DUANE WATSON, in their       :
individual capacities,       :
                             :
        Defendants           :
-------------------------------
                - - -
            Tuesday, February 27, 2024
                - - -
        Videotaped deposition of █████
taken pursuant to notice, held at Kairys, Rudovsky,
Messing, Feinberg & Lin, LLP, 718 Arch Street,
Suite 501S, Philadelphia, Pennsylvania, commencing
at 10:10 a m , before Nicolle J Tornetta,
Registered Professional Reporter and Notary Public
there being present
        KAPLAN, LEAMAN AND WOLFE
        Registered Professional Reporters
        230 South Broad Street, Suite 1303
        Philadelphia, PA 19102
        (215) 922-7112

## Page 2

1  APPEARANCES:
2
3  NEUFELD, SCHECK & BRUSTIN, LLP
   BY:  EMMA FREUDENBERGER, ESQUIRE
        PETER NEUFELD, ESQUIRE, via Zoom
4       99 Hudson Street, Eighth Floor
        New York, New York 10013
5       (212) 965-9081
        emma@nsbcivilrights com
6       peter@nsbcivilrights com
        Representing the Plaintiff
7
8  KAIRYS, RUDOVSKY, MESSING, FEINBERG & LIN, LLP
   BY:  GRACE HARRIS, ESQUIRE, via Zoom
9       The Cast Iron Building
        718 Arch Street, Suite 501 South
10      Philadelphia, Pennsylvania 19106
        (215) 925-4400
11      gharris@krlawphila com
        Representing the Plaintiff
12
13 CITY OF PHILADELPHIA LAW DEPARTMENT
   BY:  BENJAMIN JACKAL, ESQUIRE
14      CIVIL RIGHTS UNIT
        One Parkway Building
15      1515 Arch Street
        Philadelphia, Pennsylvania 19102
16      (215) 683-5448
        ben jackal@phila gov
17      Representing the Defendants, City of
        Philadelphia, Arthur Campbell, Mark Webb,
18      Michael Youse, Frank Holmes,
        Douglas Vogelman, Kevin Hodges, and
19      Duane Watson
20
21
22
23
24

## Page 3

1  APPEARANCES CONTINUED:
2
   AHMAD ZAFFARESE, LLC
3  BY:  SAMUEL H RITTERMAN, ESQUIRE
        KATELYN MAYS, ESQUIRE
4       ALEENA SORITHIA, ESQUIRE, via Zoom
        One South Broad Street, Suite 1810
5       Philadelphia, Pennsylvania 19107
        (215) 496-9373
6       sritterman@azlawllc com
        kmays@azlawllc com
7       asorithia@azlawllc com
        Representing the Defendants,
8       Martin Vinson, Robert Ellis, and
        Dennis Zungolo
9
10 CLARK HILL, PLC
   BY:  MIKAILA JULIANNE JOHN, ESQUIRE
11 BY:  JOHN DeROSE, ESQUIRE, via Zoom
        Two Commerce Square
12      2001 Market Street, Suite 2620
        Philadelphia, Pennsylvania 19103
13      (215) 640-8500
        jderose@clarkhill com
14      mjohn@clarkhill com
        Representing the Defendant,
15      Mary Bridget Smith, as Personal
        Representative of the Estate of
16      Brian Smith, deceased
17
   ALSO PRESENT:
18
   Scot Danzer, Videographer, US Legal Video
19 Zhudi He (Stan), Cantonese Interpreter
20
21
22
23
24

## Page 4

1                   I N D E X
2
3  INTERPRETER:
4  ZHUDI HE, (Stan)
5   (Interpreter sworn.)
6  WITNESS:
7  █████
8   (Witness sworn.)
9  EXAMINATION BY:                       PAGE
10 Ms. Freudenberger                       6
11 Ms. Mays                               86
12 Ms. Freudenberger                      92
13
14              E X H I B I T S
15
16 NUMBER    DESCRIPTION                 PAGE
17 51       Medical Records of █████      25
18 52       Plaintiff's Answers to        26
19          Defendants' Interrogatories
20          dated 11/29/04
21
22
23
24

1 (Pages 1 to 4)

**KAPLAN LEAMAN & WOLFE**

█████ 2/27/2024

Page 5

```
1                    - - -
2              THE VIDEOGRAPHER:  We're now on the
3    record at 10:10 a.m.  The audio and video recording
4    will continue to take place until all parties have
5    agreed to go off the record.  Let me scroll down.
6              This is the recorded deposition of
7    ████    in the matter of Termaine Hicks v. City of
8    Philadelphia, et al., filed in the United States
9    District Court for the Eastern District of
10   Pennsylvania.  This proceeding is being held in
11   Philadelphia.
12             My name is Scot Danzer; I'm the
13   videographer retained on behalf of US Legal Support of
14   Houston, Texas.  I'm not related to any party in this
15   action, nor am I financially interested in the outcome.
16   Our court reporter today is Nicolle Tornetta, also on
17   behalf of US Legal Support [sic].  Counsels'
18   appearances will be noted on the record.
19             Will Ms. Tornetta please swear in our
20   witness and our interpreter?
21             THE COURT REPORTER:  Sure.
22                   - - -
23             ZHUDI HE (STAN), Interpreter, after
24   having been duly sworn, was examined and testified as
```

Page 6

```
1    follows:
2                    - - -
3    ████      after having been duly sworn,
4    was examined and testified as follows:
5                    - - -
6              THE COURT REPORTER:  Thank you.  All
7    set.
8              MS. FREUDENBERGER:  All right.  Before
9    we begin, we reached agreement among Counsel given that
10   there was only one certified interpreter in the state,
11   and Mr. He has ample experience interpreting from
12   Cantonese to English and vice versa, that all parties
13   would stipulate to conducting the deposition through a
14   non-certified interpreter.  I will so stipulate; I'd
15   just like Counsel for each of the other parties to
16   stipulate on the record so that's clear.
17             MS. MAYS:  Yes, stipulated.
18             MS. JOHN:  Yes.
19             MR. JACKAL:  Yes, stipulated.
20             MS. FREUDENBERGER:  Okay.
21                   - - -
22             EXAMINATION
23                   - - -
24   BY MS. FREUDENBERGER:
```

Page 7

```
1    Q.   Okay.  Could you state your full name for the
2    record, please?
3    A.   ████
4    Q.   And before we begin, Ms. ████ I need to ask
5    you a couple of questions about your comfort with the
6    English language.
7    A.   I can say some basic stuff.
8    Q.   Okay.  How long have you lived in the United
9    States?
10   A.   Over 30 years.
11   Q.   And how often do you speak English in everyday
12   life?
13   A.   Yeah, only when I working -- only when I was
14   working at Dunkin' Donuts, I had to communicate with
15   the customers, but right now, I'm not speaking a lot of
16   English by myself in my home.
17   Q.   Do you speak any English in your home?
18   A.   No.  Yeah, I talk to my son in Cantonese.
19   Q.   Okay.  And who do you live with in your home?
20   A.   My younger son, also my former husband.
21   Q.   Okay.  Are you currently divorced?
22   A.   Yes.
23   Q.   But your ex-husband lives in the home with
24   you?
```

Page 8

```
1    A.   Yes.
2    Q.   Okay.  And are you currently employed?
3    A.   Yes.
4    Q.   Where do you work?
5    A.   Home care.
6    Q.   Okay.  Does that mean that you provide care in
7    the home to -- could you tell me what you do?
8    A.   Yeah, I act like a home health aide helping
9    out elderly people that are sick or they're homebound.
10   Q.   Okay.  And do any of the people who you work
11   with in their homes communicate with you in English?
12   A.   In Chinese.
13   Q.   Okay.  All of them?
14   A.   Yes.
15   Q.   My understanding from the testimony at the
16   criminal trial in this case is that you were able to
17   communicate to a -- to an extent, you were able to
18   communicate some with the police and with the district
19   attorney in English; is that correct?
20   A.   During the trial?
21   Q.   That's a good question.  When you spoke with
22   the police and the district attorney before the trial,
23   were you able to speak with them in English at all?
24   A.   Yeah, in the court, they provide me with the
```

2 (Pages 5 to 8)

KAPLAN LEAMAN & WOLFE

██████ 2/27/2024

<table>
<tr><td>

Page 9

1  interpreter.
2  Q.  Right. I understand, but you had meetings
3  before -- well, let me back up.
4      Before court, am I correct that you met
5  with police officers from the Philadelphia Police
6  Department?
7  A.  That was -- you're talking about in the
8  hospital?
9  Q.  In the hospital, yes.
10  A.  Yeah, I was taken -- I was taken to the
11  hospital by the police at the time that I was severely
12  injured.
13  Q.  I understand. And did your injuries interfere
14  with your ability to -- withdrawn.
15      Let's see. I have your trial testimony
16  here, Ms. ██ and I understand that was through an
17  interpreter, correct?
18  A.  Yes.
19  Q.  Do you read English at all?
20  A.  Very simple one.
21  Q.  Okay. So I have copies of your trial
22  transcript here. If you -- I may read you some things
23  that according to the transcript you said at the trial.
24  I think the best way to do that is probably for me to

</td><td>

Page 11

1  Q.  Okay. It sounds like for a variety of
2  reasons, it was very difficult for you to -- well,
3  withdrawn.
4      Simpler question: Would it be accurate
5  to say that in 2001, you were able to understand more
6  English than you could speak?
7      MS. MAYS: Objection.
8      THE WITNESS: What do you mean, I speak
9  more back in 2001?
10  BY MS. FREUDENBERGER:
11  Q.  And so, back in 2001, would it be accurate
12  to say that you were able to understand some English?
13  A.  Yes.
14  Q.  Okay. And you were also able to speak some
15  English, correct?
16  A.  Yes.
17  Q.  Okay. And that's all I wanted to know. I
18  want to make sure that I'm clear about -- well,
19  withdrawn.
20      A couple of things about this process
21  here today. The lawyers in the room are going to ask
22  you some questions, which you'll be answering under
23  oath. If at any point you don't understand one of my
24  questions or the interpreter's -- or the

</td></tr>
<tr><td>

Page 10

1  read them and the interpreter to translate, but if you
2  want to see what I'm reading from, I'm happy to show
3  that to you. Okay?
4      Okay?
5      MS. FREUDENBERGER: I just want to make
6  sure she understands that.
7      THE WITNESS: Yeah, even if you're
8  going to show me, I probably wouldn't understand the
9  transcript.
10  BY MS. FREUDENBERGER:
11  Q.  Okay. One of the things that --
12      MS. FREUDENBERGER: And let -- let me
13  know if you want me to break up questions or anything,
14  just -- it doesn't sound like it, but...
15      THE INTERPRETER: Okay.
16      MS. FREUDENBERGER: All right.
17  BY MS. FREUDENBERGER:
18  Q.  One of the things that you testified to at the
19  criminal trial, you were asked, Were you able to
20  communicate -- you were asked whether you were able to
21  communicate with the police officer who brought you to
22  the hospital on the morning of November 27th; and you
23  answered, Yes. Is that accurate?
24  A.  I don't remember, no.

</td><td>

Page 12

1  interpreter is translating, just feel free to let us
2  know, and I'm happy to rephrase or explain.
3  A.  Okay.
4  Q.  And at any point if you would like to take a
5  break for any reason at all, please let us know and we
6  can break as many times as you need. Okay?
7  A.  Okay.
8  Q.  Now, Ms. ██ I spoke with your son, Rocky, on
9  the phone a couple of weeks ago, and I know that one of
10  my colleagues spoke with your son, Jacky, who is here
11  with you today, and then we briefly spoke in the
12  hallway before coming in to the deposition room. Have
13  you spoken with any other lawyers --
14      First of all, have you spoken with any
15  of the other lawyers in the room today?
16      MS. MAYS: Objection. Sorry. Go
17  ahead.
18      MS. FREUDENBERGER: It's a good
19  objection.
20  BY MS. FREUDENBERGER:
21  Q.  My question --
22  A.  No. No.
23  Q.  At any time?
24  A.  No.

</td></tr>
</table>

3 (Pages 9 to 12)

█████ 2/27/2024

Page 13

1   Q.    Do you understand as you sit here today that
2   Termaine Hicks' conviction has been overturned?
3   A.    I heard about.
4   Q.    Okay.  And from whom did you hear about that?
5   A.    At the time, someone came to -- came to my
6   home and they talked to my son, Jacky.
7   Q.    Okay.  And what -- first of all, did you --
8   since the trial in this case, have you spoken either
9   directly or through another individual to anyone from
10  the Philadelphia District Attorney's office?
11  A.    Yeah, I was notified the person was -- was
12  released.  Also, they -- they talked through my son
13  because a lot of times I don't feel like, and they talk
14  to -- they talk through my son.
15  Q.    Okay.  And do you know how many times the
16  district attorneys spoke with you -- well, withdrawn.
17  It doesn't matter.
18       Ms. ███. I understand that terrible
19  things were done to you on the morning of November 27,
20  2001, and I apologize, but I need to ask you some
21  questions about that here today.
22  A.    Okay.
23  Q.    And I need to specifically ask you about the
24  many ways that this man hurt you that morning.  Okay?

Page 14

1             Now, you were grabbed from behind on
2   15th Street in Philadelphia in the early morning hours
3   on November 27th, correct?
4   A.    Yes.
5   Q.    And my understanding is that from the moment
6   this man grabbed you, he was beating you pretty much
7   continuously; is that correct?
8   A.    Yes.
9   Q.    Okay.  With both a gun, correct?
10  A.    Yes.
11  Q.    And also with his fist, correct?
12  A.    Yeah, he used a gun, point at my -- my mouth.
13  Yeah, he told me not to make any noise.
14  Q.    Okay.
15  A.    Yeah, I told -- I told him I -- I -- I was
16  working at Dunkin' Donuts, I don't have money.  I
17  thought the guy's trying to rob me.
18  Q.    You thought he was going to try to rob you,
19  correct?
20  A.    Yes.
21  Q.    But he told you he didn't want your money,
22  correct?
23  A.    Yes.
24  Q.    And he didn't take anything from you, correct?

Page 15

1   A.    No.
2   Q.    And did you have a -- did you have a purse?
3   A.    I have a string of keys.
4   Q.    Okay.  In any event, you were not robbed,
5   correct?
6   A.    Yes.  Yeah, I was crying, I don't have money.
7   And then he said, I want you to do something for me.  I
8   thought he was -- he wanted me to sell drugs or
9   something.  And I tell him I was working at Dunkin'
10  Donuts.  And he used a gun to point me all the time.
11  Q.    Okay.  And so, this man pointed a gun in your
12  face, correct?
13  A.    Yeah, he -- he -- he used his arm trying to --
14  yeah -- hold me on my neck and he have -- he have a gun
15  point at me, too.
16  Q.    Okay.  So he choked you?
17  A.    He drag me to the -- behind the -- behind the
18  hospital.
19  Q.    I understand.  And -- and I want to ask you a
20  couple more specific questions about what he did to you
21  between when he first grabbed you and when he dragged
22  you into the alley.  Okay?
23       My understanding is that he beat you
24  very badly all around your face and head; is that

Page 16

1   correct?
2             MS. MAYS:  Objection.
3             THE WITNESS:  Yes.
4   BY MS. FREUDENBERGER:
5   Q.    Okay.  He hit you many times in the head with
6   a metal gun; is that correct?
7             MS. MAYS:  Objection.  Sorry.  Go
8   ahead.
9             THE WITNESS:  Yeah, he used his fists
10  to punch.
11  BY MS. FREUDENBERGER:
12  Q.    Okay.  Just, first, I just want to ask about
13  the gun.  He beat you in the head with a gun, correct?
14            MS. MAYS:  Objection.
15            THE WITNESS:  It seems he didn't use
16  the gun to beat me; he -- he used his hands to beat me.
17  BY MS. FREUDENBERGER:
18  Q.    Okay.  So he pointed the gun in -- withdrawn.
19  I just want to make sure I understand.
20  Am I correct that he pointed the gun -- withdrawn.
21       Ms. ███ you testified at two court
22  proceedings in this case, correct?
23  A.    Yes.  I was in the court.
24            THE COURT REPORTER:  I'm sorry, I was

4 (Pages 13 to 16)

█████  2/27/2024

---

Page 17

1  in the?
2          THE INTERPRETER:  In the court.  In the
3  courthouse, yeah.
4  BY MS. FREUDENBERGER:
5  Q.    I'm going to read to you from your testimony
6  at the preliminary hearing, and this is Page 10 of the
7  preliminary hearing transcript from March 5, 2002,
8  Lines 1 through 4.
9          THE INTERPRETER:  2002?
10          MS. FREUDENBERGER:  Correct.
11          THE INTERPRETER:  Yeah.
12          THE WITNESS:  Yes.
13  BY MS. FREUDENBERGER:
14  Q.    And you were asked by the district attorney,
15  Where was he beating you up?  On what part of your
16  body?  And you answered, My head.
17  A.    Yes, my head, my face.
18  Q.    Okay.  In other words, you were beaten in both
19  your face and around your head, correct?
20          MS. MAYS:  Objection.
21          THE WITNESS:  Yes.
22  BY MS. FREUDENBERGER:
23  Q.    And then the district attorney asked you, What
24  was he beating you with?  And you said, His gun.

---

Page 18

1  A.    At the time it's very chaotic.  He used his
2  hand and he used his gun.
3  Q.    Okay.  Would it be fair to say that he beat
4  you badly around the head with both his gun and his
5  fists?
6          MS. MAYS:  Objection.
7          MR. JACKAL:  Objection.
8          THE WITNESS:  Yeah, he was punching me
9  -- punching me until I could not make any -- any noise,
10  then he dragged me to -- to the alley.
11  Q.    Okay.  And he also hit you on the head with
12  the gun, correct?
13          MS. MAYS:  Objection.
14          THE WITNESS:  I don't know what kind of
15  stuff he's using to -- to beat me, but he just
16  continually punch me, beat me until I could not make
17  any noise.
18  Q.    Okay.  When he first grabbed you, you screamed
19  as loud as you could, correct?
20  A.    Yeah, I was walking from Mifflin toward the 15
21  -- 15th Street.  At the corner, I saw a guy just rush
22  out, and then I walked towards the hospital, and -- and
23  he followed me and he -- and holding my neck.
24  Q.    Okay.  And you were trying to rush across the

---

Page 19

1  street and down 15th Street to get away from him,
2  right?
3          MS. MAYS:  Objection.
4          THE WITNESS:  Yes.
5  BY MS. FREUDENBERGER:
6  Q.    Okay.  And my understanding from the
7  transcripts is that when the man grabbed you, you had
8  made it at least ten houses down 15th Street.  Is that
9  roughly accurate?
10  A.    Yeah, I crossed the street.  I don't know
11  whether it's ten -- ten houses dis- -- distance --
12  distance or not.
13  Q.    Okay.  But you were approaching McKean Street
14  when you started screaming, right?
15          MS. MAYS:  Objection.
16          THE WITNESS:  I'm not sure.  Almost.  I
17  didn't pay attention in, like, did I get close to
18  McKean.  Haven't reach yet.
19          MS. FREUDENBERGER:  I'm sorry, what was
20  the last thing you said?
21          THE INTERPRETER:  Haven't -- haven't
22  reach yet.
23  BY MS. FREUDENBERGER:
24  Q.    Okay.  But you were -- you were hurrying

---

Page 20

1  toward -- in the direction of McKean Street when the
2  man grabbed you?
3  A.    Yes.
4  Q.    And you immediately started to scream as loud
5  as you could, right?
6          MS. MAYS:  Objection.
7          MR. JACKAL:  Objection.
8          THE WITNESS:  Yes, I mentioned early I
9  was saying, I working at the Dunkin' Donuts.
10  BY MS. FREUDENBERGER:
11  Q.    Okay.  And then after he grabbed you, you
12  started to scream, right?
13          MS. MAYS:  Objection.
14          THE WITNESS:  Yes.
15  BY MS. FREUDENBERGER:
16  Q.    All right.  And eventually, this man beat you
17  so badly that you were not able to scream anymore; is
18  that right?
19          MS. MAYS:  Objection.
20          MR. JACKAL:  Objection.
21          THE WITNESS:  Yes.
22  BY MS. FREUDENBERGER:
23  Q.    Okay.  But you screamed as loud as you could
24  for as long as you could, right?

---

KAPLAN LEAMAN & WOLFE

██████ 2/27/2024

Page 21

1          MS. MAYS:  Objection.
2          MR. JACKAL:  Objection.
3          THE WITNESS:  Yes.  Yeah, I tried to
4    scream, but he punched me to the point I could not make
5    -- make any noise.  I was scared to death.
6    BY MS. FREUDENBERGER:
7    Q.   I understand.  I'm going to read to you from
8    your interview that -- withdrawn.
9          I'm going to read to you from the
10   police documentation of your interview at the hospital.
11   Okay?  And what the police officer wrote down was, I
12   have a bump in front of my head and the top of my head
13   where he hit me with the gun.  Is that what you told
14   the police officer on the morning of November 27, 2001?
15   A.   Yes.  Yes.
16   Q.   Okay.  In other words, the man hit you with
17   the gun in the front of your head hard enough to leave
18   a bump, correct?
19          MS. MAYS:  Objection.
20          MR. JACKAL:  Objection.
21          THE WITNESS:  I don't know what kind of
22   instrument he was using to -- to -- to beat me, but I
23   was all swollen.
24   BY MS. FREUDENBERGER:

Page 22

1    Q.   Okay.  Well, you know he had a gun, correct?
2          MS. MAYS:  Objection.
3          THE WITNESS:  Yes.  Yeah, he used a
4    gun, pointed me -- point -- point into my mouth, my --
5    my -- the tissue of the -- the mouth was -- was kind of
6    break.
7    BY MS. FREUDENBERGER:
8    Q.   Yes.  In fact, the doctors at the hospital had
9    to actually take skin from your face to stitch up your
10   lip; is that right?
11          MS. MAYS:  Objection.
12          THE WITNESS:  No.
13   BY MS. FREUDENBERGER:
14   Q.   No?
15   A.   No.  Yeah, the doctor stitch -- stitch the --
16   the mouth here, stitch.
17   Q.   Okay.
18   A.   Used stitches.
19   Q.   Okay.  You needed stitches from how badly this
20   man beat you, right?
21          MR. JACKAL:  Objection.
22          THE WITNESS:  Yes.
23   BY MS. FREUDENBERGER:
24   Q.   Okay.  And what the police officer wrote down

Page 23

1    -- what the police officer wrote that you told him was,
2    I have a bump in front of my head and the top of my
3    head where he hit me with the gun.  Are you telling me
4    that you didn't tell the police officer that, or that
5    you don't remember?
6          MR. JACKAL:  Objection.
7          MS. MAYS:  Objection.
8          THE WITNESS:  I could not remember now.
9    BY MS. FREUDENBERGER:
10   Q.   Okay.  And I understand that it has been more
11   than 20 years and that this was a very traumatic
12   experience for you.  And I'm just trying to figure out
13   what -- what you remember -- the difference between
14   what you remember and what, if anything, you were
15   saying is inaccurate that the police wrote down.
16          And so, if the police officer wrote
17   down that you told him you had bumps on the front and
18   top of your head from the -- the man hitting you with a
19   gun, that is what happened, correct?
20          MS. MAYS:  Objection.  It doesn't say
21   that.
22          MS. FREUDENBERGER:  It says, I have --
23          MS. MAYS:  It says a bump.
24          MS. FREUDENBERGER:  -- a bump in front

Page 24

1    of my head --
2          MS. MAYS:  You said "bumps."
3          MS. FREUDENBERGER:  -- and the top of
4    my head; that's two bumps.
5          THE WITNESS:  Yeah, I could not recall
6    if he was punching me or with an instrument or weapon.
7    All I can tell I was punched to the point I could not
8    make any sounds.
9    BY MS. FREUDENBERGER:
10   Q.   Okay.
11   A.   And then he drag me, my -- my clothing all the
12   way to the alley.  Then he -- he took off my -- my --
13   my -- my -- my pants, and then he was touching my body.
14   And then that's all I can recall.
15   Q.   Okay.  Is that all that you can recall today?
16   A.   Yes.
17   Q.   All right.  So he beat you badly enough that
18   you fell to the ground, right?
19          MS. MAYS:  Objection.
20          THE WITNESS:  Yeah, I was on the
21   ground.  He -- he continued punching me, then he
22   dragged me.
23   BY MS. FREUDENBERGER:
24   Q.   Okay.  We have your medical records from the

KAPLAN LEAMAN & WOLFE

Page 25

1   hospital that morning, which I'm going to mark as an
2   exhibit now.
3         MS. FREUDENBERGER:  What are we up to?
4   Does anybody know?
5         MR. JACKAL:  I'm not sure.
6         MS. MAYS:  For Plaintiff, I have no
7   idea.
8         MS. FREUDENBERGER:  All right.  Let me
9   find out.
10  BY MS. FREUDENBERGER:
11  Q.    But it sounds like today your best memory is
12  that you were badly beaten around the head by this
13  man's fists, but you don't remember being hit with a
14  gun; is that correct?
15        MR. JACKAL:  Objection.
16        MS. MAYS:  Objection.
17        THE WITNESS:  Yes.
18  BY MS. FREUDENBERGER:
19  Q.    Okay.  Now, I'm going to go ahead and mark
20  your medical records as Exhibit 51.
21              - - -
22        (Whereupon, Exhibit 51, Medical Records
23  of █████ was marked for identification.)
24              - - -

Page 27

1   that your attorney prepared during that lawsuit, which
2   come from his files.  Okay?
3         Okay.  Let's start with Exhibit 52, and
4   I'm going to show you the last page of this document,
5   which is Bates-stamped Gelinas40.  And was the attorney
6   who represented you named Robert Gelinas?
7   A.    Yeah, I don't recall it.
8   Q.    No problem.  It's been a long time.  Is this
9   your signature?
10  A.    Yes.
11  Q.    Okay.  And this is a document that your lawyer
12  also signed.  And the document says many things, but
13  I'm going to read you some of the things.  Okay?  And
14  one of the things it says is that bruises to
15  Plaintiff's face eventually went away; however, she
16  continues to have a scar on her lip, posttraumatic
17  headaches, and physiological distress.  Is that
18  correct?  Is that accurate?
19  A.    Yes.
20  Q.    It also says, Plaintiff recalls having two
21  MRIs of her head taken at Jefferson Hospital because of
22  her recurring posttraumatic headaches.
23  A.    Yes.
24  Q.    And did you, in fact, have recurring headaches

Page 26

1         MS. FREUDENBERGER:  Oh, I'm sorry.
2   Actually, I need one of those back.
3         MS. MAYS:  We can share, Sam.
4         MR. RITTERMAN:  Okay.
5         MS. FREUDENBERGER:  And at the same
6   time, why don't I mark my second exhibit as Exhibit 52.
7   Let's mark this as Exhibit 52.
8               - - -
9         (Whereupon, Exhibit 52, Plaintiff's
10  Answers to Defendants' Interrogatories dated 11/29/04,
11  was marked for identification.)
12              - - -
13        MS. FREUDENBERGER:  Sorry, guys.  Do
14  you mind sharing?
15        MR. JOHN:  That's fine.
16  BY MS. FREUDENBERGER:
17  Q.    And, Ms. █████ you eventually brought a lawsuit
18  against Saint Agnes Medical Center and Mr. Hicks for
19  money damages; is that correct?
20  A.    At the time, there was -- I was told by
21  attorney, and you ask me -- attorney come to ask me to
22  fill out some paperwork.  I was told I was able to file
23  a lawsuit against Saint Agnes Hospital for the damages.
24  Q.    Okay.  And I've marked as Exhibit 52 documents

Page 28

1   after this incident because of the horrible beating by
2   this man?
3   A.    Yes.
4   Q.    It also says that you developed problems with
5   your eyesight as a result of the terrible beating you
6   experienced; is that accurate?
7   A.    Yes, at the time.
8   Q.    Okay.  And is it true that you had to return
9   to the hospital on more than one occasion to have your
10  head examined because of how badly you were beaten?
11        MS. MAYS:  Objection.
12        THE WITNESS:  Not multiple times.
13  BY MS. FREUDENBERGER:
14  Q.    Okay.  How many times?
15  A.    I always scared, like, there's some shadow
16  behind me trying to attack me.  I always felt like
17  that.
18  Q.    I understand.  But I'm asking -- and I'm going
19  to ask you about the -- the mental health impact of
20  this trauma, but right now, I just -- first, I want to
21  start by getting a sense of what was physically done to
22  you, okay? -- and the medical issues that you suffered
23  as a result, because my understanding is that you had
24  serious medical problems because of the beating that

███████ 2/27/2024

---

Page 29

1  you received; is that correct?
2           MS. MAYS: Objection.
3           THE WITNESS: Yes.
4  BY MS. FREUDENBERGER:
5  Q.    One of the things you testified to at trial is
6  that this man kept on hitting you until you were weak;
7  is that accurate?
8  A.    Yes.
9  Q.    You also testified that on the morning of the
10 assault, by the time you got to the hospital, your face
11 was blue, bruised, black all over, and swollen.
12 A.    Yes.
13 Q.    Okay. And that was all from the beating that
14 this man -- that was all from the terrible beating this
15 man inflicted on you, correct?
16          MS. MAYS: Objection.
17          THE WITNESS: Yes.
18 BY MS. FREUDENBERGER:
19 Q.    Okay. You also testified that -- well, let me
20 just ask you: Based on the things this man said and
21 the fact that he had a gun and how badly he was hurting
22 you, were you scared you were going to die?
23 A.    Yes.
24 Q.    Okay. You were utterly terrified, correct?

---

Page 30

1           MR. JACKAL: Objection.
2           THE WITNESS: Yes.
3  BY MS. FREUDENBERGER:
4  Q.    And would it be accurate to say that by the
5  time this man pulled down your pants, you were bleeding
6  badly from your face because of the terrible things he
7  had done to you?
8           MS. MAYS: Objection; leading.
9           THE WITNESS: I don't know. At the
10 time, I was so scared. I don't know. I was scared to
11 death.
12 BY MS. FREUDENBERGER:
13 Q.    Okay. Were you scared enough that it was
14 difficult to know what was going on around you?
15          MS. MAYS: Objection.
16          MR. JACKAL: Objection.
17          THE WITNESS: Could you repeat the
18 question one more time?
19 BY MS. FREUDENBERGER:
20 Q.    Sure. Were -- were you terrified enough by
21 the time you were dragged into the alley that it was
22 hard to know what was going on around you?
23          MS. MAYS: Objection.
24          MR. JACKAL: Objection.

---

Page 31

1           THE WITNESS: Yeah, I still remember he
2  dragged me all the way to the -- to the alley. His
3  body was upon my body and he took -- take -- he took
4  off my -- my pants.
5  BY MS. FREUDENBERGER:
6  Q.    Okay. And are you able to remember anything
7  after that today?
8  A.    Yeah, and the police showed up at the -- at
9  the time.
10 Q.    Now, let me -- I want to show you something
11 from your medical records at Thomas Jefferson Hospital.
12 Okay?
13          MS. MAYS: Can you say the Bates
14 number, Emma?
15          MS. FREUDENBERGER: Sure. Yeah, it's
16 Exhibit 51, and I'll read it, but -- you know what?
17 Show it to her because I want -- I want her to see that
18 I am, in fact, reading from a medical record, even if
19 it's difficult to read. Okay?
20 BY MS. FREUDENBERGER:
21 Q.    So I'm reading from what's Bates-stamped
22 D45 -- and these are your medical records that were
23 produced in response to a subpoena to the Jefferson
24 Hospital. Okay?

---

Page 32

1           And so, this is a -- a hospital
2  document that was ordered -- it's a hospital document
3  that was signed by two doctors: David Friedman and
4  Simone Arrington, on November 27th of 2001 relating to
5  a CAT scan for your head injury. Okay? And it says at
6  the top -- it has a diagnosis, and then it says, Status
7  post assault with head trauma. And you agree you had
8  head trauma from the beating, correct?
9           MS. MAYS: Objection.
10          THE WITNESS: Yes, head trauma.
11 BY MS. FREUDENBERGER:
12 Q.    And then it says, And positive loss of
13 consciousness.
14 A.    No.
15 Q.    I understand that you were conscious for much
16 of this incident, but given the beating that you
17 received and the doctor's note for positive loss of
18 consciousness, is it possible that although you don't
19 remember this 20 years later, you reported to the
20 doctors on the morning of the incident that you had, at
21 times, lost consciousness?
22          MS. MAYS: Objection; leading --
23          MR. JACKAL: Objection.
24          MS. MAYS: -- the witness.

---

8 (Pages 29 to 32)

|  |  |
|---|---|
| Page 33 | Page 35 |

Page 33

```
1        THE WITNESS:  No.
2   BY MS. FREUDENBERGER:
3   Q.    Okay.  But I will represent to you that this
4   says, Positive loss of consciousness, and it is your
5   medical record.
6   A.    I still remember the police vehicle arrived.
7   Q.    Okay.  And in particular, you remember the
8   lights from the police vehicle, correct?
9        MS. MAYS:  Objection; leading.
10       THE WITNESS:  They -- they didn't sound
11  the sirens.  The sirens -- they kept the sirens silent.
12  BY MS. FREUDENBERGER:
13  Q.    Okay.  So you didn't hear sirens, but you did
14  see the lights from their cars; is that correct?
15  A.    I could not see -- yeah, I was under; the guy
16  was on the top.  When -- when the police arrived, I --
17  I -- I -- I could not hear the -- the -- the noise.
18  Q.    Okay.  So would it be accurate to say you saw
19  lights, but you didn't hear sirens?
20  A.    No.
21  Q.    What's inaccurate about that?
22  A.    When the -- when the police arrived, they ask
23  that person to raise their hands.
24  Q.    Okay.  Let me read to you -- I'm going to show
```

Page 34

```
1   you your interview with the police.
2        MS. MAYS:  Are you marking this?
3        MS. FREUDENBERGER:  It's already marked
4   as part of Exhibit 12, so I was just going to refer it
5   by Bates, but I'm happy to remark it if you want.  Do
6   you guys care?
7        MS. MAYS:  If it's already marked,
8   that's fine.
9        MS. FREUDENBERGER:  It's part of
10  Exhibit 12.  I'll make sure the Bates are the same.
11  BY MS. FREUDENBERGER:
12  Q.    So I'm going to read from what's previously
13  marked as Exhibit 12.  And, Ms. ███ would you like to
14  see the police report of your interview at the hospital
15  on the morning of the 27th?
16       Okay.  Now --
17       THE COURT REPORTER:  Was there an
18  answer?
19       THE WITNESS:  I could not even
20  understand if I -- even I read it.
21  BY MS. FREUDENBERGER:
22  Q.    I understand.  But let me ask you this:  I'm
23  showing you Page D10548, which is Page 3 of what's been
24  produced to us as the police's written interview with
```

Page 35

```
1   you.  And is that your signature?
2   A.    Yes.
3   Q.    Okay.  And here, it says -- and I'll read to
4   you -- When the police came, did you hear the officers
5   or the male say anything?  And your answer was --
6   according to this document -- was, I was still on the
7   ground and I was confused.
8        First of all, when you -- when the
9   police arrived, were you on the ground and confused?
10  A.    Yes.
11  Q.    And then it says, I don't remember anything
12  but hearing shots.  And is it accurate that at the time
13  you spoke with the police on the morning of
14  November 27th in the hospital, you didn't remember
15  anything about when the police arrived other than
16  hearing shots?
17  A.    Yes.
18  Q.    Okay.  And then you said, I don't remember how
19  many shots there were.
20  A.    Yeah, I could not remember.
21  Q.    And -- and to be clear, I understand
22  that you had been beaten very badly and you were
23  terrified, and you had been sexually assaulted.  I'm
24  not suggesting you should remember; I'm just ask- -- I
```

Page 36

```
1   want to find out what you do remember.  Okay?
2        Now, this medical record -- it's
3   difficult because of the language -- but you don't
4   dispute that the medical record says positive -- that
5   you lost consciousness, correct?
6        MS. MAYS:  Objection.  She can't read
7   it.
8        MS. FREUDENBERGER:  I understand that,
9   but...  Why don't I ask the interpreter to read it to
10  her?
11       Could you just read this line, sir?
12       THE INTERPRETER:  (Complies.)
13  BY MS. FREUDENBERGER:
14  Q.    And so, my -- my question is do you know where
15  the doctors got the information that you had lost
16  consciousness during the attack?
17  A.    I -- when the police arrived, I was scared,
18  but I -- I --
19       Yeah, at the time I -- when -- when the
20  police arrived --
21       When the police arrived, I realized I
22  -- I would not die.
23  Q.    Okay.  So prior to realizing that the police
24  -- that it was the police there, you thought you were
```

9 (Pages 33 to 36)

KAPLAN LEAMAN & WOLFE

2/27/2024

---

**Page 37**

1  about to die, correct?
2  A.   Yes.
3  Q.   Okay.  And when you realized that the police
4  were there, you realized that you were not, in fact,
5  going to die, correct?
6  A.   Yes.
7  Q.   Something else you testified to is -- and this
8  is from the preliminary hearing, Page 12, Lines 24
9  and 25, you said, When the police came, was kind of
10 dizzy.  Is it accurate that you were dizzy when the
11 police came?
12         MS. MAYS:  Objection.
13         THE WITNESS:  I cannot recall right
14 now.
15 BY MS. FREUDENBERGER:
16 Q.   Okay.  If that's what you testified to at the
17 preliminary hearing in 2002, was it accurate?
18         MS. MAYS:  Objection.
19         THE WITNESS:  No, I didn't felt [sic]
20 dizzy.
21 BY MS. FREUDENBERGER:
22 Q.   No?
23 A.   I don't know.  I don't remember very well.
24 Q.   Okay.  But you don't dispute testifying at the

---

**Page 38**

1  preliminary hearing that you felt dizzy when the police
2  arrived?
3         MS. MAYS:  Objection.
4         THE WITNESS:  I don't understand.
5  Could you explain to me?
6  BY MS. FREUDENBERGER:
7  Q.   Sure.  The transcript I have of the
8  preliminary hearing says that you testified that you
9  felt dizzy when the police arrived.  Do you dispute
10 that that's what you said at the preliminary hearing in
11 2002?
12 A.   I don't remember.
13 Q.   Okay.  But you don't have any reason to
14 believe that the court reporter at the preliminary
15 hearing wrote down what you said inaccurately, correct?
16         MS. MAYS:  Objection.
17         MR. JACKAL:  Objection.
18         THE WITNESS:  I couldn't tell.
19 BY MS. FREUDENBERGER:
20 Q.   Okay.  All I'm trying -- I understand that you
21 don't remember today and that this was extremely
22 traumatic and you were badly injured.  At the
23 preliminary hearing when you testified, there was a
24 court reporter there, as there's a court reporter here,

---

**Page 39**

1  who wrote down everything that was said in court.  Do
2  you understand what I'm saying?
3  A.   Yeah.  That happened 20 years ago, more than
4  20 years ago.  Whatever was written should not be
5  incorrect.  This already -- the person was already
6  convict -- was in the jail already.  Why this had to --
7  had to be brought up again?
8  Q.   Okay.  Now, I'm going to read you something
9  else from your trial testimony.
10         MS. MAYS:  Can I have the page number,
11 please?
12 BY MS. FREUDENBERGER:
13 Q.   And this is from Page 39, Line 23 to Page 40,
14 Line 19.  And you were asked, I just want to be clear
15 that when the police arrived, that he was the person
16 attacking you, that his hand was on your face and was
17 pushing your head back; is that correct?  And your
18 answer was, I don't remember.
19         Is it true that by the time of trial,
20 you didn't remember the position you were in and the
21 position that your attacker was in at the time the
22 police arrived?
23         MS. MAYS:  Objection.
24         THE WITNESS:  I don't understand you --

---

**Page 40**

1  your -- the position?  The statement when you're saying
2  "the position," I don't understand.
3  BY MS. FREUDENBERGER:
4  Q.   Sure.  By the time of trial -- you know what?
5  Withdrawn.  I'm going to move on.
6         It then says, All right.  But do you
7  remember around that point, at that point that you were
8  confused, you were scared, and you were in pain; is
9  that correct?  And you say, I can say that I was
10 confused at that point.
11         Is it accurate as you -- as you
12 testified at trial that by the time the police arrived,
13 you were confused?
14         MS. MAYS:  Objection.
15         THE WITNESS:  (No verbal response.)
16 BY MS. FREUDENBERGER:
17 Q.   By the -- by the time the police arrived, were
18 you -- because of the beating you had experienced and
19 how scared you were, were you confused?
20         MS. MAYS:  Objection.
21         THE WITNESS:  I don't -- I don't
22 remember.
23 BY MS. FREUDENBERGER:
24 Q.   Okay.  The police officer's report also says

---

10 (Pages 37 to 40)

**KAPLAN LEAMAN & WOLFE**

█████ 2/27/2024

Page 41

1  that you told him on the morning of the 27th, on the
2  morning of the attack, that when the police arrived,
3  you were still on the ground and you were confused. Is
4  that accurate?
5  A.    I was very scared.
6  Q.    And I unders-- so, first of all, I
7  understand that your memory today is that you were
8  conscious when the police arrived --
9         THE INTERPRETER:  (Translates.)
10        THE WITNESS:  (Answers in native
11  language.)
12        MS. FREUDENBERGER:  I'm sorry, I just
13  have to finish the question.
14  BY MS. FREUDENBERGER:
15  Q.    -- but is it possible given the medical record
16  that says, "positive loss of consciousness," that you
17  lost consciousness at another point in the attack?
18        MR. JACKAL:  Objection.
19        MS. MAYS:  Objection; asked and
20  answered.
21        THE WITNESS:  No.
22  BY MS. FREUDENBERGER:
23  Q.    Okay.  And do you have any idea where the
24  doctors got the information that you had lost

Page 42

1  consciousness at some point?
2         MS. MAYS:  Objection; asked and
3  answered.
4         MR. JACKAL:  Objection.
5         THE WITNESS:  I don't know.
6  BY MS. FREUDENBERGER:
7  Q.    Okay.
8  A.    It's been -- it's been a long time.  I could
9  -- I could not even try to recall what happened.
10  Q.    Okay.  Were you present for all of the
11  conversations that the doctors in the hospital had with
12  the police?
13        MR. JACKAL:  Objection.
14        MS. MAYS:  Objection.  How would she
15  know that?
16        THE WITNESS:  I don't -- I don't
17  remember.
18  BY MS. FREUDENBERGER:
19  Q.    Okay.
20        MS. MAYS:  Can we take a break at a
21  good stopping point?
22        MS. FREUDENBERGER:  Yeah.  We've been
23  going for about an hour.  Why don't we take a -- why
24  don't we take a break?

Page 43

1         THE VIDEOGRAPHER:  Going off the
2  record; 11:39.
3              - - -
4         (Whereupon, a discussion was held off
5  the video record only.)
6              - - -
7         MS. MAYS:  So when I say something
8  after the word "objection," could you translate that,
9  please?  No need to translate just the word
10  "objection."
11        THE INTERPRETER:  Sure.
12        MS. FREUDENBERGER:  In other words,
13  Counsel for the defendants is requesting that the
14  interpreter translate her objections for the witness to
15  hear.
16        MS. MAYS:  Just like every other
17  witness, yes.
18              - - -
19        (Whereupon, a brief recess was taken.)
20              - - -
21        THE VIDEOGRAPHER:  We're back on the
22  record at 12 o'clock.
23  BY MS. FREUDENBERGER:
24  Q.    All right.  Ms. ████  I'm going to read to you

Page 44

1  some of the other things that you testified to at trial
2  when the district attorney, Ms. Murphy, was questioning
3  you.  Okay?
4         Now, this is Page 16, Lines 21, and
5  I'll probably go through Line 9 on the next page.  And
6  the prosecutor asked you, How did you know that the
7  police were there?  And you responded, There were
8  spotlights and there were cars around.  Is that
9  accurate?
10  A.    Yes.
11  Q.    And then she asked you, When the police
12  officers got there, what happened?  And you responded,
13  I was scared; I was confused; and I heard gunshots.  Is
14  that accurate?
15  A.    Yes.
16  Q.    Okay.  And is there anything else that you
17  remember today about the moment that the -- that the
18  police arrived other than what you told the district
19  attorney?
20  A.    No.
21  Q.    Okay.  So it would be accurate to say that the
22  sum total of what you remember today about what the
23  police -- when the police arrived is that there were
24  lights, you were scared, you were confused, and you

KAPLAN LEAMAN & WOLFE

█████ 2/27/2024

Page 45

1  heard gunshots?
2          MS. MAYS: Objection.
3          THE WITNESS: Yes.
4  BY MS. FREUDENBERGER:
5  Q.   And then you testified -- she asked you, At
6  that point when you were on the ground, lying on the
7  ground, and this person was on top of you, were you
8  able to see anything? And you said, No, I didn't see
9  anything.
10         And she asked, What kept you from
11  seeing anything? And you said, I was scared. Is that
12  accurate?
13         MR. JACKAL: Objection. I don't think
14  you read that first question correctly.
15         MS. FREUDENBERGER: I'll read it again.
16  BY MS. FREUDENBERGER:
17  Q.   Page 17 --
18         MS. FREUDENBERGER: And, in fact, why
19  don't I have the interpreter read it so that we can be
20  absolutely sure that it is accurate; is that okay?
21         MS. MAYS: Uh-huh.
22         MS. FREUDENBERGER: All right. If you
23  wouldn't mind, Mr. He, reading Page, 17, Lines 4
24  through 9 --

Page 46

1         THE INTERPRETER: 4 to 9, right?
2         MS. FREUDENBERGER: Yes -- of Ms. ████
3  trial testimony. And why don't I give you a clean
4  copy. It's those questions right there.
5         THE WITNESS: Okay.
6         MS. FREUDENBERGER: And my question is
7  whether that testimony she gave was accurate.
8         THE INTERPRETER: (Reading in native
9  language.)
10         THE WITNESS: Yes.
11  BY MS. FREUDENBERGER:
12  Q.   Okay. That testimony is accurate?
13  A.   Yes.
14  Q.   All right. And would it be correct to say
15  that when the police arrived, you were so scared that
16  you were not able to see or hear what was going on
17  around you?
18         MS. MAYS: Objection.
19         MR. JACKAL: Objection.
20         MS. MAYS: Leading.
21         THE WITNESS: No.
22  BY MS. FREUDENBERGER:
23  Q.   Okay. What's inaccurate about that?
24  A.   I am aware that the police was present.

Page 47

1  Q.   Okay. And the reason you're aware the police
2  were present is because -- well, withdrawn.
3         You told the prosecutor that when you
4  were on the ground and this person was on top of you,
5  you weren't able to see anything. And I'd like to
6  know, if you could in your own words, why it was that
7  you weren't able to see the person on top of you.
8  A.   Could you repeat again?
9  Q.   Sure. I'll ask a clearer question. You were
10  never able to see the person -- to get a good look at
11  the person who attacked you on November 27, 2001,
12  correct?
13         MS. MAYS: Objection.
14         MS. FREUDENBERGER: You know what?
15  Withdrawn. I'll respond to their objection.
16  BY MS. FREUDENBERGER:
17  Q.   Were you ever able to get a good look at the
18  person who attacked you on November 27, 2001?
19  A.   Yeah, at the time, it's still dark outside;
20  it's hard for me to see clearly.
21  Q.   Okay. And so, is it you were never able to
22  get a good look at the person who did this to you,
23  correct?
24         MS. MAYS: Objection.

Page 48

1         MR. JACKAL: Objection.
2         THE WITNESS: Yeah, that was only
3  person attacked me from the time I was grabbed and --
4  and I suffered through all the process, and I -- I -- I
5  recognize that the person was African American.
6  BY MS. FREUDENBERGER:
7  Q.   Okay. Were you able to recognize anything
8  other than that the person was African American?
9  A.   Yeah, it was, like, small hours in the
10  morning, it's dark by the time I -- I was choked and I
11  was grabbed. And the person was tall.
12  Q.   Okay.
13  A.   And I was attacked from behind.
14  Q.   Okay. I understand the reasons why; all I'm
15  asking you is were you ever able to notice anything
16  about the perpetrator other than he was taller than you
17  and he was black?
18  A.   Yeah, I could not -- I could not -- I could
19  not see anything else.
20  Q.   Okay. One thing that we've learned since
21  trial, Ms. ████ is that there was a hospital
22  surveillance camera that showed a delivery truck arrive
23  after the perpetrator dragged you into the alley but
24  before the police showed up. Are you aware of that?

12 (Pages 45 to 48)

Page 49

```
1                MS. MAYS:  Objection.
2                THE WITNESS:  I could not remember.
3    BY MS. FREUDENBERGER:
4    Q.    Okay.
5    A.    No.  No.
6    Q.    And you never saw any indication of a truck
7    pulling into the hospital loading area while the
8    perpetrator was on top of you, correct?
9                MS. MAYS:  Objection.
10               THE WITNESS:  No.
11   BY MS. FREUDENBERGER:
12   Q.    Okay.  If you had been aware of a delivery
13   truck pulling into the hospital, you would have told
14   the police that, correct?
15               MR. JACKAL:  Objection.
16               MS. MAYS:  Objection; leading.
17               MS. FREUDENBERGER:  You know, I'll
18   withdraw it.  It's not important.
19   BY MS. FREUDENBERGER:
20   Q.    And now, is it possible that the -- that
21   that's an example of something that you were too
22   confused and dazed because of how badly you had been
23   beaten and how scared you were to notice?
24               MR. JACKAL:  Objection.
```

Page 50

```
1                MS. MAYS:  Objection.
2                THE WITNESS:  No.
3    BY MS. FREUDENBERGER:
4    Q.    Okay.  Do you have any ex- --- so I'll
5    represent that we have timed photographs showing that a
6    delivery truck was there between when you were dragged
7    into the alley and when the police arrived.  Do you
8    have any explanation for the fact that you didn't see
9    that truck arrive?
10               MS. MAYS:  Objection.
11               MR. JACKAL:  Objection.
12               THE WITNESS:  No.  No.
13   BY MS. FREUDENBERGER:
14   Q.    Okay.  Now, in your police statement, Exhibit
15   -- from Exhibit 12 in front of you, at the bottom of
16   Page 2 -- I mean, I know you can't read it, but is that
17   your signature on Page 2 as well?
18   A.    Yes.
19   Q.    The bottom of the page, according to what the
20   officer wrote, he asked you, What happened after the
21   male couldn't put himself inside you?  And your
22   response according to the police was, He was holding
23   his penis and was still trying to put it in me when
24   police come.  When police come, he tried to run, but
```

Page 51

```
1    there was no way out.
2    A.    Yes.  Yes.
3    Q.    So you told the pol- --- you did tell the
4    police on the morning of the 27th that when the police
5    came, the perpetrator tried to run, but there was no
6    way out, right?
7    A.    Yes.
8    Q.    Okay.  And so, what you saw was the police
9    car's lights shining and then the perpetrator get up
10   and run; is that correct?
11               MS. MAYS:  Objection.
12               MR. JACKAL:  Objection.
13               MS. MAYS:  That's not what it says.
14               MS. FREUDENBERGER:  If she can't
15   remember, it's okay.
16               THE WITNESS:  Yeah, when the police
17   arrived, they arrive without siren on so the police was
18   able to catch the -- the -- the criminal.
19   BY MS. FREUDENBERGER:
20   Q.    I understand.  And -- but what you told --
21   hold on one second.
22               Why did you tell the police on the
23   morning of the 27th that when the police came, the man
24   tried to run, but there was no way out?
```

Page 52

```
1    A.    Yeah, because when the police arrive, he was
2    in this spot and the wall was there.  Where he could
3    possibly run?
4    Q.    Okay.  But is it -- is it your testimony that
5    you observed the man get up and -- and run?
6    A.    Yes, it's natural reaction to run away from
7    the police when the police arrive.
8    Q.    Okay.  So your testimony is you actually saw
9    the man get up and run back into the alley when the
10   police arrived?
11               MS. MAYS:  Objection.
12               THE WITNESS:  Yeah, the -- the -- the
13   alley is very narrow, there's no other direction you
14   could possibly run.  There's only one way to run.
15   BY MS. FREUDENBERGER:
16   Q.    Okay.  And so, you remember as you sit here
17   today actually seeing the man get up and run back into
18   the alley; is that -- is that right?
19               MS. MAYS:  Objection.
20   BY MS. FREUDENBERGER:
21   Q.    Is that what you're telling me?
22               MS. MAYS:  Objection.
23               THE WITNESS:  Yeah, there only -- there
24   -- there only -- it's a small alley, there's only one
```

13 (Pages 49 to 52)

██████ 2/27/2024

| Page 53 |
| --- |

1  -- one direction you could escape.  He -- he -- the
2  only place he can run towards -- is towards the wall.
3  BY MS. FREUDENBERGER:
4  Q.    I understand.  I just -- I just need to be
5  clear whether this is something -- let me think for a
6  minute.
7          I want to make sure I understand.  It
8  sounds like what you're telling me is that you saw the
9  police arrive with their headlights but no sirens, and
10 then you -- the man got up and ran back into the alley;
11 is that accurate?
12 A.    Yes.
13 Q.    Okay.
14 A.    Yeah, towards the wall.
15 Q.    Okay.  And you're sure he ran, correct?
16         MS. MAYS:  Objection.
17         MR. JACKAL:  Objection.
18         MS. FREUDENBERGER:  You know what?
19 It's okay.  I'll withdraw the question.  It's fine.  We
20 can move on.
21 BY MS. FREUDENBERGER:
22 Q.    When -- when --
23 A.    You ask a lot of conflicted questions.
24 Q.    Okay.  I'm sorry.  And, again, if any of my

| Page 54 |
| --- |

1  questions are confusing, just let me know.  If you
2  answer them, I'm going to assume you understood it.
3  Okay?
4          Now, when you saw the perpetrator run
5  back into the alley, did he run right into the wall or
6  did he make a turn around the corner?
7          MS. MAYS:  Objection; mischaracterizes.
8          THE WITNESS:  I was on the ground.  You
9  ask me a question sounds very conflict to me.  It's
10 like, I was in the theater to watch the movie.  I don't
11 know how to answer the question.
12 BY MS. FREUDENBERGER:
13 Q.    Okay.  What the police officer wrote down is,
14 When the police come, he tried to run, but there was no
15 way out.  You must have seen or been able to observe
16 the man running -- trying to run or you wouldn't --
17 withdrawn.  I'm going to try to make it clear.
18         What the police officer wrote down is,
19 he -- He tried to run, but there was no way -- way out.
20 You wouldn't have told the police officer that unless
21 you had been able to observe that the man tried to run
22 away; is that correct?
23         MS. MAYS:  Objection.
24         THE WITNESS:  I don't recall whether I

| Page 55 |
| --- |

1  told the police like that.
2  BY MS. FREUDENBERGER:
3  Q.    Okay.  But your memory today is consistent
4  with what you told the police, correct?
5          MS. MAYS:  Objection.
6          THE WITNESS:  I don't recall very well.
7  All I can tell you is when the police arrived, he tried
8  to ran and the police open -- open shots.
9  BY MS. FREUDENBERGER:
10 Q.    Okay.  Do you remember how long it was as you
11 sit here today between when the man tried to run and
12 when the police shot him -- withdrawn.
13         Do you remember -- it's not a fair
14 question.
15         Do you remember as you sit here today
16 how much time elapsed between when the man got off you
17 and when you heard the shots?
18 A.    I don't know.
19 Q.    Okay.  Okay.  Another thing that your police
20 statement says is -- well, let me -- let me do this:
21 After you observed the man run, was the next thing you
22 heard or saw the shots fired?
23         MS. MAYS:  Objection; mischaracterizes.
24         THE WITNESS:  Yes, I heard the gunshot.

| Page 56 |
| --- |

1  BY MS. FREUDENBERGER:
2  Q.    Okay.  I just want to ask a couple more
3  questions about your injuries and then I'm going to
4  move on.  On Page 37 of your trial testimony, Lines 1
5  and 2, you testified, I don't know what was going on
6  with my face, but I had a lot of bleeding from my face.
7          MS. FREUDENBERGER:  Would it be helpful
8  if I gave you a copy of the transcript to read along?
9          THE INTERPRETER:  Yeah.
10         MS. FREUDENBERGER:  Okay.
11         THE INTERPRETER:  So what's the
12 question?
13         MS. FREUDENBERGER:  So I'd just like
14 you to read to the witness Lines 1 and 2 on Page 37.
15 Is that -- oh, no.  I'm sorry.
16         THE INTERPRETER:  37?  Where is 37?
17         MS. FREUDENBERGER:  I think it's --
18         THE WITNESS:  Line 1 and 2.  Okay.
19         MS. FREUDENBERGER:  Yeah.
20         THE INTERPRETER:  Okay.  (Complies.)
21 BY MS. FREUDENBERGER:
22 Q.    Is it accurate that --
23         MS. FREUDENBERGER:  Well, actually,
24 could you then read Lines 3 through 7?

14 (Pages 53 to 56)

**KAPLAN LEAMAN & WOLFE**

█████ 2/27/2024

| Page 57 |
| --- |

1    THE INTERPRETER: All the way to 3,
2  right? -- 7? Okay.
3    MS. FREUDENBERGER: 3 through 7, yeah.
4    THE INTERPRETER: (Complies.)
5    THE WITNESS: I don't -- I don't
6  recall. I don't remember.
7  BY MS. FREUDENBERGER:
8  Q.   Okay. But do you have any reason to dispute
9  your trial testimony that by the time the man finished
10  beating you, you were bleeding heavily from the face?
11    MS. MAYS: Objection.
12    THE WITNESS: What do you mean,
13  "dispute"?
14  BY MS. FREUDENBERGER:
15  Q.   Your -- your -- what you said at trial is that
16  you were bleeding quite heavily from your face. I
17  understand you don't remember today, but if you said it
18  at trial, would you agree it's accurate?
19    MS. MAYS: Objection.
20    MR. JACKAL: Objection.
21    THE WITNESS: I don't want to change
22  anything.
23  BY MS. FREUDENBERGER:
24  Q.   Okay. So it's accurate that what you said at

| Page 58 |
| --- |

1  trial about bleeding was accurate?
2  A.   I don't know how to answer your question. I
3  -- my face was all swollen at the time.
4  Q.   Okay. Because of how badly the man had beat
5  you, correct?
6    MS. MAYS: Objection.
7    MR. JACKAL: Objection.
8    THE WITNESS: Yes.
9  BY MS. FREUDENBERGER:
10  Q.   Is that something that made it hard to see?
11  A.   No.
12  Q.   Okay. The reason that you had trouble seeing
13  is because it was dark and you were so scared; is that
14  right?
15  A.   No.
16  Q.   Okay. Tell -- you tell me why you had trouble
17  seeing.
18  A.   Could you explain to me?
19  Q.   Sure.
20    MS. FREUDENBERGER: Could you read to
21  the witness Page 39, Lines 1 through 6? And then I'm
22  going to ask her a couple of questions about it.
23    THE INTERPRETER: 39, 1 to 6?
24    MS. FREUDENBERGER: Yeah, 1 through 6

| Page 59 |
| --- |

1  on Page 39.
2    THE INTERPRETER: (Complies.)
3    MS. FREUDENBERGER: Okay. Are you
4  through the -- through to Line 6?
5    THE INTERPRETER: Yeah.
6    MS. FREUDENBERGER: Okay.
7  BY MS. FREUDENBERGER:
8  Q.   Could you show me, Ms. ███ how the
9  perpetrator's hand was in relation to your face while
10  the sexual assault was occurring?
11  A.   I don't recall.
12  Q.   Okay. And you mentioned that when the police
13  arrived, they didn't have their sirens on, right?
14  A.   Yes. Yes, no -- no siren.
15  Q.   Okay. But they arrived in police cars,
16  correct?
17  A.   Yes.
18  Q.   Okay. And that's something you actually saw.
19  When the first police arrived on the scene, you saw the
20  lights from their police cars?
21    MS. MAYS: Objection.
22    MS. FREUDENBERGER: I can ask a clearer
23  question if it's confusing.
24    THE WITNESS: Yeah, I don't know how to

| Page 60 |
| --- |

1  describe it. I don't remember very well.
2  BY MS. FREUDENBERGER:
3  Q.   Sure. My only question is when the -- I'm
4  sorry. It's -- the language is --
5    When the first police arrived, is it
6  correct that you saw the lights from their police cars,
7  but no -- no sirens on?
8  A.   Yeah, I know the police arrived, but with --
9  with no siren.
10  Q.   Okay. And they arrived in cars, right?
11  A.   Yes.
12  Q.   Okay. The -- do you remember a female police
13  officer taking you to the hospital?
14  A.   Yes.
15  Q.   And she described you -- she testified at
16  trial, and she described you as bruised, crying, dazed,
17  and shaken. Is that an accurate characterization of
18  your state when police arrived?
19    MS. MAYS: Objection.
20    THE WITNESS: Yes.
21  BY MS. FREUDENBERGER:
22  Q.   Okay. And how can you be certain, given the
23  hospital record that says that you had lost
24  consciousness, that at no point you were in and out of

Page 61

1  consciousness?
2        MR. JACKAL: Objection.
3        MS. MAYS: Objection; asked and
4  answered.
5        THE WITNESS: Yeah, because at the
6  time, I knew to put on my pants. I had to came with
7  the -- the -- police officer to the hospital. I
8  had -- I had my conscious.
9  BY MS. FREUDENBERGER:
10  Q.    I understand. And so I understand that you
11  were not unconscious at the hospital. What I'm asking
12  is, is it possible given how badly you were injured
13  that you lost consciousness at some point during the
14  attack?
15        MS. MAYS: Objection.
16        THE WITNESS: No.
17  BY MS. FREUDENBERGER:
18  Q.    Okay. And how can you be certain? Well,
19  withdrawn.
20        All right. So you don't know where
21  this information in the doc- -- in the medical record
22  that you lost consciousness came from?
23        MS. MAYS: Objection.
24        MR. JACKAL: Objection.

Page 62

1        MS. MAYS: Asked and answered.
2        MR. JACKAL: And calls for speculation.
3        THE WITNESS: I don't know why.
4  BY MS. FREUDENBERGER:
5  Q.    Okay. Now, I want to ask you some questions
6  about your contact with the police on the morning of
7  November 27th. Okay? Was it clear to you from their
8  actions that the police wanted to help you? Well,
9  withdrawn.
10        Was it -- was it -- did the police on
11  the scene make clear to you that they wanted to help
12  you?
13        MR. JACKAL: Objection.
14        THE WITNESS: Yes.
15  BY MS. FREUDENBERGER:
16  Q.    Okay. They -- in other words, did they make
17  clear to you that they understood and felt badly about
18  the terrible things this man had done to you?
19        MS. MAYS: Objection.
20        MR. JACKAL: Objection.
21        THE WITNESS: Police saw -- saw me on
22  -- on the -- on the floor, my pants was removed. And
23  some witness must call the police; that's why police
24  arrived.

Page 63

1  BY MS. FREUDENBERGER:
2  Q.    I understand. And the police then helped you
3  up, correct?
4        MS. MAYS: Objection.
5        THE WITNESS: Yes, the police came to
6  save my life.
7  BY MS. FREUDENBERGER:
8  Q.    Yes. And, in fact, the police did save your
9  life, correct? That's how you feel today?
10  A.    Yes. Yeah, I also appreciate for the -- for
11  the -- for the person that call the police.
12  Q.    Yes. But your feeling about the police today
13  is that they -- they saved your life that morning,
14  correct?
15        MS. MAYS: Objection.
16        THE WITNESS: Yes, I appreciate what
17  the police did to me. It's part of the police duty,
18  too.
19        MS. FREUDENBERGER: Wait. How the
20  police what?
21        THE INTERPRETER: It's part of -- it's
22  part of police duty, too.
23  BY MS. FREUDENBERGER:
24  Q.    Yes. And they seemed professional, right?

Page 64

1        MS. MAYS: Objection.
2        MR. JACKAL: Objection.
3        THE WITNESS: Yes, it's their job.
4  BY MS. FREUDENBERGER:
5  Q.    Yes. Did the police seem trustworthy?
6        MS. MAYS: Objection.
7        THE WITNESS: What do you mean by --
8  by -- by "trustworthy"?
9  BY MS. FREUDENBERGER:
10  Q.    Did the police at the scene -- did the police
11  officers who you -- whom you interacted with at the
12  scene of the crime seem to genuinely want to help you?
13        MR. JACKAL: Objection.
14        THE WITNESS: You want to make, like --
15  like, gave, like, a comment or kind of -- about the
16  police officer?
17  BY MS. FREUDENBERGER:
18  Q.    I'm just asking what your impression was of
19  the police officers at the scene, and specifically,
20  were they helpful?
21  A.    Yeah, I am very grateful for the police came
22  -- came to save my life.
23  Q.    Okay. Do you remember how many police
24  officers came to help you -- well, withdrawn.

██████ 2/27/2024

| Page 65 | Page 67 |
|---|---|

**Page 65**

1  Do you remember how many police
2  officers you interacted with while you were bleeding at
3  the crime scene?
4  A.   I don't remember.
5  Q.   Okay.  Was it more than one?
6  A.   Yes.
7  Q.   Okay.  Was it more than two?
8  A.   I don't recall.
9  Q.   Okay.  Now, let me ask you in particular about
10  the female police officer who brought you to the
11  hospital.  Do you remember her as you sit here today?
12  A.   I don't remember, no.
13  Q.   Okay.  At the preliminary hearing, you
14  testified that the police who spoke to you at the
15  hospital told you that they had caught the man who did
16  this to you.
17  MS. MAYS:  Could we have a page number,
18  please?
19  MS. FREUDENBERGER:  Sure.  37, starting
20  at Line 20.  It's a different hearing.
21  THE WITNESS:  Not hearing?
22  MS. FREUDENBERGER:  No.
23  BY MS. FREUDENBERGER:
24  Q.   And the question is did the police who spoke

**Page 66**

1  to you at the hospital, in fact, tell you that they had
2  caught the man who did this to you?
3  A.   I don't recall.
4  Q.   Okay.  But if that's what you testified to at
5  the preliminary hearing, then that's what happened,
6  correct?
7  MS. MAYS:  Objection.
8  MR. JACKAL:  Objection.
9  THE WITNESS:  Yes.
10  BY MS. FREUDENBERGER:
11  Q.   And you understood in your mind whether it was
12  because -- withdrawn.
13  By the time you -- you got to the
14  hospital, you understood either from the police or just
15  your own conjecture that the man who had been shot was
16  the man who attacked you, right?
17  MS. MAYS:  Objection.
18  MR. JACKAL:  Objection; leading.
19  MS. FREUDENBERGER:  You know what?
20  I'll withdraw it in response to Counsel's objection and
21  I'll re-ask it in a non-leading way.
22  BY MS. FREUDENBERGER:
23  Q.   Do you believe by the time you got to the
24  hospital that morning that the man who had been shot

**Page 67**

1  was the man who attacked you?
2  A.   Yes.
3  Q.   And although you don't remember the
4  conversation you had with the police officer who
5  brought you to the hospital, you agree that you were
6  able to speak with her in English, correct?
7  MS. MAYS:  Objection.
8  MR. JACKAL:  Objection.
9  THE WITNESS:  Yes.
10  BY MS. FREUDENBERGER:
11  Q.   And -- and she told you what she knew about
12  the police investigation, correct?
13  MR. JACKAL:  Objection.
14  MS. MAYS:  Objection; leading;
15  mischaracterizes.
16  THE WITNESS:  I don't recall.
17  BY MS. FREUDENBERGER:
18  Q.   Okay.  At the hospital, you were interviewed
19  by two male detectives.  Do you remember that?
20  A.   I don't recall.  Yeah, I don't know whether
21  there detect-- -- there were detectives because it was
22  very chaotic at the time.
23  Q.   Okay.  And you were scared, right?
24  MS. MAYS:  Objection.

**Page 68**

1  THE WITNESS:  Yeah, I still -- I was
2  still scared at the hospital.
3  BY MS. FREUDENBERGER:
4  Q.   Okay.  And would it be fair to say that when
5  police asked you questions at the hospital, you did
6  your very best to answer them?
7  A.   Yes.
8  Q.   But was it difficult for you to tell --
9  withdrawn.
10  Did you have a conversation with the
11  police detectives at the hospital before -- my
12  understanding from the testimony -- but please tell me
13  if I'm wrong -- is that before the police wrote down
14  your statement, you had a conversation that included
15  your husband in which he was helping you translate to
16  the police detectives --
17  MS. MAYS:  Object- --
18  BY MS. FREUDENBERGER:
19  Q.   -- is that correct?
20  MS. MAYS:  Objection.
21  THE WITNESS:  I don't -- I don't
22  remember.
23  BY MS. FREUDENBERGER:
24  Q.   Okay.  Would it be fair to say, Ms. ████ that

**KAPLAN LEAMAN & WOLFE**

█████ 2/27/2024

---

Page 69

1    other than being badly beaten and dragged, and the
2    police arriving in their police cars, and the man
3    running and hearing shots, you do not have a very clear
4    memory of what happened to you that night as you sit
5    here today?
6              MR. JACKAL:  Objection.
7              MS. MAYS:  Objection; leading;
8    mischaracterizes.
9              MR. JACKAL:  Compound question.
10             THE WITNESS:  No.
11   BY MS. FREUDENBERGER:
12   Q.    Okay.  But your testimony today is that you
13   don't remember anything about the process of the police
14   taking the statement from you in the hospital; is that
15   right?
16             MR. JACKAL:  Objection.
17             THE WITNESS:  Well, what do you mean?
18   BY MS. FREUDENBERGER:
19   Q.    Tell me what you remember of your interview
20   with the detectives in the hospital on the morning of
21   November 27th.
22   A.    I don't -- I don't remember.
23   Q.    Okay.  You don't remember anything; is that
24   right?

---

Page 70

1              MR. JACKAL:  Object -- objection.
2              THE WITNESS:  I know someone came to
3    the hospital, asked my husband, but I don't know who --
4    who's the detective.
5    BY MS. FREUDENBERGER:
6    Q.    Okay.  Do you mean you know that police spoke
7    with your husband at the hospital?
8    A.    I don't remember.  I don't remember.
9    Q.    Is it difficult to remember details because of
10   how traumatic this was for you?
11             MS. MAYS:  Objection.
12             MR. JACKAL:  Objection.
13             THE WITNESS:  No, it's been quite a
14   long time.  I'm -- I'm not -- I'm not thinking about
15   those things anymore.
16   BY MS. FREUDENBERGER:
17   Q.    Okay.  How many times did you speak with
18   police about this incident between when you left the
19   hospital and trial?
20   A.    I don't remember.
21   Q.    Okay.  Did -- did there come a time where you
22   were interviewed again by police on Tacony Street?  I
23   may be pronouncing that wrong.
24             THE INTERPRETER:  Tacony Street?

---

Page 71

1              THE WITNESS:  I don't remember.
2    BY MS. FREUDENBERGER:
3    Q.    What about the prosecutor, Ms. Murphy?  Was
4    she sympathetic?
5    A.    I don't know.
6    Q.    Okay.  Do you remember what she looks like?
7    A.    I don't -- I don't remember.
8    Q.    When you testified in this case, did you
9    believe that the man who was being prosecuted was the
10   man who had attacked you?
11   A.    Yes.
12   Q.    And I take it you wanted very badly for him to
13   be convicted; is that correct?
14             MS. MAYS:  Objection.
15             MR. JACKAL:  Objection.
16             THE WITNESS:  He severely injured me
17   and raped me and beat me.  Didn't he commit crime?
18   BY MS. FREUDENBERGER:
19   Q.    So I can't -- I can't answer your questions,
20   but I can represent to you that he has consistently for
21   more than 25 years adamantly maintained that did he
22   not.
23             MS. MAYS:  Is that a question?
24   BY MS. FREUDENBERGER:

---

Page 72

1    Q.    Well, do you know for sure as you sit here
2    today that Termaine Hicks is the man who attacked you?
3    A.    I don't understand.
4    Q.    Let's do this:  I'm have -- afraid I have more
5    questions.  Would you like to take a lunch break?
6    A.    Yeah.
7              MS. FREUDENBERGER:  Let's take a lunch
8    break.
9              THE VIDEOGRAPHER:  We're going off the
10   record at 1:11.
11                       - - -
12             (Whereupon, a lunch recess was taken.)
13                       - - -
14             THE VIDEOGRAPHER:  And we're back on
15   the record at 2:12.
16   BY MS. FREUDENBERGER:
17   Q.    Okay.  Ms. ██ at the criminal trial in this
18   case, you testified that the man actually put his penis
19   inside of your vagina, correct?
20             MS. MAYS:  Objection.
21             THE WITNESS:  He didn't get in yet.
22   BY MS. FREUDENBERGER:
23   Q.    Okay.  So is your position today that he was
24   not able to actually insert his penis into your vagina?

---

18 (Pages 69 to 72)

KAPLAN LEAMAN & WOLFE

██████ 2/27/2024

| Page 73 |
| --- |

1    A.    He's on the top of me, he -- he hadn't entered
2    yet, and the police arrived.
3    Q.    Okay.
4          MS. FREUDENBERGER: I'm going to ask
5    you, please, sir, to read --
6    BY MS. FREUDENBERGER:
7    Q.    And you're sure about that, correct?
8          MS. MAYS: Objection.
9          THE WITNESS: Yes.
10          MS. FREUDENBERGER: Okay. I'm going to
11   ask the interpreter to read the questions and answers
12   on Page 31 of the trial transcript.
13          THE INTERPRETER: So do you --
14          MS. FREUDENBERGER: It's November 1st.
15   I may be able to find it faster, if you don't mind.
16          THE INTERPRETER: Okay. Sorry.
17          MS. FREUDENBERGER: It's this --
18          THE INTERPRETER: Okay. Sure. Sure.
19          MS. FREUDENBERGER: -- this page.
20          You know what? Before we do, I'm very
21   sorry; I just need to go off the record for two
22   minutes. I will be right back.
23          THE VIDEOGRAPHER: Off the record;
24   2:17.

| Page 74 |
| --- |

1                - - -
2          (Whereupon, a brief recess was taken.)
3                - - -
4          THE VIDEOGRAPHER: Back on the record;
5    2:18.
6          MS. FREUDENBERGER: All right. I'm
7    going to ask the court reporter [sic] to please read to
8    the witness Page 31, Lines 2 through 19, and then I
9    will ask the witness a question. Okay?
10          MR. RITTERMAN: You mean the translator
11   or the court reporter?
12          MS. FREUDENBERGER: I'm sorry, the
13   translator.
14          THE INTERPRETER: Okay. You want me to
15   read to her in Chinese, right?
16          MS. FREUDENBERGER: Correct.
17          THE INTERPRETER: (Complies.)
18   BY MS. FREUDENBERGER:
19   Q.    Ms. ███ it sounds like the -- what -- what
20   happened here is a misunderstanding between you and the
21   trial prosecutor about what -- whether the perpetrator
22   put his penis inside of your vagina; is that acc-- -- is
23   that correct?
24          MS. MAYS: Objection.

| Page 75 |
| --- |

1          MR. JACKAL: Objection.
2          THE WITNESS: What kind of
3    misunderstanding?
4    BY MS. FREUDENBERGER:
5    Q.    Is this testimony on Page -- you see on
6    Page 31, the testimony that the court reporter [sic]
7    has just read you is inconsistent with what you told me
8    just now about whether the perpetrator put his penis
9    inside your vagina?
10   A.    So at the time I was saying he put his penis
11   into my vagina?
12   Q.    Well, I'm asking -- I'm asking you whether
13   that is what you intended to say at trial.
14   A.    Yeah, he -- he put his penis in -- in my
15   private part, but he -- he hadn't entered yet.
16   Q.    I see. Okay. So what you were -- what you
17   were saying at trial is that he put -- he had his penis
18   in his hand, but he had not put it into your body; is
19   that correct?
20          MS. MAYS: Objection.
21          MR. JACKAL: Objection.
22          MS. FREUDENBERGER: I'm just trying to
23   understand.
24          THE WITNESS: Yes.

| Page 76 |
| --- |

1    BY MS. FREUDENBERGER:
2    Q.    Okay. And I have to ask, although I think
3    it's obvious: Whether or not a man has inserted his
4    penis into your vagina is something, as a woman, you
5    cannot make a mistake about; would you agree?
6          MR. JACKAL: Objection.
7          MS. MAYS: Objection.
8          THE INTERPRETER: She -- she want me to
9    repeat.
10          MS. FREUDENBERGER: Sure. I'll try to
11   ask it more clearly.
12          THE INTERPRETER: Yeah.
13   BY MS. FREUDENBERGER:
14   Q.    If this man had gotten his penis inside your
15   vagina, you would know; would you agree?
16          MS. MAYS: Objection.
17          THE WITNESS: Yes.
18   BY MS. FREUDENBERGER:
19   Q.    Are you certain that this man never -- was
20   never able to insert his penis into your vagina?
21          MR. JACKAL: Objection.
22          THE WITNESS: Yes, I'm sure.
23   BY MS. FREUDENBERGER:
24   Q.    Okay.

19 (Pages 73 to 76)

**KAPLAN LEAMAN & WOLFE**

██████ 2/27/2024

Page 77

1          MS. FREUDENBERGER: Could I ask you,
2   Mr. He, to look at 36 of the trial testimony?
3          THE INTERPRETER: 36?
4          MS. FREUDENBERGER: Yes.
5          THE INTERPRETER: Yes. Where?
6          MS. FREUDENBERGER: Lines 13 to 20.
7          THE INTERPRETER: To 20?
8          MS. FREUDENBERGER: Will you read that
9   to her, please?
10         THE INTERPRETER: Like, All right. You
11  stated that when you...
12         MS. FREUDENBERGER: Yeah. Yeah.
13  Exactly.
14         THE INTERPRETER: (Complies.)
15  To 20, right?
16         MS. FREUDENBERGER: Yes, please.
17         THE INTERPRETER: Yes, 20 is done.
18  Yeah.
19  BY MS. FREUDENBERGER:
20  Q.    Okay. Is that testimony accurate, Ms. ████
21         THE INTERPRETER: Ms. ████ want me to
22  repeat one more time.
23         MS. FREUDENBERGER: Okay. I'm sorry.
24  Thank you.

Page 78

1          THE INTERPRETER: Yeah. (Complies.)
2          THE WITNESS: Yeah, at the time, I -- I
3   was very scared.
4   BY MS. FREUDENBERGER:
5   Q.    Okay. And you've already told me that you
6   knew the police arrived because you saw them pull in
7   with their vehicle lights on but their sirens off. At
8   that time, you were confused and you thought you were
9   going to die, correct?
10         MS. MAYS: Objection.
11         THE WITNESS: Yes, I did -- I did
12  mention that multiple times.
13  BY MS. FREUDENBERGER:
14  Q.    And when the car pulled up and the headlights
15  shined on you, the perpetrator got up and ran to the
16  back of the alley, correct?
17         MR. JACKAL: Objection.
18         MS. MAYS: Objection; leading.
19         THE WITNESS: Yes.
20  BY MS. FREUDENBERGER:
21  Q.    And then an amount of time elapsed that you
22  don't -- you can't say how much time elapsed between
23  when the perpetrator ran and you heard gunshots fired,
24  correct?

Page 79

1          MR. JACKAL: Objection.
2          MS. MAYS: Objection.
3          THE WITNESS: Yes, I couldn't.
4   BY MS. FREUDENBERGER:
5   Q.    Okay. Ms. ████ were you in the courtroom for
6   the entire trial or only your testimony?
7   A.    I don't remember.
8   Q.    Okay. I will --
9   A.    Yeah, when -- when -- when the trial's over,
10  then I left.
11  Q.    What I'm trying to understand is whether you
12  left after you finished testifying or after --
13  withdrawn.
14         Were you in the courtroom when police
15  officers testified?
16  A.    I don't remember.
17  Q.    Okay.
18  A.    It seems not, but I don't remember.
19  Q.    That's fine. As I have already represented to
20  you, Mr. Hicks has always maintained that he is not the
21  person who attacked you; that he heard screams, and
22  after he saw a shoe, walked into the receiving area,
23  and you were lying there.
24         Are you certain as you sit here today

Page 80

1   that the man who attacked you in the dark who you were
2   not able to see was Termaine Hicks?
3          MS. MAYS: Objection to the speech in
4   front of the question and to the leading nature of the
5   question.
6          THE WITNESS: How possible could it be
7   another person? I was badly beaten and dragged to the
8   alley, and my pants was being removed and he -- he
9   raped me. How could that possibly be another person?
10  BY MS. FREUDENBERGER:
11  Q.    In other words, you're certain based on what
12  the police told you and the fact that Termaine Hicks
13  was shot at the scene that he's the man who attacked
14  you, correct?
15         MR. JACKAL: Objection.
16         MS. MAYS: Objection; mischaracterizes
17  the previous testimony.
18         THE WITNESS: Are you saying that the
19  person was hit by the police is the person raped me?
20  BY MS. FREUDENBERGER:
21  Q.    I'm asking you if you -- how you can be -- I'm
22  asking you for the basis of your belief that Termaine
23  Hicks is the man who did this to you contrary to --
24         MR. JACKAL: Objection.

KAPLAN LEAMAN & WOLFE

Page 81

1          MS. MAYS: Objection.
2          MS. FREUDENBERGER: Withdrawn.
3     BY MS. FREUDENBERGER:
4     Q.    I'm asking for the basis of your belief that
5     Termaine Hicks was the man who did this to you.
6     A.    According to the experience I had, I was
7     beaten, the gun was pointed at me, I was dragged to the
8     alley.
9     Q.    But you were never able to see the man who did
10    this to you, correct?
11    A.    It was dark outside. All I know, he was tall
12    and strong.
13    Q.    Okay. And you know today that Termaine Hicks
14    worked near the Dunkin' Donuts where you worked, right?
15    A.    I don't know. I don't know.
16    Q.    Okay. But --
17    A.    I never talked to the person.
18    Q.    Okay. Prior to November 27th, though, did you
19    ever see or hear anything indicating that Termaine
20    Hicks had anything against you?
21    A.    Yeah, I -- I never met that person before.
22    You know, when I was working, I -- I rarely talked to
23    anyone else.
24    Q.    And many, many people in the neighborhood came

Page 82

1     to Dunkin' Donuts to buy their coffee, right?
2     A.    Yes.
3     Q.    Were there any other coffee shops nearby?
4     A.    No.
5     Q.    And did Termaine Hicks ever express any
6     interest in you whatsoever as opposed to anyone else in
7     the world?
8          MS. MAYS: Objection.
9          THE WITNESS: Yeah, I told you already
10    I never met that person. I never know that person.
11    BY MS. FREUDENBERGER:
12    Q.    Okay. And regardless of ever meeting him, you
13    never noticed any -- him in any way, correct?
14    A.    Yes.
15    Q.    At the -- during the criminal proceedings --
16    and I can show you if you'd like -- you testified that
17    you were sure that the -- your attacker put the gun in
18    your mouth with his left hand because he was grabbing
19    you with his right hand. Is that accurate?
20    A.    Yeah, I don't know his left hand or right
21    hand, but I know the gun was point at my mouth.
22    Q.    Okay. If at the preliminary hearing, you
23    testified that he was holding the gun in his left hand,
24    do you have any reason to dispute that today?

Page 83

1          MS. MAYS: That's the trial testimony?
2          MS. FREUDENBERGER: (Sotto voce.)
3          THE WITNESS: Yeah, I don't remember it
4     was left hand or right hand now, so I don't know how to
5     answer the question.
6     BY MS. FREUDENBERGER:
7     Q.    Sure.
8          MS. FREUDENBERGER: Would you mind,
9     Mr. He, reading to the witness from Page 26 --
10         THE INTERPRETER: 26.
11         MS. FREUDENBERGER: -- Line -- I'm
12    sorry. It's this preliminary hearing transcript, and I
13    will put a line around where I'm asking. Could you
14    translate for the witness what's on Page 26 and
15    Page 27?
16         THE INTERPRETER: You mean all the way
17    to...
18         MS. FREUDENBERGER: Yeah. I'm sorry.
19         THE INTERPRETER: That's a long -- long
20    -- long paragraph, right?
21         MS. FREUDENBERGER: I know.
22         THE INTERPRETER: Okay.
23         MS. FREUDENBERGER: Can we -- you know
24    what? I think it's okay. I am close to finished with

Page 84

1     my questioning. If you wouldn't mind if we could just
2     take a five-minute break and let me confer with my
3     colleagues.
4          THE INTERPRETER: So you don't want me
5     to read this one?
6          MS. FREUDENBERGER: No.
7          THE VIDEOGRAPHER: Okay. So we're
8     going off the record at 2:45.
9          - - -
10         (Whereupon, a brief recess was taken.)
11         - - -
12         THE VIDEOGRAPHER: We're back on the
13    record at 2:58.
14    BY MS. FREUDENBERGER:
15    Q.    I understand that you experienced horrible
16    trauma during this incident, and I have to ask because
17    I know from dealing with other traumatic situations
18    that prior trauma can be relevant to how somebody
19    experiences later trauma. Had you experienced in life
20    before this time other violence, specifically being
21    beaten?
22         MS. MAYS: Objection.
23         THE WITNESS: No.
24    BY MS. FREUDENBERGER:

Page 85

1  Q.    Okay.  And had you been sexually assaulted
2  prior to this incident?
3        MR. JACKAL:  Objection.
4        THE WITNESS:  No.
5  BY MS. FREUDENBERGER:
6  Q.    Okay.  Did you receive a settlement in
7  connection with your lawsuit against Saint Agnes
8  Hospital?
9  A.    No.
10 Q.    Okay.  And the final thing I just have to
11 bring out because I have an obligation to put it on the
12 record.  When you and I spoke through -- well,
13 withdrawn.  I'll back up.
14       For -- for so many valid reasons, you
15 did not want to come testify here today, correct?
16 A.    Yes.
17 Q.    Okay.  And -- but I have to ask you, when you
18 and I spoke with your son, Rocky, translating on the
19 phone, you asked him to ask me for $1,000 to come here
20 and testify, correct?
21 A.    Yes, because if I came here again to reopen
22 the wounds in my past, will cause me lot of distress,
23 anxiety, I need a week to take off from my work, and
24 the thousand dollars to compensate taking a week off

Page 86

1  from work.
2  Q.    Okay.
3        MS. FREUDENBERGER:  Thank you.  That's
4  all the -- the questions that I have, but the defense
5  lawyers may have questions.
6        THE VIDEOGRAPHER:  Can I -- I'm sorry.
7  Can I ask you to pass the mic?
8        MS. FREUDENBERGER:  Oh, yeah.  Sure.
9        MS. MAYS:  Thank you.
10              - - -
11            EXAMINATION
12              - - -
13 BY MS. MAYS:
14 Q.    Good afternoon, Ms. ████.  My name is Katelyn
15 Mays, and I'm an attorney for some of the Philadelphia
16 police officers that are being sued in this case.
17 Okay?
18       I'm going to ask you a few questions.
19 I'm going to try to be as quick as possible so you can
20 get out of here.  Okay?
21       You just talked to Ms. Freudenberger
22 and she asked you about the time when you talked to
23 her.  Do you remember that?
24 A.    Yes, my son talked to her.

Page 87

1        MS. FREUDENBERGER:  That's true.  For
2  the record, to be clear, I talked to her son and she
3  was --
4        MS. MAYS:  Translating.
5        MS. FREUDENBERGER:  -- in the
6  background talking --
7        MS. MAYS:  Got it.
8        MS. FREUDENBERGER:  -- to him and he
9  was relaying information to me.  I think that's the
10 most accurate way to characterize it.
11       MS. MAYS:  Okay.  So I'll clarify.
12 BY MS. MAYS:
13 Q.    So you talked to -- your son talked to
14 Ms. Freudenberger who -- and then your son told you --
15 translated for you?
16 A.    Yes.
17 Q.    And did your son tell you who
18 Ms. Freudenberger represents in this lawsuit?
19 A.    Yeah, he told me she represent the -- the --
20 the criminal.
21 Q.    Okay.  Besides asking for money for coming
22 here today, did you talk about anything else that you
23 can remember?
24 A.    Yeah, I also request for -- for, like, a

Page 88

1  vehicle pick me up for my safety to come here or to --
2  to send me back.  Also request for an interpreter.
3  Q.    Got it.  Okay.  And was a vehicle provided or
4  a ride here for you?
5  A.    My -- my eldest son, Jacky, he -- he flew back
6  from San Francisco here.  He -- he took me here.
7  Q.    Okay.  And besides that conversation, have you
8  ever talked to Ms. Freudenberger through your son
9  before?
10 A.    My son called Ms. Freudenberger.
11       MS. FREUDENBERGER:  I can clarify for
12 the record, that Jacky attempted to call me; I was
13 unavailable, and he spoke to Amelia Green.  I'm not
14 sure more -- if it was more than once.  My
15 understanding of that conversation was it was about
16 whether we could agree to use Ms. ████ trial testimony
17 instead of taking her deposition.
18       MS. MAYS:  Okay.
19       MS. FREUDENBERGER:  I don't believe
20 anything substantive about the case was discussed.
21       MS. MAYS:  Okay.  I don't think we need
22 to translate that.
23       MS. FREUDENBERGER:  It's up to you.
24       THE INTERPRETER:  (Translates.)

█████ 2/27/2024

## Page 89

```
 1   BY MS. MAYS:
 2   Q.    Okay.  Do you know whether you've ever talked
 3   to anyone else at the firm that Ms. Freudenberger works
 4   at?
 5   A.    No.
 6   Q.    Has anyone from a place called the Innocence
 7   Project ever tried to contact you?
 8   A.    Right now?
 9   Q.    At any point.
10   A.    I don't -- I don't recall whether last year or
11   the year before, there was a policeman; he was able to
12   speak Cantonese.  He contact me and -- he contact my
13   son to -- to give him a call, but my son never called
14   him.
15   Q.    Okay.  So you heard today that Mr. Hicks was
16   released from prison, right?
17   A.    Yes.
18         MS. FREUDENBERGER:  I'm sorry to
19   interrupt.  In case I have an obligation to put it on
20   the record, I want to err on the side of doing so.  My
21   understanding from files is that the Innocence Project
22   sent an investigator out in 2018 to try to get a DNA
23   sample from Ms. ████ husband, and ultimately -- I know
24   a sample was obtained from one of her sons, but I don't
```

## Page 90

```
 1   know if it was by the Innocence Project or from the
 2   DA's office.
 3         MS. MAYS:  Okay.
 4   BY MS. MAYS:
 5   Q.    Before you heard that Mr. Hicks was released
 6   from prison, did anyone from the district attorney's
 7   office ever reach out to you?
 8   A.    Yes.
 9   Q.    Do you remember who it was?
10   A.    I didn't talk to them.  I don't -- I know that
11   my husband or my son was talking to them.
12   Q.    Did your husband or your son ever tell you
13   what they said?
14         MS. FREUDENBERGER:  Objection.
15         THE WITNESS:  Was about he's released.
16   BY MS. MAYS:
17   Q.    So was he already released at that point?
18         MS. FREUDENBERGER:  Objection.
19         THE WITNESS:  I don't know.
20   BY MS. MAYS:
21   Q.    Okay.  Did anyone from the district attorney's
22   office ever tell you or your family that there was
23   going to be a hearing before he was released?
24   A.    I don't know.
```

## Page 91

```
 1   Q.    I'm going to talk now about the time that you
 2   -- around 2001, you were working at Dunkin' Donuts,
 3   right?
 4   A.    Yes.
 5   Q.    And do you -- did you usually work the same
 6   hours each day?
 7         MS. FREUDENBERGER:  Objection.
 8         THE WITNESS:  Yes.
 9   BY MS. MAYS:
10   Q.    And what were those hours?
11   A.    5:00 to 12:00.
12   Q.    5:00 a.m.?
13   A.    Yes.
14   Q.    And when you went to Dunkin' Donuts, did you
15   usually walk the same way from your home?
16   A.    Yes.
17   Q.    And how many days a week did you work at
18   Dunkin' Donuts in 2001?
19   A.    Five days.
20         MS. MAYS:  Can we take a quick
21   five-minute break?
22         THE VIDEOGRAPHER:  Going off the record
23   at 3:12.
24              - - -
```

## Page 92

```
 1         (Whereupon, a brief recess was taken.)
 2              - - -
 3         THE VIDEOGRAPHER:  And we're back on
 4   the record at 3:16.
 5         MS. MAYS:  Thank you so much for
 6   coming, Ms. ████  I don't have any other questions.
 7         MR. JACKAL:  Thank you, Ms. ████  I
 8   don't have any questions for you.
 9         MS. JOHN:  I also don't have any
10   questions.
11         MS. FREUDENBERGER:  I just have one
12   follow-up.
13         THE VIDEOGRAPHER:  I'm sorry, could you
14   exchange mics again?
15         MS. FREUDENBERGER:  (Complies.)
16              - - -
17         FURTHER EXAMINATION
18              - - -
19   BY MS. FREUDENBERGER:
20   Q.    Ms. ████ the police officer who spoke
21   Cantonese who came out to see you in 2001 or 2002, did
22   he identify himself as a Philadelphia Police Department
23   officer?
24   A.    Yes.
```

23 (Pages 89 to 92)

**KAPLAN LEAMAN & WOLFE**

## Page 93

1  Q.   And what else did he say to you?
2  A.   Yeah, he left a business card.  Then I told
3  him I'm not talking about those things, then my son
4  would probably call you.
5  Q.   Okay.  And did he explain that he was working
6  on the -- withdrawn.
7       Did he explain that his visit was in
8  relation to this civil case?
9  A.   Yeah, I'm not sure.  It seems he mentioned
10 about it.
11 Q.   Okay.
12      MS. MAYS:  I thought -- you said the
13 police officer came in 2001 or 2002 --
14      MS. FREUDENBERGER:  Yeah.
15      MS. MAYS:  -- and your question --
16      MS. FREUDENBERGER:  Yeah, that's what
17 she said.
18      MS. MAYS:  Oh, okay.  Then it can't be
19 about this civil case.
20      MS. FREUDENBERGER:  Why?  Didn't we
21 file in 2002?
22      MR. JACKAL:  You said 2001, 2002.
23      MS. FREUDENBERGER:  Oh, I'm sorry.
24      MS. MAYS:  I was like, no, I don't

## Page 94

1  think so.
2       MR. JACKAL:  It feels like it.
3  BY MS. FREUDENBERGER:
4  Q.   Could you tell me when the police officer came
5  to see you? -- because I think I misspoke.  Was it in
6  the last couple of years?
7  A.   The recent years.
8  Q.   Okay.  And -- that's what I meant to say.  And
9  did he indicate what he wanted to talk to you about?
10 A.   Because -- because I don't want to talk about,
11 and then I -- I was telling my son to call -- he asked
12 me to ask my son to call him back, and my son does not
13 have the time to call him back.
14 Q.   Okay.
15      MS. FREUDENBERGER:  All right.  Thank
16 you very much.
17      THE VIDEOGRAPHER:  Okay.  So this ends
18 today's deposition.  We're going off the record at
19 3:20.
20          - - -
21      (Whereupon, a discussion was held off
22 the video record only.)
23          - - -
24      THE COURT REPORTER:  Okay.  And,

## Page 95

1  Ms. Mays and Mr. Jackal, we have regular delivery,
2  minuscript, by e-mail, correct?
3       MR. JACKAL:  Yep.
4       Ms. MAYS:  Yes.  Thank you.
5       MS. FREUDENBERGER:  We can compensate
6  you under the rules for the lost wages from today from
7  having to be at the deposition today.
8       THE WITNESS:  I would like.
9       MS. FREUDENBERGER:  And, yes, we should
10 put that on the record.  I forgot; I'm sorry.
11      What is your -- and I assume all
12 counsel stipulates to that?
13      MS. MAYS:  Yeah, that's fine.  You're
14 firm is going to be paying it, I guess?
15      MS. FREUDENBERGER:  Yeah, we'll pay it.
16      MS. MAYS:  Yeah, that's fine.
17      MS. FREUDENBERGER:  And I don't think
18 this is going to come up, but can we all stipulate that
19 reimbursing Ms. ██ for her lost wages is permissible
20 under the rules and not subject to -- no one's going to
21 try to cross-examine her on bias based on us
22 compensating her for her lost wages for the day of
23 work?
24      MS. MAYS:  I don't know that rule

## Page 96

1  specifically on the lost wages.  I know the witness
2  fee, but, yeah, that's fine.
3       MS. FREUDENBERGER:  It doesn't seem
4  like your angle for cross.
5       MS. MAYS:  Yeah, that's fine.
6       MS. FREUDENBERGER:  All right.  And
7  what are the wages that you've lost from today?  You
8  could bring your son in and we can -- I don't know
9  normally how to do this.
10          - - -
11      (Whereupon, a brief pause was taken.)
12          - - -
13      MS. FREUDENBERGER:  So I think this is
14 the statement.  Can I ask -- is it okay if I ask your
15 son?
16      THE WITNESS:  Okay.  He don't know.
17      MS. FREUDENBERGER:  He doesn't know.
18          - - -
19      (Whereupon, a discussion was held off
20 the record.)
21          - - -
22      MS. FREUDENBERGER:  I want to make sure
23 we're doing this by agreement and on the record.  She
24 makes $1,290 and she works six hours a day, seven days

**KAPLAN LEAMAN & WOLFE**

█████ 2/27/2024

Page 97

1   a week, so that would be 12 hours, right?  Would be
2   $107.5 an hour?
3          MS. MAYS:  That seems like a lot.
4          MS. FREUDENBERGER:  I'm sorry, could
5   you pull that up again?  It's fine; I just don't want
6   to -- as long as it's --
7          MS. MAYS:  It's the right number.
8          MS. FREUDENBERGER:  As long as it's
9   accurate and it's not going to become an issue, I'm
10  fine with that.
11         So it would be -- I mean, does that
12  seem --
13         MS. MAYS:  Is it $15 an hour?
14         MS. FREUDENBERGER:  Why don't we go off
15  the record and figure it out, and then we can go back
16  on the record and put it on the record.
17                 - - -
18         (Whereupon, a discussion was held off
19  the record.)
20                 - - -
21         MS. FREUDENBERGER:  Ms. █ does $120
22  sound like an accurate estimate of what you lost today?
23         THE WITNESS:  Yes, for the day.
24         MS. FREUDENBERGER:  Could all counsel

Page 98

1   just verbally agree on the record that Plaintiff's
2   counsel will compensate Ms. █ $120 for her lost wages
3   from today, and that all counsel agrees.  And all
4   counsel agrees not to use that compensation to
5   cross-examine Ms. █ or somehow argue bias against the
6   plaintiff in this case.
7          MS. MAYS:  Yes, agreed.
8          MS. JOHN:  Agreed.
9          MR. JACKAL:  Agreed.
10         MS. FREUDENBERGER:  Thanks.
11         THE COURT REPORTER:
12  Ms. Freudenberger, is regular delivery okay?
13         MS. FREUDENBERGER:  Yes.  Thank you.
14                 - - -
15         (Whereupon, the videotaped deposition
16  of █ was concluded at 3:30 p.m.)
17                 - - -
18
19
20
21
22
23
24

Page 99

1          C E R T I F I C A T I O N
2
3
4
5          I hereby certify that the proceedings and
6   evidence noted are contained fully and accurately in
7   the stenographic notes taken by me upon the foregoing
8   matter on Tuesday, February 27, 2024, and that this is
9   a correct transcript of the testimony given by the
10  witness of the same.
11
12
13
14  --------------------
    Nicolle Joan Tornetta
15  Registered Professional Reporter
    and Notary Public
16  My Commission Expires:
    July 15, 2026
17
18
19         (The foregoing certification of this transcript
20  does not apply to any reproduction of the same by any
21  means, unless under the direct control and/or
22  supervision of the certifying reporter.)
23
24

**KAPLAN LEAMAN & WOLFE**

█████ 2/27/2024

| A | | | |
|---|---|---|---|

**A**

**a.m** 1:19 5:3
  91:12
**ability** 9:14
**able** 8:16,17,23
  10:19,20 11:5
  11:12,14 20:17
  26:22 31:6
  45:8 46:16
  47:5,7,10,17
  47:21 48:7,15
  51:18 54:15,21
  67:6 72:24
  73:15 76:20
  80:2 81:9
  89:11
**absolutely** 45:20
**acc-** 74:22
**accurate** 10:23
  11:4,11 19:9
  27:18 28:6
  29:7 30:4
  33:18 35:12
  37:10,17 40:11
  41:4 44:9,14
  44:21 45:12,20
  46:7,12 53:11
  56:22 57:18,24
  58:1 60:17
  77:20 82:19
  87:10 97:9,22
**accurately** 99:6
**act** 8:8
**action** 1:2 5:15
**actions** 62:8
**adamantly**
  71:21
**afraid** 72:4
**African** 48:5,8
**afternoon** 86:14
**Agnes** 26:18,23
  85:7
**ago** 12:9 39:3,4
**agree** 32:7 57:18
  67:5 76:5,15
  88:16 98:1

**agreed** 5:5 98:7
  98:8,9
**agreement** 6:9
  96:23
**agrees** 98:3,4
**ahead** 12:17
  16:8 25:19
**AHMAD** 3:2
**aide** 8:8
**al** 5:8
**ALEENA** 3:4
**alley** 15:22
  18:10 24:12
  30:21 31:2
  48:23 50:7
  52:9,13,18,24
  53:10 54:5
  78:16 80:8
  81:8
**Amelia** 88:13
**American** 48:5,8
**amount** 78:21
**ample** 6:11
**and/or** 99:21
**angle** 96:4
**answer** 34:18
  35:5 39:18
  54:2,11 58:2
  68:6 71:19
  83:5
**answered** 10:23
  17:16 41:20
  42:3 61:4 62:1
**answering** 11:22
**answers** 4:18
  26:10 41:10
  73:11
**anxiety** 85:23
**anybody** 25:4
**anymore** 20:17
  70:15
**apologize** 13:20
**appearances** 3:1
  5:18
**apply** 99:20
**appreciate**

  63:10,16
**approaching**
  19:13
**Arch** 1:17 2:9,15
**area** 49:7 79:22
**argue** 98:5
**arm** 15:13
**Arrington** 32:4
**arrive** 48:22
  50:9 51:17
  52:1,7 53:9
**arrived** 33:6,16
  33:22 35:9,15
  36:17,20,21
  38:2,9 39:15
  39:22 40:12,17
  41:2,8 44:18
  44:23 46:15
  50:7 51:17
  52:10 55:7
  59:13,15,19
  60:5,8,10,18
  62:24 73:2
  78:6
**arriving** 69:2
**Arthur** 1:7 2:17
**ask-** 35:24
**asked** 10:19,20
  17:14,23 39:14
  41:19 42:2
  44:6,11 45:5
  45:10 50:20
  61:3 62:1 68:5
  70:3 85:19
  86:22 94:11
**asking** 28:18
  48:15 61:11
  64:18 75:12,12
  80:21,22 81:4
  83:13 87:21
**asorithia@azl...**
  3:7
**assault** 29:10
  32:7 59:10
**assaulted** 35:23
  85:1

**assume** 54:2
  95:11
**attack** 28:16
  36:16 41:2,17
  61:14
**attacked** 47:11
  47:18 48:3,13
  66:16 67:1
  71:10 72:2
  79:21 80:1,13
**attacker** 39:21
  82:17
**attacking** 39:16
**attempted** 88:12
**attention** 19:17
**attorney** 8:19,22
  17:14,23 26:21
  26:21 27:1,5
  44:2,19 86:15
**attorney's** 13:10
  90:6,21
**attorneys** 13:16
**audio** 5:3
**aware** 46:24
  47:1 48:24
  49:12

| B | | | |
|---|---|---|---|

**B**

**B** 4:14
**back** 9:3 11:9,11
  26:2 39:17
  43:21 52:9,17
  53:10 54:5
  72:14 73:22
  74:4 78:16
  84:12 85:13
  88:2,5 92:3
  94:12,13 97:15
**background**
  87:6
**badly** 15:24 18:4
  20:17 22:19
  24:17 25:12
  28:10 29:21
  30:6 35:22
  38:22 49:22

  58:4 61:12
  62:17 69:1
  71:12 80:7
**based** 29:20
  80:11 95:21
**basic** 7:7
**basis** 80:22 81:4
**Bates** 31:13 34:5
  34:10
**Bates-stamped**
  27:5 31:21
**beat** 15:23 16:13
  16:16,16 18:3
  18:15,16 20:16
  21:22 22:20
  24:17 58:4
  71:17
**beaten** 17:18
  25:12 28:10
  35:22 49:23
  69:1 80:7 81:7
  84:21
**beating** 14:6
  17:15,24 28:1
  28:5,24 29:13
  29:14 32:8,16
  40:18 57:10
**behalf** 5:13,17
**belief** 80:22 81:4
**believe** 38:14
  66:23 71:9
  88:19
**ben.jackal@p...**
  2:16
**BENJAMIN**
  2:13
**best** 9:24 25:11
  68:6
**bias** 95:21 98:5
**black** 29:11
  48:17
**bleeding** 30:5
  56:6 57:10,16
  58:1 65:2
**blue** 29:11
**body** 17:16

24:13 31:3,3
75:18
**bottom** 50:15,19
**break** 10:13
12:5,6 22:6
42:20,24 72:5
72:8 84:2
91:21
**Brian** 1:9 3:16
**Bridget** 1:8 3:15
**brief** 43:19 74:2
84:10 92:1
96:11
**briefly** 12:11
**bring** 85:11 96:8
**Broad** 1:23 3:4
**brought** 10:21
26:17 39:7
65:10 67:5
**bruised** 29:11
60:16
**bruises** 27:14
**BRUSTIN** 2:2
**Building** 2:9,14
**bump** 21:12,18
23:2,23,24
**bumps** 23:17
24:2,4
**business** 93:2
**buy** 82:1

— C —
**C** 2:1 99:1,1
**call** 62:23 63:11
88:12 89:13
93:4 94:11,12
94:13
**called** 88:10
89:6,13
**calls** 62:2
**camera** 48:22
**Campbell** 1:8
2:17
**Cantonese** 3:19
6:12 7:18
89:12 92:21

**capacities** 1:11
**car** 78:14
**car's** 51:9
**card** 93:2
**care** 8:5,6 34:6
**cars** 33:14 44:8
59:15,20 60:6
60:10 69:2
**case** 8:16 13:8
16:22 71:8
72:18 86:16
88:20 89:19
93:8,19 98:6
**Cast** 2:9
**CAT** 32:5
**catch** 51:18
**caught** 65:15
66:2
**cause** 85:22
**Center** 26:18
**certain** 60:22
61:18 76:19
79:24 80:11
**certification**
99:19
**certified** 6:10
**certify** 99:5
**certifying** 99:22
**change** 57:21
**chaotic** 18:1
67:22
**characterizati...**
60:17
**characterize**
87:10
**Chinese** 8:12
74:15
**choked** 15:16
48:10
**City** 1:6 2:13,17
5:7
**civil** 1:2 2:14
93:8,19
**clarify** 87:11
88:11
**CLARK** 3:10

**clean** 46:3
**clear** 6:16 11:18
35:21 39:14
53:5 54:17
62:7,11,17
69:3 87:2
**clearer** 47:9
59:22
**clearly** 47:20
76:11
**close** 19:17
83:24
**clothing** 24:11
**coffee** 82:1,3
**colleagues** 12:10
84:3
**come** 26:21 27:2
50:24,24 54:14
70:21 85:15,19
88:1 95:18
**comfort** 7:5
**coming** 12:12
87:21 92:6
**commencing**
1:18
**comment** 64:15
**Commerce** 3:11
**Commission**
99:16
**commit** 71:17
**communicate**
7:14 8:11,17
8:18 10:20,21
**compensate**
85:24 95:5
98:2
**compensating**
95:22
**compensation**
98:4
**Complies** 36:12
56:20 57:4
59:2 74:17
77:14 78:1
92:15
**Compound** 69:9

**concluded** 98:16
**conducting** 6:13
**confer** 84:2
**conflict** 54:9
**conflicted** 53:23
**confused** 35:7,9
40:8,10,13,19
41:3 44:13,24
49:22 78:8
**confusing** 54:1
59:23
**conjecture**
66:15
**connection** 85:7
**conscious** 32:15
41:8 61:8
**consciousness**
32:13,18,21
33:4 36:5,16
41:16,17 42:1
60:24 61:1,13
61:22
**consistent** 55:3
**consistently**
71:20
**contact** 62:6
89:7,12,12
**contained** 99:6
**continually**
18:16
**continue** 5:4
**continued** 3:1
24:21
**continues** 27:16
**continuously**
14:7
**contrary** 80:23
**control** 99:21
**conversation**
67:4 68:10,14
88:7,15
**conversations**
42:11
**convict** 39:6
**convicted** 71:13
**conviction** 13:2

**copies** 9:21
**copy** 46:4 56:8
**corner** 18:21
54:6
**correct** 8:19 9:4
9:17 11:15
14:3,7,9,11,19
14:22,24 15:5
15:12 16:1,6
16:13,20,22
17:10,19 18:12
18:19 21:18
22:1 23:19
25:14 26:19
27:18 29:1,15
29:24 32:8
33:8,14 36:5
37:1,5 38:15
39:17 40:9
46:14 47:12,23
49:8,14 51:10
53:15 54:22
55:4 58:5
59:16 60:6
63:3,9,14 66:6
67:6,12 68:19
71:13 72:19
73:7 74:16,23
75:19 78:9,16
78:24 80:14
81:10 82:13
85:15,20 95:2
99:9
**correctly** 45:14
**counsel** 6:9,15
43:13 95:12
97:24 98:2,3,4
**Counsel's** 66:20
**Counsels'** 5:17
**couple** 7:5 11:20
12:9 15:20
56:2 58:22
94:6
**court** 1:1 5:9,16
5:21 6:6 8:24
9:4 16:21,23

16:24 17:2
34:17 38:14,24
38:24 39:1
74:7,11 75:6
94:24 98:11
**courthouse** 17:3
**courtroom** 79:5
79:14
**crime** 64:12 65:3
71:17
**criminal** 8:16
10:19 51:18
72:17 82:15
87:20
**cross** 96:4
**cross-examine**
95:21 98:5
**crossed** 19:10
**crying** 15:6
60:16
**currently** 7:21
8:2
**customers** 7:15

**D**

**D** 4:1
**D10548** 34:23
**D45** 31:22
**DA's** 90:2
**damages** 26:19
26:23
**Danzer** 3:18
5:12
**dark** 47:19
48:10 58:13
80:1 81:11
**dated** 4:20 26:10
**David** 32:3
**day** 91:6 95:22
96:24 97:23
**days** 91:17,19
96:24
**dazed** 49:22
60:16
**dealing** 84:17
**death** 21:5 30:11

**deceased** 1:9
3:16
**Defendant** 3:14
**defendants** 1:12
2:17 3:7 43:13
**Defendants'**
4:19 26:10
**defense** 86:4
**delivery** 48:22
49:12 50:6
95:1 98:12
**Dennis** 1:7 3:8
**Department**
2:13 9:6 92:22
**deposition** 1:15
5:6 6:13 12:12
88:17 94:18
95:7 98:15
**DeROSE** 3:11
**describe** 60:1
**described** 60:15
60:16
**DESCRIPTI...**
4:16
**details** 70:9
**detect-** 67:21
**detective** 70:4
**detectives** 67:19
67:21 68:11,16
69:20
**developed** 28:4
**diagnosis** 32:6
**die** 29:22 36:22
37:1,5 78:9
**difference** 23:13
**different** 65:20
**difficult** 11:2
30:14 31:19
36:3 68:8 70:9
**direct** 99:21
**direction** 20:1
52:13 53:1
**directly** 13:9
**dis-** 19:11
**discussed** 88:20
**discussion** 43:4

94:21 96:19
97:18
**dispute** 36:4
37:24 38:9
57:8,13 82:24
**distance** 19:11
19:12
**distress** 27:17
85:22
**district** 1:1,1 5:9
5:9 8:18,22
13:10,16 17:14
17:23 44:2,18
90:6,21
**divorced** 7:21
**dizzy** 37:10,10
37:20 38:1,9
**DNA** 89:22
**doc-** 61:21
**doctor** 22:15
**doctor's** 32:17
**doctors** 22:8
32:3,20 36:15
41:24 42:11
**document** 27:4
27:11,12 32:2
32:2 35:6
**documentation**
21:10
**documents**
26:24
**doing** 89:20
96:23
**dollars** 85:24
**Donuts** 7:14
14:16 15:10
20:9 81:14
82:1 91:2,14
91:18
**Douglas** 1:10
2:18
**drag** 15:17
24:11
**dragged** 15:21
18:10 24:22
30:21 31:2

48:23 50:6
69:1 80:7 81:7
**drugs** 15:8
**Duane** 1:11 2:19
**duly** 5:24 6:3
**Dunkin'** 7:14
14:16 15:9
20:9 81:14
82:1 91:2,14
91:18
**duty** 63:17,22

**E**

**E** 2:1,1 4:1,14
99:1
**e-mail** 95:2
**early** 14:2 20:8
**Eastern** 1:1 5:9
**Eighth** 2:4
**either** 13:8
66:14
**elapsed** 55:16
78:21,22
**elderly** 8:9
**eldest** 88:5
**Ellis** 1:7 3:8
**Emma** 2:3 31:14
**emma@nsbci...**
2:5
**employed** 8:2
**ends** 94:17
**English** 6:12 7:6
7:11,16,17
8:11,19,23
9:19 11:6,12
11:15 67:6
**entered** 73:1
75:15
**entire** 79:6
**err** 89:20
**escape** 53:1
**ESQUIRE** 2:3,3
2:8,13 3:3,3,4
3:10,11
**Estate** 1:9 3:15
**estimate** 97:22

**et** 5:8
**event** 15:4
**eventually** 20:16
26:17 27:15
**everyday** 7:11
**evidence** 99:6
**ex-** 50:4
**ex-husband**
7:23
**Exactly** 77:13
**EXAMINATI...**
4:9 6:22 86:11
92:17
**examined** 5:24
6:4 28:10
**example** 49:21
**exchange** 92:14
**exhibit** 25:2,20
25:22 26:6,6,7
26:9,24 27:3
31:16 34:4,10
34:13 50:14,15
**experience** 6:11
23:12 81:6
**experienced**
28:6 40:18
84:15,19
**experiences**
84:19
**Expires** 99:16
**explain** 12:2
38:5 58:18
93:5,7
**explanation**
50:8
**express** 82:5
**extent** 8:17
**extremely** 38:21
**eyesight** 28:5

**F**

**F** 99:1
**face** 15:12,24
17:17,19 22:9
27:15 29:10
30:6 39:16

███ 2/27/2024

56:6,6 57:10
57:16 58:3
59:9
**fact** 22:8 27:24
29:21 31:18
37:4 45:18
50:8 63:8 66:1
80:12
**fair** 18:3 55:13
68:4,24
**family** 90:22
**faster** 73:15
**February** 1:13
99:8
**fee** 96:2
**feel** 12:1 13:13
63:9
**feeling** 63:12
**feels** 94:2
**Feinberg** 1:17
2:8
**fell** 24:18
**felt** 28:16 37:19
38:1,9 62:17
**female** 60:12
65:10
**figure** 23:12
97:15
**file** 26:22 93:21
**filed** 5:8
**files** 27:2 89:21
**fill** 26:22
**final** 85:10
**financially** 5:15
**find** 25:9 36:1
73:15
**fine** 26:15 34:8
53:19 79:19
95:13,16 96:2
96:5 97:5,10
**finish** 41:13
**finished** 57:9
79:12 83:24
**fired** 55:22
78:23
**firm** 89:3 95:14

**first** 12:14 13:7
15:21 16:12
18:18 28:20
35:8 41:6
45:14 59:19
60:5
**fist** 14:11
**fists** 16:9 18:5
25:13
**Five** 91:19
**five-minute** 84:2
91:21
**flew** 88:5
**floor** 2:4 62:22
**follow-up** 92:12
**followed** 18:23
**follows** 6:1,4
**foregoing** 99:7
99:19
**forgot** 95:10
**former** 7:20
**Francisco** 88:6
**Frank** 1:10 2:18
**free** 12:1
**Freudenberger**
2:3 4:10,12 6:8
6:20,24 10:5
10:10,12,16,17
11:10 12:18,20
16:4,11,17
17:4,10,13,22
19:5,19,23
20:10,15,22
21:6,24 22:7
22:13,23 23:9
23:22,24 24:3
24:9,23 25:3,8
25:10,18 26:1
26:5,13,16
28:13 29:4,18
30:3,12,19
31:5,15,20
32:11 33:2,12
34:3,9,11,21
36:8,13 37:15
37:21 38:6,19

39:12 40:3,16
40:23 41:12,14
41:22 42:6,18
42:22 43:12,23
45:4,15,16,18
45:22 46:2,6
46:11,22 47:14
47:16 48:6
49:3,11,17,19
50:3,13 51:14
51:19 52:15,20
53:3,18,21
54:12 55:2,9
56:1,7,10,13
56:17,19,21,23
57:3,7,14,23
58:9,20,24
59:3,6,7,22
60:2,21 61:9
61:17 62:4,15
63:1,7,19,23
64:4,9,17
65:19,22,23
66:10,19,22
67:10,17 68:3
68:18,23 69:11
69:18 70:5,16
71:2,18,24
72:7,16,22
73:4,6,10,14
73:17,19 74:6
74:12,16,18
75:4,22 76:1
76:10,13,18,23
77:1,4,6,8,12
77:16,19,23
78:4,13,20
79:4 80:10,20
81:2,3 82:11
83:2,6,8,11,18
83:21,23 84:6
84:14,24 85:5
86:3,8,21 87:1
87:5,8,14,18
88:8,10,11,19
88:23 89:3,18

90:14,18 91:7
92:11,15,19
93:14,16,20,23
94:3,15 95:5,9
95:15,17 96:3
96:6,13,17,22
97:4,8,14,21
97:24 98:10,12
98:13
**Friedman** 32:3
**front** 21:12,17
23:2,17,24
50:15 80:4
**full** 7:1
**fully** 99:6
**FURTHER**
92:17

___

### G

**Gelinas** 27:6
**Gelinas40** 27:5
**genuinely** 64:12
**getting** 28:21
**gharris@krla...**
2:11
**give** 46:3 89:13
**given** 6:9 32:16
41:15 60:22
61:12 99:9
**go** 5:5 12:16
16:7 25:19
44:5 73:21
97:14,15
**going** 10:8 11:21
14:18 17:5
21:7,9 25:1,19
27:4,13 28:18
29:22 30:14,22
33:24 34:4,12
37:5 39:8 40:5
42:23 43:1,24
46:16 54:2,17
56:3,5 58:22
72:9 73:4,10
74:7 78:9 84:8
86:18,19 90:23

91:1,22 94:18
95:14,18,20
97:9
**good** 8:21 12:18
42:21 47:10,17
47:22 86:14
**gotten** 76:14
**grabbed** 14:1,6
15:21 18:18
19:7 20:2,11
48:3,11
**grabbing** 82:18
**GRACE** 2:8
**grateful** 64:21
**Green** 88:13
**ground** 24:18,21
35:7,9 41:3
45:6,7 47:4
54:8
**guess** 95:14
**gun** 14:9,12
15:10,11,14
16:6,13,13,16
16:18,20 17:24
18:2,4,12
21:13,17 22:1
22:4 23:3,19
25:14 29:21
81:7 82:17,21
82:23
**gunshot** 55:24
**gunshots** 44:13
45:1 78:23
**guy** 18:21 33:15
**guy's** 14:17
**guys** 26:13 34:6

___

### H

**H** 3:3 4:14
**hallway** 12:12
**hand** 18:2 39:16
59:9 75:18
82:18,19,20,21
82:23 83:4,4
**hands** 16:16
33:23

---

happened 23:19
39:3 42:9
44:12 50:20
66:5 69:4
74:20
happy 10:2 12:2
34:5
hard 21:17
30:22 47:20
58:10
HARRIS 2:8
head 15:24 16:5
16:13 17:16,17
17:19 18:4,11
21:12,12,17
23:2,3,18 24:1
24:4 25:12
27:21 28:10
32:5,7,8,10
39:17
headaches 27:17
27:22,24
headlights 53:9
78:14
health 8:8 28:19
hear 13:4 33:13
33:17,19 35:4
43:15 46:16
81:19
heard 13:3
44:13 45:1
55:17,22,24
78:23 79:21
89:15 90:5
hearing 17:6,7
35:12,16 37:8
37:17 38:1,8
38:10,15,23
65:13,20,21
66:5 69:3
82:22 83:12
90:23
heavily 57:10,16
held 1:16 5:10
43:4 94:21
96:19 97:18

help 62:8,11
64:12,24
helped 63:2
helpful 56:7
64:20
helping 8:8
68:15
Hicks 1:3 5:7
26:18 72:2
79:20 80:2,12
80:23 81:5,13
81:20 82:5
89:15 90:5
Hicks' 13:2
HILL 3:10
hit 16:5 18:11
21:13,16 23:3
25:13 80:19
hitting 23:18
29:6
Hodges 1:10
2:18
hold 15:14 51:21
holding 18:23
50:22 82:23
Holmes 1:10
2:18
home 7:16,17,19
7:23 8:5,7,8
13:6 91:15
homebound 8:9
homes 8:11
horrible 28:1
84:15
hospital 9:8,9,11
10:22 15:18
18:22 21:10
22:8 25:1
26:23 27:21
28:9 29:10
31:11,24 32:1
32:2 34:14
35:14 42:11
48:21 49:7,13
60:13,23 61:7
61:11 65:11,15

66:1,14,24
67:5,18 68:2,5
68:11 69:14,20
70:3,7,19 85:8
hour 42:23 97:2
97:13
hours 14:2 48:9
91:6,10 96:24
97:1
houses 19:8,11
Houston 5:14
Hudson 2:4
hurrying 19:24
hurt 13:24
hurting 29:21
husband 7:20
68:15 70:3,7
89:23 90:11,12

**I**

idea 25:7 41:23
identification
25:23 26:11
identify 92:22
immediately
20:4
impact 28:19
important 49:18
impression
64:18
inaccurate
23:15 33:21
46:23
inaccurately
38:15
incident 28:1
32:16,20 70:18
84:16 85:2
included 68:14
inconsistent
75:7
incorrect 39:5
indicate 94:9
indicating 81:19
indication 49:6
individual 1:11

13:9
inflicted 29:15
information
36:15 41:24
61:21 87:9
injured 9:12
38:22 61:12
71:16
injuries 9:13
56:3
injury 32:5
Innocence 89:6
89:21 90:1
insert 72:24
76:20
inserted 76:3
inside 50:21
72:19 74:22
75:9 76:14
instrument
21:22 24:6
intended 75:13
interacted 64:11
65:2
interest 82:6
interested 5:15
interfere 9:13
interpreter 3:19
4:3,5 5:20,23
6:10,14 9:1,17
10:1,15 12:1
17:2,9,11
19:21 36:9,12
41:9 43:11,14
45:19 46:1,8
56:9,11,16,20
57:1,4 58:23
59:2,5 63:21
70:24 73:11,13
73:16,18 74:14
74:17 76:8,12
77:3,5,7,10,14
77:17,21 78:1
83:10,16,19,22
84:4 88:2,24
interpreter's

11:24
interpreting
6:11
Interrogatories
4:19 26:10
interrupt 89:19
interview 21:8
21:10 34:1,14
34:24 69:19
interviewed
67:18 70:22
investigation
67:12
investigator
89:22
Iron 2:9
issue 97:9
issues 28:22

**J**

J 1:19
Jackal 2:13 6:19
18:7 20:7,20
21:2,20 22:21
23:6 25:5,15
30:1,16,24
32:23 38:17
41:18 42:4,13
45:13 46:19
48:1 49:15,24
50:11 51:12
53:17 57:20
58:7 61:2,24
62:2,13,20
64:2,13 66:8
66:18 67:8,13
69:6,9,16 70:1
70:12 71:15
75:1,21 76:6
76:21 78:17
79:1 80:15,24
85:3 92:7
93:22 94:2
95:1,3 98:9
Jacky 12:10
13:6 88:5,12

**jail** 39:6
**jderose@clar...**
  3:13
**Jefferson** 27:21
  31:11,23
**Joan** 99:14
**job** 64:3
**JOHN** 3:10,11
  6:18 26:15
  92:9 98:8
**JULIANNE**
  3:10
**July** 99:16

**K**

**Kairys** 1:16 2:8
**KAPLAN** 1:22
**Katelyn** 3:3
  86:14
**kept** 29:6 33:11
  45:10
**Kevin** 1:10 2:18
**keys** 15:3
**kind** 18:14
  21:21 22:5
  37:9 64:15
  75:2
**kmays@azlaw...**
  3:6
**knew** 61:6 67:11
  78:6
**know** 10:13
  11:17 12:2,5,9
  13:15 18:14
  19:10 21:21
  22:1 25:4 30:9
  30:10,14,22
  31:16 36:14
  37:23 40:4
  42:5,15 44:6
  47:6,14 49:17
  50:16 53:18
  54:1,11 55:18
  56:5 58:2
  59:24 60:8
  61:20 62:3

66:19 67:20
70:2,3,6 71:5
72:1 73:20
76:15 81:11,13
81:15,15,22
82:10,20,21
83:4,21,23
84:17 89:2,23
90:1,10,19,24
95:24 96:1,8
96:16,17

**L**

**language** 7:6
  36:3 41:11
  46:9 60:4
**LAW** 2:13
**lawsuit** 26:17,23
  27:1 85:7
  87:18
**lawyer** 27:11
**lawyers** 11:21
  12:13,15 86:5
**leading** 30:8
  32:22 33:9
  46:20 49:16
  66:18 67:14
  69:7 78:18
  80:4
**LEAMAN** 1:22
**learned** 48:20
**leave** 21:17
  ■ 1:15 4:7,17
  5:7 6:3 7:3,4
  9:16 12:8
  13:18 16:21
  25:23 26:17
  34:13 43:24
  48:21 59:8
  68:24 72:17
  74:19 77:20,21
  79:5 86:14
  92:6,7,20
  95:19 97:21
  98:2,5,16
  ■ 46:2 88:16

89:23
**left** 70:18 79:10
  79:12 82:18,20
  82:23 83:4
  92:3
**Legal** 3:18 5:13
  5:17
**Let's** 9:15 26:7
  27:3 72:4,7
**life** 7:12 63:6,9
  63:13 64:22
  84:19
**lights** 33:8,14,19
  44:24 51:9
  59:20 60:6
  78:7
**Lin** 1:17 2:8
**line** 36:11 39:13
  39:14 44:5
  56:18 59:4
  65:20 83:11,13
**Lines** 17:8 37:8
  44:4 45:23
  56:4,14,24
  58:21 74:8
  77:6
**lip** 22:10 27:16
**live** 7:19
**lived** 7:8
**lives** 7:23
**LLC** 3:2
**LLP** 1:17 2:2,8
**loading** 49:7
**long** 7:8 20:24
  27:8 42:8
  55:10 70:14
  83:19,19,20
  97:6,8
**look** 47:10,17,22
  77:2
**looks** 71:6
**loss** 32:12,17
  33:4 41:16
**lost** 32:21 36:5
  36:15 41:17,24
  60:23 61:13,22

95:6,19,22
96:1,7 97:22
98:2
**lot** 7:15 13:13
  53:23 56:6
  85:22 97:3
**loud** 18:19 20:4
  20:23
**lunch** 72:5,7,12
**lying** 45:6 79:23

**M**

**maintained**
  71:21 79:20
**male** 35:5 50:21
  67:19
**man** 13:24 14:6
  15:11 19:7
  20:2,16 21:16
  22:20 23:18
  28:2 29:6,14
  29:15,20 30:5
  51:23 52:5,9
  52:17 53:10
  54:16,21 55:11
  55:16,21 57:9
  58:4 62:18
  65:15 66:2,15
  66:16,24 67:1
  69:2 71:9,10
  72:2,18 76:3
  76:14,19 80:1
  80:13,23 81:5
  81:9
**man's** 25:13
**March** 17:7
**mark** 1:8 2:17
  25:1,19 26:6,7
**marked** 25:23
  26:11,24 34:3
  34:7,13
**Market** 3:12
**marking** 34:2
**Martin** 1:7 3:8
**Mary** 1:8 3:15
**matter** 5:7 13:17

99:8
**Mays** 3:3 4:11
  6:17 11:7
  12:16 16:2,7
  16:14 17:20
  18:6,13 19:3
  19:15 20:6,13
  20:19 21:1,19
  22:2,11 23:7
  23:20,23 24:2
  24:19 25:6,16
  26:3 28:11
  29:2,16 30:8
  30:15,23 31:13
  32:9,22,24
  33:9 34:2,7
  36:6 37:12,18
  38:3,16 39:10
  39:23 40:14,20
  41:19 42:2,14
  42:20 43:7,16
  45:2,21 46:18
  46:20 47:13,24
  49:1,9,16 50:1
  50:10 51:11,13
  52:11,19,22
  53:16 54:7,23
  55:5,23 57:11
  57:19 58:6
  59:21 60:19
  61:3,15,23
  62:1,19 63:4
  63:15 64:1,6
  65:17 66:7,17
  67:7,14,24
  68:17,20 69:7
  70:11 71:14,23
  72:20 73:8
  74:24 75:20
  76:7,16 78:10
  78:18 79:2
  80:3,16 81:1
  82:8 83:1
  84:22 86:9,13
  86:15 87:4,7
  87:11,12 88:18

88:21 89:1
90:3,4,16,20
91:9,20 92:5
93:12,15,18,24
95:1,4,13,16
95:24 96:5
97:3,7,13 98:7
**McKean** 19:13
19:18 20:1
**mean** 8:6 11:8
50:16 57:12
64:7 69:17
70:6 74:10
83:16 97:11
**means** 99:21
**meant** 94:8
**medical** 4:17
24:24 25:20,22
26:18 28:22,24
31:11,18,22
33:5 36:2,4
41:15 61:21
**meeting** 82:12
**meetings** 9:2
**memory** 25:11
41:7 55:3 69:4
**mental** 28:19
**mention** 78:12
**mentioned** 20:8
59:12 93:9
**Messing** 1:17
2:8
**met** 9:4 81:21
82:10
**metal** 16:6
**mic** 86:7
**Michael** 1:9
2:18
**mics** 92:14
**Mifflin** 18:20
**MIKAILA** 3:10
**mind** 26:14
45:23 66:11
73:15 83:8
84:1
**minuscript** 95:2

**minute** 53:6
**minutes** 73:22
**mischaracteri...**
54:7 55:23
67:15 69:8
80:16
**misspoke** 94:5
**mistake** 76:5
**misunderstan...**
74:20 75:3
**mjohn@clark...**
3:14
**moment** 14:5
44:17
**money** 14:16,21
15:6 26:19
87:21
**morning** 10:22
13:19,24 14:2
21:14 25:1
29:9 32:20
34:15 35:13
41:1,2 48:10
51:4,23 62:6
63:13 66:24
69:20
**mouth** 14:12
22:4,5,16
82:18,21
**move** 40:5 53:20
56:4
**movie** 54:10
**MRIs** 27:21
**multiple** 28:12
78:12
**Murphy** 44:2
71:3

**N**

**N** 2:1 4:1 99:1
**name** 5:12 7:1
86:14
**named** 27:6
**narrow** 52:13
**native** 41:10
46:8

**natural** 52:6
**nature** 80:4
**near** 81:14
**nearby** 82:3
**neck** 15:14
18:23
**need** 7:4 12:6
13:20,23 26:2
43:9 53:4
73:21 85:23
88:21
**needed** 22:19
**neighborhood**
81:24
**NEUFELD** 2:2
2:3
**never** 47:10,21
49:6 76:19,20
81:9,17,21
82:10,10,13
89:13
**New** 2:4,4
**Nicolle** 1:19
5:16 99:14
**night** 69:4
**noise** 14:13 18:9
18:17 21:5
33:17
**non-certified**
6:14
**non-leading**
66:21
**normally** 96:9
**Notary** 1:20
99:15
**note** 32:17
**noted** 5:18 99:6
**notes** 99:7
**notice** 1:16
48:15 49:23
**noticed** 82:13
**notified** 13:11
**November** 10:22
13:19 14:3
21:14 32:4
35:14 47:11,18

62:7 69:21
73:14 81:18
**number** 4:16
31:14 39:10
65:17 97:7

**O**

**O** 99:1
**o'clock** 43:22
**oath** 11:23
**Object** 70:1
**Object-** 68:17
**objection** 11:7
12:16,19 16:2
16:7,14 17:20
18:6,7,13 19:3
19:15 20:6,7
20:13,19,20
21:1,2,19,20
22:2,11,21
23:6,7,20
24:19 25:15,16
28:11 29:2,16
30:1,8,15,16
30:23,24 32:9
32:22,23 33:9
36:6 37:12,18
38:3,16,17
39:23 40:14,20
41:18,19 42:2
42:4,13,14
43:8,10 45:2
45:13 46:18,19
47:13,15,24
48:1 49:1,9,15
49:16,24 50:1
50:10,11 51:11
51:12 52:11,19
52:22 53:16,17
54:7,23 55:5
55:23 57:11,19
57:20 58:6,7
59:21 60:19
61:2,3,15,23
61:24 62:13,19
62:20 63:4,15

64:1,2,6,13
66:7,8,17,18
66:20 67:7,8
67:13,14,24
68:20 69:6,7
69:16 70:1,11
70:12 71:14,15
72:20 73:8
74:24 75:1,20
75:21 76:6,7
76:16,21 78:10
78:17,18 79:1
79:2 80:3,15
80:16,24 81:1
82:8 84:22
85:3 90:14,18
91:7
**objections** 43:14
**obligation** 85:11
89:19
**observe** 54:15
54:21
**observed** 52:5
55:21
**obtained** 89:24
**obvious** 76:3
**occasion** 28:9
**occurring** 59:10
**office** 13:10 90:2
90:7,22
**officer** 10:21
21:11,14 22:24
23:1,4,16
50:20 54:13,18
54:20 60:13
61:7 64:16
65:10 67:4
92:20,23 93:13
94:4
**officer's** 40:24
**officers** 9:5 35:4
44:12 64:11,19
64:24 65:2
79:15 86:16
**oh** 26:1 56:15
86:8 93:18,23

■ 2/27/2024

Page 107

| | | | |
|---|---|---|---|
| **okay** 6:20 7:1,8 7:19,21 8:2,6 8:10,13 9:21 10:3,4,11,15 11:1,14,17 12:3,6,7 13:4,7 13:15,22,24 14:9,14 15:4 15:11,16,22 16:5,12,18 17:18 18:3,11 18:18,24 19:6 19:13,24 20:11 20:23 21:11,16 22:1,17,19,24 23:10 24:10,15 24:24 25:19 26:4,24 27:2,3 27:11,13 28:8 28:14,22 29:13 29:19,24 30:13 31:6,12,19,24 32:5 33:3,7,13 33:18,24 34:16 35:3,18,21 36:1,23 37:3 37:16,24 38:13 38:20 39:8,9 40:24 41:23 42:7,10,19 44:3,16,21 45:20 46:5,12 46:23 47:1,21 48:7,12,14,20 49:4,12 50:4 50:14 51:8,15 52:4,8,16 53:13,15,19,24 54:3,13 55:3 55:10,19,19 56:2,10,18,20 57:2,8,24 58:4 58:12,16 59:3 59:6,12,15,18 60:10,12,22 61:18 62:5,7 | 62:16 64:23 65:5,7,9,13 66:4 67:18,23 68:4,24 69:12 69:23 70:6,17 70:21 71:6 72:17,23 73:3 73:10,16,18 74:9,14 75:16 76:2,24 77:20 77:23 78:5 79:5,8,17 81:13,16,18 82:12,22 83:22 83:24 84:7 85:1,6,10,17 86:2,17,20 87:11,21 88:3 88:7,18,21 89:2,15 90:3 90:21 93:5,11 93:18 94:8,14 94:17,24 96:14 96:16 98:12 **once** 88:14 **one's** 95:20 **open** 55:8,8 **opposed** 82:6 **ordered** 32:2 **outcome** 5:15 **outside** 47:19 81:11 **overturned** 13:2 | **P** **P** 2:1,1 **p.m** 98:16 **PA** 1:23 **page** 4:9,16 17:6 27:4 34:23,23 37:8 39:10,13 39:13 44:4,5 45:17,23 50:16 50:17,19 56:4 56:14 58:21 59:1 65:17 | 73:12,19 74:8 75:5,6 83:9,14 83:15 **pain** 40:8 **pants** 24:13 30:5 31:4 61:6 62:22 80:8 **paperwork** 26:22 **paragraph** 83:20 **Parkway** 2:14 **part** 17:15 34:4 34:9 63:17,21 63:22 75:15 **particular** 33:7 65:9 **parties** 5:4 6:12 6:15 **party** 5:14 **pass** 86:7 **pause** 96:11 **pay** 19:17 95:15 **paying** 95:14 **penis** 50:23 72:18,24 74:22 75:8,10,14,17 76:4,14,20 **Pennsylvania** 1:1,18 2:10,15 3:5,12 5:10 **people** 8:9,10 81:24 **permissible** 95:19 **perpetrator** 48:16,23 49:8 51:5,9 54:4 74:21 75:8 78:15,23 **perpetrator's** 59:9 **person** 13:11 33:23 39:5,15 45:7 47:4,7,10 47:11,18,22 | 48:3,5,8,11 63:11 79:21 80:7,9,19,19 81:17,21 82:10 82:10 **personal** 1:8 3:15 **PETER** 2:3 **peter@nsbcivi...** 2:6 **Philadelphia** 1:6 1:18,23 2:10 2:13,15,17 3:5 3:12 5:8,11 9:5 13:10 14:2 86:15 92:22 **phone** 12:9 85:19 **photographs** 50:5 **physically** 28:21 **physiological** 27:17 **pick** 88:1 **place** 5:4 53:2 89:6 **plaintiff** 1:4 2:6 2:11 25:6 27:20 98:6 **Plaintiff's** 4:18 26:9 27:15 98:1 **PLC** 3:10 **please** 5:19 7:2 12:5 39:11 43:9 65:18 68:12 73:5 74:7 77:9,16 **point** 11:23 12:4 14:12 15:10,15 21:4 22:4,4 24:7 40:7,7,10 41:17 42:1,21 45:6 60:24 61:13 82:21 89:9 90:21 | **pointed** 15:11 16:18,20 22:4 81:7 **pol-** 51:3 **police** 8:18,22 9:5,5,11 10:21 21:10,11,14 22:24 23:1,4 23:15,16 31:8 33:6,8,16,22 34:1,14 35:4,9 35:13,15 36:17 36:20,21,23,24 37:3,9,11 38:1 38:9 39:15,22 40:12,17,24 41:2,8 42:12 44:7,11,18,23 44:23 46:15,24 47:1 48:24 49:14 50:7,14 50:22,24,24 51:4,4,8,16,17 51:22,23 52:1 52:7,7,10 53:9 54:13,14,18,20 55:1,4,7,8,12 55:19 59:12,15 59:19,20 60:5 60:6,8,12,18 61:7 62:6,8,10 62:21,23,23 63:2,5,8,11,12 63:17,17,20,22 64:5,10,10,16 64:19,21,23 65:1,10,14,24 66:14 67:4,12 68:5,11,13,16 69:2,2,13 70:6 70:18,22 73:2 78:6 79:14 80:12,19 86:16 92:20,22 93:13 94:4 **police's** 34:24 |

**KAPLAN LEAMAN & WOLFE**

policeman 89:11
position 39:20
  39:21 40:1,2
  72:23
positive 32:12
  32:17 33:4
  36:4 41:16
possible 32:18
  41:15 49:20
  61:12 80:6
  86:19
possibly 52:3,14
  80:9
post 32:7
posttraumatic
  27:16,22
preliminary
  17:6,7 37:8,17
  38:1,8,10,14
  38:23 65:13
  66:5 82:22
  83:12
prepared 27:1
present 1:21
  3:17 42:10
  46:24 47:2
pretty 14:6
previous 80:17
previously 34:12
prior 36:23
  81:18 84:18
  85:2
prison 89:16
  90:6
private 75:15
probably 9:24
  10:8 44:5 93:4
problem 27:8
problems 28:4
  28:24
proceeding 5:10
proceedings
  16:22 82:15
  99:5
process 11:20
  48:4 69:13

produced 31:23
  34:24
professional
  1:20,22 63:24
  99:15
Project 89:7,21
  90:1
pronouncing
  70:23
prosecuted 71:9
prosecutor 44:6
  47:3 71:3
  74:21
provide 8:6,24
provided 88:3
Public 1:20
  99:15
pull 78:6 97:5
pulled 30:5
  78:14
pulling 49:7,13
punch 16:10
  18:16
punched 21:4
  24:7
punching 18:8,9
  24:6,21
purse 15:2
pursuant 1:16
pushing 39:17
put 50:21,23
  61:6 72:18
  74:22 75:8,10
  75:14,17,18
  82:17 83:13
  85:11 89:19
  95:10 97:16

_____

Q

question 8:21
  11:4 12:21
  30:18 36:14
  41:13 45:14
  46:6 47:9
  53:19 54:9,11
  55:14 56:12

58:2 59:23
  60:3 65:24
  69:9 71:23
  74:9 80:4,5
  83:5 93:15
questioning
  44:2 84:1
questions 7:5
  10:13 11:22,24
  13:21 15:20
  46:4 53:23
  54:1 56:3
  58:22 62:5
  68:5 71:19
  72:5 73:11
  86:4,5,18 92:6
  92:8,10
quick 86:19
  91:20
quite 57:16
  70:13

_____

R

R 2:1 99:1
raise 33:23
ran 53:10,15
  55:8 78:15,23
raped 71:17
  80:9,19
rarely 81:22
re-ask 66:21
reach 19:18,22
  90:7
reached 6:9
reaction 52:6
read 9:19,22
  10:1 17:5 21:7
  21:9 27:13
  31:16,19 33:24
  34:12,20 35:3
  36:6,9,11 39:8
  43:24 45:14,15
  45:19 50:16
  56:8,14,24
  58:20 73:5,11
  74:7,15 75:7

77:8 84:5
reading 10:2
  31:18,21 45:23
  46:8 83:9
realized 36:21
  37:3,4
realizing 36:23
reason 12:5
  38:13 47:1
  57:8 58:12
  82:24
reasons 11:2
  48:14 85:14
recall 24:5,14,15
  27:7 37:13
  42:9 54:24
  55:6 57:6
  59:11 65:8
  66:3 67:16,20
  89:10
recalls 27:20
receive 85:6
received 29:1
  32:17
receiving 79:22
recess 43:19
  72:12 74:2
  84:10 92:1
recognize 48:5,7
record 5:3,5,18
  6:16 7:2 31:18
  33:5 36:2,4
  41:15 43:2,5
  43:22 60:23
  61:21 72:10,15
  73:21,23 74:4
  84:8,13 85:12
  87:2 88:12
  89:20 91:22
  92:4 94:18,22
  95:10 96:20,23
  97:15,16,16,19
  98:1
recorded 5:6
recording 5:3
records 4:17

24:24 25:20,22
  31:11,22
recurring 27:22
  27:24
refer 34:4
regardless 82:12
Registered 1:20
  1:22 99:15
regular 95:1
  98:12
reimbursing
  95:19
related 5:14
relating 32:4
relation 59:9
  93:8
relaying 87:9
released 13:12
  89:16 90:5,15
  90:17,23
relevant 84:18
remark 34:5
remember 10:24
  23:5,8,13,14
  25:13 31:1,6
  32:19 33:6,7
  35:11,14,18,20
  35:24 36:1
  37:23 38:12,21
  39:18,20 40:7
  40:22 42:17
  44:17,22 49:2
  51:15 52:16
  55:10,13,15
  57:6,17 60:1
  60:12 64:23
  65:1,4,11,12
  67:3,19 68:22
  69:13,19,22,23
  70:8,8,9,20
  71:1,6,7 79:7
  79:16,18 83:3
  86:23 87:23
  90:9
removed 62:22
  80:8

███ 2/27/2024

reopen 85:21
repeat 30:17
  47:8 76:9
  77:22
rephrase 12:2
report 34:14
  40:24
reported 32:19
reporter 1:20
  5:16,21 6:6
  16:24 34:17
  38:14,24,24
  74:7,11 75:6
  94:24 98:11
  99:15,22
Reporters 1:22
represent 33:3
  50:5 71:20
  87:19
representative
  1:9 3:15
represented
  27:6 79:19
Representing
  2:6,11,17 3:7
  3:14
represents 87:18
reproduction
  99:20
request 87:24
  88:2
requesting
  43:13
respond 47:15
responded 44:7
  44:12
response 31:23
  40:15 50:22
  66:20
result 28:5,23
retained 5:13
return 28:8
ride 88:4
right 6:8 7:15
  9:2 10:16 19:2
  19:14 20:5,12

20:16,18,24
  22:10,20 24:17
  24:18 25:8
  28:20 37:13
  40:6 43:24
  45:22 46:1,4
  46:14 51:6
  52:18 54:5
  57:2 58:14
  59:13 60:10
  61:20 63:24
  66:16 67:23
  69:15,24 73:22
  74:6,15 77:10
  77:15 81:14
  82:1,19,20
  83:4,20 89:8
  89:16 91:3
  94:15 96:6
  97:1,7

RIGHTS 2:14
RITTERMAN
  3:3 26:4 74:10
rob 14:17,18
robbed 15:4
Robert 1:7 3:8
  27:6
Rocky 12:8
  85:18
room 11:21
  12:12,15
roughly 19:9
Rudovsky 1:16
  2:8
rule 95:24
rules 95:6,20
run 50:24 51:5
  51:10,24 52:3
  52:5,6,9,14,14
  52:17 53:2
  54:4,5,14,16
  54:19,21 55:11
  55:21
running 54:16
  69:3
rush 18:21,24

**S**
S 2:1 4:14
safety 88:1
Saint 26:18,23
  85:7
Sam 26:3
sample 89:23,24
SAMUEL 3:3
San 88:6
save 63:6,8
  64:22
saved 63:13
saw 18:21 33:18
  49:6 51:8 52:8
  53:8 54:4
  55:22 59:18,19
  60:6 62:21,21
  78:6 79:22
saying 20:9
  23:15 39:2
  40:1 75:10,17
  80:18
says 23:22,23
  27:12,14,20
  28:4 32:5,6,12
  33:4 35:3,11
  36:4 38:8 40:6
  40:24 41:16
  51:13 55:20
  60:23
scan 32:5
scar 27:16
scared 21:5
  28:15 29:22
  30:10,10,13
  36:17 40:8,19
  41:5 44:13,24
  45:11 46:15
  49:23 58:13
  67:23 68:2
  78:3
scene 59:19
  62:11 64:10,12
  64:19 65:3
  80:13
SCHECK 2:2

Scot 3:18 5:12
scream 20:4,12
  20:17 21:4
screamed 18:18
  20:23
screaming 19:14
screams 79:21
scroll 5:5
second 26:6
  51:21
see 9:15 10:2
  31:17 33:14,15
  34:14 45:8,8
  46:16 47:5,7
  47:10,20 48:19
  50:8 58:10
  75:5,16 80:2
  81:9,19 92:21
  94:5
seeing 45:11
  52:17 58:12,17
seen 54:15
sell 15:8
send 88:2
sense 28:21
sent 89:22
serious 28:24
set 6:7
settlement 85:6
seven 96:24
severely 9:11
  71:16
sexual 59:10
sexually 35:23
  85:1
shadow 28:15
shaken 60:17
share 26:3
sharing 26:14
shined 78:15
shining 51:9
shoe 79:22
shops 82:3
shot 55:12 66:15
  66:24 80:13
shots 35:12,16

35:19 55:8,17
  55:22 69:3
show 10:2,8
  27:4 31:10,17
  33:24 59:8
  82:16
showed 31:8
  48:22,24
showing 34:23
  50:5
sic 5:17 37:19
  74:7 75:6
sick 8:9
side 89:20
signature 27:9
  35:1 50:17
signed 27:12
  32:3
silent 33:11
Simone 32:4
simple 9:20
Simpler 11:4
sir 36:11 73:5
siren 51:17
  59:14 60:9
sirens 33:11,11
  33:11,13,19
  53:9 59:13
  60:7 78:7
sit 13:1 52:16
  55:11,15 65:11
  69:4 72:1
  79:24
situations 84:17
six 96:24
skin 22:9
small 48:9 52:24
Smith 1:8,9 3:15
  3:16
somebody 84:18
son 7:18,20 12:8
  12:10 13:6,12
  13:14 85:18
  86:24 87:2,13
  87:14,17 88:5
  88:8,10 89:13

89:13 90:11,12
93:3 94:11,12
94:12 96:8,15
**sons** 89:24
**SORITHIA** 3:4
**sorry** 12:16 16:7
16:24 19:19
26:1,13 41:12
53:24 56:15
60:4 73:16,21
74:12 77:23
83:12,18 86:6
89:18 92:13
93:23 95:10
97:4
**Sotto** 83:2
**sound** 10:14
33:10 97:22
**sounds** 11:1
24:8 25:11
53:8 54:9
74:19
**South** 1:23 2:9
3:4
**speak** 7:11,17
8:23 11:6,8,14
67:6 70:17
89:12
**speaking** 7:15
**specific** 15:20
**specifically**
13:23 64:19
84:20 96:1
**speculation** 62:2
**speech** 80:3
**spoke** 8:21 12:8
12:10,11 13:16
35:13 65:14,24
70:6 85:12,18
88:13 92:20
**spoken** 12:13,14
13:8
**spot** 52:2
**spotlights** 44:8
**Square** 3:11
**sritterman@a...**

3:6
**Stan** 3:19 4:4
5:23
**start** 27:3 28:21
**started** 19:14
20:4,12
**starting** 65:19
**state** 6:10 7:1
60:18
**stated** 77:11
**statement** 40:1
50:14 55:20
68:14 69:14
96:14
**States** 1:1 5:8
7:9
**Status** 32:6
**stenographic**
99:7
**stipulate** 6:13,14
6:16 95:18
**stipulated** 6:17
6:19
**stipulates** 95:12
**stitch** 22:9,15,15
22:16
**stitches** 22:18,19
**stopping** 42:21
**street** 1:17,23
2:4,9,15 3:4,12
14:2 18:21
19:1,1,8,10,13
20:1 70:22,24
**string** 15:3
**strong** 81:12
**stuff** 7:7 18:15
**subject** 95:20
**subpoena** 31:23
**substantive**
88:20
**sued** 86:16
**suffered** 28:22
48:4
**suggesting** 35:24
**Suite** 1:18,23 2:9
3:4,12

**sum** 44:22
**supervision**
99:22
**Support** 5:13,17
**sure** 5:21 10:6
11:18 16:19
19:16 25:5
30:20 31:15
34:10 38:7
40:4 43:11
45:20 47:9
53:7,15 58:19
60:3 65:19
72:1 73:7,18
73:18 76:10,22
82:17 83:7
86:8 88:14
93:9 96:22
**surveillance**
48:22
**swear** 5:19
**swollen** 21:23
29:11 58:3
**sworn** 4:5,8 5:24
6:3
**sympathetic**
71:4

_____

**T**

**T** 4:14 99:1,1
**Tacony** 70:22,24
**take** 5:4 12:4
14:24 22:9
31:3 42:20,23
42:24 71:12
72:5,7 84:2
85:23 91:20
**taken** 1:16 9:10
9:10 27:21
43:19 72:12
74:2 84:10
92:1 96:11
99:7
**talk** 7:18 13:13
13:14 87:22
90:10 91:1

94:9,10
**talked** 13:6,12
81:17,22 86:21
86:22,24 87:2
87:13,13 88:8
89:2
**talking** 9:7 87:6
90:11 93:3
**tall** 48:11 81:11
**taller** 48:16
**tell** 8:7 15:9 23:4
24:7 38:18
51:3,22 55:7
58:16,16 66:1
68:8,12 69:19
87:17 90:12,22
94:4
**telling** 23:3
52:21 53:8
94:11
**ten** 19:8,11,11
**Termaine** 1:3
5:7 13:2 72:2
80:2,12,22
81:5,13,19
82:5
**terrible** 13:18
28:5 29:14
30:6 62:18
**terrified** 29:24
30:20 35:23
**testified** 5:24 6:4
10:18 16:21
29:5,9,19 37:7
37:16 38:8,23
40:12 44:1
45:5 56:5
60:15 65:14
66:4 71:8
72:18 79:15
82:16,23
**testify** 85:15,20
**testifying** 37:24
79:12
**testimony** 8:15
9:15 17:5 39:9

46:3,7,12 52:4
52:8 56:4 57:9
68:12 69:12
75:5,6 77:2,20
79:6 80:17
83:1 88:16
99:9
**Texas** 5:14
**Thank** 6:6 77:24
86:3,9 92:5,7
94:15 95:4
98:13
**Thanks** 98:10
**theater** 54:10
**thing** 19:20
48:20 55:19,21
85:10
**things** 9:22
10:11,18 11:20
13:19 27:12,13
27:14 29:5,20
30:6 44:1
62:18 70:15
93:3
**think** 9:24 45:13
53:5 56:17
76:2 83:24
87:9 88:21
94:1,5 95:17
96:13
**thinking** 70:14
**Thomas** 31:11
**thought** 14:17
14:18 15:8
36:24 78:8
93:12
**thousand** 85:24
**time** 9:11 12:23
13:5 15:10
18:1 26:6,20
27:8 28:7
29:10 30:5,10
30:18,21 31:9
35:12 36:19
39:19,21 40:4
40:12,17 42:8

47:19 48:3,10
55:16 57:9
58:3 61:6
66:13,23 67:22
70:14,21 75:10
77:22 78:2,8
78:21,22 84:20
86:22 91:1
94:13
**timed** 50:5
**times** 12:6 13:13
13:15 16:5
28:12,14 32:21
70:17 78:12
**tissue** 22:5
**today** 5:16 11:21
12:11,15 13:1
13:21 24:15
25:11 31:7
38:21 41:7
44:17,22 52:17
55:3,11,15
57:17 63:9,12
65:11 69:5,12
72:2,23 79:24
81:13 82:24
85:15 87:22
89:15 95:6,7
96:7 97:22
98:3
**today's** 94:18
**told** 14:13,15,15
14:21 21:13
23:1,17 26:20
26:22 41:1
44:18 47:3
49:13 51:3,20
54:20 55:1,4
65:15 67:11
75:7 78:5
80:12 82:9
87:14,19 93:2
**top** 21:12 23:2
23:18 24:3
32:6 33:16
45:7 47:4,7

49:8 73:1
**Tornetta** 1:19
5:16,19 99:14
**total** 44:22
**touching** 24:13
**transcript** 9:22
9:23 10:9 17:7
38:7 56:8
73:12 83:12
99:9,19
**transcripts** 19:7
**translate** 10:1
43:8,9,14
68:15 83:14
88:22
**translated** 87:15
**Translates** 41:9
88:24
**translating** 12:1
85:18 87:4
**translator** 74:10
74:13
**trauma** 28:20
32:7,8,10
84:16,18,19
**traumatic** 23:11
38:22 70:10
84:17
**trial** 8:16,20,22
9:15,21,23
10:19 13:8
29:5 39:9,19
40:4,12 44:1
46:3 48:21
56:4 57:9,15
57:18 58:1
60:16 70:19
72:17 73:12
74:21 75:13,17
77:2 79:6 83:1
88:16
**trial's** 79:9
**tried** 21:3 50:24
51:5,24 54:14
54:19,21 55:7
55:11 89:7

**trouble** 58:12,16
**truck** 48:22 49:6
49:13 50:6,9
**true** 28:8 39:19
87:1
**trustworthy**
64:5,8
**try** 14:18 42:9
54:17 76:10
86:19 89:22
95:21
**trying** 14:17
15:13 18:24
23:12 28:16
38:20 50:23
54:16 75:22
79:11
**Tuesday** 1:13
99:8
**turn** 54:6
**two** 3:11 16:21
24:4 27:20
32:3 65:7
67:19 73:21

**U**

**Uh-huh** 45:21
**ultimately** 89:23
**unavailable**
88:13
**unconscious**
61:11
**unders-** 41:6
**understand** 9:2
9:13,16 10:8
11:5,12,23
13:1,18 15:19
16:19 21:7
23:10 28:18
32:15 34:20,22
35:21 36:8
38:4,20 39:2
39:24 40:2
41:7 48:14
51:20 53:4,7
57:17 61:10,10

63:2 72:3
75:23 79:11
84:15
**understanding**
8:15 14:5
15:23 19:6
28:23 68:12
88:15 89:21
**understands**
10:6
**understood** 54:2
62:17 66:11,14
**UNIT** 2:14
**United** 1:1 5:8
7:8
**use** 16:15 88:16
98:4
**usually** 91:5,15
**utterly** 29:24

**V**

**v** 5:7
**vagina** 72:19,24
74:22 75:9,11
76:4,15,20
**valid** 85:14
**variety** 11:1
**vehicle** 33:6,8
78:7 88:1,3
**verbal** 40:15
**verbally** 98:1
**versa** 6:12
**vice** 6:12
**video** 3:18 5:3
43:5 94:22
**videographer**
3:18 5:2,13
43:1,21 72:9
72:14 73:23
74:4 84:7,12
86:6 91:22
92:3,13 94:17
**videotaped** 1:15
98:15
**Vinson** 1:7 3:8
**violence** 84:20

**visit** 93:7
**voce** 83:2
**Vogelman** 1:10
2:18
**vs** 1:5

**W**

**Wa** 1:15 4:7,17
5:7 6:3 7:3
25:23 98:16
**wages** 95:6,19
95:22 96:1,7
98:2
**Wait** 63:19
**walk** 91:15
**walked** 18:22
79:22
**walking** 18:20
**wall** 52:2 53:2
53:14 54:5
**want** 10:2,5,13
11:18 14:21
15:7,19 16:12
16:19 28:20
31:10,17,17
34:5 36:1
39:14 53:7
56:2 57:21
62:5 64:12,14
74:14 76:8
77:21 84:4
85:15 89:20
94:10 96:22
97:5
**wanted** 11:17
15:8 62:8,11
71:12 94:9
**watch** 54:10
**Watson** 1:11
2:19
**way** 9:24 24:12
31:2 51:1,6,24
52:14 54:15,19
54:19 57:1
66:21 82:13
83:16 87:10

91:15
**ways** 13:24
**we'll** 95:15
**we're** 5:2 43:21
72:9,14 84:7
84:12 92:3
94:18 96:23
**we've** 42:22
48:20
**weak** 29:6
**weapon** 24:6
**Webb** 1:8 2:17
**week** 85:23,24
91:17 97:1
**weeks** 12:9
**went** 27:15
91:14
**weren't** 47:5,7
**whatsoever** 82:6
**withdraw** 49:18
53:19 66:20
**withdrawn** 9:14
11:3,19 13:16
16:18,20 21:8
40:5 47:2,15
54:17 55:12
61:19 62:9
64:24 66:12
68:9 79:13
81:2 85:13
93:6
**witness** 4:6,8
5:20 10:7 11:8
16:3,9,15
17:12,21 18:8
18:14 19:4,16
20:8,14,21
21:3,21 22:3
22:12,22 23:8
24:5,20 25:17
28:12 29:3,17
30:2,9,17 31:1
32:10,24 33:1
33:10 34:19
37:13,19 38:4
38:18 39:24

40:15,21 41:10
41:21 42:5,16
43:14,17 45:3
46:5,10,21
48:2 49:2,10
50:2,12 51:16
52:12,23 54:8
54:24 55:6,24
56:14,18 57:5
57:12,21 58:8
58:21 59:24
60:20 61:5,16
62:3,14,21,23
63:5,16 64:3,7
64:14 65:21
66:9 67:9,16
68:1,21 69:10
69:17 70:2,13
71:1,16 72:21
73:9 74:8,9
75:2,24 76:17
76:22 78:2,11
78:19 79:3
80:6,18 82:9
83:3,9,14
84:23 85:4
90:15,19 91:8
95:8 96:1,16
97:23 99:10
**WOLFE** 1:22
**woman** 76:4
**word** 43:8,9
**words** 17:18
21:16 43:12
47:6 62:16
80:11
**work** 8:4,10
85:23 86:1
91:5,17 95:23
**worked** 81:14
81:14
**working** 7:13,14
14:16 15:9
20:9 81:22
91:2 93:5
**works** 89:3

**96**:24
**world** 82:7
**wouldn't** 10:8
45:23 54:16,20
84:1
**wounds** 85:22
**written** 34:24
39:4
**wrong** 68:13
70:23
**wrote** 21:11
22:24 23:1,15
23:16 38:15
39:1 50:20
54:13,18 68:13

_____

**X**

**X** 4:1,14

_____

**Y**

**yeah** 7:13,18 8:8
8:24 9:10 10:7
13:11 14:12,13
14:15 15:6,13
15:14 16:9
17:3,11 18:8
18:20 19:10
21:3 22:3,15
24:5,20 27:7
31:1,8,15
33:15 35:20
36:19 39:3
42:22 47:19
48:2,9,18
51:16 52:1,12
52:23 53:14
56:9,19 57:3
58:24 59:5,24
60:8 61:5
63:10 64:21
67:20 68:1
72:6 75:14
76:12 77:12,12
77:18 78:1,2
79:9 81:21
82:9,20 83:3

**83**:18 86:8
87:19,24 93:2
93:9,14,16
95:13,15,16
96:2,5
**year** 89:10,11
**years** 7:10 23:11
32:19 39:3,4
71:21 94:6,7
**Yep** 95:3
**York** 2:4,4
**younger** 7:20
**Youse** 1:10 2:18

_____

**Z**

**ZAFFARESE**
3:2
**Zhudi** 3:19 4:4
5:23
**Zoom** 2:3,8 3:4
3:11
**Zungolo** 1:7 3:8

_____

**0**

_____

**1**

**1** 17:8 56:4,14
56:18 58:21,23
58:24
**1,000** 85:19
**1,290** 96:24
**1:11** 72:10
**10** 17:6
**10:10** 1:19 5:3
**10013** 2:4
**107.5** 97:2
**11/29/04** 4:20
26:10
**11:39** 43:2
**12** 34:4,10,13
37:8 43:22
50:15 97:1
**12:00** 91:11
**120** 97:21 98:2
**13** 77:6
**1303** 1:23
**15** 18:20 97:13

**99**:16
**1515** 2:15
**15th** 14:2 18:21
19:1,8
**16** 44:4
**17** 45:17,23
**1810** 3:4
**19** 39:14 74:8
**19102** 1:23 2:15
**19103** 3:12
**19106** 2:10
**19107** 3:5
**1st** 73:14

_____

**2**

**2** 50:16,17 56:5
56:14,18 74:8
**2:12** 72:15
**2:17** 73:24
**2:18** 74:5
**2:22-cv-00977...**
1:4
**2:45** 84:8
**2:58** 84:13
**20** 23:11 32:19
39:3,4 65:20
77:6,7,15,17
**2001** 3:12 11:5,9
11:11 13:20
21:14 32:4
47:11,18 91:2
91:18 92:21
93:13,22
**2002** 17:7,9
37:17 38:11
92:21 93:13,21
93:22
**2018** 89:22
**2024** 1:13 99:8
**2026** 99:16
**21** 44:4
**212** 2:5
**215** 1:24 2:10,16
3:5,13
**23** 39:13
**230** 1:23

2/27/2024

Page 113

**24** 37:8
**25** 4:17 37:9
  71:21
**26** 4:18 83:9,10
  83:14
**2620** 3:12
**27** 1:13 13:19
  21:14 47:11,18
  83:15 99:8
**27th** 10:22 14:3
  32:4 34:15
  35:14 41:1
  51:4,23 62:7
  69:21 81:18

**3**

**3** 34:23 56:24
  57:1,3
**3:12** 91:23
**3:16** 92:4
**3:20** 94:19
**3:30** 98:16
**30** 7:10
**31** 73:12 74:8
  75:6
**36** 77:2,3
**37** 56:4,14,16,16
  65:19
**39** 39:13 58:21
  58:23 59:1

**4**

**4** 17:8 45:23
  46:1
**40** 39:13
**496-9373** 3:5

**5**

**5** 17:7
**5:00** 91:11,12
**501** 2:9
**501S** 1:18
**51** 4:17 25:20,22
  31:16
**52** 4:18 26:6,7,9
  26:24 27:3

**6**

**6** 4:10 58:21,23
  58:24 59:4
**640-8500** 3:13
**683-5448** 2:16

**7**

**7** 56:24 57:2,3
**718** 1:17 2:9

**8**

**86** 4:11

**9**

**9** 44:5 45:24
  46:1
**92** 4:12
**922-7112** 1:24
**925-4400** 2:10
**965-9081** 2:5
**99** 2:4

# Exhibit E

District Attorney's Office Memorandum

CISIU CONFIDENTIAL WORK PRODUCT

# Memorandum

<u>To:</u> ADA Patricia Cummings, Supervisor, CISIU
<u>From:</u> Dylan Reichman, Paralegal, CISIU
<u>Re:</u> *Commonwealth v. Weeks/Hicks* – Review of File
<u>Date:</u> March 31, 2020

---

On November 28, 2018, the Innocence Project submitted a formal request for the CIU to review Tremaine Joseph Hicks'[1] 2002 conviction for rape and PIC. One week later, they filed a PCRA petition based on the same claims. The PCRA was based on newly discovered evidence that purported to show Hicks' actual innocence and that police witnesses committed perjury at trial. I have conducted a thorough review of the file and conclude the following: 1) Hicks' actual innocence claim fails; 2) three key police witnesses committed perjury during trial; and 3) on the basis of that perjury, Hicks is entitled to post-conviction relief. This memorandum summarizes the, trial and post-conviction proceedings, Hicks' present claims, and my recommendations stemming from my review.

### A.      <u>Materials Reviewed</u>

I reviewed the following materials during my examination of the case:[2]

- Transcripts for all court proceedings;
- Post-conviction opinions and briefs;
- The Innocence Project's CIU submission;
- Hicks' currently PCRA;
- The DAO's motion to dismiss Hicks' PCRA;
- DNA analyses; and
- Medical reports.

### B.      <u>Facts of Case and Trial Proceedings[3]</u>
*1.  Commonwealth's Case*

The Commonwealth's theory of the case, as presented by ADA Sybil Murphy, was relatively straightforward. According to the Commonwealth, Hicks followed ███████ physically assaulted her at gunpoint, and dragged her behind a dumpster in an alley behind St. Agnes Hospital. Two civilian witnesses saw the perpetrator do so, though neither they nor the complainant saw the perpetrator's face. Hicks then raped ██████ while the two eyewitnesses called 911. Within a few minutes, police officers Martin Vinson and Dennis Zungolo arrived on

---

[1] For reasons that remain unclear, Hicks' name was entered as Jermaine Weeks into the record. However, because his real name is Tremaine Joseph Hicks, I use that name in this memorandum.
[2] Note: I did not review the trial file nor Internal Affairs documents related to this case. Any materials besides those listed above likely reside with ADA Barbara Paul.
[3] This summary is not exhaustive. I have only included the key witnesses for the sake of brevity.

scene and went into the alley, where they observed the defendant in the act of raping the complainant. They ordered him to get up, and a standoff ensued. After a few minutes, the defendant began to pull a gun out of his pockets while facing the officers, so Officer Vinson discharged three times, non-fatally wounding the defendant. The officers, joined by Officer Robert Ellis, searched the defendant and found a bloody gun in his pocket. Blood inside the barrel was determined to be ████ In addition, DNA evidence showed that the complainant's blood was on the defendant's clothing, critically, on his sweatpants and boxer shorts.

In sum, the Commonwealth's theory was that the defendant dragged the complainant off of the street, beat her, and raped her. When police showed up, they saw the defendant in the act. The defendant then pulled his gun on the officers and Officer Vinson shot him. However, while the details of the shooting were part of the Commonwealth's case, fundamentally, the Commonwealth believed that "This is not a shooting case. This is a rape case." (N.T. 11/7/02, 210.)

    *i.*    *Civilian Witnesses*

████

The complainant, ████ was 40 years old at the time of the incident and had immigrated to the United States from China in 1989. She was not fluent in English and testified with the aid of a Cantonese-to-English translator at trial. On November 27, 2001, Ms. ██ left her home to go to work at Dunkin Donuts around 5:00am (N.T. 11/1/02, 15-16). She walked on the 1500 block of Mifflin Street then turned onto 15th Street. She saw a "black male right behind me with a black jacket." *(Id.)* She tried to grab her pepper spray from her keychain, but the male grabbed her and began to punch and pistol whip her *(Id.*, 15-17).

The assailant dragged her into an alleyway behind St. Agnes' Hospital and laid on top of her. While she struggled, he pulled down her pants and raped her. *(Id.*, 27.) She acknowledged that she did not see the assailant's face because "he was holding on to my face," pushing her chin to the side and backwards. *(Id.*, 38-39.) At some point, Ms. ██ saw what looked like police lights, and "When the police came, he was still on top of me." *(Id.*, 38.) The assailant stood up and ██ heard gun shots. *(Id.*, 27) ██ pulled up her pants and was taken to the hospital.

<u>Justin Votta:</u>

At the time of the incident, Justin Votta lived in an apartment at 1902 S. 15th St., "directly across the street [from the alley] …towards the back of the hospital, where they do their deliveries and such." (N.T. 10/31/02, 109-10.) On November 27, 2001, he was awoken by a noise and "heard someone yell for help." *(Id.*, 110.) He looked out of his window and saw a woman "get knocked to the ground and then dragged behind a dumpster, like in St. Agnes' delivery lot," by an individual wearing a black jacket and a grey hood. *(Id.*, 110-12.)

Votta called 911 "within a minute." *(Id.*, 112.) He could not see what was happening behind the dumpster. *(Id.* 113.) He also could not see the sidewalk directly in front of his house. *(Id.*, 127.) The 911 operator told him to go outside so he could direct police to the alley when they arrived on-scene. *(Id.)* After he hung up, he went downstairs to stand outside his apartment,

### CISIU CONFIDENTIAL WORK PRODUCT

taking approximately one minute to do so. *(Id.*, 132.) He stood directly in front of his house and two police vehicles soon arrived. *(Id.*, 133.) He directed the officers to the alley then heard the officers say "Put up your hands." He went back upstairs to his apartment for safety, and a "couple of minutes" later heard gunshots. *(Id.*, 136.)

Joseph Christinzio:

On November 27, 2001, Joseph Christinzio lived at 1910 S. 15th St. *(Id.*, 150.) He was in the parlor of his home on the first floor when he first heard screaming. *(Id.*, 148.) He looked out his window and saw what looked to him like a couple arguing. Then he "heard somebody say 'No, no, no,' the girl hollered, 'No, no, no.' Then they stated to walk by the loading dock. Then, she must have fell or something, and I saw him pick her up and continue right into the loading dock." *(Id.*, 149.) The loading dock was approximately 45 feet away from his window. *(Id.*, 150.) He called 911, but the operator said they already had gotten a call about the incident. He then went outside and stood outside with Justin Votta, then police arrived shortly thereafter. *(Id.*, 150-51.) Of note, while his direct and cross-examinations were brief, on cross examination, defense counsel asked him the following:

> Q. Okay, there were no sounds of construction or heavy machinery?
> A. Well, there are trucks.
> Q. There are trucks every once in a while that go down the street?
> A. Every night, the trucks come up for a delivery and all.
> Q. Well, not constantly?
> A. Well, the gates open at 12:00 at night.

*(Id.*, 162.)

   ii.   *Police Witnesses*

Officer Martin Vinson (#4892)

Officer Martin Vinson was the first officer to arrive in the alleyway, along with his partner, Dennis Zungolo. He and Zungolo walked to the back of the loading dock area, Vinson in front of Zungolo. Vinson heard a "faint moan, and then I heard a muffled, 'Shut up.'" (N.T. 11/1/02, 83.) Vinson turned his flashlight on, and saw a male on top of a female, both with their pants down, and "it appeared that they were having intercourse." *(Id.*) Vinson shouted, "Rise to your feet," and the male stood up. According to Vinson, "it appeared as though [the male] was pulling his penis out of her vagina" in the process of getting up. *(Id.*, 84.) Next, the male

> rose up on his feet. He bent down to pull his pants up, and he had his back to us the whole time. He pulled up his pants, and then I told him, "Put your hands up," after he, you know, pulled his pants up. He pulled his pants up. I mean, he put his hands up, and I told him, "All right, turn around and face us."

*(Id.*)

Officer Vinson directed the male to get against the wall, but the male froze, so Vinson reached for his hands.

D007442

## CISIU CONFIDENTIAL WORK PRODUCT

> He took his right hand and slapped my hand down and acted as if he was coming towards me. I backed up, and I tripped and fell into my partner's hands. He caught me and then pushed me back up. At the time, he was kind of looking at me, and then he hunched down and was taking steps backwards. All the while, he was turning away from me and simultaneously sticking his hand in his pocket.

*(Id.*, 86.) Vinson ordered the male to put his hands up several times, but the male was not complying.

> By the time I went to say it the fourth or fifth time, he reaches into his pocket, and then he lunges around. I could see off the light a gun coming towards me…When he was almost to where he was fully facing me, I discharged two shots. He stepped back and hesitated, and then he went to come back up again. When he went to bring the gun back up again, that's when I had a reactionary shot, and I stepped back.

*(Id.*, 87.) The male then retreated further before finally collapsing. "At that time, I put his hands out. I put his hands out to the side. I did step on his right hand, the one that was holding the gun, and I pulled up his shirt to see what injuries he sustained." *(Id.*, 90.)

On cross examination, Vinson reiterated that the male was directly facing him when he discharged: "He was just about around and almost just about had it pointed at me, directly at me." *(Id.*, 141.) In addition, he claimed that the male put the gun back in his jacket pocket after he had been shot. *(Id.*, 155.) Further, when other officers came to search the suspect, Vinson "said, 'His gun in his right pocket,' and they went in and actually recovered the gun. They actually took the gun out of his pocket." *(Id.*, 159.) In addition, he clarified that he was not sure whether the shirt he pulled up was or was not a grey hoodie: "I don't know if it was a gray hoody, but I pulled up his shirt. All I know is I pulled up his shirt. Whatever he was wearing underneath the jacket, that's what I pulled up." *(Id.*, 173.)

<u>Officer Robert Ellis (#1329)</u>

Officer Ellis stated that when he arrived at the scene, "I exited my vehicle. At that time, I heard approximately two shots. I ran around to what would be the loading dock of the hospital at St. Agnes." (N.T. 11/4/02, 77.) He ran over to the officers and began searching Hicks. When ADA Murphy showed him the gun at trial, he identified it as follows: "This is a gun I recovered from the gentleman's pocket. That would be the right-hand pocket." *(Id.*, 79.) He noticed that "there was blood on the handle of the gun." *(Id.*, 80.) He also noted that Hicks was wearing a "black leather jacket, with a gray top and gray bottom," *(Id.*, 83.)

On cross examination, Officer Ellis elaborated that when he first secured the gun, he did not have gloves on, and then "secured this gun by putting it in my waistband area." *(Id.*, 94.) He did, however, reiterate that he found the gun in Hicks' jacket pocket: "What I did was went right to the jacket. What I did was completely pat him down.  Once my hand got right to the pocket, that's when I went right into it." *(Id.*, 96.) In addition, he noted that he "grabbed it […] You're going to put your hand around it, and then you're going to pull it out. That's what I did." *(Id.*)* In addition, he noted that Hicks was also wearing a "knitted hat. It was, I believe, also gray in color." *(Id.*, 105.)

D007443

**CISIU CONFIDENTIAL WORK PRODUCT**

<u>Officer Brian Smith (#7341)</u>

Officer Smith pulled up to the scene at the same time as Vinson and Zungolo. While those two went into the alley, Smith went to speak with Votta on his front steps. Smith gave an account of the shooting as well. According to him, while he was speaking with Votta, the following occurred:

> I heard voices coming from across the street, "Get off her, get off her." I heard that three or four times.
> At that point, I left Mr. Votta, and I went back over to the loading dock area. On the way there, I could hear, "Take your hands out of your pocket, take your hands out of your pocket."
> I got there, and there was an Asian female laying on the ground. Her pants and her under pants were pulled down, and a black male with a black jacket and a gray hoody was standing over her, looking at her.
> Officers Zungolo and Vinson had their guns drawn, and the male, he just kept staring at him like he was a deer staring in the headlights.
> I don't know if he knew what was going on or what, but he kept his hands in his pocket, and they were hollering, "Take your hands out of your pocket."
> He turned away from them in an easterly direction and proceeded that way. They told him, "Stop, stop. Take your hands out of your pockets."
> He made a quick turn towards them. At that point, I went to the other side of this modular building that's there, figuring he's going to come out the other side.
> I heard a few shots go off, and then I heard someone yell, "The male's down."

(N.T. 11/1/02, 46-47.)

On cross examination, Smith elaborated on the circumstances of the confrontation between the male and the officers. He reiterated that the male was initially facing away from the officers, but then turned to face them, with two hands in his jacket pocket. *(Id.*, 63.) Then, Smith went to the other side of the modular building and heard shots.

<u>Officer Michael Youse (#3915)</u>

Officer Youse arrived with his partner Officer Holmes before the shooting. He pulled his police vehicle into the loading dock area of the alleyway. (N.T. 11/4/02, 30.) He then proceeded into the alleyway, where he saw two officers facing a male wearing a dark jacket, who was standing over a woman on the ground. *(Id.*, 31.) The male "had his hands in his pocket, and I remember his right hand in his pocket, and he was using the right side of his body, like moving himself away from the officers […] He was moving away from them." *(Id.*, 32.) Officer Youse went around the other side of the scene in case the male hopped a fence, and then heard shots. He returned to the scene and saw the female pulling up her pants. He went to the female to ensure her safety and then passed her to a female officer. *(Id.*, 37.)

<u>Officer Valerie Brown (#6690)</u>

After police recovered the gun supposedly possessed by Hicks, the Firearms Unit ran the serial number, and determined that the gun was licensed to then-active PPD Officer Valerie

D007444

## CISIU CONFIDENTIAL WORK PRODUCT

Brown. Officer Brown testified that in either 1989 or 1990 she purchased the gun from a fellow PPD officer. (N.T. 11/5/02, 134.) At the time she purchased the gun, her daughter was nineteen years old. *(Id.)* Officer Brown testified that the last time she saw the gun before seeing it at trial was either 1994 or 1995. She originally bought it as an off-duty weapon, before deciding she no longer needed to carry it, so she put it in a box and put the box in the back of a closet in the basement of her home. *(Id.*, 138.) At one point, her home was the subject of a burglary, but Officer Brown checked and determined that the gun was not taken during the burglary. *(Id.*, 142-43.) She was completely unaware that her gun had subsequently been taken from her home and had no idea how it ended up in Hicks' possession.

### iii.   Scientific Experts

#### Marianne Scafidi-Magee

Ms. Magee was a PPD civilian forensic scientist who examined physical evidence in the case. Specifically, she examined Hicks' and ██████ clothing for the presence of blood and/or seminal fluid before passing the evidence to a different scientist for DNA testing. Of particular note is that she discovered blood on Hicks' yellow boxer shorts. (N.T. 11/6/20, 34-35.)

On cross examination, she explained that the only items she was given of Mr. Hicks' were a black leather jacket, a red and black top (which was moldy and could not be properly analyzed), a white t-shirt, a pair of boots, yellow boxer shorts, gray sweatpants, and a pair of white sweat socks. *(Id.* 41-42.)* Notably, a gray hoody or top was not included. In her analysis, she did not note the presence of any blood in cuttings she made from the right jacket pocket. *(Id.*, 47.)

#### Robert Dillard

After Ms. Magee completed her analysis, the items were passed to Robert Dillard, also a civilian PPD forensic scientist, who was trained in DNA testing. First, Dillard examined Ms. ██████ rape kit, and found it to be inconclusive for the present of seminal fluid in Ms. ██████ vaginal wall, cervix, and mouth when using acid phosphate testing, and negative when examined using a microscope. *(Id.*, 75-77.)* Mr. Dillard did DNA testing on the inside of the barrel of the gun in the case, and found that there was blood on the inside of the barrel, the DNA of which corresponded to Ms. ████ *(Id.*, 86.)* Crucially, DNA testing also confirmed that Ms. ████ was the source of the blood on Mr. Hicks' sweatpants and on the waistband of his boxer shorts. *(Id.*, 87-88.)

### 2.   Defense's Case

While the Commonwealth discussed the shooting of the defendant as an ancillary component in its theory of the case, the defensive theory of the case focused squarely on the shooting to impeach the credibility of the officers. The defense, led by attorney Louis Nicholson, contended that the defendant was simply walking down the street when he heard the victim's cries. He saw a man, seemingly serving as a lookout, across the street from the alleyway. The

D007445

## CISIU CONFIDENTIAL WORK PRODUCT

defendant approached out of curiosity and, seeing him approach, the lookout yelled into the alleyway. A man wearing a dark jacket and a grey hoodie ran out, and the two men fled the scene together. The defendant went into the alley and saw the victim lying on the ground. He nudged her with his foot to see if she was alive, then put his hand in his pocket to grab his phone to call the police. Suddenly, he heard police commands behind him to show his hands, and when he tried to pull his hand out of his pockets, the police shot him in the back.

The defense contended that the gun found in the alleyway was not the defendant's. In particular, they claimed that the gun was not in the defendant's pocket but was planted by police officers to cover up the circumstances of the shooting. They pointed to the fact that the registered owner of the gun was an active PPD officer. In addition, because the police never recovered a grey hoodie from the hospital after Mr. Hicks was shot, the defense claimed he could not have been the perpetrator because witnesses clearly described the assailant as having worn a grey hoodie. Finally, to the extent that DNA seemed to inculpate the defendant, the defense claimed that the DNA transfer came not from the rape, but from improper handling of evidence.

In short, the defense claimed that the defendant was actually innocent, only in the alley out of curiosity after the real perpetrator fled. After the police shot the defendant in the back without justification, they planted evidence and lied to cover up for the impropriety of the shooting. Doing so meant framing the defendant. Thus, the defensive theory of the case focused squarely on the credibility of the involved officers.

### Officer Dennis Zungolo (#6140)

Because the Commonwealth did not call Officer Zungolo as a witness, the defense did so. On the date of the incident, Officer Zungolo was working with his partner, Officer Vinson. They arrived at the scene together. When they "got there, [they] observed the Defendant on top of the female with his pants down about his knees, as well as the Complainant." (N.T. 11/6/02, 153.) When the officers commanded the assailant to get off of the woman, "He picked his pants up. He started walking backwards, with his eyes on us the whole time." *(Id.)* The assailant walked roughly 15 feet backwards, all the while with his hands in his pockets and with the officers following him. *(Id.*, 154.)

When the parties got to the back of the alleyway, "Officer Vinson, who was in front of me, attempted to grab [the assailant] but was unsuccessful," as the assailant bladed his body away from the officer. *(Id.*, 156-59.) Afterwards, "I just saw him coming out, like his arm, his right arm coming out. Then, the next thing I know, I heard approximately three shots." *(Id.*, 159.) Officer Zungolo clarified that the did not see the assailant's hand come out of his pocket, simply his arm appearing to do so, and then shots rang out:

> Q. When that hand was coming out of that pocket, could you see the hand itself?
> A. No.
> Q. You didn't see the hand?
> A. No.
> Q. Pretty much what you saw was his arm, right?
> A. Right.

D007446

**CISIU CONFIDENTIAL WORK PRODUCT**

> Q. You just saw his elbow moving up?
> A. Come up.
> Q. All right, you didn't see the hand at that point at all?
> A. I didn't see it coming out.
> Q. All right, a split second after you saw that, three shots rang out, is that correct?
> A. I can't say the time, but, yes, three shots.
> Q. That's a split second after you saw that movement, right?
> A. Everything happened so fast.  Yes.

*(Id.*, 160.) Officer Zungolo was clear that the assailant was directly facing the officers when he was shot:

> Q.  At the time those three shots were fired, was my client facing you and Officer Vinson?
> Was his chest, his stomach and the front of his body facing the two of you?
> A. Yes, I believe so.
> […]
> Q.  So, are you saying that by the time the shots rang out, my client turned about 90 degrees
> away from Officer Vinson?  He had turned all the way back so he's facing Officer Vinson;
> is that what you're saying?
> A. Yes.

*(Id.*, 161-62.) Further, Zungolo stated that "By the third shot, [the assailant] hits the ground," having walked "Maybe a step" backwards. *(Id.*, 162-63.)

Almost immediately, Officer Zungolo approached Hicks with Officer Ellis, who had now arrived on the scene. Officer Zungolo administered first aid while Officer Ellis began searching Hicks for a firearm. *(Id.*, 166.) Officer Ellis said he found a gun, then Zungolo "Saw him take it out of the Defendant's pocket," by putting one finger through the trigger slot. *(Id.*, 168-69.) However, Zungolo later clarified that the gun was *not* in Hicks' pocket when Elis recovered it: "Q. All right, did you see him actually in the process of pulling that out of his jacket pocket? A. The weapon was already out of the pocket. Q. Oh, it was already out of the pocket? A. Right." *(Id.*, 170.) Zungolo noted that he saw blood on the grip of the weapon. *(Id.*, 177.)

<u>Tyron McClendon</u>

Mr. McClendon was the defendant's brother. He testified that on the day in question, he was hanging out with his brother at his brother's apartment, then the two men left around 3:00am. In addition, that night, he observed that his brother did not have any chipped teeth. *(Id.*, 225-226.)

<u>Tamika Hicks</u>

Ms. Hicks was Mr. Hicks' sister. On the day in question, she "received a call from the hospital chaplain, and she told [her] to come to the hospital." *(Id.*, 229.) She was unable to see her brother at the hospital, but her "brother called me the next morning, and I asked him what was going on. He said, 'Get me a lawyer, and get my clothes.'" *(Id.*, 230.)

D007447

**CISIU CONFIDENTIAL WORK PRODUCT**

Tremaine Joseph Hicks

Mr. Hicks testified on his own behalf at trial. He stated that after working a shift at Popeye's the night before, he hung out with his brother at his apartment. His brother left around 4:30 in the morning. (N.T. 11/7/02, 13-15.) When his brother left, he went to buy cigars. *(Id.,* 15-16.) He testified that on that day, he was wearing "a black leather jacket, a red and black polo shirt, a white T-shirt, some gray Sean John sweatpants, a pair of Gap boxers which were yellow, tan Timberland boots and some white ankle socks." He was clear that he was not wearing a grey hoodie:

> Q. Did you have a gray hoodie on?
> A. No Sir.
> Q. Did you have a gray hoodie on at any time that night?
> A. No, sir.
> Q. You're certain about that?
> A. I'm positive.

*(Id.,* 17.)

That evening, he was carrying a cellphone in his right jacket pocket. *(Id.,* 19.) He left the market where he bought cigars and began walking home. He was

> between 16th and 15th and Snyder when I heard a scream […] as I was approaching 15th Street, 15th and Snyder, I heard another scream.
> That one got my attention to where I looked around, but I still wasn't really caring, just being curious.
> As I was crossing 15th Street, I looked up 15th Street to my left, and I saw an individual standing on the corner about a block or a block and a half up.

*(Id.,* 24-25.) He heard more screaming, so he began walking towards the sound of the screaming. *(Id.,* 28-29.) Next, Mr. Hicks testified that when he got closer, the individual

> started like looking in my direction, and after a few seconds he said something. I couldn't make out what it was that he said, but he was looking in my direction.
> So, I turned around to see if there was anybody behind me, and there wasn't nobody behind me. So, I kept walking.
> Then, a few seconds later, he walked off the corner, and I heard him holler something else.
> So, I'm sitting there, and I heard a scream, and this dude just hollered something in my direction, and there wasn't nobody behind me.
> So, I started to walk a little further. I heard scuffling feet. After I heard the scuffling feet, this joker came running out of this opening that I know now is the receiving area of the hospital.

*(Id.,* 29-30.)

The man who ran out of the opening had on "a dark jacket and a gray hoody and some dark pants." *(Id.,* 31.) When the defendant looked into the alleyway, he saw a white tennis shoe,

**CISIU CONFIDENTIAL WORK PRODUCT**

which aroused his curiosity, so he entered the alley. *(Id.*, 31-32.) The defendant described the next set of events as follows:

> When I got a little closer, I saw a silhouette. It looked like a body or something
>
> So, when I walked over there to the left, I had put my hand in my pocket because I was ready to call the Police.
>
> I saw the silhouette of a body. I had walked over to her. She had on -- I know it was a woman. She had her pants down like maybe past her knees. She had blood all on her face.
>
> So, I said, "Are you okay?"
>
> She didn't say anything.
>
> Then, I had nudged her with my foot. She still didn't move.
>
> The next thing I heard was, "Freeze. Get your hands up."
>
> So, I turned around, and I looked down at the woman, and I looked back at the cops. I said, "I was trying to help her. I was getting ready to call you all."
>
> They said, "Get your hands up. Don't move."
>
> So, I looked back down at this woman. She had sat up. So, I'm like, "Damn," you know what I mean?
>
> Now, my hand was on my cell phone, and I let it go. But, before I got my hand out of my pocket, that's when I heard the shots.

*(Id.*, 32-33.)

Mr. Hicks was clear about the direction of his body when he was shot: "Q. Now, was your back facing the officers when you were shot? A. Yes." *(Id.*, 34.) Defense counsel then had the defendant lift his shirt and show the jury his various scars from the bullet wounds while the defendant reiterated several times that he had been shot in the back. Defense counsel asked about the positioning of his arm when he was shot, to which the defendant answered that it was "coming out of my pocket." *(Id.*, 39.) After he was shot, he fell forward, and chipped his tooth. *(Id.*, 40.) After he fell,

> like a second later, there was a cop leaning down next to me, he's at the wall, and he said 'Damn' or something like that, and he started crying, but he kept patting me down.
>
> Then, another cop came over, and I closed my eyes […]
>
> So, when I closed my eyes again and opened them up, there was another cop standing over me. I didn't know what he was doing […]
>
> So then, I remember getting my clothes cut off. My clothes are getting cut, and I had got on a stretcher or something, and I went to the hospital.

*(Id.*, 40-41.)

When his mother arrived at the hospital, she told him that he was being charged with rape, so he told her "'Well, I had seen what the guy had on that ran out of there,' and I told them to make sure they got my clothes and to contact an attorney." *(Id.*, 48.) In addition, when the defendant heard that there was apparently video footage from the alley, he told his attorney to get the footage "about a hundred" times, "Because I assumed that it showed this woman being taken

## CISIU CONFIDENTIAL WORK PRODUCT

up in there by whoever was in the gray hoody and the black jacket, who was this individual running out, and then me walking in there and getting shot." *(Id.,* 56.)

On cross examination, Mr. Hicks testified that the only nudged ▮▮▮▮ with his foot, but never bent down, touched her with his hands, or knelt beside her. *(Id.,* 86-87.) In addition, while he could not tell how many officers there were, when he turned around in response to their initial arrival and commands, "There were lights." *(Id.,* 91.) Crucially, Mr. Hicks did not mention any vehicles pulling into the alley at any time.


### 3.  *Stipulation and Closing Arguments*

<u>Stipulation</u>

After the conclusion of Mr. Hicks' testimony, defense counsel read a letter that counsel stipulated would be the testimony of Dr. Murray Cohen, who operated on Mr. Hicks' gunshot wounds. The stipulation, in full, follows:

> I performed surgery on a Tremaine Hicks on November 27th, 2001, for injuries sustained from multiple gunshot wounds. I was told that my testimony is being sought with respect to the direction in which Mr. Hicks was shot, from the front or from the back. I can answer unequivocally that it is beyond my expertise to determine the direction in which the bullets were fired; thus, I cannot testify to those facts.

*(Id.,* 121.) Besides the entry of Mr. Hicks' medical records into evidence, Mr. Hicks' testimony regarding the circumstances of the shooting, and the above stipulation, defense counsel did not present any further evidence regarding the shooting.

<u>Defense Closing</u>

Early in Mr. Nicholson's closing, he stated that "Like most disputes, there are two sides. Like every coin, there are two sides. The defense is on one side, and the DA's office and the Police, which constitute the Commonwealth, are on the other side." *(Id.,* 136.) Having set up the opposition between his client and the police, Mr. Nicholson then placed police credibility at the heart of the defense's case:

> The issue here is:  Did this man do it?
> On the defense side of the coin, you have people such as Joseph Hicks, a man who, on November 27th of 2001, was just an Assistant Manager of a Popeye's.
> On the Commonwealth side of the coin, you have all of those officers in their blue uniforms, officers who have been law-enforcement professionals for years, law-enforcement professionals who've taken the stand several times, who know how to testify, who know supposedly how to collect evidence and to analyze it and to bring that evidence to the District Attorney's office and to very professionally and expeditiously present it to all of you.
> Did that happen in this case?
> Absolutely not.  This was a very sloppy and shoddy case, I'll submit, that the Commonwealth brought forth.

D007450

**CISIU CONFIDENTIAL WORK PRODUCT**

> And why is that?
> Are all these officers who testified, are they all incompetent or imbeciles?
> Of course not.
> Perhaps, something else was going on here.

*(Id.*, 137-38.)

Mr. Nicholson focused on the fact that the victim was confused and did not see the assailant's face, before turning to the testimony of the eyewitnesses. He argued that Justin Votta couldn't "see the side of 15th Street where my client saw that person," the lookout, "standing." *(Id.*, 146.) In addition, he made great pains to focus on the fact that Votta observed the perpetrator wearing a grey hoodie. Regarding the other eyewitness, Joseph Christinzio, he merely commented that "I like him. He was a little slow, but I liked him a lot."

Mr. Nicholson then turned to the crux of the defensive theory, that the police framed the defendant to cover up an unjustified shooting. He reiterated that none of the eyewitnesses heard the officers say, "get up off of her," as Officers Vinson and Zungolo testified, and asked, Well, why would they say that? Because they want you to believe that they saw my client, Mr. Hicks on that morning. If that's the case, they would be uninterested witnesses who really don't give a darn, who would only come in here to testify to what they saw." *(Id.,* 148-149.) Mr. Nicholson zeroed in on the testimony of Officer Vinson, highlighting several inconsistencies between his testimony and that of other officers, including the claim that the defendant struck him, the description of the gun that was purportedly in the defendant's hand, that it took three shots to fell the defendant, and that the defendant put the gun back in his pocket after being shot. *(Id.*, 149-61.)

Mr. Nicholson then scrutinized the testimony of Officer Ellis, highlighting inconsistencies in his account of retrieving the gun from the defendant's pockets. *(Id.*, 161-63.) Mr. Nicholson also pointed out that no blood was found in the jacket pocket, in an attempt to highlight that Officer Ellis' account was untruthful. *(Id.*, 165.) In addition, he highlighted that the gun was registered to a police officer to hint that the gun was planted, before making pains to point out that the police never recovered a grey hoodie. Next, he attempted at length to raise concerns about the mishandling of evidence. (Id, 181-94.)

Finally, Mr. Nicholson ended his closing by returning to the notion that the police framed his client, forcefully summing up the defensive theory of the case:

> There are three victims there at the crime scene:
> ▮▮▮▮▮ was the one who suffered the most tragedy, the most pain.
> My client was shot three times in the back.
> But, then, there was another victim, a victim by the name of Martin Vinson, because I submit to you that Martin Vinson, as he said, was nervous. He was hyped up. He goes back there in the receiving area. It's dark. He shines that flashlight. He sees my client, as he said, standing there, and he admittedly jumped the gun. Vinson shot first and asked questions later.
> He shoots my client in the back. Then, when he got on the radio, he had tears in his eyes because he knew what he had done was wrong.

D007451

**CISIU CONFIDENTIAL WORK PRODUCT**

He said, "Yes, I thought he had something, but I didn't see it." I would submit to you that that happened, because based on what Zungolo says, when you use your common sense, Vinson knew he had made a mistake, and he had to live with that.

But, then, after that happened to him, rather than him just saying, "Okay, I made a mistake. I shouldn't have shot this man. I didn't know what this man was doing."

Instead, he turns it into something sinister. He gets together with other officers and Officer Ellis, and he says, "All right, we've got to clean this up. This man will probably die. He's just a rapist. Who cares about him. We've got to worry about our careers."

Those officers are all concerned about Vinson, and they all, when they crouched down around my client's feet, got their story together. As Detective Arthur Campbell said, they had to get the throw down weapon.

This was the throw-down weapon. (Indicating)

This weapon was possessed in the hands of a Police Officer for over 12years.

They said, "Okay, this gun looks like a cell phone. It will fit into his jacket."

I think that Officer Ellis, when he came to that scene, had this gun. He had this gun when he came. He threw it down. He closed it up. He puts the blood on it. "Let's get these stories together."

That's why you have all these inconsistencies, because at the time that it took place they didn't have time to get their story together.

Then, later, Vinson gets it together and says, "All right, I'mreally going to protect myself. Here I am in Internal Affairs. I've got to protect myself.

"Yes, it was a gun. I'm not going to say what I said on the radio. I'm not going to say what Zungolo says. I'm going    to say that that man had a gun, and he pointed it at me.

"I'm certainly not going to say I shot the man in the back, because then I'll really be questioned."

This case had a lot of publicity, as you know, within the media. Vinson and Zungolo were in the media. The pressure on these officers to prove to the world, to communicate to the world that they didn't do anything wrong was tremendous.

This is why, when they put this case together and took these clothes down to the chemical laboratory, they knew it wasn't enough. They knew the testimony wasn't enough. They had to link my client somehow scientifically, physically, to this evidence, to this Complainant, to Ms. █████.

They didn't get the answer that they wanted when they submitted all the clothes down to the chemical laboratory.

And somebody, after Detective Webb took the clothes down there, took those clothes, my client's clothes, out of there and did something with those clothes.

Then, Detective Merrick took them back after they tampered with this evidence, because they've got to make sure that their brother officer, Officer Vinson, is protected.

*(Id.*, 202-06.)

In sum, the defensive theory of the case was that Officer Vinson shot Hicks without justification and the police framed Mr. Hicks to cover up the shooting. Officer credibility was thus of vital importance to the defensive theory of the case.

**CISIU CONFIDENTIAL WORK PRODUCT**

<u>Commonwealth Closing</u>

In response to the defense's theory of a conspiracy between officers to cover up for Officer Vinson, ADA Murphy, early in her closing statement, said the following:

> The Commonwealth called 16 police officers. There were a few more on the scene, but you heard from 16 Police Officers, and the defense wants you to believe that these 16 Police Officers […] conspired against this Defendant to lie about how this incident occurred, to lie about what they saw, to plant a gun on the Defendant, to plant blood from one place to another, all within a couple of minutes.
>
> Now, in order for the testimony or the lies and the deceit and the conspiracy of these 16 officers to work, you've got to bring in the civilians […] But, then, furthermore, you have to bring in the testimony of the technicians. They, too, have to be part of this conspiracy and part of this grand lie all against this Defendant, none of whom know him.

*(Id.*, 210-11.) Crucially, ADA Murphy stood up for the officers and the veracity of their testimony, saying:

> There is no conspiracy here. There is no planning. There is no opportunity to plan. [Officer Vinson] saw this Defendant on top of this woman. He said "Get off of her, off of her."
>
> You know how you know he said that? Because Vinson said he said it, **and he was under oath just like everybody else. He's just a Police Officer, but he was under oath just like everybody else.**
>
> Officer Zungolo said that's what they said. "We both said it." **Officer Zungolo's under oath just like all the other witnesses.**

*(Id.*, 226 (emphasis added).)

ADA Murphy spent extensive time in her closing on the circumstances of the shooting, again putting up Vinson, Zungolo, and Ellis' accounts as truthful – spanning 23 pages of notes of testimony. *(Id.*, 227-50.) She reiterated that they were under oath: "There is no conspiracy here. These people took a stand, took an oath and told you how it happened to the best of their memory and to the best of their ability." *(Id.*, 249.) In addition, she stated that "There is no credible medical testimony presented that could tell you that this Defendant was shot in the back." *(Id.*, 257.)

Despite the extensive discussion of the shooting, ADA Murphy stated,

> Now, it is a justifiable shooting, but this is a rape case. In the beginning of this case, I told you that this was a rape case. So, the question is whether or not we have proved beyond a reasonable doubt that ███████ was raped by this Defendant, and I submit to you, yes, we have, based on the testimony of ██████ and based on the witnesses.

*(Id.*, 251-52.)

**CISIU CONFIDENTIAL WORK PRODUCT**

In sum, ADA Murphy stated:

> Ladies and gentlemen, **what connects this Defendant to the scene and to the crime is** the Complainant, Justin Votta, Joe Christinzio, **Officer Vinson, Officer Zungolo**, Officer Smith, **Officer Ellis**, the gun, the blood on the gun, the blood on the Defendant's pants, the blood on the Defendant's underwear, Robert Dillard's testimony, the DNA technician who found a match between the blood of ██████ and the blood on the gun, and the photographs.

*(Id.* 262 (emphasis added).)

After deliberations, the jury found Mr. Hicks guilty on all counts.


### C.    Post-Trial and Post-Conviction Proceedings
*i.    Post-Trial Motion for Extraordinary Relief*

The parties had long known that there was a surveillance camera that captured part of the alley behind St. Agnes Hospital; however, prior to trial, the footage could not be properly viewed because the hospital used obsolete hardware to store the video and special equipment was needed to view it.

Sometime after trial but before sentencing, Det. Arthur Campbell was able to procure the necessary equipment. Upon review, the video showed the following: 1) the assailant dragging ██████ into the alley; 2) the assailant wearing a dark jacket, light pants, and a grey hoodie; 3) the assailant did not leave the alley before police arrived and no one else entered; 4) the police arriving, but the shooting was not captured. (N.T. 12/20/02, 16-22.) Defense filed a motion for extraordinary relief, claiming a *Brady* violation. At argument on the motion, defense counsel added that the video showed a white pretzel van partially backing into the alley during the time of the rape (N.T. 2/27/03, 27-29.) Det. Campbell interviewed the driver of the van, who did not see or hear anything when he was at the scene, which the Commonwealth argued was a product of a loud compressor being in the alleyway. *(Id.)*

The Court found that the Commonwealth itself did not have the ability to view the video before trial and had shown due diligence in attempting to obtain it; the defense failed to exercise reasonable diligence and even used the lack of the tape at trial to insinuate that the Commonwealth was covering up evidence in furtherance of the police conspiracy. In addition, it found nothing exculpatory in the video. On these bases, the Court denied the motion for extraordinary relief. (Trial Court Opinion Dated 12/3/03.) On February 27, 2003, the Court sentenced Hicks to 12 ½ to 25 years of incarceration. (N.T. 2/27/03, 59.)

*ii.    Direct Appeal*

Hicks timely filed a counseled direct appeal, alleging that the trial court erred in denying the motion for extraordinary relief pursuant to *Brady*. The Superior Court, in an opinion dated January 31, 2005, denied the appeal. In the opinion, the Superior Court acknowledged the clear defensive theory of the case:

D007454

**CISIU CONFIDENTIAL WORK PRODUCT**

> Appellant's defense claimed that the police were concerned that Appellant might die and that the officer who shot him would be accused of an unjustified killing. Thus, he alleged, the officers conspired to frame Appellant by falsely reporting that when they arrived they found him on top of the victim with his pants down. They also agreed to report that Appellant had refused to remove his hands from his pockets, and that when he did, he had a gun which he pointed at them. To account for the fact that Appellant was not armed, they planted a "throw down gun" in his pocket. Finally, Appellant alleges the police planted the victim's blood on his pants, boxer shorts, and the gun.

(Superior Court Opinion Dated 1/31/05, 3-4) (*see also* n.1: "There exists a discrepancy in the testimony as to whether Appellant was shot in the back or in the chest,").

However, the appeal only focused on the video tape. The court concluded that Hicks did not establish due diligence in making efforts to obtain the tape before trial and that the Commonwealth had, thus the evidence could not have been obtained before trial. *(Id.*, 8.) In addition, the court ruled that the tape was not exculpatory, as evidence of the grey hoodie was merely cumulative and the presence of the delivery truck was of no moment. *(Id.*, 9.) In fact, the court found that the video "was more likely inculpatory." *(Id.*, 11.) On these bases, the appeal was denied. The Supreme Court of Pennsylvania denied *allocatur* on December 28, 2005.

###### *iii.   PCRA*

Hicks timely filed a *pro se* PCRA on April 20, 2006; he was appointed counsel, who then filed an amended petition. In the petition, Hicks raised three claims: 1) that counsel was ineffective for failing to obtain and present medical evidence regarding the shooting; 2) that counsel was ineffective for failing to obtain the technology necessary to view the video tape; and 3) that counsel was ineffective for failing to explore how a police officer's gun made its way to the crime scene.

On August 17, 2007, the trial court denied the PCRA for the following reasons:

> With respect to Claim No. 1, the defendant is not entitled to a hearing of the issue of whether he was shot in the back. Expert testimony could not overcome evidence that, A, the defendant was physically on top of the victim when the officer arrived on the seen [sic]; B, the defendant was asked to show his hands, both to non-shooting police officers and civilians and failed to do so. The defendant had the victim's blood on both his gun and boxer shorts. Thus, there was no claim of arguable merit on this particular issue.
> Counsel's action were [sic] reasonable and defendant has not shown prejudice.
> With respect to the second claim the defendant is not entitled to a hearing or relief of [sic] the issue of failure of trial counsel to produce the enhanced videotape for trial. The videotape has been reviewed subsequently and determined not to be claiming any exculpatory evidence. Thus, defendant has not shown prejudice.
> The third claim, the defendant is not entitled to on the issue that trial attorney failed to   investigate the relationship between Officer Vincent [sic] and Brown regarding the gun attributed to Mr. Weeks. The defendant has not produced any evidence of any sort to support an elicit relationship, and the claim must be dismissed.

D007455

**CISIU CONFIDENTIAL WORK PRODUCT**

(N.T. 8/17/07, 6-7.)

In a written opinion, the Court expanded upon its reasoning. Crucially, on the issue of the medical evidence, the Court stated that Hicks' ineffectiveness claim failed, "because he has not established the existence of a witness who could provide the medical testimony he desires." (Trial Court Opinion Dated January 31, 2008, 6.) Furthermore, the Court agreed with the Commonwealth's argument that

> "Regardless of any possible expert testimony with respect to the directionality of the bullets, the independence of defendant's guilt is simply overwhelming." Indeed, when police encountered defendant they witnessed him on top of the victim, in the process of raping her. Moreover, both the gun taken from the defendant, and the pants and underwear he was wearing at the time of the incident were stained with the victim's blood. Thus, defendant can not demonstrate that he was prejudiced by the absence of expert testimony that would corroborate his theory of being shot in the back.

*(Id.*, 7 (citing Commonwealth's Motion to Dismiss First PCRA).)

Regarding the video, the Court reiterated that the videotape was not exculpatory, so its existence at trial would not have resulted in a different verdict *(Id.*, 8.) Finally, the Court found that Hicks had not made a showing of how investigating the source of gun would overcome the "overwhelming evidence against" him. *(Id.*, 9.)

Hicks timely appealed the trial court's decision. In his appellate brief, counsel made clear that these issues were far more serious than the trial court had acknowledged. On the issue of the shooting, counsel argued that:

> The credibility of the officer/witnesses was and is the foundation stone of the entire case, as it is only the officers whose testimony constituted the inculpatory evidence against appellant […] Trial counsel permitted this issue to be presented to the jury as simply appellant's word against those of several members of "Philadelphia's finest."

(Appellant's Brief on PCRA, 8.) While other evidence (civilian witnesses, DNA) certainly also constituted inculpatory evidence at trial, the credibility of the officers was certainly the foundation of the defensive theory of the case.

In addition, counsel specifically named a doctor who could opine on the issue if the court would authorize payment for expert services, contrary to the trial court's claim that Hicks had not shown that such an expert existed. *(Id.*, 14.) Hicks petitioned the court for funds but was denied. Counsel largely reiterated previous arguments regarding the videotape and the gun.

The Superior Court merely reasoned that "the PCRA court's Opinion addressed each of Week's claims and properly concluded they lacked merit," and denied the appeal as such.

D007456

CISIU CONFIDENTIAL WORK PRODUCT

(Superior Court Opinion Dated 4/23/09, 5.) The Supreme Court of Pennsylvania denied review on August 10, 2009.

iv.    *Habeas Petition*

Hicks timely filed a *pro se* habeas petition in the Eastern District of Pennsylvania on September 10, 2009. In his petition, he alleged a *Brady* violation with regards to the video tape, and ineffectiveness for trial counsel failing to obtain medical evidence regarding the shooting, failing to obtain the video tape, and failure to explore the ownership of the gun gun. He mostly rehashed the same arguments as previously presented; however, he also made a great deal of the "pretzel truck" in the video and the fact that none of the witnesses testified to seeing the truck.

The Commonwealth responded to many of Hicks' claims with many of the same arguments, including the overwhelming evidence of the defendant's guilt. However, the Commonwealth did devote a larger amount of time to discussing the claim regarding the shooting. Despite acknowledging that trial "counsel's theory of the case was focused on the fact of the shooting itself," the Commonwealth remarkably concluded that "There is really no possibility that expert testimony on the bullets' trajectory would have led the jury to conclude that Officer Vinson was lying," because "the alley was dark." (Cw. Habeas Response, 14.)

Magistrate Jude Linda Caracappa issued a Report and Recommendation ("R+R") opining that the habeas petition should be denied. The R+R repeated the same arguments all previous courts had on the issues besides the shooting. In regard to the shooting, the R+R deferred to the Superior Court's opinion, as it was not "contrary to, or an unreasonable application of, clearly established federal law." (R+R, 11-12.)

District Court Judge Barclay Surrick adopted the R+R and dismissed the petition, reiterating the same arguments on the claims besides the shooting. Regarding the shooting, Judge Surrick argued that "The jury was able to hear from Petitioner with regard to the location of the bullet wounds and to see the wounds when he lifted his shirt during his testimony at trial. **They were then able to weigh his credibility as compared to that of the officers.**" (District Court Opinion Dated 8/23/13, 12. (internal citations omitted) (emphasis added).) In addition, the court reasoned that:

> The fact remains that the officers testified that they discovered Petitioner on top of the victim in the act of raping her.  Upon witnessing Petitioner reach for a gun in his pants, which were down and stained in the victim's blood, the officers shot Petitioner.
> **Whether the bullets entered Petitioner's body from the back and exited through the chest or entered the chest and exited through the back is of little consequence.**

(*Id.*, 13 (emphasis added).) Judge Surrick refused to issue a certificate of appealability, and the Third Circuit declined to review the case.

D007457

**CISIU CONFIDENTIAL WORK PRODUCT**

    *v.*     *Motion for DNA Testing and Second PCRA*

    On November 10, 2015, Hicks, through newly-retained pro bono counsel, filed a motion for post-conviction DNA testing. Despite the Commonwealth's opposition, on February 3, 2017, the PCRA Court granted the motion. DNA testing was performed on the physical evidence collected in the case. Based, in part, on the results of the testing, Hicks filed a second PCRA, amended December 5, 2018.[4]

    In the PCRA, Hicks claims actual innocence, and raises two claims of newly discovered evidence: DNA testing purporting to exonerate Hicks and the results of a new forensic pathology report showing that Hicks was shot in the back by police. In sum and substance, the DNA claim revolved around the discovery of DNA of an unknown male on ███████ underwear; Hicks was definitively excluded from that sample. Regarding the shooting, forensic pathologist Dr. Michael Baden reviewed the medical records in this case and determined that Hicks was shot in the back. The petition otherwise also touches on claims of mishandling evidence, gun planting, and the grey hoodie, but does not assert them as new claims.

    On July 9, 2019, the Commonwealth filed a motion to dismiss the petition. Regarding the shooting, the Commonwealth primarily argued that the claim had been previously litigated (and denied) and was now time-barred, because Hicks could have obtained a medical expert's opinion well before the filing of the petition. On the merits, the Commonwealth argued that "Whether defendant was shot in the front or the back was simply irrelevant to his rape and PIC convictions. Further, the proffered evidence would not have compelled a different verdict in light of the [] overwhelming evidence against defendant." (MTD, 17.) The Commonwealth cited Judge Surrick's contention that "'Whether the bullets entered Petitioner's body from the back and exited through the chest or entered the chest and exited through the back is of little consequence' in light of the evidence against defendant." *(Id.*, n.7.) Finally, relying in part on an independent review of the medical evidence, conducted by City of Philadelphia Medical Examiner Dr. Sam Gulino, the Commonwealth disputed the veracity of Dr. Baden's conclusions.

    Regarding the DNA testing, the Commonwealth argued that the new testing was *inculpatory*, and the presence of the DNA of an "unknown male" on ███████ underwear was more likely attributable to Ms. ████ husband or son, due to the scientific nature of the sample. Admittedly, the section is incredibly technical, but after having consulted with ADA Carrie Wood, who wrote the relevant section in the motion to dismiss, I believe her conclusions are correct based on the science. *(Id.*, 19-31.)[5]

---

[4] Hicks, through the Innocence Project, brought the case to the CIU's attention, requesting a review, on week earlier.

[5] Because ADA Wood only reviewed the forensic reports in the case, not any trial documents, the motion to dismiss mistakenly argues that the lab found "wearer DNA" on Mr. Hicks' boxer shorts matching ██ ██ which only could have come from the transfer of **skin cells** from prolonged, vigorous contact. However, after reviewing the notes of testimony from PPD Forensic Analyst at trial – in which he stated that the sample at issue came from **blood**, not skin cells – and discussing his testimony with ADA Wood,

CISIU CONFIDENTIAL WORK PRODUCT

Subsequent to the Commonwealth's filing, physical evidence – namely, the defendant's clothing – was made available to the forensic experts in this case. Upon review, Dr. Gulino amended his findings, now concluding that Mr. Hicks was indeed shot in the back.[6]

### D. __Analysis__

Based on my review of the file and relevant case law, I conclude the following: 1) Hicks' actual innocence claim fails (indeed, my review suggests that Hicks **did** commit the crime); 2) Police Officers Martin Vinson, Dennis Zungolo, and Robert Ellis committed perjury at Hicks' trial; and 3) because three key Commonwealth witnesses committed perjury on issues central to the trial, the interests of justice require *vacatur* of Hicks' conviction.

### i. *Actual Innocence Claim*

In essence, Hicks' actual innocence claim boils down to four arguments: 1) the new DNA testing is exculpatory; 2) both the eyewitnesses and video in the alley missed the actual perpetrator leaving the scene and Hicks entering; 3) the perpetrator was said to be wearing a grey hoodie but police did not recover such a hoodie from the hospital; and 4) other evidence in the case was fabricated to inculpate Hicks for the purposes of covering up an unjustified shooting. I address each in turn.

DNA

As stated above, the DNA in this case hinges on rather complex issues. However, after discussing the findings with ADA Wood, several points are clear. First, the DNA from the "unknown man" on ███████ underwear is highly likely to be from a source other than the perpetrator, and is much more likely to have come from her husband or son; either way, it is not of the quality to suggest that it came from the perpetrator. Second, ███████ blood is present in significant quantities on Mr. Hicks' clothing, including on his sweatpants and his boxers. In sum, the DNA inculpates Mr. Hicks, and any conclusion to the contrary is scientifically unsound.

Eyewitnesses and Video

Justin Votta and Joseph Christinzio were clear at trial that they observed the assailant drag ██████ into the alley and called police before heading outside to wait for the cops. The Innocence Project theorizes that these eyewitnesses clearly did not see the entire scene for three reasons. First, neither Votta nor Christinzio had an angle that allowed them to see the position of the alleged "lookout." Second, Votta stepped away from his window to call the police and had to walk downstairs from his third-floor apartment to wait outside for the police, leaving open

---

[6] ADA Wood realized that the motion's "wearer DNA" conclusion is incorrect. Any subsequent filing by the Commonwealth should retract this error. (MTD, 25-26.)

[6] It should be noted that Dr. Gulino still maintained the same objections to Dr. Baden's report, and reached his conclusion using an independent analysis.

CISIU CONFIDENTIAL WORK PRODUCT

roughly a minute where he did not see the scene. Third, neither witness mentioned that a truck backed into the area at the time.

Assuming that the first point is correct, no evidence points to the existence of the alleged lookout. None of the eyewitnesses – who could clearly hear much of the yelling in the alley – heard the eyewitness call to the assailant in the alley, nor did they see him running away when they eventually got outside. This argument fails.

Second, the amount of time Votta did *not* see the scene amounts to roughly a minute, by his estimation at trial. One would have to believe the assailant running out of the alley and out of sight, and Hicks entering took place in that short minute, which, while admittedly possible, is unlikely.

Third, the nature of the pretzel truck's involvement is somewhat unclear, as I have not had the benefit of seeing the video myself and the truck is not described in great detail in the notes of testimony. That said, the witnesses were asked straightforward questions only about seeing the assailant drag the woman in, then waiting for the cops, then hearing shots. They were not asked about whether or not a truck entered the alley; however, Christinzio did testify that trucks regularly came in and out of the alley. Admittedly, that the witnesses did not volunteer the specific information is not tremendously helpful, but it is worth noting that Hicks, in the account he gave at trial, made no mention of a truck entering the alley, either.

In any event, any potential issues raised above are mooted by the fact that video from the hospital captured the assailant dragging ███████ in, then the cops arriving, with no indication that anyone ran out or anyone else came in prior to the shooting. When confronted with as much, Hicks in the past has chalked that up simply to the fact that the video was really a series of photos taken at three-second increments, so both actions must have taken place in gaps between captures. Even if the description of the video is true, the argument absolutely strains credulity. One would have to believe both that the assailant ran out and Hicks walked in 1) in the minute it took Votta to walk downstairs; **and** 2) between seconds-long gaps in the video. These arguments fail.

Grey Hoodie

Hicks has consistently made much of the fact that police never recovered a grey hoodie from the hospital. Votta stated unequivocally that the assailant was wearing a grey hoodie, and the video shows the assailant wearing what appears to be a grey hoodie. Yet, when police brought Hicks' clothes to the lab, even though all of the other clothing the assailant was seen wearing was provided, a grey hoodie was not included.

This claim also fails. Multiple police witnesses at the scene described Hicks as wearing a grey hoodie. Officer Smith listed a grey hoodie on his 75-48; Vinson stated Hicks was wearing a grey hoodie; Zungolo stated he pulled up Hicks' grey "shirt" to administer first aid; Ellis stated he was wearing a grey cap. One would have to believe that 1) the assailant on video with the

**CISIU CONFIDENTIAL WORK PRODUCT**

grey hoodie ran out of the alley; 2) Hicks happened to be wearing identical clothing to the assailant besides the hoodie; **and** 3) the officers lied about that specific article of clothing – despite there being no evidence that police knew beforehand that this would become a central issue at trial.

Further complicating Hicks' claim is the fact that first responders and hospital personnel cut off Hicks' clothing in a rush to save his life from three center-mass bullet wounds. It is entirely conceivable that, in this rush and ripping of clothing, the hoodie was not properly kept with the rest of Hicks' clothing. Absent evidence to the contrary, I am deeply unpersuaded by this argument.

Police Conspiracy

Hicks insinuates that all of the physical evidence inculpating him was fabricated in a police conspiracy to protect Officer Vinson. In particular, he points to blood evidence on his and ▓▓▓▓▓▓ clothing and the gun recovered at the scene. Neither argument is convincing from an "actual innocence" standpoint.

First, Hicks points to the fact that *his* blood ended up on ▓▓▓▓▓▓ pants. He asserts he never touched her, so the blood was either planted or the result of improper comingling of her evidence. Hicks reiterates the latter argument with respect to the blood from ▓▓▓▓▓ found on his clothing. While both circumstances are theoretically possible, there is no evidence to suggest either. Rather, it is far more likely that ▓▓▓▓▓ blood was on Hicks' pants and boxers because he struck her with his hand, leaving the gun bloody, then pulled down his pants and boxers before pulling them back up again. Admittedly, how his blood ended up on ▓▓▓▓▓ clothing is unclear, but this alone does not an actual innocence case make, especially absent affirmative evidence of an alternate explanation.

Second, Hicks has always argued that the gun was planted by the police to make him look like the assailant and to support Officer Vinson's claim that Hicks drew a gun on him. At trial, he pointed to three specific facts supporting that claim: 1) that the gun was registered to an active PPD officer; 2) no blood was found in his jacket pocket, despite the gun being covered in blood; and 3) the officer who recovered the gun, Officer Ellis, has been found to have planted guns in other cases.

As discussed further below, I believe it is entirely clear that Officer Ellis did not recover the gun from Hicks' pocket, as he testified. I also believe he said he did to cover for Officer Vinson. However, I do not believe he planted the gun at the scene. There is no evidence to establish any connection between the officer to whom the gun was registered and any other party in the case. Granted, the circumstances under which the gun left her possession are unclear and strange, but there is no affirmative evidence to point to any particular explanation. It is just as likely that her daughter, who was nineteen when the officer bought the gun, had someone over who took the gun, for example.

D007461

**CISIU CONFIDENTIAL WORK PRODUCT**

While the absence of blood in the pocket makes clear that the gun was not in the pocket after it became bloody, it is entirely plausible that Hicks put the gun to the side while he raped ███████ Indeed, ███████ testified that, the entire time she was being raped, the assailant had his hand against her face. It is not inconceivable that his other hand was being used to support himself on the ground, instead of continuing to hold a firearm against a victim he had already overpowered. That the gun was not immediately in Hicks' grasp or in his pocket does not mean he did not have the gun; it simply proves that it was not in his jacket when he was shot.

Finally, while I have not reviewed the other case in which the Innocence Project asserts Officer Ellis planted a gun; but even without doing so, the chance he did here is unlikely. Not only was ███████ blood found on the handle of the gun, it was also found *inside the barrel*. Ellis would have to have been carrying the gun around with him, have wiped a significant amount of ███████ blood off of her face, have then rubbed the blood on the handle of the gun and thought to put some *inside the barrel*. This is flatly unlikely, and there is no evidence to support as much.

In total, Hicks' actual innocence claim must fail. The DNA is *inculpatory*, contrary to his claims. Eyewitnesses and video point convincingly to him as the perpetrator and absolutely contradict his account of the events. The grey hoodie was likely cut off at the hospital, as several witnesses saw Hicks wearing it after he had been shot. The broader police conspiracy claim (in regard to the physical evidence) lacks any evidence and is merely speculative. Rather, there is clear and convincing evidence that Hicks raped ███████

*ii.*     *Perjury by Officers Vinson, Zungolo, and Ellis*

Despite the lack of evidence pointing to a broader police conspiracy to fabricate evidence of the rape, there is objective scientific evidence that proves that Officers Vinson, Zungolo, and Ellis all committed perjury at Hicks' trial regarding the nature of Officer Vinson's discharge. It is now undisputed that Hicks was shot in the back, and it is scientifically clear that Hicks did not have the gun in his pocket when he was shot. Yet, the officers offered perjured testimony to the contrary.

Officer Vinson clearly testified that Hicks was directly facing him when he shot, and that Hicks had the gun in his pocket before and after Vinson shot him, as evidenced below (alleged perjured statements in bold):

> [H]e reaches into his pocket, and then he lunges around. I could see off the light a gun coming towards me…**When he was almost to where he was fully facing me, I discharged two shots.** He stepped back and hesitated, and then he went to come back up again. When he went to bring the gun back up again, that's when I had a reactionary shot, and I stepped back. (N.T. 11/1/02., 87.)
>
> "**He was just about around and almost just about had it pointed at me, directly at me.**" *(Id.*, 141.)

Page 23 of 27

CISIU CONFIDENTIAL WORK PRODUCT

In addition, he claimed that "T**he male put the gun back in his jacket pocket after he had been shot**." (*Id.*, 155.) Further, when other officers came to search the suspect, Vinson "**said, 'His gun is in his right pocket,' and they went in and actually recovered the gun. They actually took the gun out of his pocket.**" (*Id.*, 159.)

Officer Zungolo also clearly lied about the direction of Hicks' body:

Q. At the time those three shots were fired, was my client facing you and Officer Vinson? Was his chest, his stomach and the front of his body facing the two of you?
**A. Yes, I believe so.**
[…]
Q. So, are you saying that by the time the shots rang out, my client turned about 90 degrees away from Officer Vinson?  He had turned all the way back so he's facing Officer Vinson; is that what you're saying?
**A. Yes.**

(N.T. 11/6/02., 161-62.) It is worth noting, however, that he did not maintain that the gun was recovered from Hicks' pocket.

While Officer Ellis did not see the shooting itself, he clearly lied about his recovery of the gun to cover for it:

**"This is a gun I recovered from the gentleman's pocket. That would be the right-hand pocket."**

(N.T. 11/4/02., 79.) Even if he did not know Vinson shot Hicks in the back, it is likely that he saw that Hicks was unarmed at the moment he was shot and said that he found the gun in his pocket to make Vinson's shooting seem justified.

In short, all three officers committed perjury regarding the circumstances of the shooting. The perjury was of such an egregious nature that, were we within the statute of limitations, I would suggest prosecuting them for it.

iii.    *Legal Analysis*

In *U.S. v. Agurs,* 96 S.Ct. 2392 (1976), the Supreme Court of the United States discussed at length the Court's historic approach to a prosecutor's knowing use of perjured testimony. The Court was clear that:

a conviction obtained by the knowing use of perjured testimony is fundamentally unfair ,and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. It is this line of cases on which the Court of Appeals placed primary reliance in those cases the Court has applied a strict standard of materiality,

D007463

not just because they involve prosecutorial misconduct, **but more importantly because they involve a corruption of the truth-seeking function of the trial process.**

*Agurs*, 96 S.Ct. at 2397 (emphasis added).

The Supreme Court has, in those cases, made clear that the knowing use of perjured testimony is an issue that extends far beyond witness credibility:

The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. **The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.**

*Napue v. People of the State of Illinois*, 79 S.Ct. 1173, 1177 (emphasis added).

While the Supreme Court has been hesitant to extend this line of cases to *un*knowing use of perjured testimony, several courts have so held. There appears to be a circuit split regarding whether a prosecutor's lack of knowledge that the testimony was perjured clears away a due process violation. *See Evenstad v. Carlson*, 470 F.3d 777, n.6 (8th Cir. 2006) (collecting cases). The Third Circuit Court of Appeals has often used the standard enunciated in *Larrison v. United States*, 24 F.2d 82 (7th Cir. 1928) in analyzing such cases (albeit without adopting the test as its formal position on the matter):

Under that rule the following must be established: 1. A material witness gave false testimony; 2. Without the false testimony, the jury might have reached a different verdict; and 3. The defendant did not know the testimony was false until after the trial.

*U.S. v. Massac*, 867 F.2d 174, 178 (3d Cir. 1989).

Especially on-point here, the Ninth Circuit Court of Appeals in *U.S. v. Young,* 17 F.3d 1201 (9th Cir. 1994) held that

a government's assurances that false evidence was presented in good faith are little comfort to a criminal defendant wrongly convicted on the basis of such evidence. **A conviction based in part on false evidence, even false evidence presented in good faith, hardly comports with fundamental fairness.** Thus, even if the government unwittingly presents false evidence, a defendant is entitled to a new trial "if there is a reasonable probability that [without the evidence] the result of the proceeding would have been different."

*Young*, 17 F.3d at 1203-04 (emphasis added).

## CISIU CONFIDENTIAL WORK PRODUCT

Here, three key police witnesses clearly committed perjury on facts material to the defensive theory of the case. Yet, that fact was known to and argued by the defendant at trial, and there is no indication that ADA Murphy knew the officers were lying (although in Ellis' case, the lack of blood in the pocket arguably should have made as much clear). Thus, this case does not neatly fit with the above-cited cases.

That said, I believe the nature of the officers' perjury nonetheless warrants relief. Contrary to Judge Surrick's opinion that "Whether the bullets entered Petitioner's body from the back and exited through the chest or entered the chest and exited through the back is of little consequence," (District Court Opinion Dated 8/23/13, 13), the defense made that argument central to its theory at trial. Indeed, the defense's case rose and fell upon the officers' credibility. "The credibility of the officer/witnesses was and is the foundation stone of the entire case [...] Trial counsel permitted this issue to be presented to the jury as simply appellant's word against those of several members of 'Philadelphia's finest.'" (Appellant's Brief on PCRA, 8.)

Police witnesses occupy a unique position in the criminal justice system. Their badge confers the imprimatur of truth to their testimony, especially when placed in opposition to that of the accused. Here, where police credibility regarding the nature of the shooting was the "foundation stone" of the defense's case, the three most crucial witnesses committed perjury about those very facts. It matters little that Hicks knew they were lying at trial; without evidence to bolster his claims, it was simply the word of an accused rapist against that of three sworn police officers.

The Commonwealth, in its motion to dismiss Hicks' pending PCRA, argued extensively that this claim is time-barred, as Dr. Baden's report could have been obtained in a timely fashion but was only obtained a decade-and-a-half after the incident. While this is technically true, the spirit of the argument ignores the history of this case.

Hicks' trial counsel did not pursue such evidence. He again represented Hicks on direct appeal and failed to present any argument regarding the nature of the shooting. Hicks raised an ineffectiveness claim in his timely-filed PCRA regarding counsel's failure to obtain such evidence, and even petitioned the court for funding to obtain an expert opinion; yet, the court ruled that "because he has not established the existence of a witness who could provide the medical testimony he desires," his claim lacked merit. (Trial Court Opinion Dated January 31, 2008, 6.)

After the Superior Court rebuffed his appeal, Hicks again raised this claim in federal court. He filed several times for the court to provide funds for an expert witness to provide an analysis of the gunshots. In response, the Commonwealth disingenuously claimed that "There is really no possibility that expert testimony on the bullets' trajectory would have led the jury to conclude that Officer Vinson was lying," because "the alley was dark." (Cw. Habeas Response, 14.) Judge Surrick agreed, and reasoned that Hicks was given a fair trial because "The jury was able to hear from Petitioner with regard to the location of the bullet wounds and to see the

D007465

CISIU CONFIDENTIAL WORK PRODUCT

wounds when he lifted his shirt during his testimony at trial. They were then able to weigh his credibility as compared to that of the officers." (District Court Opinion Dated 8/23/13, 12. (internal citations omitted).)

Simply, Hicks argued that his trial counsel was ineffective for failing to obtain a proper medical opinion on the gunshot wounds, and Hicks has attempted for over a decade to obtain the medical opinion he sought. He argued that trial counsel was ineffective for failing to procure such an opinion – which now shows that three key police witnesses committed perjury – but the courts have denied his claims. He has asked multiple courts several times to provide funds to obtain the opinion himself because he was indigent, but the courts refused. To now fault him for his failure to obtain the necessary information earlier flatly ignores that he has long sought to do so but could not because he simply did not have the funds. One wonders if Hicks could have avoided this procedural bar were he a wealthier defendant.

E.      **Conclusion**

After my review of the case, I firmly believe that Tremaine Joseph Hicks raped ███████ However, there is now scientific proof that three key police witnesses – against whose credibility stood only the word of the defendant himself – committed perjury regarding facts that were essential to the defensive theory of the case. It matters not that the prosecutor did not knowingly suborn perjury, that the claim is technically time-barred, nor even that Hicks committed the crime. Hicks has been incarcerated for nearly 19 years – seven years over his minimum term of incarceration and six shy of his maximum; *vacatur* of his conviction would not mean escaping punishment. As Judge Goodwin stated in *Young,* "A conviction based in part on false evidence, even false evidence presented in good faith, hardly comports with fundamental fairness." 17 F.3d at 1204. Hicks' is such a conviction, and fundamental fairness dictates that it cannot stand.