IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TERMAINE HICKS** | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 22-977 |
| | : | |
| **CITY OF PHILADELPHIA, MARTIN VINSON, ROBERT ELLIS, ARTHUR CAMPBELL, MARK WEBB, MICHAEL YOUSE, FRANK HOLMES, DOUGLAS VOGELMAN, KEVIN HODGES, DENNIS ZUNGOLO, MARY BRIDGET SMITH** | : : : : : | |

## MEMORANDUM

**MURPHY, J.**                                                                 October 10, 2024

"A lawyer, as a member of the legal profession, is . . . a public citizen having a special responsibility for the quality of justice."[1]  We expect — demand — that lawyers zealously advocate for their clients.  But lawyers must not lose sight of their other obligations.  In this contentious civil-rights litigation, there is a dispute about whether the plaintiff, Mr. Hicks, could have heard a rape victim screaming from two blocks away.  So Mr. Hicks's lawyers devised a test.  And with no warning to the people who live and work near Broad and Passyunk in South Philadelphia, the lawyers played a looped recording of a woman screaming.  At 122 decibels.  For an hour.  At 5:30 a.m.  By a daycare center that was opening.

Alarmed local citizens found out about this case from the lawyers present and understandably complained by e-mail to our chambers.  After we figured out what was happening, we ordered counsel for Mr. Hicks to show cause why they should not be sanctioned. Admirably, counsel admitted error, took responsibility, and urged us not to punish their client for their actions.  Considering the circumstances, we conclude that Mr. Hicks's lawyers owe the

---

[1] Pa. R. Pro. Conduct, Preamble ¶ 1.

local citizens an apology.  The opinion below explains how we reached that decision and specifies the nature of the apology.

I.  **FACTS AND PROCEDURAL HISTORY**

In the early morning hours of September 23, 2024, residents of the 1900 block of South 15th Street in Philadelphia awoke to the "deeply disturbing" sound of a woman screaming.  DI 194 at 2.[2]  As community members later described in their emails to our chambers, the screams began at 5:30 a.m. that morning and played for over an hour.[3]  DI 196 at 2-3.  Unbeknownst to residents awoken from their sleep, the screams came from an audio speaker — not a real person — and were broadcast as part of this litigation between plaintiff Termaine Hicks and the City of Philadelphia.  Nonetheless, neighbors noted that the sounds were "clearly a woman getting assaulted" and that "[e]very woman who has been assaulted and lives within a few blocks had to hear this."  DI 194 at 2; *see* DI 196 at 2 ("Statistically, 1 in 6 women in the surrounding blocks have been assaulted and then had to be woken up . . . by a recording of a screaming woman.").  The speaker that broadcast the screams was located right next to a daycare center that opened at 6:30 a.m.  DI 196 at 2.  Community members "saw children go in while they were playing the screaming sounds."  *Id.*  Some worried that the situation could have become violent: "This could have caused a very dangerous situation as there are firearm owners in this area and we all thought a woman was being raped."  DI 194 at 2.  Neighbors expressed their frustration to local

---

[2] We adopt the pagination supplied by the CM/ECF docketing system.

[3] Beginning on September 23, we received numerous unsolicited emails from community members describing the scream test incident and requesting recourse.  *See* DI 194, 196.

news stations that picked up the story.[4]  The strong community reaction is no surprise considering that plaintiff later told us that the screaming sounds were broadcast at 122 decibels.[5] DI 199 at 5.

To understand how this unusual situation came before us, it is necessary to briefly recount the facts of the underlying case.  In March 2022, Mr. Hicks filed suit against the City of Philadelphia and various individually named police officers alleging that defendants framed him for a brutal crime he did not commit, resulting in 19 years of wrongful incarceration.  DI 23.  In his amended complaint, Mr. Hicks alleges that he was walking home in South Philadelphia in the early morning hours of November 27, 2001 when he heard a woman screaming.  *Id.* at 9.  He claims that he went to help the woman, who had been sexually assaulted and was lying on the ground.  *Id.* at 2, 9.  According to Mr. Hicks, when police officers arrived on the scene, they shot him in the back three times, planted a gun, and proceeded to frame him for the crime.  *Id.* at 10-11.  Mr. Hicks's conviction was vacated in December 2020, and he was released from prison.  *Id.* at 22.  Defendants maintain that Mr. Hicks committed the assault.  DI 202 at 5.  The parties have been engaged in highly contentious discovery for over a year and are approaching the deadline for dispositive motions.

---

[4] *See* Kate Reilly et al., *Recording of screaming woman rattles South Philly neighborhood for an hour*, NBC 10 Philadelphia (Sept. 26, 2024), https://www.nbcphiladelphia.com/news/local/recording-of-screaming-woman-rattles-south-philly-neighborhood-for-an-hour/3980310/; Greg Payne, *Loud screaming in South Philly was test for court case, not person in danger*, FOX 29 Philadelphia (Sept. 26, 2024), https://www.fox29.com/news/loud-screaming-south-philly-was-test-court-case-not-person-danger.

[5] For reference, 122 decibels is considered somewhere on the border between uncomfortable and painful, and is similar to an ambulance siren, a rock concert, or a chainsaw.

After we learned that the "scream test" was related to this case and that defense counsel was on the scene, we ordered defendants to explain the situation.[6] DI 194. Defendants informed us that plaintiff, not defendants, had conducted the experiment. DI 197 at 1. We then ordered plaintiff to show cause as to why any evidence obtained from the scream test should not be precluded and why plaintiff's counsel should not be required to apologize to affected residents. DI 198. Plaintiff responded to our show-cause order. In the response, plaintiff's counsel apologizes to the court, provides additional factual context regarding the scream test, and ultimately argues that there is no basis for precluding the results of the study. DI 199. Defendants filed a joint reply. DI 202.

According to the parties, defendants conducted an acoustics test in April 2024 to "determine the veracity of [Mr. Hicks's] claim that he heard the rape victim's screams from two blocks away." DI 197 at 1. Defense expert Dr. Durand Begault used a "siren chirp" as a proxy for a woman's scream. *Id.* Plaintiffs then retained acoustics experts, Dr. Bruce Koenig and Dr. Douglas Lacey, to conduct their own testing. *Id.* at 2; *see* DI 199-9, 199-10. The parties dispute whether defense counsel had adequate notice that plaintiff's study would use a recording of a woman's scream. *See* DI 199 at 5; DI 202 at 2. What is clear is that no one provided *community members* with notice of the scream test. Plaintiff's counsel, having been "specifically directed by counsel for the City . . . not [to] speak directly to any City employees," assumed defendants would take necessary precautions with the community. DI 199 at 3. Plaintiff's counsel states:

> The City subsequently indicated that they were working with a liaison at the PPD and had informed the Lieutenant and Sergeant for the District of the testing. . . . [W]e continued to understand that the PPD was following whatever precautions they had taken when

---

[6] This court had no notice of, and did not authorize, the scream test.

4

defense counsel had conducted a similar study earlier this year, which to our knowledge had not created any significant problems.

*Id.* at 6.  Defense counsel counters that "[p]laintiff did not need police authorization or assistance to conduct the testing, much less to inform residents about [the] testing."  DI 202 at 2.

Counsel from both parties attended the September 23 scream test.  *See* DI 197 at 2; DI 199 at 2.  The approximate location of the speaker is depicted by a star on the map below — about a block northwest of the intersection of Broad and Passyunk.  The speaker was directly adjacent to a daycare center and across the street from more than two dozen rowhomes.  DI 197 at 2.



Plaintiff's counsel admits that "no counsel was fully aware of how loud the screams would be," and that the "residents were clearly upset."  DI 199 at 6.  Plaintiff's counsel present at the scene claims she had "three interactions with members of the public concerning the study."  DI 199-7 at 2.  Plaintiff's paralegal describes how a person approached him "recording our

5

interaction on a cell phone and asked a number of questions about what we were doing and why we were doing it." DI 199-8 at 2. Plaintiff's expert, Dr. Koenig, recalls "a man coming over with a baseball bat, and a woman yelling at me." DI 199-9 at 3. Defense counsel describes the scene as follows:

> When some residents tried to confront the Production Tech, police officers intervened and diffused the confrontations . . . Many individuals inquired as to the underlying case, expressed concerns that such a loud sound over such a large loudspeaker could not be "scientifically valid," and asked for the Undersigned to identify themselves and advise as to whom they could direct their concerns.

DI 197 at 3.

Despite all of this, the scream test continued until 6:32 a.m. — over an hour after it started. *Id.*; DI 199 at 6. At some point, defense counsel explained to inquiring residents that the test was being conducted as part of an ongoing lawsuit. DI 197 at 3. In their response to our show cause order, plaintiff's counsel recognizes that they "did not appreciate the impact of the study on the community or the impact that it could have on trauma victims — although in hindsight [they] should have." DI 199 at 1.

**II.    DISCUSSION**

   **A. Sanctions are justified pursuant to the court's inherent authority.**

A district court has "inherent authority" to "wield sanctioning power . . . where necessary to preserve the integrity of the judicial process." *In re Cendant Corp.*, 260 F.3d 183, 199 (3d Cir. 2001). "[T]he 'inherent power' to sanction an attorney [is] 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Eash v. Riggins Trucking, Inc.*, 757 F.2d 557, 567 (3d Cir. 1985) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 631 (1962)).

A court's inherent authority is not without limits. "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). When exercising inherent powers, "a district court must ensure that there is an adequate factual predicate for flexing its substantial muscle." *Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 74 (3d Cir. 1994). "[A] court should normally look first to rule-based or statute-based powers and reserve inherent powers for those times when rule- or statute-based powers are not 'up to the task.'" *Saldana v. Kmart Corp.,* 260 F.3d 228, 238 (3d Cir. 2001) (quoting *Chambers*, 501 U.S. at 50). However, except for sanctions for attorneys' fees, "a court need not always find bad faith before sanctioning under its apparent powers." *Westinghouse*, 43 F.3d at 74 n.11; *see Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc.*, 57 F.3d 1215, 1225 (3d Cir. 1995) (requiring bad faith in the attorneys' fees context); *Chambers*, 501 U.S. at 49 (same).

Here, no rule or statute neatly applies to the situation at hand. Plaintiff's counsel has not filed groundless pleadings or papers, *see* Fed. R. Civ. P. 11(c); 28 U.S.C. § 1927, failed to appear, prosecute, or abide by a court order or subpoena, *see* Fed. R. Civ. P. 16(f), 41(b), 45(g), or violated rules of discovery, *see* Fed. R. Civ. P. 26(g), 30(g), 37(d)-(f).

Yet we find that there is a strong "factual predicate" to wield our inherent authority in this scenario. *Westinghouse*, 43 F.3d at 74. In so doing, we agree with other courts in this circuit and beyond that a court can rely on its inherent authority to address attorneys' ethical lapses. *See, e.g.*, *Scranton Prod., Inc. v. Bobrick Washroom Equip., Inc.*, 190 F. Supp. 3d 419, 433 (M.D. Pa. 2016) ("[Inherent power] includes the ability to 'prohibit or remedy litigation practices which constitute ethical violations.'" (quoting *Comuso v. Nat'l R.R. Passenger Corp.*, No. CIV A

7

97-7891, 2000 WL 502707, at *3 (E.D. Pa. Apr. 26, 2000))); *see also United States ex rel. Holmes v. Northrop Grumman Corp.*, 642 Fed. App'x 373, 378 (5th Cir. 2016) ("District courts are afforded discretion in penalizing ethical violations.").

Plaintiff counsel's disregard for community members fell short of the ethical standards by which all attorneys practicing in this district must abide.[7]  Though questions of ethics typically concern attorneys' responsibilities to clients or opposing parties, attorneys also have responsibilities to the public.  "[L]egal institutions in a constitutional democracy depend on popular participation and support to maintain their authority." Pa. R. Pro. Conduct, Preamble ¶ 6.  Attorneys, "as public citizen[s] having a special responsibility for the quality of justice," should "further the public's . . . confidence in the rule of law and the justice system." *Id.* ¶¶ 1,6.  Lawyering is a difficult profession, and it is not uncommon for conflicts to arise between "a lawyer's responsibilities to clients" and "the lawyer's own interest in remaining an ethical person." *Id.* ¶ 9.  When such issues arise, it is imperative that an attorney exercise "sensitive professional and moral judgment." *Id.*

Such judgment was not exercised here.  In plaintiff counsel's enthusiastic effort to invalidate Dr. Begault's findings, they failed to foresee the obvious impact that their scream test would have on densely populated residential blocks in South Philadelphia.  They failed to discern meaningful differences between an acoustic test using a "siren chirp" and an acoustic test using the sound of a woman being assaulted.  *See* DI 199 at 6.  As a result, they failed to provide residents with notice of the test or otherwise tailor their experiment to reduce the harm to the

---

[7] "The Rules of Professional Conduct adopted by this court are the Rules of Professional Conduct adopted by the Supreme Court of Pennsylvania." E.D. Pa. Civ. R. 83.6.IV.B.

surrounding community. At best, this lack of forethought and sensitive judgment resulted in a deeply disturbing and potentially dangerous situation. At worst, it undermined the local community's confidence in the exact justice system that Mr. Hicks relies on for recourse.

**B. The appropriate sanction is a formal written apology to community members.**

A sanction pursuant to the district court's inherent authority must be "tailored to address the harm identified." *Westinghouse*, 43 F.3d at 74. "[T]he district court must specifically consider the range of permissible sanctions and explain why less severe alternatives to the sanction imposed are inadequate or inappropriate." *Id.*

Though we asked plaintiff's counsel to show cause as to why any evidence relying on the scream test should not be precluded from this case, we determine that a lesser sanction — a formal apology to affected community members — is more appropriate. First, despite their error in judgment, plaintiff's counsel did not act maliciously or in bad faith in executing the scream test. There is no evidence that plaintiff's counsel intended to harm the community or deceive defendants. In their response to the court, plaintiff's counsel appropriately recognizes their missteps and offers to take measures to ameliorate the harm to residents. DI 199 at 1. Precluding the evidence would be too harsh of a sanction.

Second, unlike other decisions in which courts have precluded evidence based on an ethical violation, there is no apparent prejudice to defendants here. *See Westinghouse*, 43 F.3d at 74 (explaining that an action that prejudices one's opponent "may demand a stronger response"); *Scranton Prod.*, 190 F. Supp. 3d at 434 (precluding the plaintiff from relying on notes from a call that plaintiff's counsel covertly attended because "[t]here [was] no doubt that [plaintiff counsel's] conduct has resulted in prejudice to [defendant]"); *University Patents, Inc. v.*

9

*Kligman*, 737 F. Supp. 325, 329 (E.D. Pa 1990) (precluding defendants from using information obtained through *ex parte* contacts that disrupted the relationship between plaintiff's counsel and their client's employee).

Third, precluding the evidence would have misplaced effects. Such an action would benefit defense counsel, who were present for the scream test and at least complicit in allowing the test to move forward. *See* DI 197 at 4. It would penalize Mr. Hicks himself, who, to our knowledge, played no role in organizing the scream test. *See Westinghouse*, 43 F.3d at 74 ("If an attorney, rather than a client, is at fault, the sanction should ordinarily target the culpable attorney."). And it would do little to address the harm to the community.

Instead, we require that plaintiff's counsel prepare a written apology that explains their transgression and takes full responsibility for the repercussions of the scream test. Plaintiff's counsel shall mail the apology letter, with a copy of this opinion, to every home and business on the blocks marked in red or blue on the map below. At least one of plaintiff's counsel[8] shall personally visit the homes and businesses on the blocks marked in blue below to reasonably endeavor to apologize in person. No later than the end of this month, plaintiff's counsel shall file on the docket a certification that they fully complied, including a detailed explanation of what steps were taken and a copy of the apology letter.

---

[8] In response to our show-cause order, plaintiff's counsel Emma Freudenberger, Esq. of the law firm Neufeld Scheck Brustin Hoffmann & Freudenberger, LLP took personal responsibility for what happened. It is not necessary for Ms. Freudenberger to conduct the personal visits herself, but the visits must be performed by one or more lawyers who have appeared in this case on behalf of plaintiff.



This formal apology will target the individuals harmed by the conduct (community members) without penalizing Mr. Hicks or benefiting defendants.⁹ *See Pritchard v. Dow Agro Sciences*, No. 07-1621, 2009 WL 1813145, at *10 (W.D. Pa June 25, 2009) (upholding an apology letter as "the most appropriate sanction"). Any lesser sanction — such as an apology by mail only or to a smaller group of residents — would not be commensurate with the extent of the disturbance caused by the scream test.

### III.   CONCLUSION

For the foregoing reasons, any evidence or testimony relying on the scream test is not precluded at this stage. Plaintiff's counsel shall issue a formal apology to residents affected by the scream test as explained above.

---

⁹ Of course, our decision today does not predetermine any motion to exclude expert testimony or findings pursuant to Rule 702 or Rule 403.

11