**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TERMAINE HICKS,<br><br>       Plaintiff,<br><br>  v.<br><br>CITY OF PHILADELPHIA, et. al.,<br><br>       Defendants. | Civil Action No. 2:22-cv-00977 (JFM) |

**ORDER**

AND NOW, this _____ day of _____, 2025, upon consideration

of Plaintiff's Motion for Attorneys' Fees and Costs it is **HEREBY ORDERED** that the Motion

is **GRANTED.**

                    **BY THE COURT:**


                    _____

                    **JOHN F. MURPHY, J.**

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TERMAINE HICKS,<br><br>       Plaintiff,<br><br>   v.<br><br>CITY OF PHILADELPHIA, et. al.,<br><br>       Defendants. | Civil Action No. 2:22-cv-00977 (JFM) |

<u>**PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**</u>

For the reasons explained in the attached Memorandum, Plaintiff Termaine Hicks

respectfully moves the court for attorneys' fees and costs at the amounts requested herein.

Dated: October 30, 2025             Respectfully submitted,

<u>*/s/ Anna Benvenutti Hoffmann*</u>
Anna Benvenutti Hoffmann*
Emma Freudenberger*
Amelia Green*
Nick Brustin*
Katrina C. Rogachevsky
Mary Katherine McCarthy*
Grace Paras*
Katherine Cion*
Neufeld Scheck Brustin Hoffmann &
   Freudenberger, LLP
200 Varick Street, Suite 800
New York, NY 10014
(212) 965-9081
*Attorneys admitted to the Eastern
   District of Pennsylvania* pro hac vice

Jonathan H. Feinberg
Susan M. Lin
Grace Harris
Kairys, Rudovsky, Messing, Feinberg & Lin
   LLP
The Cast Iron Building

718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400

*Counsel for Plaintiff Termaine Hicks*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

TERMAINE HICKS,

        Plaintiff,

  v.

CITY OF PHILADELPHIA, et. al.,

        Defendants.

Civil Action No. 2:22-cv-00977 (JFM)

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR ATTORNEYS' FEES AND COSTS

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................II

INDEX OF EXHIBITS.................................................................................................. V

INTRODUCTION.......................................................................................................... 1

STATEMENT OF THE CASE ...................................................................................... 2

ARGUMENT ................................................................................................................ 11

   I.   **As the prevailing party, Plaintiff is entitled to his attorneys' fees and costs.**............... 11

      A.  The time spent by Plaintiff's counsel is reasonable and should be compensated.......... 13

      B.  The hourly rates that Plaintiff's counsel request are reasonable.................................... 18

  II.  **Plaintiff is entitled to his reasonable costs.** ....................................................... 39

CONCLUSION ............................................................................................................ 40

i

**TABLE OF AUTHORITIES**

**US Supreme Court Cases**

*Blum v. Stenson*, 465 U.S. 886 (1984) ................................................................................ 11, 19, 28

*City of Riverside v. Rivera*, 477 U.S. 561 (1986) ........................................................................ 16

*Fox v. Vice*, 563 U.S. 826 (2011) ............................................................................... 8, 11, 12, 14

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ................................................................. 11, 14, 17, 18

*Perdue v. Kenny A ex rel. Winn*, 559 U.S. 542 (2010) ........................................................ 11, 14, 23

**Federal Cases**

*In re Suboxone Antitrust Litig.*, 2024 WL 815503 (E.D. Pa. Feb. 27, 2024)................................ 36

*Abrams v. Lightolier Inc.*, 50 F.3d 1204 (3d Cir. 1995) ........................................................ 21, 39

*Al Thani v. Hanke*, 2025 WL 1591379 (S.D.N.Y. June 5, 2025) ........................................... 29, 32

*An v. Despins*, 2024 WL 1157281 (S.D.N.Y. Mar. 18, 2024) .................................... 28, 30, 31, 32

*Angelo, Gordon & Co., L.P. v. MTE Holdings, LLC*,
   2021 WL 1353756 (S.D.N.Y. Apr. 12, 2021) ........................................................................ 30

*Becker v. ARCO Chem. Co.*, 15 F. Supp. 2d 621 (E.D. Pa. 1998)........................................... 39, 40

*Berry v. City of Philadelphia*, No. 19-cv-3699 (E.D. Pa.)............................................................ 25

*Braun v. Philadelphia Inquirer, LLC*, 32025 WL 1314089 (E.D. Pa. May 6, 2025) ................... 36

*Charles v. Seinfeld*, 2022 WL 889162 (S.D.N.Y. Mar. 25, 2022)................................................. 33

*Cockerill v. Corteva*, 2025 WL 1523002 (E.D. Pa. May 27, 2025) ............................................ 36

*Damian J. v. School Dist. of Phil.*, 2008 WL 1815302 (E.D. Pa. Apr. 22, 2008) ...................... 34

*Davis v. Riddle & Associates, P.C.*, 579 F. Supp. 2d 692 (E.D. Pa 2008) ................................ 34

*Demonchaux v. Unitedhealthcare Oxford*, 2014 WL 1273772 (S.D.N.Y. Mar. 27, 2014).......... 32

*Dennis v. Jastrzembski*, 2025 WL 1582452 (E.D. Pa 2025)............................................ 12, 25, 37

*Fair Hous. Justice Ctr. v. Pelican Mgmt., Inc.*, 2025 WL 965129 (S.D.N.Y. 2023) ............. 32, 33

*Fulton-Green v. Accolade, Inc.*, 2019 WL 4677954 (E.D. Pa. Sept. 23, 2019) .......................... 36

*Gallo v. City of Philadelphia*, 161 F.3d 217 (3d Cir. 1998) ...................................................... 25

*Gay Officers Action League v. Puerto Rico*, 247 F.3d 288 (1st Cir. 2001) .................................. 16

*Grammenos v. Allstate Ins. Co.*, 2009 WL 2448556 (E.D. Pa. Aug. 7, 2009) ............................ 40

*Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014) ......................................................................... 24

*Heard v. J and G Spas, LLC*, 2024 WL 4458549 (E.D. Pa Oct. 10 2024) .................................. 38

*Hernandez v. Kalinowski*, 146 F.3d 196 (3d Cir. 1998) .............................................................. 18

*In re Philadelphia Inquirer Data Sec. Litig.*, 2025 WL 845118 (E.D. Pa. Mar. 18, 2025) .......... 36

*In re Viropharma Inc., Sec. Litig.*, 2016 WL 312108 (E.D. Pa. Jan. 25, 2016) ........................... 36

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694 (3d Cir. 2005), ............... 8, 20, 22, 23

*Ismail v. IHI Power Servs. Corp.*, 2023 WL 3689608 (E.D. Pa. May 25, 2023) ......................... 39

*Knox on behalf of D.K. v. Poughkeepsie City Sch. Dist.*,
    2022 WL 305275 (S.D.N.Y. Feb. 2, 2022) ............................................................................ 23

*Lanni v. New Jersey*, 259 F.3d 146, (3d Cir. 2001) .............................................................. 20, 30

*Macquarie Mexico Real Estate Mgmt. S.A. de C.V. v. Hoiston Int'l Enters., Inc.*, 2021 WL
    4952693 (S.D.N.Y. Oct. 1, 2021) ............................................................................ 29, 30, 31

*Maldonado v. Houstoun*, 256 F.3d 181 (3d Cir. 2001) .......................................................... 13, 34

*Mary Courtney T. v. Sch. Dist. of Phil.*, 2009 WL 185426 (E.D. Pa Jan. 22, 2009) ................... 34

*Mathers v. Gonzales*, 2008 WL 3539961 (E.D. Pa. Aug. 13, 2008) ........................................... 40

*McKenna v. City of Philadelphia*, 582 F.3d 447 (3d Cir. 2009) .................................................. 18

*Meigs v. Care Providers Ins. Servs., LLC*, 2024 WL 21792 (E.D. Pa Jan 2, 2024) ............... 37, 38

*Middlebrooks v. Teva Pharma. USA, Inc.*, 2019 WL 936645 (E.D. Pa. Feb. 26, 2019) .............. 40

*Moreno v. City of Sacramento*, 534 F.3d 1106 (9th Cir. 2008) ................................................... 14

*Nadarajah v. Holder*, 569 F.3d 906 (9th Cir. 2009) ................................................................... 19

*Pearlstein v. BlackBerry Ltd.*, , 2022 WL 4554858 (S.D.N.Y. Sept. 29, 2022) .......................... 29

*Planned Parenthood of Cent. N.J.  v. Att'y Gen. of N.J*, 297 F.3d 253 (3d Cir. 2002) .......... 17, 39

*R.B.A. v. Jersey City Board of Education*, 2023 WL 3098713 (D.N.J. April 26, 2023) .............. 22

*Ravina v. Columbia Univ.*, 2020 WL 1080780 (S.D.N.Y. Mar. 6, 2020) ................................... 40

*Restivo v. Nassau County*, 2015 WL 7734100 (E.D.N.Y. Nov. 30, 2015)........................... passim

*Rode v. Dellarciprete*, 892 F.2d 1177 (3d Cir. 1990)....................................................... 11, 19, 23

*Rosario v. City of New York*, 2023 WL 2523624 (S.D.N.Y. Mar. 15, 2023) ........................ passim

*Rudman v. CHC Grp. Ltd.*, 2018 WL 3594828 (S.D.N.Y. July 24, 2018) ................................... 29

*StoneX Grp., Inc. v. Shipman*, , 2025 WL 1212165 (S.D.N.Y. Apr. 25, 2025)................. 29, 30, 31

*Themis Capital v. Democratic Republic of Congo*,
    2014 WL 4379100 (S.D.N.Y. Sept. 4, 2014)............................................................................ 29

*Truesdell v. Phila. Housing Auth.*, 290 F.3d 159 (3d Cir. 2002)................................................. 11

*Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.*, 63 F.3d 516 (7th Cir. 1995)................... 18

*Vista Outdoor Inc. v. Reeves Family Trust*, 2018 WL 3104631 (S.D.N.Y. May 24, 2018)... 29, 31

*Washington v. Philadelphia Cnty. Court of Common Pleas*, 89 F.3d 1031 (3d Cir. 1996).... 12, 20

**Other Authorities**

Senate Report No. 1011, 94th Cong., 2d Sess., 5 U.S. Cong. & Admin News (1976) ................ 19

**INDEX OF EXHIBITS**

| Exhibit No. | Exhibit Title |
|---|---|
| Ex. 1 | **Article Compilation** |
| Ex. 2 | **Real Rate Report** |
| Ex. 3 | **CLS Fee Schedule** |
| Ex. 4 | **Declaration of Andrew G. Celli, Jr.** |
| Ex. 5 | **Declaration of Carl H. Loewenson, Jr.** |
| Ex. 6 | **Declaration of Marc J. Sonnenfeld** |
| Ex. 7 | **Declaration of Alan J. Tauber** |
| Ex. 8 | **Declaration of Anna Benvenutti Hoffmann**<br>Ex. A – Resume<br>Ex. B – Anna Benvenutti Hoffmann Time Records |
| Ex. 9 | **Declaration of Emma Freudenberger**<br>Ex. A – Resume<br>Ex. B – Paralegal Time Records<br>Ex. C – Intern and Law Clerk Time Records<br>Ex. D – Emma Freudenberger Time Records |
| Ex. 10 | **Declaration of Amelia Green**<br>Ex. A – Expense Records<br>Ex. B – Resume<br>Ex. C – Amelia Green Time Records |
| Ex. 11 | **Declaration of Nick Brustin**<br>Ex. A – Resume<br>Ex. B – Nick Brustin Time Records |
| Ex. 12 | **Declaration of Jonathan H. Feinberg**<br>Ex. A – Resume<br>Ex. B – Jonathan H. Feinberg Time Records |
| Ex. 13 | **Declaration of Gerardo Romo**<br>Ex. A – Resume<br>Ex. B – Gerardo Romo Time Records |
| Ex. 14 | **Declaration of Grace Harris**<br>Ex. A – Resume<br>Ex. B – Grace Harris Time Records |
| Ex. 15 | **Declaration of Grace Paras**<br>Ex. A – Resume<br>Ex. B – Grace Paras Time Records |
| Ex. 16 | **Declaration of Kate Fetrow**<br>Ex. A – Resume<br>Ex. B – Kate Fetrow Time Records |

| Exhibit No. | Exhibit Title |
|---|---|
| Ex. 17 | **Declaration of Katie Cion**<br>Ex. A – Resume<br>Ex. B – Katie Cion Time Records |
| Ex. 18 | **Declaration of Katie McCarthy**<br>Ex. A – Resume<br>Ex. B – Katie McCarthy Time Records |
| Ex. 19 | **Declaration of Katrina C. Rogachevsky**<br>Ex. A – Resume<br>Ex. B – Katrina C. Rogachevsky Time Records |
| Ex. 20 | **Declaration of Peter Neufeld**<br>Ex. A – Resume<br>Ex. B – Peter Neufeld Time Records |
| Ex. 21 | **Declaration of Sona R. Shah**<br>Ex. A – Resume<br>Ex. B – Sona R. Shah Time Records |
| Ex. 22 | **Declaration of Tony Balkissoon**<br>Ex. A – Resume<br>Ex. B – Tony Balkissoon Time Records |

**INTRODUCTION**

Plaintiff Termaine Hicks brought this § 1983 suit accusing more than 10 individual Philadelphia Police Department officers of incredibly serious misconduct. He asserted after he happened upon a rape victim in a Philadelphia alley, one officer, Defendant Martin Vinson, without justification shot him in the back, critically injuring him. And Mr. Hicks asserted that a number of officers then conspired to frame him for the rape, including by planting a gun on him, hiding an exculpatory surveillance tape, and fabricating other evidence, which caused him to spend nearly two decades wrongly imprisoned.

Defendants vehemently denied these allegations. They called them "specious," DI 219 at 9, and derisively referred to Mr. Hicks's account as an implausible wide-ranging conspiracy.[1] They called Mr. Hicks a rapist and said the only injustice was that his conviction was ever overturned. But as the jury ultimately found, everything Mr. Hicks said was true. He was innocent; he was framed; the gun Defendants claimed was his was planted. And the jury found the constitutional violations committed by the individual Defendants were directly attributable to customs and failures by City of Philadelphia. Indeed, after over three years of litigation culminating in a three-week trial, it took only approximately two hours of deliberation for the jury to find for Plaintiff on every single claim against all five remaining trial defendants[2] and the City of Philadelphia and award $3,000,000 in damages.

---

[1] During their openings at trial alone, Defendants called Plaintiff's case an "impossible conspiracy theory," Ex. XX (8/11/25 Trial Tr.) at 69:18–25, a "grand conspiracy," *id.* at 75:24–76:7, a "sprawling, far-fetched story," *id.* at 88:16–20, an "inconceivable tale," *id.* at 97:21–25, "a beautiful smoke show [] designed to distract…from the rape of W.L.", *id.* at 92:1–11, and scoffed that by Plaintiff's account he was the "single most unlucky man in the world," *id.* at 91:20–25.

[2] Plaintiff had survived summary judgment on claims against all 10 individual defendants involved in the case at that time.

As the prevailing party, Mr. Hicks is now entitled to his reasonable attorneys' fees and costs. Because, as shown below, qualified local counsel were unavailable to take this case alone, this motion seeks an award of fees at reasonable hourly rates in the New York City legal market: an award of $8,055,705.00 in attorneys' fees on the merits, $53,323.75 in fees for travel, and an additional $131,207.50 for preparing the attorneys' fees petition. In the alternative, this motion seeks a fee award applying Philadelphia rates of $6,960.265.00 on the merits, $46,464.25 for travel, and $112,779.00 for the instant petition. In either case, this motion seeks $304,553.47 in compensable expenses, for a total of $8,544,789.72 applying New York rates or $7,424,061.72 applying Philadelphia rates.

## STATEMENT OF THE CASE

This case stands out even among § 1983 wrongful-conviction suits as particularly challenging and particularly hard-fought for several reasons. First, unique among wrongful-conviction suits to counsel's knowledge, this case essentially combined *both* a wrongful conviction suit *and* a police shooting suit. Although Mr. Hicks was time barred from bringing claims related to the shooting, the facts of this police shooting were unavoidably wrapped up with the facts leading to the wrongful conviction. Thus, this litigation required exploration of not only the investigative and prosecution files related to the rape for which Mr. Hicks was wrongly convicted, but also the two Internal Affairs (IA) investigations into the shooting in this case. And while disproving an officer's account of a shooting based on forensic evidence is complicated enough in any case, it was especially complicated here because 20 years had passed by the time of this litigation, limiting what evidence was available. Ex. 9 (Freudenberger Decl.) ¶ 13.

Second, while Mr. Hicks's conviction had been overturned before this civil rights suit, there had not been any finding of actual innocence. It was clear from the start of the litigation that Defendants would aggressively argue that Mr. Hicks was guilty. And there were some facts

2

that superficially supported their position. It was undisputed that when police arrived in the alley, Mr. Hicks was the only person there with the victim, who was lying on the ground, beaten, with her pants down. Although the victim never saw her assailant well enough to identify him, and medical evidence demonstrated she had lost consciousness, by the time of these proceedings she believed Mr. Hicks must have been her assailant. Beyond that, Officers Vinson and Zungolo dramatically (albeit falsely) claimed to have observed Mr. Hicks in the act of committing the rape. Given that Mr. Hicks was shot three times and critically injured, and civilian neighbors did not see Mr. Hicks's interactions with the police, Mr. Hicks had to prove his case based largely on testimony from PPD officers, all who denied any wrongdoing. Proving that Defendants were lying and the victim was mistaken—and that Mr. Hicks was actually innocent, as he had always claimed—took substantial work, including additional forensic testing. Ex. 9 (Freudenberger Decl.) ¶ 14.

Third, the circumstances required Plaintiff to prove the misconduct and complicity of a very large number of PPD officers. Defendants repeatedly argued the sheer number of officers involved made Plaintiff's allegations near impossible, while Plaintiff contended (and eventually proved) that these officers were adhering to the code of silence, lying to cover up for their fellow officers. Plaintiff successfully maintained fabrication and conspiracy claims against 10 separate officers through summary judgment. And even after Plaintiff voluntarily dismissed several of those defendants to narrow the issues at trial, he had to be ready to demonstrate dismissed officers (such as Youse) were lying at the civil rights trial. This greatly expanded the scope of depositions and discovery beyond what a wrongful conviction suit more typically entails. Ex. 9 (Freudenberger Decl.) ¶ 15.

3

Fourth, the City would not commit to indemnifying the officers. Thus, to ensure he could collect on any verdict, Plaintiff had to prove not just individual constitutional violations but also *Monell* liability. Plaintiff successfully pursued four separate theories of *Monell* liability through summary judgment and trial. To Plaintiff's knowledge this is the first *Monell* verdict in a wrongful conviction suit against the City of Philadelphia. *See* Ex. 12 (Feinberg Decl.) ¶ 15; Ex. 9 (Freudenberger Decl.) ¶ 16. The different legal theories required familiarity with a large volume of additional evidence, including in particular the disciplinary and IA histories of the individual officer Defendants and evidence of systemic deficiencies in supervision and discipline. Ex. 9 (Freudenberger Decl.) ¶ 17.

Together, these issues created an especially intense litigation, spanning nearly 500 docket entries. The Court is well familiar with how "hard fought" this case was throughout the litigation, with "a bunch of really tough lawyers, with a lot of strong passion for [their] cases" on both sides. DI 414-5 (8/22/2025 Trial Tr.) at 14:5–8. A few examples illustrate the point.

First, there were a number of disputes during document discovery; Defendants consistently objected to whole swaths of Plaintiff's requests, which required much back and forth between the parties over disputes, many of which made their way to the Court. Indeed, discovery disputes were so commonplace over the history of this litigation that at the height of fact discovery the Court held eight monthly status conferences to actively address the endless stream of disagreements and keep the litigation moving forward. And most disputes were iterative, like document-hydras; Plaintiff would push for documents, receive some, review them, only to find that relevant documents were still outstanding, requiring the process to start all over again. For example, despite Plaintiff's *Monell* claims, Defendants took a very narrow position on which of each Defendant-officer's IA files were relevant to the case, at first agreeing only to produce a

narrow subset of IA files, and only ultimately producing underlying files after this Court's order on Plaintiff's motion to compel. *See* DI 64. Yet even when the files started coming, Plaintiff would review them and see that they were not complete files, requiring further follow-up to obtain complete productions. Ex. 9 (Freudenberger Decl.) ¶ 18.

Outside of the laborious process to procure documents, there was also the sheer breadth of documentary discovery, which took extraordinary amounts of time and effort to organize, produce, and also review materials produced by Defendants. Over the course of this litigation Plaintiff produced 38,068 pages of documents to Defendants, including flipping subpoena productions from third-parties. Defendants produced 34,472 pages. Plaintiff's document productions were particularly labor-intensive as they required a detailed privilege review of all of his post-conviction counsel's legal files, as the majority of discoverable material was intermingled among privileged files. That is not to mention audio-visual productions, including many of Plaintiff's prison phone calls—reviewed and produced at Defendants' request—which together with an extensive review of text messages, emails, and other cell phone records account for hours and hours of (compensable) work. The officers' often lengthy IA histories and the *Monell* case also injected a high-volume of documents into the case, with Defendants producing 81 IA files including the two created as a result of Mr. Hicks's case itself. Separate from IA files, the Mortimer/Adams investigation files alone, which Plaintiff put to productive use during trial, amounted to 1,883 pages. And given that Plaintiff contended (and proved) that the City's supervision and disciplinary system was systematically inadequate, Plaintiff's review of these files from other instances of misconduct involving the defendant officers required searching analysis to demonstrate where the IA investigations had critical omissions or flaws. Similarly, *Monell* notice evidence spanned multiple lawsuits and other sources, all of which Plaintiff's

5

counsel had to substantively review to effectively frame this claim. Ex. 9 (Freudenberger Decl.) ¶¶ 19–22.

In addition to this document discovery, the parties also needed to take a large number of depositions—27 depositions of fact witnesses in total, with several spanning multiple days. Again, 14 of these depositions were of law-enforcement witnesses, both Defendants and otherwise, whom Plaintiff contended (and ultimately proved) were adhering to the code of silence—in other words, lying about and/or hiding their own and their fellow officers' misconduct. Thus, Plaintiff's depositions required both extensive preparation and extensive deposition time, as Plaintiff could not merely accept the deponent's account at face value, but had to demonstrate where the witness was lying. Nor was the large number of depositions one-sided to Plaintiff's case. For example, Defendants took the unusual step of deposing all of Plaintiff's damages witnesses, something Plaintiff's counsel does not usually see in the other wrongful conviction cases on their firms' dockets. Ex. 9 (Freudenberger Decl.) ¶¶ 23–24.

Expert discovery was also exceptionally extensive and contentious. The central issues in this case necessitated wide-ranging expert discovery commenting on topics with little if any overlap: multiple types of expertise as to whether Vinson shot Mr. Hicks in the back, DNA experts opining on Mr. Hicks's innocence based on blood and other evidence, audio experts on whether Mr. Hicks would have heard W.L.'s screams, and forensic psychologists going to damages. Some of these experts required additional testing, inspections of original evidence supervised by lawyers from both sides, or independent studies similarly supervised by attorneys. And since every single affirmative expert was disputed, rebuttal experts or reports were often needed, inflating the amount of work across expert discovery. The parties together took 14 expert depositions, and Plaintiff and Defendants each made five *Daubert* motions, resulting in 15 total

6

briefs filed on both sides, including responses and replies. Plaintiff was successful both in limiting the testimony of several of Defendants' experts and defending all of the attacks against Plaintiff's experts. Ex. 9 (Freudenberger Decl.) ¶ 26; DI 209–18, 231–49 (Daubert briefing); DI 324–25.

Plaintiff also litigated two rounds of dispositive briefing, first successfully defending against a motion to dismiss and then defending against three separate motions for summary judgment. Even though, as the Court wrote, Defendants' own summary judgment motions "engage[d] in studied avoidance of critical material disputes," DI 303 at 2, they asserted there was insufficient evidence to support all of Plaintiff's claims. As a result, Plaintiff's opposition required immense effort, (as demonstrated in the recorded hours), in order to develop and then marshal an extensive factual record for each claim as against each Defendant. This opposition was successful; Plaintiff retained almost all his claims, including claims against every individual defendant then in the case, and all four theories of *Monell* liability. Ex. 9 (Freudenberger Decl.) ¶ 27.

After more robust pretrial briefing, this all led to two days of jury selection before a 13-day trial, with 21 live fact witnesses (14 of which were put on by Plaintiff) and 12 expert witnesses (half of which were put on by Plaintiff). By all accounts, the trial required months of preparation from both sides. And, once again, resulted in a resounding verdict in favor of Plaintiff. Ex. 9 (Freudenberger Decl.) ¶¶ 28–29.

In sum, despite the righteousness of his cause, litigation in this case was contentious and expensive, requiring the investment of extensive attorney time and energy, and victory was never certain. Yet after that litigation, the jury ruled uniformly in favor of Plaintiff, finding that five separate PPD officers conspired to frame him, including by fabricating evidence and deliberately

7

deceiving the court. And the jury found these constitutional violations were directly attributable to the City of Philadelphia, based both on its customs and its deliberately indifferent failures. DI 410 (Jury Verdict).

This *Monell* verdict—to counsel's knowledge the first of its kind in the district—has particular public significance. Plaintiff's evidence demonstrated that despite repeated warnings over decades that the PPD Internal Affairs and disciplinary system was inadequate, the City had failed to take minimally appropriate measures to address and correct the issue. Indeed, even after Mr. Hicks's conviction was overturned on the basis of evidence that several PPD officers had perjured themselves at his criminal trial, no disciplinary or other corrective action was taken. To the contrary, the City continued to stand behind those officers through this litigation and argue no changes were needed to the PPD. The resounding recognition by the jury of the systemic problems at the PPD is a paradigmatic example of counsel serving as a "private attorney general, vindicating a policy that Congress considered of the highest priority." *Fox v. Vice*, 563 U.S. 826, 833 (2011) (cleaned up); Ex. 9 (Freudenberger Decl.) ¶ 31.

As the prevailing party in the litigation, Plaintiff is entitled to recover reasonable fees and costs. As shown below, because the record demonstrates that under the specific circumstances here, qualified Philadelphia counsel were unavailable or unwilling to handle the case alone, the New York City-based NSBHF should receive out-of-district rates. *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 705 (3d Cir. 2005), *as amended* (Nov. 10, 2005). Accordingly, Plaintiff seeks the following in the first instance, for similar services by lawyers of reasonably comparable skill, experience and reputation in the New York area (with Philadelphia-based attorneys seeking Philadelphia-based rates marked with an asterisk):

| Name of Counsel | Grad Year | Hourly Rate | Hours | Total |
|---|---|---|---|---|
| Peter Neufeld | 1975 | $1150 | 99.6 | $114,540.00 |
| Nick Brustin | 1995 | $1000 | 632.6 | $632,600.00 |
| Anna Benvenutti Hoffmann | 2004 | $900 | 798.6 | $718, 740.00 |
| Emma Freudenberger | 2007 | $900 | 1655.9 | $1,490,310.00 |
| Jonathan Feinberg* | 2001 | $800 | 224.3 | $179,440.00 |
| Amelia Green | 2015 | $650 | 1443.2 | $938,080.00 |
| Tony Balkisoon | 2010 | $600 | 468.2 | $280,920.00 |
| Katie McCarthy | 2015 | $575 | 577.1 | $331,832.50 |
| Katrina Rogachevsky | 2014 | $525 | 1822.1 | $956,602.50 |
| Sona Shah | 1997 | $525 | 177.6 | $93,240.00 |
| Grace Paras | 2020 | $475 | 878.6 | $417,335.00 |
| Gerardo Romo | 2019 | $475 | 1090.7 | $518,082.50 |
| Grace Harris* | 2020 | $350 | 114.9 | $40,215.00 |
| Katie Cion | 2021 | $450 | 1011.9 | $455,355.00 |
| Kate Fetrow | 2017 | $450 | 111 | $49,950.00 |
| Paralegals/Law Clerks | N/A | $225 | 3018.4 | $679,140.00 |

This totals $8,055,705. Plaintiff also requests $53,323.75 for travel, billed at a half rate, and requests the following for preparation of this fee petition, also at New York City-based rates, save for Philadelphia-based attorneys marked with an asterisk: $131,205.50. Ex. 8 (Hoffmann Decl.) ¶¶ 18–20. Put together, Plaintiff requests a total of $8,240,236.25 in fees with New York-based attorneys billed at New York-based rates.

9

In the alternative, should this Court decline to award out-of-district hourly rates, Plaintiff requests the following, which the evidence demonstrates are reasonable rates for similar services by lawyers of reasonably comparable skill, experience and reputation in the Philadelphia market:

| Name of Counsel | Grad Year | Hourly Rate | Hours | Total |
|---|---|---|---|---|
| Peter Neufeld | 1975 | $1050 | 99.6 | $104.580.00 |
| Nick Brustin | 1995 | $950 | 632.6 | $600,970.00 |
| Anna Benvenutti Hoffmann | 2004 | $800 | 798.6 | $638,880.00 |
| Emma Freudenberger | 2007 | $800 | 1655.9 | $1,324,720.00 |
| Jonathan Feinberg | 2001 | $800 | 224.3 | $179,440.00 |
| Amelia Green | 2015 | $550 | 1443.2 | $793,760.00 |
| Tony Balkisoon | 2010 | $550 | 468.2 | $257,510.00 |
| Katie McCarthy | 2015 | $475 | 577.1 | $274,122.50 |
| Katrina Rogachevsky | 2014 | $450 | 1822.1 | $819,945.00 |
| Sona Shah | 1997 | $450 | 177.6 | $79,920.00 |
| Grace Paras | 2020 | $350 | 878.6 | $307,510.00 |
| Gerardo Romo | 2019 | $350 | 1090.7 | $381,745.00 |
| Grace Harris | 2020 | $350 | 114.9 | $40,215.00 |
| Katie Cion | 2021 | $350 | 1011.9 | $354,165.00 |
| Kate Fetrow | 2017 | $350 | 111 | $38,850.00 |
| Paralegals/Law Clerks | N/A | $225 | 3018.4 | $618,772.00 |

This totals $6,960,265. At half these rates, Plaintiff requests $46,464.25 for travel. And applying these Philadelphia-based hourly rates, Plaintiff requests the following for preparation of this fee

petition: $112,779.00. Ex. 8 (Hoffmann Decl.) ¶ 21. Thus, should this Court apply Philadelphia rates across the board, Plaintiff requests a total of $7,119,508.25 in fees.

Finally, Plaintiff requests 304,553.47 in compensable costs. *See* Ex. 10 (Green Decl.) ¶ 3.

**ARGUMENT**

**I.    As the prevailing party, Plaintiff is entitled to his attorneys' fees and costs.**

Congress passed the Civil Rights Attorneys' Fees Awards Act (the "Act") in 1976, allowing prevailing parties in civil rights actions like this one to recover "reasonable attorneys' fee[s]." *Truesdell v. Phila. Housing Auth.*, 290 F.3d 159, 163 (3d Cir. 2002) (Alito, J.) (quoting 42 U.S.C. § 1988(b)). "When a plaintiff succeeds in remedying a civil rights violation,…he serves as a 'private attorney general,' vindicating a policy that Congress considered of the highest priority." *Fox*, 563 U.S. at 833 (cleaned up). The purpose of the Act is to permit plaintiffs with valid claims to attract effective legal representation and thereby encourage private enforcement of civil rights statutes, to the benefit of the public as a whole. *See Hensley v. Eckerhart*, 461 U.S. 424, 444–45 (1983).

Courts calculate a reasonable fee under the Act by reference to a "lodestar," calculated "by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Blum v. Stenson*, 465 U.S. 886, 888 (1984). As both the Third Circuit and Supreme Court have recognized, the lodestar is presumed to be the reasonable fee. *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990) (citing *Blum*, 465 U.S. at 897); *see also Perdue v. Kenny A ex rel. Winn*, 559 U.S. 542, 552 (2010) ("[T]he lodestar method yields a fee that is presumptively sufficient to achieve this objective [of securing attorneys for civil rights cases]").

The district court enjoys wide discretion in determining an appropriate fee award under § 1988. *See Fox*, 563 U.S. at 838 ("[A]ppellate courts must give substantial deference to these determinations [regarding fee awards], in light of the district court's superior understanding of

11

the litigation. We can hardly think of a sphere of judicial decisionmaking in which appellate micromanagement has less to recommend it." (cleaned up)); *Washington v. Philadelphia Cnty. Court of Common Pleas*, 89 F.3d 1031, 1034–35 (3d Cir. 1996) ("We review the reasonableness of an award of attorneys' fees for an abuse of discretion…. [while] an attorneys' marketplace billing rate is a factual question which is subject to a clearly erroneous standard of review.").

Here, Plaintiff's fee request as a whole, whether applying New York or Philadelphia rates, is reasonable. Plaintiff's counsel from both Neufeld Scheck Brustin Hoffmann & Freudenberger, LLP ("NSBHF") and Kairys, Rudovsky, Messing, Feinberg & Lin LLP ("KRMFL") bring decades of experience as two of the premier civil rights firms in the country. NSBHF, which took the lead in this litigation, "has particular expertise litigating § 1983 wrongful conviction suits and has successfully litigated dozens of such cases around the country." *Restivo v. Nassau County*, No. 06-cv-6720 (JS) (SIL), 2015 WL 7734100, at *3 (E.D.N.Y. Nov. 30, 2015), *aff'd sub nom. Restivo v. Hessemann*, 846 F.3d 547 (2d Cir. 2017). KRMFL likewise has been litigating civil rights suits including wrongful conviction cases in the Philadelphia area for the past 20 years. *See Dennis v. Jastrzembski*, No. 18-cv-2689 (JRS), 2025 WL 1582452, at *3 (E.D. Pa 2025) ("Over several decades, KRMFL has focused its work on systemic constitutional violations in the criminal legal system, resulting in several multi-million-dollar settlements and precedent-setting cases at the Third Circuit Court of Appeals.").

Further, as laid out above, this was a particularly complex case spanning over three years of litigation with numerous Defendants, extensive and hotly contested document and deposition discovery, over a dozen experts between the two sides, copious motion practice, and a 13-day jury trial wherein Plaintiff prevailed on every claim against every Defendant. And up through the very end of trial, Defendants vociferously denied not only any actionable misconduct, but also

12

the very fact of Plaintiff's innocence, requiring Plaintiff's counsel to, "in effect [] relitigate a decades-old [rape] trial while fitting Plaintiff's claims into the complex and evolving legal doctrines governing this area of civil rights litigation." *Rosario v. City of New York*, No. 18-cv-4023 (LGS), 2023 WL 2523624, at \*2 (S.D.N.Y. Mar. 15, 2023). Not just Plaintiff's counsel, but defense counsel as well dedicated significant time and manpower in order to effectively litigate this case, demonstrating that such efforts were unavoidable and, in the face of the facts and law at play here, utterly reasonable.

At bottom, Plaintiff's counsel brought a wealth of experience litigating exactly this type of case to bear on this especially thorny wrongful conviction action, achieving a far-from-guaranteed complete victory on behalf of Mr. Hicks. Such efforts inform and justify the requested fees as reasonable.

## A. The time spent by Plaintiff's counsel is reasonable and should be compensated.

The first step in setting the lodestar is to determine the amount of time reasonably expended and therefore compensable. *See Maldonado v. Houstoun*, 256 F.3d 181, 184 (3d Cir. 2001). Plaintiff has provided detailed accounting of the attorney hours spent across this litigation from contemporaneous records, allowing the Court to "review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are excessive, redundant, or otherwise unnecessary." *Id.* (cleaned up).

That said, the Supreme Court has instructed that "trial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees…is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit" in assessing the reasonableness of the fees. *Fox*, 563 U.S. at 838 (citation omitted). As part of this inquiry, the Court may rely on its own familiarity with the litigation and attorneys, as well as factors such as whether the hours expended achieved "excellent results,"

13

*Hensley*, 461 U.S. at 435, and the complexity of the legal and factual issues presented in the litigation, *id.* at 436. Further, as relevant to this case, the Ninth Circuit has noted:

> [L]awyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees. The payoff is too uncertain, as to both the result and the amount of the fee. It would therefore be the highly atypical civil rights case where plaintiff's lawyer engages in churning. By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker.

*Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008).

NSBHF has used professional judgment in determining how much time to spend per task, and the nature of their caseload demands that they do so. Given NSBHF's practice representing civil rights plaintiffs who cannot afford attorneys' fees, NSBHF only recovers any fee or costs if the suit is successful. The vast majority of NSBHF's cases settle for a global figure that includes attorneys' fees; it is only the rare case in which NSBHF makes a fee application to a court. At the same time, NSBHF maintains a full, busy docket of approximately 35 other complex civil rights cases at any given time. As a result, NSBHF's attorneys have every incentive to work efficiently, spending only the time on any task that they judge necessary to the successful prosecution of each case. Ex. 8 (Hoffmann Decl.) ¶ 8. An NSBHF partner also reviewed all hours, exercising billing judgment to trim any unnecessary time. Ex. 8 (Hoffmann Decl. ¶ 46.

The total number of hours is exceedingly reasonable given the scope of this litigation to date. *See Perdue*, 559 U.S. at 553 (describing how the "novelty and complexity of a case…presumably are fully reflected in the number of billable hours recorded by counsel" (cleaned up)). The Declaration of Emma Freudenberger describes the long and tumultuous path this case took to its ultimately successful conclusion. The representation spanned three-and-a-half years and approached 500 docket entries. It involved a complicated underlying procedural

14

history surrounding the overturning of Mr. Hicks's conviction—a history that Defendants' focused on as a defense through summary judgment and even trial. The litigation also included a series of discovery disputes necessitating repeated entreaties to this Court in order to obtain and/or inspect the full suite of case documents and evidence, including those concerning Plaintiff's *Monell* claims that injected mountains of documents into the case. It required 41 depositions, many spanning two or three days, during which many Defendants displayed unusual hostility and evasiveness. Fourteen expert witnesses from both sides opined on technical and varied issues in the case, generating dozens of briefs across the entire *Daubert* process. The case also proceeded through briefing on a motion to dismiss as well as three separate motions for summary judgment brought by various groupings of Defendants, all of which Plaintiff was overwhelmingly successful in defending against. Finally, Plaintiff prepared and prosecuted a three-week trial, putting on 20 total live witnesses, and again achieving excellent results. Ex. 9 (Freudenberger Decl.) ¶¶ 12–31.

Defendants' vigorous opposition at each stage of the litigation increased the time Plaintiff's counsel spent. For example, although unusual in a civil rights case like this one, Defendants elected to depose all of Plaintiff's damages witnesses, requiring Plaintiff to expend hours preparing to defend and defending these depositions. In addition, Defendants filed three separate motions for summary judgment on all of Plaintiff's claims and moved to exclude the testimony of nearly all of Plaintiff's experts in whole or substantial part. Although Defendants' motions were ultimately unsuccessful, they still required substantial time from Plaintiff's counsel to adequately defend. For example, Defendants advanced a quasi-jurisdictional argument at summary judgment concerning the Pennsylvania state court's application of Pennsylvania law in overturning Plaintiff's conviction—an argument that prompted this Court to solicit additional

15

briefing from both the City and the District Attorney's Office. This gambit was emblematic of Defendants' posture throughout this litigation, in which they aggressively pursued the theory that Plaintiff committed the violent rape (of which the civil jury ultimately found he is innocent). Obviously, Plaintiff needed to respond forcefully to this argument across every instance and iteration. That, on top of litigating the core of Plaintiff's § 1983 case, took tremendous time.

While Defendants are of course entitled to choose an aggressive litigation posture, a party must be compensated for meeting the vigorous defense of the opposing party. *City of Riverside v. Rivera*, 477 U.S. 561, 580 n.11 (1986) (A defendant "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." (cleaned up)); *see also Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 298 (1st Cir. 2001) ("After setting such a militant tone and forcing the plaintiffs to respond in kind, it seems disingenuous for the [defendant] to castigate the plaintiffs for putting too many troops into the field.").

Further, the reasonableness of the staffing by NSBHF is demonstrated by the rough equivalence to staffing on the defense team. Throughout discovery, day-to-day case management was primarily handled by an NSBHF associate, supervised at various times by a senior associate or one of two partners, Amelia Green and Emma Freudenberger, who took many of the depositions. Defendants' staffing appeared to mirror if not overtake Plaintiff's own, with multiple attorneys from the City and two private law firms participating actively in discovery. For example, at a majority of depositions, there were more attorneys present on behalf of Defendants than for Plaintiff. Ex. 9 (Freudenberger Decl.) ¶ 25.

Both sides ramped up staffing during the run up to and during trial; Defendants ultimately had eight attorneys participating in some capacity at trial, not counting any out-of-court work by other attorneys Plaintiff was not privy to, and at least one supervising attorney in court at all

16

times in addition. *Id.* ¶ 30. Even though Plaintiff had the burden of proof and presented nearly all

evidence, the trial staffing was similar: three partners, one counsel, three associates, and two

paralegals. *See, e.g.*, *Planned Parenthood of Cent. N.J.  v. Att'y Gen. of N.J*, 297 F.3d 253, 272–

73 (3d Cir. 2002) (holding fee awards for multiple attorneys appropriate because "the magnitude

of the case mandated the help of numerous attorneys for both parties" and because staffing was

appropriate given "the complexity and specialized medical knowledge necessary for the proper

presentation of the case" (cleaned up)); *Restivo*, 2015 WL 7734100 at \*4–5 (approving

reasonableness of fee award for 10 attorneys, including eight at one trial).

"Where a plaintiff has obtained excellent results, his attorney should recover a fully

compensatory fee. Normally this will encompass all hours reasonably expended on the

litigation[.]" *Hensley*, 461 U.S. at 435. Here, Plaintiff has undeniably achieved excellent results:

the jury found in his favor on every one of his claims against every Defendant on the verdict

sheet,[3] and endorsed both of Plaintiff's overarching pathways to *Monell* liability against the City,

a particularly difficult claim on which to prevail.

Still, Plaintiff is also entitled to be compensated for time spent on the few motions and

issues on which he did not prevail. *Id.* ("In these circumstances, the fee award should not be

reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit.").

"[W]here a plaintiff's claims involve 'a common core of facts' or are based on 'related legal

theories, much of counsel's time will be devoted generally to the litigation as a whole, making it

difficult to divide the hours expended on a claim-by-claim basis.'" *McKenna v. City of*

*Philadelphia*, 582 F.3d 447, 457 (3d Cir. 2009) (quoting *Hensley*, 461 U.S. at 435 (cleaned up));

---

[3] Although Plaintiff prudently trimmed Defendants in the lead up to and during trial in order to streamline his presentation to the jury, it is worth noting that across the history of this litigation this Court never dismissed his claims in their entirety against any Defendant.

*see also Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.*, 63 F.3d 516, 526 (7th Cir. 1995) ("[The defendant] wishes to exclude fees incurred for any work performed by Uniroyal's attorneys on motions which were eventually denied…. Common sense, however, informs us that such a rule is inappropriate."). Here, all claims and discovery were directly related to the Philadelphia Police Department's investigation that caused Mr. Hicks's wrongful conviction, to Mr. Hicks's innocence—which is directly related to both liability and damages—and to the *Monell* claims on which Mr. Hicks prevailed at trial.

As demonstrated by the supporting declarations, all of the hours requested are carefully documented in detailed contemporaneous time records. The attorneys seek compensation only for time reasonably expended, and have exercised billing judgment, excluding time where appropriate. *See* Ex. 8 (Hoffmann Decl.) ¶ 46. The reasonableness of the hours requested is further supported by the declaration of Marc Sonnenfeld, a recently retired partner from the Philadelphia office of Morgan, Lewis & Bockius LLP and recognized expert in attorneys' fees, who reviewed the timesheets and endorses the reasonableness of the request. Ex. 6 (Sonnenfeld Decl.) ¶¶ 19–21.

In addition, time spent in preparing the fee application is also compensable. *See Hernandez v. Kalinowski*, 146 F.3d 196, 198–99 (3d Cir. 1998) (noting fees for preparing a motion requesting costs and fees are recoverable under § 1988). Including work on this motion, Plaintiff seeks a total of 182.3 attorney hours and 82.8 paralegal/law clerk hours for preparing the instant fee petition. Ex. 8 (Hoffmann Decl.) ¶ 3.

## B. The hourly rates that Plaintiff's counsel request are reasonable.

The Supreme Court has declared that the reasonable hourly rate to be applied in awarding fees under statutory fee provisions is the "prevailing market rate," that is, the rate that lawyers of similar skill, reputation, and experience would charge in the legal market of that geographic area.

18

That rate is determined, as the Supreme Court held in *Blum v. Stenson*, by examining the "prevailing market rates in the relevant community" for "similar services by lawyers of reasonably comparable skill, experience and reputation." 465 U.S. at 895–96 & n.11 (1984). Quoting from the Senate Report on the Civil Rights Attorneys Fees Act, the Supreme Court noted that: "It is intended that the amount of fees awarded under [§ 1988] be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases." *Id.* at 893 (quoting Senate Report No. 1011, 94th Cong., 2d Sess., 5 U.S. Cong. & Admin News, p. 5908, 5913 (1976)).

A court must initially determine what lawyers of comparable skill and experience, handling other complex litigation, charge their private clients, as "the rates charged in private representations may afford relevant comparisons." *Id.* at 895 n.11. *See, e.g.*, *Nadarajah v. Holder*, 569 F.3d 906, 917 (9th Cir. 2009) (citing rates charged by Los Angeles office of multinational firm as comparator for Los Angeles civil rights counsel); *Rosario*, 2023 WL 2523624, at *2 (setting rates for NSBHF in wrongful conviction case in part in reference to "top New York firms"). "[T]he court should assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Rode*, 892 F.2d at 1183. In addition, fee awards reflect the rate at the time fees are sought, not at the earlier time when work was performed. *Lanni v. New Jersey*, 259 F.3d 146, 149–50 (3d Cir. 2001).

1. **Out-of-district rates apply to work done by New York City-based NSBHF attorneys.**

"The general rule is that a reasonable hourly rate is calculated according to the prevailing market rates in the community." *Washington,* 89 F.3d at 1035. The default "community" from which courts draw the relevant market rate is the forum in which the litigation took place—here,

19

Philadelphia. *Interfaith*, 426 F.3d at 704–05. However, there are exceptions to this "forum rate rule": as relevant here, if a party can show that "local counsel are unwilling to handle the case," the court may award attorneys' fees "based on prevailing rates in the community in which the part[y]'s attorneys practice." *Id.* at 705–07. For NSBHF attorneys, New York City.

Plaintiff's submissions here establish that under the unique circumstances of this case, qualified local counsel were unavailable or unwilling to handle this case alone. Specifically, the Declarations of Jonathan H. Feinberg, co-counsel with NSBHF on the instant case, and Alan Tauber establish that, given the nature of this case, no local counsel would have been willing to take the case on at the time Mr. Hicks was seeking counsel. Feinberg is a preeminent civil rights attorney recognized as a leader in the field. Ex. 12 (Feinberg Decl.) ¶¶ 2–10. KRMFL, at which Feinberg is a named partner and has litigated civil rights and wrongful conviction cases in Philadelphia for more than two decades, is one of the leading firms, if not *the* leading firm in Philadelphia handling wrongful conviction cases. *Id.* ¶¶ 6–10. Feinberg is likewise well-enmeshed in the civil-rights litigation community both nationally and in  Philadelphia. *Id.* ¶¶ 2–9. All such practitioners of whom Feinberg is aware take wrongful conviction and other civil rights cases on a contingency fee basis, fronting all costs at the outset. *Id.* ¶ 11.

For many of the reasons already canvassed, it was evident from the outset that this wrongful conviction litigation would be significantly more complicated, expert-dense, and contentious than most—particularly because the facts involved a police shooting, outrageous and wide-ranging misconduct, and multiple IA investigations on top of the police investigation itself. Feinberg Decl. ¶¶ 12–17. Thus it would it have been clear to any civil rights lawyer considering taking this case that the litigation would be lengthy, expensive, and require a significant devotion of manpower to be successful, and that a considerable portion of the necessary outlaid costs

would be in expert fees—costs *not* compensable through attorneys' fee motions. *Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1225 (3d Cir. 1995) (Under § 1988, expert fees not encompassed within "attorneys' fees"). Indeed, that turned out to be the case, as the total out-of-pocket expenses necessary to pursue this case through trial was approximately $500,000, with expert expenses alone of over $200,000. Ex. 10 (Green Decl.) ¶ 3. And civil rights practitioners would also have understood that success in this litigation—and with it any potential contingency fee or attorney fee award—was far from guaranteed. Given the City of Philadelphia's recent practice of reserving its right to decline indemnification for judgments entered against individual officers, success on the thorny *Monell* claims would have been viewed as essential for any local practitioner considering taking the case. *See* Ex. 12 (Feinberg Decl.) ¶¶ 15, 17.

In light of the necessary resources and risks apparent in handling this case, as well as the realities of its docket and competing demands at that time, KRMFL itself would not have been willing to handle this case on its own, without co-counsel able to devote necessary time, money, and manpower in a leading role in the litigation. *Id.* ¶ 18. That is in fact the way this case was litigated by NSBHF and KRMFL as co-counsel: NSBHF handled well over 95 percent of hours and fronted well over 95 percent of expenses. What's more, given the realities of the Philadelphia civil rights bar in and around December 2020 and early 2021 when Mr. Hicks sought representation—as the COVID-19 pandemic was still widespread and had drastically impacted the legal market, in particular those lawyers handling wrongful conviction cases— Feinberg does "not believe Plaintiff would have been able to secure representation from a Philadelphia-area attorney or law firm willing to on its own assume the risk of litigating a case of this nature, particularly without contemporaneous payment for their services and expenses." *Id.* ¶ 22. Tauber, another long-time Philadelphia civil rights attorney with experience in § 1983

wrongful conviction litigation, agrees given the risks of this case and the state of the local bar at that point, no qualified Philadelphia lawyer or firm would have taken this case without heavily involved co-counsel. Ex. 7 (Tauber Decl.) ¶¶ 4–5; *see also* Ex. 6 (Sonnenfeld Decl.) ¶¶ 12–13.

In *Interfaith Community Organization v. Honeywell Intern, Inc.*, the Third Circuit affirmed an award of out-of-district rates based on a similar showing from a leading local practitioner and co-counsel. 426 F.3d at 707. That affidavit, similar to Feinberg's declaration here, maintained that "no attorney in [the relevant community] would have been willing to handle this case without an immediate advance of out of pocket costs which, in this case, foreseeably amounted to over one million dollars." *Id.*; *see also R.B.A. v. Jersey City Board of Education*, No. 15-cv-8269 (LDW), 2023 WL 3098713, at *6 (D.N.J. April 26, 2023) (holding plaintiff established "unwilling exception" to forum rate rule via declaration maintaining that local counsel were unwilling to take on the case at the time plaintiff sought representation given plaintiffs' inability to pay legal fees and the types of issues at play).

Thus, as the record demonstrates that in these unique circumstances qualified local counsel were unavailable or unwilling to handle this case, Plaintiff meets that exception to the forum rate rule. This Court should thus award NSBHF attorneys New York City rates.

Further, because the Third Circuit has held that travel time for out-of-district lawyers is compensable on this same showing that local counsel were unwilling to take the case, the Court should award Plaintiff's travel time at 50% of the relevant rate—the standard practice in the New York City legal community. *Interfaith*, 426 F.3d at 710–11; *Knox on behalf of D.K. v. Poughkeepsie City Sch. Dist.*, No. 17 Civ. 8190 (NSR), 2022 WL 305275, at *10 (S.D.N.Y. Feb. 2, 2022) (noting courts in Second Circuit generally reimburse travel time at half-rate.

22

### 2.  Plaintiff's requested rates are reasonable.

To begin with, Plaintiff's counsel's "skill, experience, and reputation," as well as the particular "services" provided in this complex litigation, fully justify the rates sought. *Rode*, 892 F.2d at 1183; *Perdue*, 559 U.S. at 553 (noting "the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate" (cleaned up)).

NSBHF is a recognized leader in wrongful conviction practice nationally, having successfully litigated dozens of wrongful conviction cases. *See, e.g.*, *Restivo*, No. 06-cv-6720 (E.D.N.Y.) (jury awarded $36 million, $18 million to each plaintiff amounting to $1 million for every year spent wrongfully incarcerated); *Trulove v. D'Amico*, No. 16-cv-050 (N.D. Cal) (jury awarded $10 million in damages to plaintiff who spent six years in prison after being wrongfully convicted of murder); *Deskovic v. City of Peekskill*, No. 07-cv-8150 (S.D.N.Y.) ($41.65 million jury verdict); *Gates v. District of Columbia*, No. 11-cv-040 (D.D.C.) (jury found that District of Columbia police officers had fabricated evidence and hid exculpatory evidence during plaintiff's trial for rape and murder, resulting in 28-year wrongful conviction, with the government subsequently settling claims for $16.65 million); *Rosario*, No. 18-cv-4023 (S.D.N.Y.) ($5 million dollar jury verdict in wrongful conviction case); *Howard v. City of Durham*, No. 17-cv-477 (M.D.N.C.) (jury awarded $6 million to plaintiff after he spent decades in prison for two murders he did not commit). *See* Ex. 8 (Hoffmann Decl.) ¶ 8. NSBHF has also achieved numerous appellate victories in this evolving area of the law. *See, e.g.*, *Restivo v. Hesseman*, 846 F.3d 547 (2d Cir. 2017); *Roberts v. City of Fairbanks*, 947 F.3d 1191 (9th Cir. 2020); *Mellen v. Winn*, 900 F.3d 1085 (9th Cir. 2018); *Fogle v. Sokol*, 957 F.3d 148 (3d Cir. 2020). *See* Ex. 8 (Hoffmann Decl.) ¶ 30. Since the vast majority of NSBHF's cases settle, the firm has a much

23

longer list of substantial settlements in § 1983 wrongful conviction cases around the country, many of which are the highest in their respective jurisdictions.[4]

KRMFL is the industry leader in the Philadelphia area. The firm is recognized locally, and nationally, for its litigation of § 1983 cases in the criminal justice field. Since its founding in 1971, the firm has been at the center of numerous Philadelphia lawsuits raising claims of systemic constitutional violations in the criminal justice system. Ex. 12 (Feinberg Decl.) ¶¶ 2–9. In addition to these systemic class action matters, the firm has for the past 20-plus years focused on litigation concerning issues like those presented in this case: seeking compensation for persons wrongfully convicted due to law enforcement misconduct. In many of these cases KRMFL has co-counseled with NSBHF, including *Halsey v. Pfeiffer*, 750 F.3d 273, 295–96 (3d Cir. 2014) (first Third Circuit recognition of a Fourteenth Amendment fabrication-of-evidence claim, leading to a $12.5 million settlement); *Wright v. City of Philadelphia*, No. 16-cv-5020 (E.D. Pa.) ($9.85 million settlement); *Veasy v. City of Philadelphia*, No. 20-cv-5107 (E.D Pa.) ($5 million settlement).  KRMFL has also independently been involved in similar cases in district courts throughout the Third Circuit, including obtaining a $16 million verdict in April 2024 in *Dennis v. City of Philadelphia*, No. 18-cv-2689 (E.D. Pa.), as well as repeated multi-

---

[4] *Hastings v. Price* ($25 million); *Klene v. Los Angeles County* ($24 million); *Deskovic v. City of Peekskill* (over $23 million); *Coley v. Simi Valley* ($21 million); *Register v. City of Los Angeles* ($16.7 million); *Gates v. District of Columbia* ($16.65 million); *Saunders v. City of Chicago* ($15.99 million); *Berry v. Las Vegas Metro. Police Dep't* ($14.5 million); *Kidd v. Kansas City* ($14 million); *Allen v. City of St. Louis* ($14 million); *Estate of Wilson v. City of New York* ($13 million); *Fogle v. Sokol* ($13 million); *McIntyre v. Unified Government of Wyandotte Cnty*. *& Kansas City* ($12.5 million); *Halsey v. Pfeiffer* ($12.5 million); *Rubalcava v. San Jose* ($12 million); *Tapp v. City of Idaho Falls* ($11.7 million); *Roberts v. City of Fairbanks* ($11.5 million). *See* Ex. 8 (Hoffmann Decl.) ¶ 9.

million-dollar settlements.[5] In its wrongful conviction litigation, KRMFL has also argued appeals that have established significant precedents in the Third Circuit on issues frequently arising in such cases. *See, e.g.*, *Dennis v. City of Philadelphia*, 19 F.4th 279, 290–92 (3d Cir. 2021) (Fourteenth Amendment deliberate-deception claim); *Gallo v. City of Philadelphia*, 161 F.3d 217, 225 (3d Cir. 1998) (Fourth Amendment malicious-prosecution claim).

And both firms' successes are due in large part to the exceptional quality of the work done by the firms' respective leadership. Mr. Brustin, a named partner at NSBHF, has litigated over 75 wrongful conviction cases in the last two decades alone, and is responsible for several of biggest verdicts nationally. *See* Ex. 11 (Brustin Decl) ¶ 9. Because of his expertise in this area, he is regularly consulted by other experienced civil rights lawyers on trial strategy. *Id.* ¶ 13. Ms. Freudenberger, a named partner as well, has helped achieve trial and appellate victories, as well as substantial settlements, in dozens of other wrongful conviction cases. She has also lectured on litigating wrongful conviction cases at several preeminent law schools including Yale Law School, Columbia Law School, and Cardozo School of Law. *See* Ex. 9 (Freudenberger Decl.) ¶ 3. Ms. Hoffmann, also a named partner, in addition to trial successes in *Restivo, Trulove*, and *Rosario* is responsible for notable appellate decisions in this field, *see, e.g.*, *Restivo*, 846 F.3d 547 (2d Cir. 2017); *Mellen*, 900 F.3d 1085 (9th Cir. 2018), and is regularly consulted by other civil rights lawyers as a leading expert in § 1983 wrongful conviction law. *See* Ex. 8 (Hoffmann Decl.) ¶¶ 30–31. Lastly, Ms. Green, partner, recognized by Bloomberg Law in 2024 as one of the top young lawyers in the country for her litigation practice, has achieved successful

---

[5] *See, e.g.*, *Siehl v. City of Johnstown*, No. 18-cv-0077 (W.D. Pa.) ($8.2 million settlement); *Berry v. City of Philadelphia*, No. 19-cv-3699 (E.D. Pa.) ($5.65 million settlement); *Miller v. City of Philadelphia*, No. 20-cv-3054 (E.D. Pa.) ($4.6 million settlement); *Thomas v. City of Philadelphia*, No. 17-cv-4196 (E.D. Pa.) ($4.1 million settlement).

outcomes for clients nationwide, including securing favorable settlements or trial verdicts in more than twenty wrongful conviction cases. Ms. Green has also developed specific expertise in wrongful conviction cases involving the Philadelphia Police Department, obtaining settlements against the City of Philadelphia that rank among some of the largest in the City's history. *See* Green Decl. ¶ 44. All four partners are consistently named as "Super Lawyers."

Similarly, Mr. Feinberg, named partner at KRMFL, has successfully litigated numerous civil rights and other wrongful conviction cases to multi-million dollar verdicts and settlements, is president of the National Police Accountability Project, and teaches a civil rights litigation course with a special focus on wrongful convictions at Penn Carey Law. Further, junior attorneys at both firms typically have elite academic records from the nation's leading law schools, experience and facility with civil rights litigation, and often federal and/or state clerkships— allowing them to contribute at a level far above that reflected merely by years of practice.

As recognized by their peers, the attorneys involved in this case are at the highest level of their profession and are well deserving of the requested rates. *See* Ex. 8 (Hoffmann Decl. ¶¶ 13– 15). Complete biographies are provided for each attorney in their supporting declarations. *See* Exhibits 8–22. These qualifications and experiences were all brought to bear on the exceedingly complicated, difficult case at bar, to tremendous result. The Third Circuit holds the Court must keep all of this in mind in setting reasonable rates.

### a.  Plaintiff's New York City requested rates are reasonable.

Applying out-of-district, New York City–based rates for NSBHF attorneys, Plaintiff is seeking reimbursement for time expended at the hourly rates of $1150 for Peter Neufeld; $1000 for Nick Brustin; $900 for Anna Benvenutti Hoffmann and Emma Freudenberger; $650 for Amelia Green; $600 for Tony Balkisoon; $575 for Katie McCarthy; $525 for Katrina

Rogachevsky and Sona Shah; $475 for Grace Paras and Gerardo Romo; $450 for Katie Cion and Kate Fetrow; and $225 for paralegals and law clerks.

As attested to by three separate outside reviewers,[6] counsel's proposed rates are reasonable compared with the market rates for similarly complex federal litigation in the Southern District of New York, NSBHF's home district. *See Rosario*, 2023 WL 2523624, at *3 (noting in fee decision for NSBHF that the "skills required to win a complex civil rights case like this one are comparable to…those required in a complex commercial case"); *Restivo*, 2015 WL 7734100, at *3 (finding NSBHF's requested rates were "in line with rates charged in similar complex federal work in the Southern District" and citing a fee award in commercial litigation case), *aff'd sub nom. Restivo v. Hesseman*, 846 F.3d at 591 (affirming district court's award of "higher out-of-district rates" for NSBHF attorneys).

Indeed, rates typically charged for similarly complex litigation in the SDNY market dwarf the requested rates. For example, Mr. Loewenson notes that current hourly rates at Morrison & Foerster, where he was a partner, *start* at $795 for the newest associates and reach as high as $2450 for some partners. Ex. 5 (Loewenson Decl.) ¶ 9. And rates at big law firms, both in New York and nationwide, have risen precipitously in the past several years. *See, e.g.*, Ex. 1 (Article Compilation) at 6–7 (describing a Wells Fargo survey documenting a 9.2% increase in billing rate growth during the first half of 2025); *id.* at 1–5 (documenting a trend at top law firms with rates approaching or surpassing $3,000 per hour for partners, and in any event "nearly doubling in the past decade"); *see also Rosario*, 2023 WL 2523624, at *3 (emphasizing need for hourly rates in civil right cases to "reflect [] evolving market realities" to "'attract competent counsel' to enforce civil rights law even in difficult cases" (quoting *Blum*, 465 U.S. at 897)).

---

[6] *See generally* Exs 4 (Cell. Decl.), 5 (Loewenson Decl.), 6 (Sonnenfeld Decl.).

27

Of course, as a mid-sized civil rights firm, NSBHF is differently situated from these large commercial comparators, with somewhat lower overhead and a different clientele. But the requested rates, certainly nowhere near these levels, already reflect that reality. *Id.* at *3 (noting rates at top law firms were a relevant point of comparison for NSBHF given the comparable complexity of federal litigation, and the "large gap" between NSBHF's requested rates and larger firms' analogous rates "fully accounted" for "different cost structures" and "a different legal sub-market"). And in this case in particular—which required advancing and carrying substantial out-of-pocket costs, including the risk those costs might never be repaid, and staffing many attorneys on the case—it was necessary for NSBHF to have sufficient staff and resources (i.e. overhead) to litigate the case successfully. Emery Celli Brinckerhoff Abady Ward & Mazel LLP ("ECBAWM"), a litigation boutique with both a complex civil-rights practice and a commercial practice—and therefore the best comparator for NSBHF—has customary billing rates comparable to or higher than what NSBHF requests, including senior-partner rates of $950–$1150, junior-partner rates of $775–$950, and associates rates of $525–$575. Ex. 4 (Celli Decl.) ¶ 12.

In recent years, courts in the Southern District have found reasonable attorneys' fees at rates as high as $1760 per hour for complex federal litigation. *See, e.g.*, *An v. Despins*, No. 22-cv-10062 (VEC) (JW), 2024 WL 1157281, at *2–4 (S.D.N.Y. Mar. 18, 2024) (approving reasonableness of 2023 rates of $1760 for partner with 20 years' experience, $1440 for counselor with 10 years' experience, and $895 for associates with federal clerkship experience); *Macquarie Mexico Real Estate Mgmt. S.A. de C.V. v. Hoiston Int'l Enters., Inc.*, No. 20-cv-8383 (JGK) (KNF), 2021 WL 4952693, at *8 (S.D.N.Y. Oct. 1, 2021), *adopted by* 2021 WL 4951764 (S.D.N.Y. Oct. 25, 2021) (awarding a managing partner with more than 25 years' experience

28

$1300/hour and a partner with more than 20 years $1250/hour in 2021, in a case the court described as "relatively straightforward"); *StoneX Grp., Inc. v. Shipman*, No. 23-cv-613 (JGK) (VF), 2025 WL 1212165, at *3–4 (S.D.N.Y. Apr. 25, 2025) (approving as reasonable rates of $1285 for a partner with 30 years' experience and $800 for a senior associate); *Vista Outdoor Inc. v. Reeves Family Trust*, No. 16-cv-5766 (JSR), 2018 WL 3104631, at *6 (S.D.N.Y. May 24, 2018) (awarding $1260/hour to partner with over 20 years' experience in contract dispute); *Al Thani v. Hanke*, No. 20-cv-4765 (JPC), 2025 WL 1591379, at *5–7 (S.D.N.Y. June 5, 2025) (approving as reasonable 2021 rates of $1108 for partner with 30 years' experience, $768 for associate with 6 years' experience and $616 for associate with 3 years' experience); *Pearlstein v. BlackBerry Ltd.*, No. 13-cv-7060 (CM) (KHP), 2022 WL 4554858, at *10 (S.D.N.Y. Sept. 29, 2022) (finding reasonable hourly rates from $500 for associates to $1200 for senior partners).

In fact, as early as 2014, the Southern District routinely awarded partners hourly rates in excess of $1,000 an hour in complex commercial litigation. *Themis Capital v. Democratic Republic of Congo*, No. 09-cv-1652 (PAE), 2014 WL 4379100, at *7 (S.D.N.Y. Sept. 4, 2014) ("[P]artner billing rates in excess of $1,000 an hour[] are by now not uncommon in the context of complex commercial litigation."); *Rudman v. CHC Grp. Ltd.*, No. 15-cv-3773 (LAK), 2018 WL 3594828 (S.D.N.Y. July 24, 2018) (finding an hourly rate of $985 per hour reasonable for lawyers at a financial litigation firm); *Angelo, Gordon & Co., L.P. v. MTE Holdings, LLC*, No. 20-misc-23 (AT), 2021 WL 1353756, at *3 (S.D.N.Y. Apr. 12, 2021) (approving rates of $1175 and $1350 for partners in bankruptcy action).

NSBHF's requested New York rates here are also in line with its most recent fee award in the Southern District, taking into account inflation, staffing variations, and the decidedly more complex issues present in this case. *See Rosario*, 2023 WL 2523624, at *5. For example, even

29

adjusting solely for inflation, Mr. Brustin's 2022 rate of $900 approved in *Rosario* would be approximately $1000 in September 2025. That figure is based on the most recent Consumer Price Index data available from the Bureau of Labor Statistics, and is essentially the rate requested here.[7] *Lanni*, 259 F.3d at 149–50 (hourly rates must be set at the "current" market rate at the time of the fee petition, to take into account delay in payment). His $1000 rate is on the low end of senior-partner rates currently charged at ECBAWM, Ex. 4 (Celli Decl.) ¶ 12 (senior-partner rates range from $950–$1150), and it is far below rates approved for comparably experienced partners. *See, e.g., An*, 2024 WL 1157281, at *2–4 ($1760 for partner with 20 years' experience); *Macquarie*, 2021 WL 4952693, at *8 ($1300 to managing partner with more than 25 years' experience); *StoneX Grp., Inc.*, 2025 WL 1212165, at *3–4 ($1285 for a partner with 30 years' experience). The $1150 rate sought for Peter Neufeld—a widely recognized leader and pioneer of modern wrongful conviction litigation, the co-founder of both the Innocence Project and NSBHF, and an attorney with 50 years of experience including decades litigating wrongful conviction actions like this one—is similarly supported by this record.

So too for partners Emma Freudenberger and Anna Benvenutti Hoffmann, whose 2022 rates of $800 awarded in *Rosario* are roughly equivalent to $900 per hour today. The $900 rate requested here for these two partners—each with approximately 20 years' experience—is well below comparable rates at ECBAWM, *see* Ex. 4 (Celli Decl.) ¶ 12 (*junior*-partner rates rise to $950), and well below rates awarded to similarly situated partners in New York, *see, e.g., Macquarie*, 2021 WL 4952693, at *8 ($1250 to partner with more than 20 years' experience); *Vista Outdoor Inc*, 2018 WL 3104631, at *6 ($1260 to partner with over 20 years' experience).

---

[7] All inflation calculations included in this brief are done using the Bureau of Labor Statistics' online CPI Inflation Calculator, available at https://www.bls.gov/data/inflation_calculator.htm.

Partner Amelia Green's requested New York rate of $650 per hour is, if anything, modest for complex cases in the Southern District. It is well below the rates reflected in ECBAWM's billing practices, which *start* junior-partner billing rates at $775, Ex. 4 (Celli Decl.) ¶ 12, and is in line with past awards by courts in the jurisdiction, *see, e.g., Restivo*, 2015 WL 7734100, at *5 (approving $500 per hour for Ms. Hoffmann, then a junior partner, based on 2014 rates, equivalent to almost $700 when adjusted for inflation); *An*, 2024 WL 1157281, at *2–4 ($1440 to counselor with 10 years' experience; $895 for associates with federal clerkship experience); *StoneX Grp., Inc.*, 2025 WL 1212165, at *3–4 ($800 for senior associate). Ms. Green's rate is also supported by reference to the $500-per-hour 2022 rate awarded to her in *Rosario*, which equals approximately $575 in today's dollars. However there is also a significant difference in her experience level: in 2022, Ms. Green was only seven years out of law school and had only been a partner for one-and-a-half years, whereas now she has over ten years of experience—five as a partner—which she leveraged in this litigation, where she took a leading role. Ex. 10 (Green Decl.) ¶ 45.

Similarly, the rates requested for experienced counsel Katie McCarthy ($575/hour, 10 years' experience) and Tony Balkissoon ($600/hour, 15 years' experience) are also amply supported by the record evidence. Despite their impressive credentials and experience, their requested rates are far below the current $795 *starting* rate for big-firm associates, Ex. 5 (Loewenson Decl.) ¶ 9, in line with the $575 top rate for ECBAWM associates, Ex. 4 (Celli Decl.) ¶ 12, and well below rates awarded to similarly qualified lawyers, *see, e.g., An*, 2024 WL 1157281, at *2–4 ($1440 to counselor with 10 years' experience, $895 for associates with federal clerkship experience); *Al Thani*, 2025 WL 1591379, at *5 ($768 for associate with 6 years' experience and $616 for associate with 3 years' experience). The difference between Ms.

McCarthy's 2022 rate in *Rosario*—approximately $460 today—and her requested rate here is easily accounted for by her increased seniority and role: at the time, she was a fifth-year associate, and she is now counsel with ten years' experience, meriting a $575/hour rate. And Ms. McCarthy's contributions to this case bear this out: she took the lead on complex, technical expert work in forensic audio and DNA during discovery and at trial, and she successfully argued consequential legal issues before this Court. Ex. 18 (McCarthy Decl.) ¶¶ 12–13.

The rates Plaintiff seeks for associates ($450–$525) are likewise reasonable, consistent with prior awards in civil rights and other complex cases, and lower than corollary rates customarily charged at ECBAWM. Ex. 4 (Celli Decl.) ¶ 12 (associate rates of $525–575); *Fair Hous. Justice Ctr. v. Pelican Mgmt., Inc.*, No. 18-cv-1564 (ER), 2025 WL 965129, at *3 (S.D.N.Y. 2023) (awarding $550 to a 2017 law graduate in an employment law matter). The highest associate rate requested—$520—is for Katrina Rogachevsky and Sona Shah, who have 11 and 26[8] years of experience, respectively. *Demonchaux v. Unitedhealthcare Oxford*, No. 10-cv-4491 (DAB), 2014 WL 1273772, at *7 (S.D.N.Y. Mar. 27, 2014) (approving $500 per hour in 2014 for senior associates). Rates of $475 per hour have also been approved for associates in civil rights cases with similar levels of experience to Grace Paras and Gerardo Romo (5 years' experience, seeking $475), and Katie Cion and Kate Fetrow (4 years' experience, seeking $450)—experience that includes prestigious federal judicial clerkships and time spent in civil rights practice during and after law school. *See, e.g.*, *Fair Hous. Justice Ctr.*, No. 18-cv-1564, DI 195 at 11 (in 2023, requesting $475 for 2020 law graduate with two federal clerkships); *id.*, 2025 WL 965129, at *3 (finding $475 rate for associate with 3 years' experience reasonable and

---

[8] As Sona Shah has departed NSBHF, this motion relies on the number of years of experience she had at the time she conducted her work on this case. The same is true for Gerardo Romo and Kate Fetrow, both of whom no longer work for NSBHF.

undisputed by defendants). For additional context, in 2007, the Central District of California awarded Ms. Hoffmann, then a junior associate, an hourly rate of $300—the equivalent of over $480 today adjusted for inflation. *See* Ex. 8 (Hoffmann Decl.) ¶ 33.

Lastly, the $225 per hour rate for paralegals and law clerks is reasonable; it is less than the 2022 rate of $200 approved in *Rosario* for NSBHF adjusted for inflation. *See* 2023 WL 2523624, at *5; *see also Charles v. Seinfeld*, No. 18-cv-1196 (AJN), 2022 WL 889162, at *5 (S.D.N.Y. Mar. 25, 2022) ("Courts in this district generally find that reasonable hourly rates for paralegal and litigation support staff range from $150 to $250.").

### b. If this Court declines to award out-of-district rates, Plaintiff's requested Philadelphia rates are reasonable.

In the event this Court applies the "forum rate" rule and looks to prevailing rates in the Philadelphia legal community, Plaintiff requests the following hourly rates: $1050 for Peter Neufeld; $950 for Nick Brustin; $800 for Anna Benvenutti Hoffmann, Emma Freudenberger, and Jonathan Feinberg[9]; $550 for Amelia Green; $550 for Tony Balkisoon; $475 for Katie McCarthy; $450 for Katrina Rogachevsky and Sona Shah; $350 for Grace Paras, Gerardo Romo, Grace Harris, Katie Cion, and Kate Fetrow; and $205 for paralegals and law clerks. As demonstrated by the Sonnenfeld declaration, although Philadelphia rates are slightly lower than those in New York, the difference is not substantial. For example, in 2024 Sonenfeld's former firm Morgan, Lewis & Bockius LLP, billed associates between $665 and 1015 per hour, and partners between $1075 and 1950 per hour. Ex. 6 (Sonnenfeld Decl.) ¶ 14. Thus, prevailing

---

[9] Because Jonathan Feinberg and Grace Harris of KRMFL practice in the Philadelphia community, Plaintiff requests Philadelphia-based rates for these attorneys no matter if the forum rate rule applies.

Philadelphia market rates for similarly complex litigation—like the New York market rates discussed above—are far higher than Plaintiff's requested rates.

For Philadelphia attorney rates in § 1983 cases, courts often consider as a starting point the Community Legal Services ("CLS") fee schedule. *See Maldonado*, 256 F.3d at 187–88. However, because of several observed deficiencies with the CLS fee schedule, courts in this district often depart (usually upwards) from the rates called for by the CLS schedule when case-specifics demand it. *See, e.g.*, *Mary Courtney T. v. Sch. Dist. of Phil.*, No. 06-cv-2278 (ABB), 2009 WL 185426, at *3 (E.D. Pa Jan. 22, 2009) ("I find that it would be inappropriate to apply the CLS fee schedule here. This case does not involve CLS-affiliated attorneys, nor is it a case where the parties failed to submit sufficient evidence of prevailing market rates."); *Davis v. Riddle & Associates*, *P.C.*, 579 F. Supp. 2d 692, 694 (E.D. Pa 2008) ("The CLS schedule, while a useful starting point, is not the exclusive tool to determine appropriate fees in the presence of other evidence…. [T]he CLS schedule is based solely upon years of practice and takes into account no other factors. By contrast, under governing precedent, we must determine whether the rate is appropriate given an attorneys' particular skill, experience, and reputation." (cleaned up)); *Damian J. v. School Dist. of Phil.*, No. 06-cv-3866 (JRS), 2008 WL 1815302, at *2 (E.D. Pa. Apr. 22, 2008) ("I do not find the CLS rates reasonably can be applied here…. The fee schedule does not take into account the specialized skills and advanced degrees the attorneys bring to their practice, their experience in the particular field [of the litigation], the size of the law firm, the level of work performed, nor the positions of counsel. Moreover, the CLS schedule…does not reflect current rates." (cleaned up)).

Here, all of the concerns courts in this district have expressed about reliance on the CLS fee schedule are present, almost uniformly operating to depress the true reasonable market rate

34

for Plaintiff's attorneys in this litigation. For one, the latest version of the schedule was published in January 2023 and is now several years out of date. Like the 2023 New York rates discussed above, these CLS rates fail to account for even inflation, let alone additional market factors that have led to documented increases in billing rates. *See, e.g.*, Ex. 1 (Article Compilation) at 8–9. Further, the fee schedule's rote reliance on years of legal experience fails to capture several factors courts have repeatedly recognized as justifying rates at the very top of any applicable range—namely, counsel's particular expertise and national reputation in complex § 1983 wrongful conviction litigation; the unusually complex and risky nature of this case; and the excellent results achieved despite those challenges.[10]

In addition, a 2023 nationwide survey of partner and associate rates for commercial litigation at Philadelphia firms with 51-200 lawyers found rates ranges comparable to those requested here, especially when adjusted for inflation. Ex. 2 (Real Rate Report Philadelphia) (partner rates at $481 first quartile, $713 median, $999 third quartile; associate rates at $334 first quartile, $431 median, $485 third quartile). Accordingly, this Court should award Plaintiff his requested rates despite any deviation from the CLS fee schedule.

Further, the rates requested—topping out at $1050 for Peter Neufeld and "progressively working downward" to $350 for the most junior associates and $205 for paralegals, *In re Suboxone Antitrust Litig.*, No. 13-md-2445, 2024 WL 815503, at *17 (E.D. Pa. Feb. 27, 2024)— are in line with or below those awarded in similarly complex civil litigation in this district,

---

[10] Plaintiff notes that his effort to fairly incorporate these factors into the appropriate market rate resulted in some requests that are lower than what a rote application of the CLS schedule would produce. For example, although Sona Shah had 26 years of legal experience during her time at NSBHF, not all of her experience was relevant to wrongful conviction work. And given her role as an associate, Plaintiff has requested a rate for Ms. Shah *below* that contemplated by the CLS schedule, because that better reflects the reasonable market rate.

wherein "[t]here has recently been a large increase in the amount of fees charged by lawyers handling complex litigation." *Cockerill v. Corteva*, No. 21-cv-3966, 2025 WL 1523002, at *2 (E.D. Pa. May 27, 2025). *See also, e.g.*, *In re Philadelphia Inquirer Data Sec. Litig.*, No. 24-cv-2106, 2025 WL 845118, at *15 (E.D. Pa. Mar. 18, 2025) (awarding a rate of $1,000 for named partner in class action litigation); *In re Suboxone*, 2024 WL 815503, at *17 ($1550 rate for co-lead counsel in a class action case in February 2024 considered "well within reasonable range for [his] experience and for the region"); *Cockerill*, No. 21-cv-3966, DI 386-4 ¶¶ 4–5 (2025 declaration by Philadelphia law firm partner noting requested rates of $1275 for attorneys with more than 20 years' experience to $500 for attorneys with five or fewer years' experience consistent with local market rates for attorneys handling complex class actions)); *Braun v. Philadelphia Inquirer, LLC*, No. 22-cv-4185, DI 70-3 (requesting rates from $210–310 for paralegals, $450–$595 for associates, $675 for counsel, and $750–975 for partners); *id.*, 2025 WL 1314089, at *12–13 (E.D. Pa. May 6, 2025) (using those submitted rates to calculate lodestar); *Fulton-Green v. Accolade, Inc.*, No. 18-cv-274, 2019 WL 4677954, at *12 (E.D. Pa. Sept. 23, 2019) (approving class counsel's rates that ranged from $202 to $975 per hour); *In re Viropharma Inc., Sec. Litig.*, No. 12-cv-2714, 2016 WL 312108, at *18 (E.D. Pa. Jan. 25, 2016) ("The hourly billing rates of all of Plaintiff's Counsel range from $610 to $925 for partners, $475 to $750 for of counsels, and $350 to $700 for other attorneys.").

That the requested rates are reasonable is even more evident when considered person-by-person. The partner rates align with what is expected for top-tier legal work by highly experienced practitioners in Philadelphia. For example, Peter Neufeld requests $1050 per hour based on his preeminent role in wrongful conviction law and his 50 years of directly relevant legal experience. Even taking the CLS scale at face value, lawyers with over 25 years'

36

experience receive $735–$850. Ex. 3 (CLS Schedule). Even adjusting only the top-end rate of

$850 for inflation equals approximately $925 today.  Moreover, as other courts in this district

have noted, the CLS schedule is particularly ill-suited for attorneys like Mr. Neufeld, who have

25 years' experience two times over. *See Dennis*, 2025 WL 1582452, at *3 (departing upward

from CLS schedule for KRMFL partners with 57 and 51 years' experience). Mr. Neufeld's

exceptional reputation, experience, and skills warrant the $1050 rate requested. *See id.* (awarding

KRMFL partner with 57 years' experience $1,150 in a comparatively more straightforward

wrongful conviction matter); *see also* Sonnenfeld decl. (describing recent big-firm partner rates

in Philadelphia up to $1950).

The same holds for Mr. Brustin's request for $950 per hour. With 30 years of experience,

his requested rate is below the 2024 *starting* partner rates at big law firms in Philadelphia for

comparably complex work. Ex. 6 (Sonnenfeld Decl.) ¶ 14 (2024 partner rates start at $1075)*; see

also Meigs v. Care Providers Ins. Servs.*, LLC, No. 21-cv-867, 2024 WL 21792, at *3–4 (E.D.

Pa Jan 2, 2024) (awarding $960 rate to co-managing member of employment law firm with over

30 years' experience and concentrated practice in employment law); Ex. 2 (Real Rate Report

Philadelphia) ($999 as the third-quartile partner rates for commercial litigation at firms with 51-

200 lawyers in 2023). Likewise, the $800 rate requested by Ms. Freudenberger, Ms. Hoffmann,

and Mr. Feinberg—all of whom have approximately 20 years' legal experience—is certainly

reasonable in this market.  *See Meigs*, 2024 WL 21792, at *3 (awarding $870 to co-managing

partner of employment law firm with 20 years' experience); Ex. 2 (Real Rate Report

Philadelphia) (median partner rate for undifferentiated "commercial litigation" rounds to $772

adjusted for inflation—before accounting for Plaintiff's lawyers' premiere reputation and skill).

37

The requested Philadelphia rate of $550 per hour for partner Amelia Green, co-lead counsel in this case, is also reasonable. As the Sonnenfeld declaration shows, recent big-firm partner rates in Philadelphia start at nearly double this rate ($1,075), and even *associate* rates begin above it, ranging from $665 to $1015. Ex. 6 (Sonnenfeld Decl.) ¶ 14. Even using the CLS schedule as a starting point, Ms. Green's 10 years of experience post-law school would place her at $415, approximately $450 when adjusted for inflation. But, as discussed above, Ms. Green has also been a partner at NSBHF for five years and played a central leadership role throughout this complex litigation. A rate of $550 per hour is therefore a more reasonable rate for her services. *See Heard v. J and G Spas, LLC*, No. 22-cv-3212, 2024 WL 4458549, at *7–8 (E.D. Pa Oct. 10 2024) (awarding $500 rate to firm partner with nine years' experience in employment law case).

Similarly, NSBHF counsel Ms. McCarthy and Mr. Balkissoon warrant their requested rates of $475 and $550, respectively, given their 10 and 15 years of experience. Indeed, despite Mr. Balkisoon's exceptional qualifications and 15 years in practice, his requested rate is ultimately modest—below the corresponding CLS rate for 15 years ($515) when adjusted for inflation ($575). Senior associates Ms. Rogachevsky and Ms. Shah both request $450 per hour, which aligns with the median associate rate charged for commercial work at Philadelphia firms with 51-200 lawyers in 2023. Ex. 2 (Real Rate Report Philadelphia). And the $350 per hour rate requested for associates with four to five years' experience is likewise reasonable, roughly matching the first quartile of rates charged by associates in the Real Rate Report, and representing only a modest increase from the top of their relevant CLS band ($315) adjusted for inflation ($340).

Finally, the requested rate for paralegals and law clerks, $205 per hour, is well within the CLS range and is therefore plainly reasonable, especially given the substantial volume of document discovery, deposition support, and trial-related work handled by the paralegals here.

***

Based on all of the above criteria, all rates requested are eminently reasonable for their respective markets.

## II.  Plaintiff is entitled to his reasonable costs.

In addition to a fee award, a prevailing party under § 1988 is entitled to reimbursement for out-of-pocket litigation expenses. *Abrams*, 50 F.3d at 1225–26; *Becker v. ARCO Chem. Co.*, 15 F. Supp. 2d 621, 635 (E.D. Pa. 1998) ("Successful civil rights litigants are entitled to reimbursement of costs connected with litigating their claim as long as the costs are reasonably and necessarily incurred.." (cleaned up)). District courts should award costs under § 1988 commensurate to what would "normally [be] charged to a fee-paying client, in the course of providing legal services." *Planned Parenthood*, 297 F.3d at 267 (cleaned up). This includes "reasonable costs and expenses beyond the costs specifically listed in 28 U.S.C. § 1920 provided those expenses are both documented and reasonably necessary." *Ismail v. IHI Power Servs. Corp.*, No. 20-cv-4801, 2023 WL 3689608, at *7 (E.D. Pa. May 25, 2023) (collecting cases).

Here, Plaintiff seeks $304,553.47 in costs under § 1988.[11] *See* Ex. 10 (Green Decl.) ¶ 3–4. This includes $49,525.95 for deposition and discovery costs; $17,427.42 for investigation fees and expenses; $9,817.88 for printing, copying, and scanning; $2,108.47 for records requests; $675.00 for court fees; $14,938.95 for Westlaw/research costs; $270.07 for shipping; $59,737.27 for travel and meal costs; $127,180.70 for trial costs; $22,709.72 for trial transcripts; and

---

[11] Although some of the categories of expenses here sought are compensable under § 1920, for simplicity, Plaintiff seeks them all here.

39

$162.04 for witness fees. All of these costs are normally billed to fee-paying clients under the standard billing practices in this district, and were reasonably incurred during this litigation. Ex. 10 (Green Decl.) ¶ 6; *see*, *e.g.*, *Mathers v. Gonzales*, No. 05-cv-3778, 2008 WL 3539961, at *5–6 (E.D. Pa. Aug. 13, 2008) (reimbursing computerized legal research costs and travel costs such as Amtrak tickets); *Middlebrooks v. Teva Pharma. USA, Inc.*, No. 17-cv-412, 2019 WL 936645, at *19–20 (E.D. Pa. Feb. 26, 2019) (reimbursing deposition costs and various trial costs such as trial-related meals, transcripts from court reporter, and information technology support); *Ravina v. Columbia Univ.*, No. 16-CV-2137 (RA), 2020 WL 1080780, at *14 (S.D.N.Y. Mar. 6, 2020) (awarding costs for jury consulting); *Grammenos v. Allstate Ins. Co.*, No. 07-cv-2725, 2009 WL 2448556, at *2–3 (E.D. Pa. Aug. 7, 2009) (reimbursing "pre- and post-suit investigation costs"); *Becker*, 15 F. Supp. 2d at 637 (reimbursing deposition costs, delivery fees, and Federal Express charges);

And given that Plaintiff's counsel were carrying these costs for years with no guarantee of success in the litigation—in addition to substantial other costs that are not compensable, such as over $200,000 in expert fees—they endeavored to minimize costs as much as possible. *See* Ex. 10 (Green Decl.) ¶ 3.

## CONCLUSION

For the reasons stated herein, Plaintiff's request for attorneys' fees and costs in the amounts stated should be granted.

Dated: October 30, 2025                    Respectfully submitted,

                                           */s/ Anna Benvenutti Hoffmann*
                                           Anna Benvenutti Hoffmann*
                                           Emma Freudenberger*
                                           Amelia Green*
                                           Nick Brustin*
                                           Katrina C. Rogachevsky
                                           Mary Katherine McCarthy*

40

Grace Paras*
Katherine Cion*
Neufeld Scheck Brustin Hoffmann &
    Freudenberger, LLP
200 Varick Street, Suite 800
New York, NY 10014
(212) 965-9081
*Attorneys admitted to the Eastern
    District of Pennsylvania pro hac vice

Jonathan H. Feinberg
Susan M. Lin
Grace Harris
Kairys, Rudovsky, Messing, Feinberg & Lin
    LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400

*Counsel for Plaintiff Termaine Hicks*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 30, 2025, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record and serve a copy of the same filing via electronic mail on all parties.

*/s/Katherine Cion*
Katherine Cion
Attorney for Plaintiff
