# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| TERMAINE HICKS, | |
| Plaintiff, | |
| vs. | Case No. 2:22-cv-00977 (JFM) |
| CITY OF PHILADELPHIA, et al., | |
| Defendants. | |

---

**DECLARATION OF STEVEN A. TASHER, ESQ.
IN SUPPORT OF DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**

---

Steven A. Tasher
Wyatt Partners
P.O. Box 358
Berkeley Heights, NJ 07922
stasher@wyattpartners.com

1

## I.      INTRODUCTION AND SCOPE OF EXPERT ANALYSIS

1.      I have been retained by the City of Philadelphia (the "City") on behalf of Defendants in the above-captioned proceedings (the "Litigation").  The scope of my retention was to evaluate the reasonableness of the fee request sought by Plaintiff in their October 30, 2025 Motion for Fees and Costs (Plaintiff's "Fee Motion")[1] and to evaluate the opinions of Marc J. Sonnenfeld, Esq. ("Attorney Sonnenfeld"), as set forth in his declaration of the same date (the "Sonnenfeld Decl.").[2]  My opinions are set forth in this "Tasher Declaration".

## II.     EXECUTIVE SUMMARY OF OPINIONS

2.      Based upon my experience with attorneys' fees in cases across the country (including in Pennsylvania) and in accordance with applicable legal standards and reliable methodologies, my opinions are summarized as follows:

a.      My first opinion is that Plaintiff's fee submission reflects a profound lack of billing judgment, seeking reimbursement for a substantially overstaffed representation as well as expenses that no reasonable paying client would ever pay.

b.      My second opinion is that the time records submitted by Plaintiff's counsel do not reflect high quality, accurate, or contemporaneous time recordation.  Rather, they contain all the hallmarks of inaccurate and belated reconstructions of time records that are, at times, inconsistent with the factual record.

c.      My third opinion is that Plaintiff's counsel substantially overstaffed the representation with scores of unnecessary timekeepers; overstaffed hearings, depositions, trial, and other litigation tasks; overworked nearly every task with an unreasonable number

---

[1] See, ECF No. 466 et seq.
[2] See, ECF No. 466-6.

2

of timekeepers that duplicated each other's work; engaged in far too many unreasonably staffed conferences; and performed the work in an unreasonably top-heavy manner; among other issues.  Once adjustments are made to address these and other issues, a non-excessive number of hours for Plaintiff's counsel comes to 9,394.73 hours.

d.       My fourth opinion is that the Philadelphia hourly rates sought by Plaintiff's counsel are excessive and do not reflect reasonable market rates in the community for similar work.

e.       My fifth opinion is that applying more appropriate market rates for Philadelphia to the non-excessive number of hours set forth in Opinion 3 produces a lodestar amount of $3,677,550.10 in fees.

f.       My sixth opinion is that Plaintiff's cost request is excessive, poorly lacking in documentation, displays a profound lack of billing judgment, and should be reduced by no less than $152,077.83.

g.       My seventh opinion is that the opinions proffered by Attorney Sonnenfeld in support of Plaintiff's fee motion are flawed, as they lack substantive analysis, are inconsistent with the more substantive analysis he generally conducts in other matters, and fail to review or take into account important information (such as the expenses or the work product) that should have informed his opinions.

## III.    MY BACKGROUND, CREDENTIALS, AND EXPERIENCE

3.       I have spent my entire legal career handling or supervising major litigation and, as outlined below, have become an expert in the field of assessing and evaluating the reasonableness and necessity of attorneys' fees, costs, and settlements.  Further information is available in my curriculum vitae (attached as **Exhibit A**) and testifying history (**Exhibit B**).

3

4.      In 2009, I co-founded Wyatt Partners, a consulting firm that, among other things, provides expert analysis on the reasonableness of attorneys' fees and the reasonableness of settlements in complex litigation.  Since 2009, I have been Co-Chief Executive Officer (and, since mid-2013, Chief Executive Officer) of Wyatt Partners.  As a consultant on the issue of legal fees and costs, I have advised companies and law firms with respect to billing guidelines used in complex litigation and have been retained by a number of national and international law firms to assist them in their analysis of legal fees and costs in ongoing litigation.

5.      I have been accepted as an expert on the reasonableness of attorneys' fees, costs, and settlements in numerous courts and tribunals across the country and around the world, including cases across Pennsylvania and in Philadelphia.  By way of limited example:

- **Diana Gladstone v. Robert Hacker**, in which my expert testimony on the subject of legal fees resulted in 2016's top jury verdict for a contract dispute in the entire Commonwealth of Pennsylvania (federal or state court)[3];

- **Clayton Com. Litig., LLC v. Nkansah**, in which I testified before a Philadelphia jury as to the reasonableness of fees claimed in a breach of contract claim.  The jury awarded over 99% of the fees sought (and I opined were reasonable) and the Hon. Judge Crumlish awarded my fees and costs as part of the final judgment.[4]

- **Trevor Milton v. Nikola Corp.**, an advancement proceeding in which Mr. Milton sought advancement of his legal fees in connection with proceedings brought by the US Department of Justice and Securities & Exchange Commission.  The arbitrators credited my testimony when effectuating reductions for, inter alia, overpriced document review charges; overstaffing; excessive attendance at meetings, hearings, and other events; unreasonable hourly rate increases; and unreasonable expenses.[5]

- **Austin v. Kinzel & Co., LLC**, a malpractice and insurance dispute before the New Jersey Superior Court, in which "[the Court] accept[ed] and adopt[ed] the analysis and

---

[3] Civil Action no. GD12-24308 (Pa. Ct. Com. Pl. All. Cnty.); Legal Intelligencer 2016 Top Verdicts and Settlements, "Top Pennsylvania Verdicts of 2016", p. 21.

[4] No. 200801675 (Pa. Ct. Com. Pl. Sept. 12, 2022 Judgment of the Court).

[5] AAA Case No. 01-21-0004-8978 (Feb. 22, 2022 Fee Order of Panel) (Meyerson, Lyons, and Skelly, Arbs.).  The Panel's Feb. 22, 2022 Fee Order is publicly available at Case 25-10258-TMH (D. Del.) (ECF No. 725-3) and its March, 9, 2022 Fee Order is available at ECF No. 725-4.

4

reasoning of Steven A. Tasher, Plaintiff's expert on counsel fees and expenses as to the reasonableness and amount of the legal fees and expenses sought by Plaintiffs' herein."[6];

- **Duquette v. Lux Capital Mgt. LLC**, a commercial dispute in which an arbitration panel led by former Delaware Supreme Court Chief Justice Steele favorably credited my written opinions in awarding fees and costs to three firms[7];

- **Velva B. v. DeJoy**, a discrimination class action in which the EEOC applied substantial reductions in accordance with my recommendations regarding counsel's lack of billing judgment, overstaffing, deficient time records, and unreasonable expenses[8]; and

- **Appian Corp., LLC v. Pegasystems, Inc.**, a trade secret matter in Virginia, in which the Court awarded $23.6 million in fees following a $2 billion jury verdict, consistent with my opinions, and found that I provided "incredibly detailed and well written affidavits" in support of the fee request, underscoring the historic nature of the largest jury verdict ever in the Commonwealth of Virginia's history.[9]

6.      Other cases that credited or adopted my testimony in some part include (without limitation) Union Square Ltd. v. Mr. Bar-B-Q Prods, LLC., No. 21-CV-11032 (VSB), 2023 WL 6506148, at *1 (S.D.N.Y. Oct. 5, 2023) (affirming arbitration award of fees I opined were reasonable); Lee David Auerbach P.C. v. Delgatto, No. 69908/2015 (N.Y. Sup. Ct. Westchester Cnty. July 7, 2017) (finding "much merit" in my testimony and reducing fees in accordance with them); Fox Paine & Co., LLC v. Equity Risk Partners, Inc., No. 52607/2014 (N.Y. Sup. Ct. Westchester Cnty. Aug. 3, 2021) (describing my testimony as "extremely effective"); AECOM Tech. Servs., Inc. v. Flatiron | Aecom, LLC, 2025 U.S. Dist. LEXIS 40755 (D. Colo. Mar. 6, 2025) and AECOM Tech. Servs. v. Flatiron | AECOM, LLC, 2025 U.S. Dist. LEXIS 44073 (D. Colo. Mar. 11, 2025) (effectuating substantial reductions to fee request based upon numerous issues I

---

[6] No. MRS-L-000281-20, slip op. at 4 (N.J. Super. Ct. Jan. 29, 2024).
[7] AAA Case No. 01-20-0019-3259 (May 6, 2025 Attorney Fee Order) (Platt, Vizcarrondo, Steele, Arbs.). Justice Steele's Attorney Fee Order is publicly available at Lux Capital Management LLC v. Duquette, Index No. 653774/2025 (NYSCEF No. 51).
[8] 2022 EEOPUB LEXIS 2677 (EEOC Nov. 8, 2022).
[9] No. 2020-07216 (Va. Cir. Ct. Fairfax Cty. May 9, 2022) (Hrg. Tr., 8:1).

identified in my declarations); and <u>Kuhlman Elect. Corp. v. Travelers Indem. Co.</u>, No. 251-07-549 (Miss. Cir. Ct. 1st Jud. Dist. Apr. 13, 2022) (jury award of 100% of costs I opined were reasonable).

7.    Examples of law firms that have engaged my services include: ArentFox Schiff; Arnold & Porter; Carlton Fields; Cleary Gottlieb Steen & Hamilton; Clyde & Co.; Farella Braun; Fox Rothschild; Greenberg Traurig; Herrick Feinstein; Holland & Knight; Hunton Andrews & Kurth; Jackson Walker; Jones Day; Kasowitz Benson Torres; Kelley Drye & Warren; King & Spalding; Kirkland & Ellis; McGuire Woods; Mintz Levin; Morgan Lewis,; Morrison & Foerster; Norton Rose Fullbright; Orrick, Herrington & Sutcliffe; Patterson Belknap Webb & Tyler; Paul Weiss; Reed Smith; Venable; and Zuckerman Spaeder.

8.    I have also been retained on behalf of multiple longshore workers in the San Francisco Bay Area who made claims under the Longshore and Harbor Workers' Compensation Act ("LHWCA") to provide expert analysis on fee petitions to various federal agencies (including the Office of Administrative Law Judges and the Benefits Review Board in San Francisco) and the Ninth Circuit Court of Appeals.  Declaration testimony that I provided in such matters was found to "help Petitioner meet the burden of production"[10]

9.    Examples of clients include: ABB Ltd.; Allianz Australia Insurance Ltd.; Aon PLC; Appian Corp.; Benihana of Tokyo; Big E Transportation, LLC; Boeing Company; Chevron-Texaco Company; the City of Modesto (California); E.I. du Pont de Nemours & Co.; Energy Transfer LP (f/k/a New England Gas Co.); First Horizon National Corporation; Ford Motor Company; GATX Rail Austria, GmbH; General Electric Company; Georgia-Pacific, LLC; Honeywell International, Inc.; the Howard Hughes Corporation; HUB International; Lionbridge Technologies, LLC;

---

[10] <u>Robert Broe v. SSA Terminals, LLC</u>, OALJ No. 2018-LHC-00423/00607 at *9 (Feb. 25, 2022) (crediting my knowledge of San Francisco law firm rates); <u>Maverick Qualls v. SSA Terminals, LLC</u>, OALJ No. 2021-LHC-01377 at * 12 (Feb. 15, 2024) ("I conclude that the evidence set forth in the … Tasher Declaration 1 meets the fee petitioner's burden of production under <u>Seachris</u>.").

6

Lumber Liquidators; Nikola, Inc.; Telebrands; the Port of Houston; the San Diego Unified Port District; the State of New Jersey; UBS; Ultimate Kronos Group; the United States Justice Department; the United States Postal Service; X Corp.; and Zurich Insurance Group, Ltd.

10. I have been involved in the evaluation, resolution, and trial of legal fees and costs in litigations, arbitrations, and matters before federal administrative agencies throughout the United States (including Alabama, Arizona, California, Colorado, Delaware, the District of Columbia, Florida, Georgia, Illinois, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Mississippi, Nevada, New Jersey, New Mexico, New York, North Carolina, Pennsylvania, Rhode Island, Tennessee, Texas, Utah, Virginia, Washington, Wisconsin, and the Commonwealth of Puerto Rico) and internationally (including Australia, the Bahamas, the British Virgin Islands, Canada, Hong Kong, Italy, Mexico, Singapore, and the United Kingdom).

11. Before forming Wyatt Partners, I had various roles handling or supervising complex litigation, as well as overseeing legal expenses internally and as a client around the world, including in the Commonwealth of Pennsylvania. Early in my career, as Deputy Attorney General for the State of New Jersey, I personally tried and supervised numerous government civil and regulatory cases in state and federal court involving, inter alia, tort and contract claims brought against the State, election fraud, eminent domain law and other real estate disputes, transportation issues, and environmental matters, including criminal prosecutions for environmental matters.

12. During my tenure as Deputy Attorney General for New Jersey (and as Chief Counsel to the New Jersey Commissioner of Environmental Protection), I brought or supervised numerous enforcement actions against companies and individuals who had engaged in the illegal transportation and disposal of hazardous wastes in sites around the State (including in Atlantic City, Elizabeth, New Brunswick, and the New Jersey Meadowlands). I was part of a team that

7

successfully prosecuted an enforcement action against a group of individuals who perpetrated one of the largest land fraud deals in the history of the State. I argued numerous appellate matters before the Appellate Division and the Supreme Court of New Jersey.

13.    In 1980, I served as an in-house attorney at E.I. DuPont De Nemours & Co. at DuPont's headquarters in Wilmington, Delaware. During my time in the DuPont law department, I supervised a diverse litigation portfolio as a member of Special Litigation section of the law department, which supervised outside counsel on major litigation against the company seeking, inter alia, equitable or injunctive relief, asbestos claims, toxic tort claims, corporate disputes, contract disputes, and major personal injury claims.

14.    In 1983, I became a Partner at the firm of Donovan, Leisure, Newton & Irvine, and in 1988, I became a Partner at the Firm of Willkie Farr & Gallagher. At those firms, I represented companies like AT&T, Ashland Chemical, Arco, Cummins, Inc., Dupont, Texas Instruments, and the Walt Disney Company in transactional or litigation matters, many of which were mass-tort or multi-party matters throughout the United States. I served as counsel of record in numerous matters in the Commonwealth of Pennsylvania, including on behalf of my client, Simon's Wrecking Company, who was accused of transporting waste from Berks, Lyoming, and Tioga Counties to a landfill in Lackawanna County, Pennsylvania, resulting in an often-cited reported decision, Piccolini v. Simon's Wrecking et al., 686 F. Supp. 1063 (M.D. Pa. 1988). I served as national coordinating counsel for Chemical Leaman Tank Lines, a nationwide common carrier transporter (headquartered in Chester County, Pennsylvania), defending environmental and tort claims involving the transportation of hazardous materials and environmental remediation claims arising out of the operation of terminal facilities throughout the United States. I tried numerous cases throughout and at the Third Circuit Court of Appeals.

15.     My firms also served as transactional counsel to the Walt Disney Company in connection with its development of theme parks around the world (including Walt Disney World in Florida, Tokyo Disneyland, and Disneyland Paris).  I worked on the latter two transactions, each of which have collectively generated hundreds of billions in revenue and geographically transformed entire regions.  My firms also served as counsel to financial institutions like Prudential and Shearson and, as a result, I served as transactional counsel for Penn Central Railroad, Nabisco, Tyco, and others.  My responsibilities included due diligence in evaluating the quantum of liabilities of companies they were assisting in acquisitions, divestitures, or financings, and working on transactional documents to effectuate the transactions.  I also performed work on numerous licensing and real estate issues for these clients.

16.     In 1992, I became Vice President and Associate General Counsel at Wyeth and, in 2002, Senior Vice President of its pharmaceutical division (initially located in Radnor, Pennsylvania and later in Collegeville, Pennsylvania).  At Wyeth, I supervised outside counsel on many of the company's most complex and critical domestic and international litigation.  One such matter involved Wyeth's diet drug (Fen-Phen) litigation, one of the largest mass tort cases in U.S. history.  In that Multi-District Litigation, venued in the Eastern District of Pennsylvania[11], 63,000 lawsuits were filed in virtually every state (including thousands of claims in the Commonwealth of Pennsylvania) by plaintiffs who claimed that their use of the product led to moderate to severe pulmonary and cardiac issues.  Wyeth engaged 220 law firms (including many in the Commonwealth of Pennsylvania) and reserved $20 billion to respond to these claims.  I served as one of the chief architects of the defense of the Diet Drug litigation which was, at the time, the largest case to ever come through the Eastern District of Pennsylvania.

---

[11] In re Diet Drugs, MDL No. 1203 (E.D. Pa.).

17.     My responsibilities at Wyeth also included the evaluation and analysis of the quantum and value of actual or potential liabilities, the administration of claims associated with them, and providing status reports to Wyeth's Board of Directors as well as its Law and Regulatory Review Committee (the corporate committee vested with the oversight of all the Company's liabilities), of which I was a member.  These included the evaluation of thousands of claims brought throughout the Commonwealth of Pennsylvania.  At Wyeth, I had responsibility for the supervision of five operating departments of the Company.

18.     In addition to my work at Wyatt Partners, I am the founding Partner at the law firm of Steven A. Tasher, Attorney at Law.  Over the past decade, the firm has primarily provided three sets of services.  First, it serves as transactional counsel to private equity funds, independent sponsors, and other small to medium-sized businesses, and has formed numerous PE Funds and closed several dozen transactions over the past five years.  Second, it provides advice and counsel to officers and directors of businesses regarding professional and fiduciary obligations.  Third, it provides fractional general counsel services to small and medium-sized businesses, managing and supervising the litigation and transactional needs of those companies.  A number of these businesses have been located in eastern Pennsylvania.

19.     From 2017 to 2022, I served as General Counsel of Case Medical, Inc., a global manufacturer and supplier of medical instruments, sterile products, and medical devices. In that capacity, I was involved in and provided counsel to Case Medical, Inc. on issues involving intellectual property, product quality, product recalls, product safety, consumer safety, product labeling, transportation, and distribution. I negotiated Master Supply and Master Quality Agreements with many of the leading global pharmaceutical companies in the world on its behalf. In addition, Case Medical, Inc. assigned me to manage and supervise its portfolio of litigation for

10

claims preserving and defending challenges to the patents, trademarks, trade dress, and other intellectual property rights of its products around the world.

20.    Through a number of nationally-recognized Continuing Legal Education organizations, I teach other lawyers on litigation management, legal ethics, billing issues, attorney-client engagement agreements, issues regarding litigation settlements, and other similar topics. These organizations include the Association of Corporate Counsel, the Practising Law Institute, the Federal Bar Association, Lawline, ClearLaw, and Celesq.

21.    Throughout my career, I have reviewed billions of dollars in legal spend in three capacities: (a) as a provider of legal services around the United States, (b) as a consumer of legal services around the world, and (c) as an expert on the subject of legal services around the world. I have been responsible for actually reviewing and paying for the type of legal services in question here.  My expert testimony has been accepted by courts and tribunals around the world, including throughout the Commonwealth of Pennsylvania as well as in Philadelphia County.

## IV.    INFORMATION CONSIDERED/METHODOLOGY EMPLOYED

### A. Documentation Reviewed and Considered

22.    I reviewed, analyzed, and synthesized voluminous supporting documentation for this Declaration. Information I considered include the Fee Motion and supporting documentation (ECF 466 to ECF No. 466-22); the list of materials attached as **Exhibit C**; and all other materials referenced or cited to herein.  Where the contents of this Declaration are not specifically cited, they represent my understanding based on the entirety of this review process.  To inform my evaluation of Attorney Sonnenfeld's opinions, I reviewed certain other opinions he proffered,

11

including in <u>Dennis v. Jastrzembski</u> ("Sonnenfeld Dennis Decl.")[12]; <u>DeFrank v. Kais</u> ("Sonnenfeld DeFrank Decl.")[13]; and <u>Lucas v. Lowe's Companies, Inc.</u>, ("Sonnenfeld Lucas Decl.").[14]

### B. The "Lodestar Method"

23.    The starting point for evaluating reasonableness begins with the "Lodestar" method, which is calculated by multiplying a reasonable number of hours times a reasonable hourly rate.[15]  Under the Lodestar method, "[t]he prevailing party has the burden of establishing reasonable hours and a reasonable hourly rate for each of the attorneys."[16]  The lodestar is intended to "produce[] an award that approximates the fee the prevailing attorney would have received for representing a paying client who was billed by the hour in a comparable case."[17]

24.    As part of the reasonableness analysis, the amount sought under the lodestar should be reviewed to determine "whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are 'excessive, redundant, or otherwise unnecessary.'"[18]  Such a review requires a "thorough and searching analysis" of the time claimed to ensure that the hours and rates sought are all reasonable.[19]

### C. The "Johnson" Factors

---

[12] Case No. 2:18-cv-02689-JS (E.D. Pa.), dated June 7, 2024.

[13] Case No. 02798 (Court of Common Pleas, Philadelphia County), dated September 4, 2024.

[14] Case No. 190100018 (Court of Common Pleas, Philadelphia County), dated July 28, 2022.

[15] <u>Clemens v. New York Cent. Mut. Fire Ins. Co.</u>, 903 F.3d 396, 400 (3rd Cir. 2018).

[16] <u>Elliot v. US Inspect Grp., Inc.</u>, 2020 WL 2933676, at *2 (E.D. Pa. June 3, 2020), <u>amended</u>, 2020 WL 7705881 (E.D. Pa. July 6, 2020), <u>citing</u> <u>Maldonado v. Houstoun</u>, 256 F.3d 181, 187 (3rd Cir. 2001).

[17] <u>Purdue v. Kenny A. ex rel. Winn</u>, 559 US 542, 551 (2010).

[18] <u>Clemens</u>, 903 F.3d at 400, <u>quoting</u> <u>Pub. Interest Research Grp. of N.J., Inc. v. Windall</u>, 51 F.3d 1179, 1188 (3d Cir. 1995)).

[19] <u>Interfaith Comm. Org. v. Honeywell Int'l, Inc.</u>, 426 F.3d 694, 711 (3rd Cir. 2005) <u>quoting</u> <u>Evans v. Port Auth. Of N.Y. & N.J.</u>, 273 F.3d 346, 362 (3rd Cir. 2001).

25.     The lodestar calculation also should consider other factors set forth in each jurisdiction's Rules of Professional Conduct, as commented or elaborated upon by Courts, often known as the "Johnson Factors,"[20] which are:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.[21]

26.     Analysis of the Johnson Factors is important for several reasons.  The first is that they provide an objective basis and set of factors to conduct the "objective" inquiry that is the reasonableness analysis.  The second is because they provide an objective set of standards, they also provide an insight into the quality of an expert's opinions concerning reasonableness and evaluating the strength of an expert's "why and wherefore" behind any opinions.  For example, it is not enough simply to say that the results were good or a matter was complex—it is incumbent to explain why the matter was objectively complex or difficult compared to other similar matters or the results were objectively better than other similar cases.

## V.    FACTUAL BACKGROUND/STATEMENT OF THE CASE

### A. Mr. Hicks' Underlying Conviction

27.     In November of 2002, Termaine Hicks ("Mr. Hicks") was convicted of rape in Pennsylvania state Court following a six-day trial in connection with a sexual assault which

---

[20] Hensley v. Eckerhart, 461 U.S. 424, 430 (1983), citing Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974)); Souryavong v. Lackawanna County, 872 F. 3d 122, 128 (3rd Cir. 2017) (Johnson factors should be considered in calculating a fee, either in the calculation of the lodestar itself or on the back end for any factors not already subsumed into the lodestar).
[21] Johnson, 488 F.2d at 717-719.

occurred on November 27, 2001.[22]  Mr. Hicks was sentenced to 12.5-25 years of incarceration.[23]

Mr. Hicks subsequently sought to vacate his conviction under the Pennsylvania Conviction Relief

Act (PCRA), and his relief was granted in 2020, along with the District Attorney's Office's motion

to nolle the charges.[24]  Mr. Hicks was released from prison on December 16, 2020.[25]

### B. **Mr. Hicks Sues the City and Certain of its Officers**

28.    On March 15, 2022, Mr. Hicks sued the City and the officers involved in the

investigation and trial, alleging fabrication of evidence, concealing and suppressing evidence,

malicious prosecution, civil rights conspiracy, and municipal liability, as well as state law

malicious prosecution.[26]  Defendants moved to dismiss the case, which the Court generally denied,

other than dismissing a portion of Count IV.[27]

29.    There were generally three groups of defendants: Officers Vinson, Zungolo, and

Ellis ("Vinson defendants"); (2) the Estate of Officer Smith ("Smith"); and (3) the City of

Philadelphia, Detectives Campbell and Webb, Sergeant Vogelman, Lieutenant Hodges, and

Officers Youse and Holmes (the "City Defendants").[28]  The City's Law Department defended the

City itself, along with Officers Campbell, Hodges, Holmes, Vogelman, Webb, and Youse, while

separate counsel (Ahmad Zaffarese LLC) was engaged to represent Officers Ellis, Vinson, and

Zungolo.  I also understand that the law firm of Clark Hill was engaged to represent the estate of

a deceased member of the City's police force due to concern over a conflict of interest.

30.    Each group of defendants moved for Summary Judgment, which the Court partly

granted and partly denied (ECF No. 303).  The Court ruled that qualified immunity barred Mr.

---

[22] See, ECF No. 303 at pp. 1-2, 8.
[23] Id., p. 8.
[24] Id., pp. 9-10.
[25] Id., p. 10.
[26] Id.
[27] Id.; Hicks v. City of Philadelphia, 2023 WL 5278713 (E.D. Pa. Aug. 16, 2023).
[28] Id.

Hicks' <u>Brady</u> claim and Fourteenth Amendment malicious prosecution claim.[29]    The Court

dismissed the fabrication of evidence claim against Detective Webb and the deliberate deception

claim against Officers Ellis and Vinson, but denied dismissal against the other officers.[30]    All other

claims were cleared to proceed to trial, including for municipal liability.[31]

### C. Pre-Trial, Trial, and Post-Trial Processes

31.    Each of the parties filed motions <u>in limine</u> (including, <u>inter alia</u>, by Plaintiff

pertaining to his prior convictions, past work by defense experts, and his ability to question the

Prosecutor in the underlying criminal case and by Defendants pertaining to department policies

and alleged prior bad acts).[32]    The Court granted a number of these motions, while denying a

number of them without prejudice.[33]

32.    Before trial, Mr. Hicks dropped his malicious prosecution claim.[34]    While the

individual City Defendants (Hodges, Holmes, Webb, and Youse) sought dismissal via Summary

Judgment, Plaintiff opposed their dismissal.[35]    Despite this, Plaintiff voluntary agreed to dismiss

all four individual City Defendants shortly before trial, with the Court approving a stipulation of

dismissal on August 9, 2025, "with each party to bear its own fees and costs."[36]

33.    Trial began only two days after the voluntary dismissal of these defendants[37] and

lasted thirteen days, until August 27, 2025.[38]    The jury found in favor of Mr. Hicks on each count,

awarding him $3,000,000 in damages, with the Court entering judgment on August 28, 2025.[39]    On

---

[29] <u>Id.</u>, p. 17.
[30] <u>Id.</u>, p. 45.
[31] <u>Id.</u>
[32] See ECF No. 371.
[33] <u>Id.</u>
[34] <u>Id.</u>, p. 8 ("Mr. Hicks informs us that he has dropped his malicious prosecution claim").
[35] <u>See, ECF No. 256, ECF No. 273.</u>
[36] <u>See, ECF No. 379</u>, p. 1.
[37] <u>See, Trial Transcript Day 1.</u>
[38] <u>See, Trial Transcript Day 13.</u>
[39] <u>See, ECF No. 413</u>, p. 1.

September 25, 2025, Plaintiff filed a Motion for a New Trial on Damages (ECF No. 449). Plaintiff's own counsel described this verdict as, inter alia, "a small fraction of what is typically awarded for similar injuries"[40]; an "exceedingly low damages award"[41]; "plainly inadequate"[42]; only 15% of the "reasonable and typical" benchmark for similar cases[43]; and "so far outside the reasonable range of compensation" for Plaintiff.[44]  Plaintiff even claimed that the jury verdict was below amounts paid by the City to settle similar claims.[45]  Plaintiff asked the Court to order a new trial limited only to damages.[46]  This motion remains pending.

### D.  **Plaintiff Files the Fee Motion; Defendants Seek Discovery on the Fee Motion**

34.     On October 30, 2025, Plaintiff filed a Motion for Attorneys' Fees and Costs (ECF No. 466) (the "Fee Motion"), accompanied by declarations from both members of Plaintiff's legal team (ECF No. 466-8 to ECF No. 466-22) and declarants offering opinion testimony concerning various aspects of the fee petition (ECF No. 466-4 to ECF No. 466-7), including a declaration by fee expert Marc J. Sonnenfeld, Esq. (the "Sonnenfeld Decl.") (ECF No. 466-6).[47]  Plaintiff also provided a copy of the Philadelphia Community Legal Services (CLS) fee schedule ECF No. 466-3) and one page from an hourly rate survey known as the Real Rate Report ("RRR") (See, ECF No. 466-2).  Plaintiff's motion did not include any backup documentation for its cost/expense claims, nor any invoices from experts/vendors sought.

---

[40] ECF No. 449 at p.1.
[41] Id.
[42] Id. at p.8.
[43] Id. at pp, 9, 12.
[44] Id., p. 12.
[45] Id. at p. 12, n.6.
[46] Id., p. 18.
[47] At least certain of Plaintiff's counsel (including Attorney Feinberg) offer some testimony that is not factual, such as opinions regarding the availability of local counsel in Philadelphia to handle Mr. Hicks' case.  See, ECF No. 466-12 at ¶ 20 (opining that "it would have been very difficult, if not impossible, for [Mr. Hicks] to retain civil rights counsel in Philadelphia").

35.     On November 20, 2025, Defendants filed a Motion to Compel materials in connection with the Fee Motion (ECF No. 467) seeking three sets of items; (a) backup documentation, including receipts or invoices, for the costs/expenses and experts/vendors sought; (b) time records provided in their native format; and (c) a list of documentation reviewed and relied upon by the declarants offering opinion testimony.  Plaintiff opposed the Motion to Compel (ECF No. 469) and Defendants replied (ECF No. 470).

36.     The Court generally granted the relief sought (ECF No. 472), ordering Plaintiff to produce by December 18, 2025 (a) additional information concerning the expenses sought (with any unresolved issues being resolved by meet-and-confers and letters to the Court); (b) the original output sheets for the time records; and (c) the underlying materials reviewed and relied upon in forming all opinion declarant testimony and any exhibits/demonstratives to be used at a hearing.

37.     On January 5, 2026, the Court granted Defendants' unopposed request to extend the time for Defendants to file their response to the Fee Motion, with the new deadline being January 20, 2026.[48]  On January 8, 2026, the Court ordered Defendants to narrow its request for additional receipts to "up to 50 receipts/records" for plaintiff to produce "no later than January 13, 2026" with any "further production … requir[ing] a record-specific showing of good cause."[49]  Plaintiff produced a very limited set of receipts on January 13, 2026.

****

---

[48] See, ECF No. 477.
[49] See, ECF No. 479.

## OPINIONS AND ANALYSIS

### VI.    OPINION I: PLAINTIFF'S FEE MOTION DEMONSTRATES A SUBSTANTIAL LACK OF "BILLING JUDGMENT" IN SEVERAL RESPECTS

38.    Before analyzing legal fees, it is important to put those fees into their proper context within the case.  A critical "ingredient" of a reasonable fee is the concept of "Billing Judgment", a phrase that comes from the Supreme Court case Hensley v. Eckerhart, 461 U.S. 424 (1983).  Billing Judgment requires a party seeking fees to treat every dollar it asks a third-party to pay as if that third-party were its own paying client.  Or as the Supreme Court put it: "[h]ours that are not properly billed to one's *client* are also not properly billed to one's *adversary*".[50]

39.    A reasonableness requirement attaches to legal fees being sought from a third-party to ensure that "[a]n award of reasonable attorneys' fees is not a blank check for prevailing parties."[51]  Typically, in the private sector, when clients are being billed by counsel, counsel is expected to review the fees and expenses before sending the bill to the client, and the client is free to reject any amounts the client views as excessive or unreasonable.  But that is not the case where there is functionally no paying client (as is the case here).[52]

40.    As explained by the Third Circuit: "it is the duty of the requesting party to 'make a good faith effort to exclude … hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission.'"[53]  This comports with the fundamental purpose of the lodestar: to simulate "an award that approximates the fee the prevailing attorney would have received for representing a paying

---

[50] Hensley, 461 U.S. at 424 (emphasis in original).
[51] Lijoi v. Cont'l Cas. Co., 2009 WL 10700150, at *4 (E.D.N.Y. Aug. 20, 2009) ("An award of reasonable attorneys' fees is not a blank check for prevailing parties.").
[52] See, McDaniel v. County of Schenectady, 595 F.3d 411, 422 n.7 (2nd Cir. 2010) (noting that in the fee-shifting context, plaintiffs have little incentive to negotiate a market-based rate structure with attorneys because fees are paid entirely by defendants).
[53] Clemens v. N.Y. Cent. Mut. Fire Ins. Co., 903 F.3d 396, 403 (3rd Cir. 2018), quoting Hensley, 461 U.S. at 434.

client who was billed by the hour in a comparable case." Purdue v. Kenny A. ex rel. Winn, 559 US 542, 551 (2010). It is also clear that, here, this did not occur—no effort was undertaken to exclude various charges that no lawyer would dream of passing on to a paying client, but which are being sought from Defendants via Plaintiff's fee application.

41.    This principle is, of course, guided by the fact that a reasonable, paying client wishes to spend the minimum amount necessary to litigate the case effectively.[54] In this context, "reasonableness" is an objective inquiry[55]—grounded in objective principles that look at what a reasonable paying client would be willing to pay on an hourly basis. In my review, I bring over five decades of evaluating what my own clients were willing to pay, as well as what I was willing to pay from my counsel while I was their client at three businesses.

42.    Accordingly, my analysis begins with an examination of Plaintiff's counsel's Billing Judgment. Having been a provider and consumer of legal services in this Commonwealth, as well as an expert evaluating fees for many years, it is my experience that Billing Judgment (or a lack thereof) can be reflected in a number of ways, including: (a) utilization of lean and efficient staffing throughout the matter; (b) thoughtful and proper administration of the workload; and (c) thoughtful reflection on the value of legal services after the fact. As will be demonstrated below, none of this occurred in this matter.

43.    It is in the latter (the reflection on the value of legal services after the fact) that the measurement of Billing Judgment can often be seen, particularly in fee-shifting matters, where Plaintiff's counsel has already become a prevailing party and thus has no incentive to do anything

---

[54] See, Beastie Boys v. Monster Energy Co., 112 F. Supp. 3d 31, 48 (S.D.N.Y. 2015) ("The presumptively reasonable fee boils down to 'what a reasonable, paying client would be willing to pay,' given that such a party wishes 'to spend the minimum necessary to litigate the case effectively.'") (citations omitted).
[55] See, Souryavong v. Lackawanna County, 872 F. 3d 122, 128 (3rd Cir. 2017) ("the lodestar method … is objective") (citations omitted).

19

but maximize its fee recovery. Where I find this is often reflected is in the nature of the expenses that are sought by the prevailing party—are those expenses only those reasonably necessary to get the case to a successful result or did counsel decide to throw everything and anything into the fee petition (often without proper documentation), such as "treats" to celebrate a birthday, high-tech lamp sets, lavish meals at Buddakan, and multiple room service meals in the same evening (as Plaintiff seeks here) to maximize their recovery from the taxpayers?

44.    Having reviewed billions of dollars in legal invoices, it is my experience that a telltale sign of Billing Judgment and case management (or lack thereof) can be found in the nature of the expenses and costs incurred during a litigation. While thankfully, rare, I occasionally do come across prevailing party's counsel that demonstrates such a profound lack of billing judgment by seeking charges that no private attorney would dream of charging to a reasonable paying client, and that no reasonable client would ever pay. I know, because I have served in both roles—as the reasonable paying client and as the counsel charging reasonable paying clients.

45.    There are, generally, four classes of expenses I look for in this evaluation. The first are what I call "phantom" charges—charges that have no apparent connection to the case or are inconsistent with the time records themselves. The second are what I like to call "treats" or "sundries"—these are little personal items where the attorneys treat themselves to little luxuries but are not strictly necessary to winning the client's case. The third are "overhead" charges—these are charges that are either reusable for other clients or are everyday items that counsel would need to buy regardless of the case. The fourth are "lavish" expenses—expenses that are clearly excessive in either degree or nature and no reasonable paying client would agree to pay for them.

46.     I observed all four types of these expenses being sought in this case.  I saw a $72 "b[irth]day treat" by Attorney Cion[56] (Treats); two pricey in-room dinners at the Ritz Carlton for Attorney Freudenberger on the same night, January 25, 2025 (Phantom and Lavish)[57]; a $319.27 dinner at Buddakan on August 16, 2025, a weekend during trial (Lavish)[58]; and a $91.14 "Lamp for A. Green's Hotel Room" (Overhead)[59]; and an attorney—Rogachevsky—charging expenses to attend a deposition on November 29, 2023, when she did not attend a single deposition that day and billed no time to the case that day[60] (Phantom), among other things.  This is not to say that counsel is not free to "treat" itself on its own dime—they are welcome to buy all the $72 "bday treats" and $91 lamp sets and dinners at Buddakan they wish to buy.  But reasonable paying clients would not pay them for these charges, thus they are objectively unreasonable in a lodestar analysis.

47.     What makes these charges demonstrate such a profound a lack of Billing Judgment is the amount of "judgment" that went into these charges being sought.  At first, Attorney Green (a partner at the NSBHF) states that when preparing her declaration listing the expenses being sought, she personally "reviewed the expenditures detailed in these records and rely on those accounting records in making this declaration"[61] and she personally "reviewed and categorized the expenses for reasonableness and compensability."[62]  She also billed four hours for her review.[63]  On its face, these statements demonstrate that she made judgment calls that these aforementioned expenditures were somehow reasonable to ask the Court to award from the City.

---

[56] See, NSB Hicks 03805.
[57] See, NSB Hicks 038105.
[58] See, ECF No. 466-10, p. 23.
[59] See, id., at p. 28.
[60] See ECF 466-19, p. 24 (time records); ECF No. 466-10 p. 30 (expense records); Gaskins Dep. Tr. 2:3-7.
[61] See, Green Decl., ¶ 7.
[62] Id., ¶ 54.
[63] See, ECF No. 466-10, p. 92.

48.     Plaintiff's counsel was given a further opportunity to exercise Billing Judgment after Defendants filed their Motion to Compel (ECF No. 467).  Therein, Defendants identified many of the charges listed here (including the Buddakan dinner, the $92 Lamp for Attorney Green's hotel, and the Ritz Carlton Charges).[64]  Thus, even if Attorney Green erroneously or mistakenly forgot to remove her $91 lamp or the Buddakan charge in good faith at first, Plaintiff now had the opportunity to correct the issue.

49.     In its opposition to the motion, Plaintiff asserted that had Defendants "raised specific questions about [certain] hours or expenses to us" then they "would concede [those charges] should be withdrawn".[65]  However, Plaintiff chose not to withdraw any of the list of expense charges listed in Defendants' Motion to Compel.  At this point, there was no mistake as to Plaintiff's intent to seek unreasonable charges—having been afforded multiple stages to exercise Billing Judgment, the only judgment made by counsel was to seek these unreasonable charges.

50.     Notable to me is the degree to which Plaintiff resisted providing basic documentation for their travel and meal charges—something Plaintiff's counsel knows is an issue because prior courts have reduced their expenses before for the same reason.[66]  Plaintiff's response (that the payment of the expense is somehow proof of the reasonableness)[67] misses the mark: the fact that they spent hundreds of dollars on a stay at the Ritz Carlton that included $112 in bar charges, two room service dinners the same night, and $70 in valet parking charges[68] does not make it reasonable—nor would this have been apparent from Plaintiff's original motion (ECF No. 466-10), listing a $269.99 charge at "The Ritz Carlton" with the only explanation being: "Multiple

---

[64] See, ECF No. 467 at pp. 5-7.
[65] See, ECF No. 469 at p. 4.
[66] See, Rosario v. City of New York, 2023 WL 2523624 *3 (S.D.N.Y. Mar. 15, 2023).
[67] ECF No. 474 at 31:3-18.
[68] See, NSB Hicks 038105.

travel meals & parking for E. Freudenberger".[69]  Plaintiff's production of limited receipts makes clear why Plaintiff's counsel resisted so strongly in providing them in the first place.

51.    Ultimately, it is hard to put a dollar figure on the impact a lack of "Billing Judgment" has in connection with a set of fees and costs.  Having been reviewing attorney bills for over fifty years, one thing that is certain to me is that the impact is not the $91 charged for the lamp or the $72 charged for the "bday treat", as a simple line-item adjustment cannot adjust for a profound lack of billing judgment.  Put another way I see charges for these items, I find it correlates with many other billing issues (such as excessive staffing).

52.    While the impact of a lack of Billing Judgment can never be truly measured or reflected in any one time entry, it is my experience (having prepared and reviewed billions of dollars of legal invoices for over fifty years) that it has an enormous impact on the fees charged, and that can only be remedied via a percentage reduction.  I will address my opinion regarding such a percentage reduction to account for this issue (and other issues) later in this document.

## VII.    OPINION II: PLAINTIFF'S FEE MOTION IS BELOW THE STANDARD OF CARE IN THE WAY OF TIME RECORDS AND DOCUMENTATION

### A.    The Importance of Adequate Documentation / Contemporaneous Time Records

53.    A key starting point to my analysis is to review the quality and accuracy of the time records.  This involves ensuring the time records are accurate, contemporaneous, and provide robust narrative descriptions of the work being performed so that a third-party reviewer (such as a client, carrier, court, or expert) can evaluate the time spent and ensure it was reasonable.

54.    As a general rule, "[a]ny attorney … should keep *accurate and current* records of work done and time spent … [t]here is no excuse for an established law firm to rely on estimates made on the eve of payment and almost entirely unsupported by daily records or for it to expect a

---

[69] ECF No. 466-10 at p. 15.

court to do so."[70]  As both a litigator, deal-attorney, and in-house attorney, I have spent my legal career reviewing and approving payment of legal invoices.  While in private practice, I was responsible for sending out clear, thorough, contemporaneous, and timely invoices to my clients (this included certain fee-shifting matters I undertook on a contingent fee arrangement).

55.    As an in-house counsel for three companies, I was responsible for reviewing and approving these documents as the paying client.  My ability to fulfill my roles under each circumstance depended upon the quality, accuracy, timeliness, and thoroughness of the invoices. It made no difference whether I charged/paid on an hourly basis or on any sort of contingent (or alternative) fee arrangement—neither the client nor the supervisory partner can conduct a fulsome analysis of the invoices without contemporaneous time records.[71]

56.    Sufficiently detailed and high-quality time entries give the client, a third party, and/or the Court evaluating reasonableness of the fees the ability to determine from each entry the nature and scope of the activity, its benefit, whether the entry is appropriately related to and billed to that file, and the reasonableness of the time spent in performing that activity.  Within this context is my experience that original and contemporaneous recordation of time is the most reliable source of information in evaluating legal fees and time entries, for several reasons:

a.    Contemporaneous records are the most accurate recordation of time spent[72];

---

[70] 1 Speiser ATTORNEYS' FEES § 8.3, citing In re Hudson & Manhattan R.R. Co., 339 F.2d 114, 115 (2nd Cir. 1964) (emphasis added).

[71] See, Mary Beth Montera v. Premier Nutrition Corp., 2022 U.S. Dist. LEXIS 190146 at *12 (N.D. Cal. Oct. 18, 2022, citing In re Optical Disk Drive Prods. Litig., 2021 U.S. Dist. LEXIS 171405 (N.D. Cal. Sept. 9, 2021); State Bar of California Arbitration Advisory 2016-02, Analysis of Potential Bill Padding and Other Billing Issues, Mar. 25, 2016 at p.3 ([it is] ("universally acknowledged that contemporaneous records are the best practice").

[72] Young v. Alden Gardens of Waterford, LLC, 30 NE 3d 631 at 651 and 656 (Ill. App. Ct. 2015) ("[Reconstructed estimates] are clearly more susceptible to error and thus more suspect than more properly maintained time records"); D.J. v. City of N.Y., 2012 WL 5431034, *13 (S.D.N.Y. Oct. 16, 2012) ("the reconstructed records she has now submitted are neither reliable nor accurate.").

b.       Contemporaneous time records do not require counsel to recall weeks, months, or years later what an attorney performed on a specific day[73];

c.       Contemporaneous time records do not suffer from bias of the reconstructor(s), since those persons(s) are the ones who have an interest in seeking to maximize their fee award, often after becoming a prevailing party[74];

d.       Contemporaneous time records do not suffer from vague, or block-billed narratives that afford a reviewer little insight into the work performed, thereby possibly hindering assessing whether the time spent and work performed were reasonable[75]; and

e.       It is difficult for a supervisory lawyer to perform his/her required duties under R. Prof. Cond. 5.1-5.3 to review reconstructed bills for reasonableness months or years after the work was performed.[76]

## B.  Issues with the Documentation and Time Records Here

57.      I was asked by the City to look at the time records submitted by Plaintiff's counsel and provide my opinions as to the quality of their submission, particularly the quality of the time records.  In other words, did Plaintiff's submission appear to include high-quality, accurate, and contemporaneous time records?

---

[73] Ramos v. Lamm, 713 F.2d 546, 553 n2 (10th Cir. 1983) ("lawyers who remember spending the entire day working on a case are likely to overstate the hours worked by forgetting interruptions and intrusions unrelated to the case"); Ward v. Brown, 899 F. Supp. 123, 128 (W.D.N.Y. 1995) ("such an after-the-fact reconstruction presents the danger that the attorney's memory, and his estimates of how long it would have taken to perform various tasks, could be faulty").
[74] Mitchell v. City of Warren, 2012 WL 5334133 (E.D. Mich. Oct. 26, 2012) at *4-5 (finding a firm's attempt to reconstruct hours to be inflated on its face" and "not credible").
[75] Id. at *6 (reconstruction of its hours "is inadequate for all the attorneys," partly because the records "only describe the work performed in the most basic of terms.").
[76] Fletcher v. O'Donnell, 729 F. Supp. 422, 428 (E.D. Pa. 1990) (When fee petitions rely on reconstructed time records "[w]ithout good contemporaneous time records, it is difficult to establish whether counsel, in preparing a fee petition, chose not to bill for certain fruitless hours for which a commercial client would not be billed.  This deprives the court of much of the context it requires in considering billing judgment, and it adds to the burdens of the non-moving party.").

58.    In my opinion, the answer is clearly no, with Plaintiff's counsel stating something very revealing on the record during oral argument on Defendants' Motion to Compel (ECF No. 474): "We are going through and *entering the time* generally as it occurs, whether it's at that moment, whether it's at that day, whether it's *within* days or a *few weeks after the fact* as we are going through."[77]  Put simply, there is nothing "contemporaneous" about recording your time "within … a few weeks after the fact".  And this showed in the quality of the time records.

59.    When I examine time records for quality-checking purposes, I look to see if a number of factors are present, including (a) significant quantities of "patterned" or "cut and paste" entries for days on end; (b) a number of deviations between time records and time stamps within transcripts or that fail to match up to something in the record; (c) entries that are repeatedly very round numbers (particularly those always ending in 0.5 or 0.0 increments).[78]  Additionally, I look to see if there are time records that seem to be inflated on their face.  I saw all these hallmarks of problematic time-keeping in this case.  A few examples below (some of which I identified to counsel to use in support of their Motion to Compel) will illustrate.

### C.  Plaintiff's Trial Time Records

60.    One very obvious example is the cut-and-paste trial entries that often use round numbers and sometimes bear no resemblance to the actual trial time on the record in the transcript. The below chart shows the actual start/stop times from August 18-22, 2025, along with the billing records of just five (5) attorneys[79] from the Fee Motion for just their trial attendance time that day:

| Date | Start | Stop | Trial Time | Paras | McCarthy | Cion | Green | Brustin |
|---|---|---|---|---|---|---|---|---|
| 8/18/25 | 9:00 AM | 4:49 PM | 7.8 | 8.5 | 8.0 | 8.0 | 9.5 | 8.0 |
| 8/19/25 | 8:49 AM | 4:58 PM | 8.1 | 8.5 | 8.0 | 8.0 | 9.0 | 8.0 |
| 8/20/25 | 8:46 AM | 4:36 PM | 7.8 | 8.5 | 8.0 | 8.0 | 9.5 | 8.0 |

---

[77] ECF No. 474 at 36:24-37:3 (emphasis added).
[78] Industry standard is to bill in 6-minute increments, or 15-minute increments.
[79] Plaintiff staffed far more each day.  On 8/21/25 and 8/22/25 for example, nine timekeepers billed for trial attendance.

| 8/21/25 | 9:00 AM | 2:44 PM | 5.7 | 8.0 | 8.0 | 8.0 | 8.5 | 8.0 |
|---|---|---|---|---|---|---|---|---|
| 8/22/25 | 8:54 AM | 4:57 PM | 6.0 | 6.0 | 8.0 | 8.0 | 5.5 | 6.0 |

61.     As the Court can see, many of the timekeepers just billed a flat time amount every day with no deviation (like Cion and McCarthy), and every one of the timekeepers exceeded the transcript record time on 8/21/25 by at least two hours (in Attorney Green's case, by nearly three hours).  These numbers also do not account for there being a lunch break (on August 21, for example, lunch lasted from 12:30 PM to 1:37 PM).[80]  The overly round numbers (that frequently repeat every day) and the obvious discrepancies with the time in the transcript record are hallmark indicators of non-contemporaneous time records.[81]

### D. Grace Paras' Trial Time

62.     A second example is that of Grace Paras, an associate who did not appear on the record during a single day of trial.  Ms. Paras not only bills identical time entries (as described above) for the entire first week of trial (regularly charging exactly 8.5 hours each day from 8/11-8/15 for attending the trial plus exactly 9.0 hours each day for trial prep), but during the middle of the trial she began to charge multiple days of over 20 hours.  The following shows her time entries combined for prep and attendance at trial for the week of January 18:

| Date | Trial Prep | Attendance at Trial | Total Time Claimed |
|---|---|---|---|
| 8/18/25 | 9.0 | 8.5 | **17.5** |
| 8/19/25 | 14.0 | 8.5 | **22.5** |
| 8/20/25 | 12.0 | 8.5 | **20.5** |
| 8/21/25 | 12.0 | 8.0[82] | **20.0** |
| 8/22/25 | 12.0 | 6.0 | **18.0** |

---

[80] See, Day 9 Tr. at 67:20-21.

[81] I was informed that late on Friday, January 16, 2026 (the last business day prior to the due date of Defendants' opposition), Plaintiff belatedly modified certain time descriptions.  My analysis was already complete, and the modification of certain time narratives reinforces the inaccuracy and unreliability of their time records.

[82] The time stamps of the trial transcript for 8/21/25 show the court convened at 9:00 AM and was dismissed at 2:44 PM, or only 5.7 hours of trial time on this day, leaving a multi-hour discrepancy in this time entry—with more than a one-hour lunch break, so the actual in-court time was only 4.6 hours.

63.     Not only are these very round numbers (suggesting a *post-hoc* creation of these time records), but if this set of time records is to be believed, Ms. Paras averaged 19.7 hours of billing time during this week, with back-to-back 22.5 and 20.5 hour days where she presumably did not utilize the restroom, sleep, eat, or perform any other task, and even that defies credibility.

64.     I note that several of these examples were highlighted in Defendants' Motion to Compel (ECF No. 467) and I reviewed Plaintiff's opposition (ECF No. 469) to see if Plaintiff's counsel offered any explanation for these discrepancies, which Plaintiff did not do.

## E.  Deposition Time Discrepancies

65.     Another set of tasks where these discrepancies can be seen are depositions, where the amount actually claimed often differed (sometimes wildly) with the time stamps in the transcript.  The following table contains a dozen examples of this:

| Depo. | Date | Start | Stop | Time | Invoiced | Timekeeper |
|---|---|---|---|---|---|---|
| Vinson | 7/24/23 | 9:43 AM | 7:05 PM | 9.4 | 10.0 | Harris/Romo/Feinberg |
| Ellis | 7/25/23 | 9:53 AM | 5:32 PM | 7.7 | 9.5 | Harris/Feinberg/Freudenberger |
| Holmes | 9/26/23 | 10:00 AM | 1:13 PM | 3.2 | 4.0 | Green |
| Youse | 10/13/23 | 9:05 AM | 11:47 AM | 2.7 | 6.0 | Green |
| Gaskins | 11/29/23 | 10:12 AM | 12:28 PM | 2.25 | 3.0 | Feinberg |
| Murphy | 1/24/24 | 10:10 AM | 5:35 PM | 7.4 | 9.0 | Taylor |
| Taylor | 3/7/24 | 10:02 AM | 2:19 PM | 4.3 | 5.0 | Green |
| Ty. Hicks | 4/3/24 | 10:47 AM | 1:16 PM | 2.5 | 3.0 | Romo |
| Pendergrast | 5/13/24 | 11:01 AM | 1:52 PM | 2.8 | 3.5 | Taylor |
| Kelly/Hewitt | 6/7/24 | 10:04 AM 12:50 PM | 12:39 PM 2:37 PM | 4.4 | 5.0/5.5 | Taylor/Romo |
| Fischer | 9/11/24 | 10:05 AM | 1:30 PM | 2.4 | 4.7 | Freudenberger |
| Koenig | 9/30/24 | 10:04 AM | 1:42 PM | 3.4 | 4.8 | McCarthy |

66.     As with the trial, these entries are often round numbers (10.0, 3.0, 5.0, 4.0) that bear little resemblance to the record time, each at least 30 minutes higher than the time on the record

28

(and with some over an hour more). The overly round numbers and the obvious discrepancies with the time in the transcript record are hallmark indicators of non-contemporaneous time records.

67. One issue precluding a more fulsome evaluation of this issue is that certain timekeepers block-billed (i.e. lumped multiple unrelated tasks into one entry with no further breakdown of their time). While block-billing is not per se unreasonable, where it masks inaccurate or unreasonable billings, it precludes a precise analysis of those issues (as here, where it precludes a precise analysis of the accuracy of the time records). Attorney Freudenberger was the worst offender, as two examples illustrate: (a) the Lee deposition (2/27/24), which lasted 5.3 hours, she block-billed 9.0 hours for "Victim dep; follow-up team strategy meeting; call with Termaine; pre-dep prep"; and (b) the Palmback deposition (9/25/24), which lasted 4.3 hours, she block-billed 9.8 hours for "Palmbach dep; letter to court re audio test; Mitchell prep". Because she block-billed, there is no way to evaluate the accuracy of her deposition attendance time.

68. One other observation is that time entries were sometimes billed on the wrong day. For example, Attorney Feinberg billed 9.0 hours to attend the Vogelman deposition on August 2, 2023[83], when the deposition itself took place on August 3, 2023. Attorney Cion also billed her attendance at the March 25, 2025 Oral Argument on March 24, 2025.[84] Typically, when time is contemporaneously recorded, the recordation takes place on the same day so there is no mistake as to what date someone attended a deposition.

### F. Katrina Rogachevsky Phantom Deposition Attendance

69. I observed numerous billings by Attorney Rogachevsky for deposition attendance that did not match the record. For example, Attorney Rogachevsky billed to attend the following depositions, but appeared nowhere on the record or anywhere in the transcript for any of them:

---

[83] See, ECF No. 466-12, p. 18.
[84] See, ECF No. 466-17, p. 14.

- Ellis Deposition (7/25/23): 4.0 hours to "Attend deposition of R. Ellis";

- Nelson Deposition (12/15/23): 0.8 hours to "Attend Nelson Deposition";

- Vinson Deposition (7/24/23): 6.0 hours to "Attend deposition of M. Vinson";

- Vogelman Deposition (8/3/23): 10.5 hours to "Assist with deposition of D. Vogelman";

- Webb Deposition (12/1/23): 2.5 hours to "Attend Webb deposition".

70.     As with these other issues, the discrepancy between the actual record and the time records is a further reflection that these narratives are neither accurate nor contemporaneous.

## G. March 24, 2025 Oral Argument

71.     I reviewed the time records from the March 24, 2025 oral argument, which was notable for the vast time discrepancies between timekeepers who billed for their attendance. The following table summarizes the time records for each of the seven timekeepers seeking time for this court appearance:

| Date | Billed | Narrative |
|---|---|---|
| A. Taylor | 8.5 | "Attend Hicks Oral Argument" |
| A. Green | 8.5 | "Court appearance for SJ and Daubert arguments" |
| E. Freudenberger | 8.0 | "Hearing prep; court hearing; post-hearing feedback with team" |
| K. Rogachevsky | 8.0 | "Attend oral argument" |
| A. Hoffman | 8.0 | At SJ/Daubert hearing w/ Emma, Amelia, Katie C., Katrina, Alfred, at times Peter |
| P. Neufeld | 6.0 | "Oral argument on Daubert and summary judgment" |
| G. Harris | 3.0 | "In court for oral argument" |
| J. Feinberg | 3.0 | "In court for oral argument" |

72.     The vast discrepancies for just the court appearance are notable, with Attorneys Feinberg and Harris billing only 3.0 hours for their appearance but Attorney Green billing 8.5 hours for it. Notably, Attorney Green billed a separate time entry that day for her preparation time, so the obvious answer that she block-billed preparation time into her entry cannot be the answer. The audio file of the hearing is 6.3 hours long, meaning that five of the eight timekeepers who billed solely for their attendance billed two or more hours longer than the hearing lasted.

30

73.    As with many of the other situations, the overly round numbers (3.0, 6.0, 8.0) that generally bear no time resemblance to each other or the record are hallmark indicators of non-contemporaneous time records.

### H. Phantom Expense Charges

74.    One final phenomenon that is thankfully rare in the legal industry, but comes to pass only in instances where the time and expense records are below the quality and standard of care expected of counsel are what I refer to as "phantom" charges (these are expenses that have no apparent connection to the case or are inconsistent with the time records themselves).  I did observe examples of such "phantom" charges here, although the lack of documentation and receipts for expenses made it difficult to evaluate this issue in its entirety.

75.    For example, there is an expense charge for "Katrina" [Rogachevsky] "to Dep" and "from Dep" on November 29, 2023 ($16.76 and $15.95 respectively).  Attorney Rogachevsky billed no time on that date.  The only deposition which took place that date was Tomekia Gaskins, and the only counsel on the record representing the Plaintiff was Attorney Feinberg.[85]

76.    Another example can be seen with Sara Morrison, who is Plaintiff's counsels "Office Manager"[86], who billed only a limited amount of time to the case and billed no time after January 19, 2024.[87]  However, there are a number of "phantom" expense charges by Sara Morrison well after that date, including a train ticket on 8/6/25[88], a $56.95 car service from the train on 8/6/25[89], and a Wawa charge on 8/6/25[90], all dates on which she billed no time to the case.

---

[85] Gaskins Dep. Tr. 2:3-7.
[86] https://nsbhf.com/gs_team/sara-morrison/.
[87] See, ECF No. 466-9, p. 94.
[88] See, ECF No.4 66-10 at p. 35.
[89] Id. at p. 36.
[90] Id.

77.     As with these other issues, the discrepancy between the actual record and the time records is a further reflection that these narratives are neither accurate nor contemporaneous.  I include other examples below in a section dealing with the expenses more directly, including meals being misrepresented as to what they were, multiple meals charged by the same person on the same day, and other similar charges.

**I.   Conclusion**

78.     All of the foregoing leads me to the conclusion that the time records submitted by Plaintiff's counsel were neither contemporaneous (as they said on the record, often recorded weeks after the fact) nor accurate—often deviating from the time stamps by substantial amounts.

79.     In my opinion, this warrants a substantial reduction of the hours claimed.  I shall address this issue subsequently by recommending an aggregate percentage reduction.

**VIII.   OPINION III: PLAINTIFF'S SUBSTANTIAL OVERSTAFFING OF THE CASE**

**A.   Context of Plaintiff's Overstaffing of the Litigation**

80.     A critical aspect of both Billing Judgment and a reasonable fee is ensuring that a matter is leanly and efficiently staffed.  This is because the "more lawyers representing a side of the litigation, the greater the likelihood will be for duplication of services".[91]  The problem with not having efficient staffing on a case (as is the case with Plaintiff's counsel here) is that it inevitably leads to "overlap and duplication".[92]

81.     Here, Plaintiff seeks fees for thirty-eight (38) timekeepers, including (a) six (6) Partners/Of Counsel[93]; (b) two (2) Counsel[94]; (c) five (5) Associates[95]; (d) two (2) Staff

---

[91] Ramos v. Lamm, 713 F.2d 546, 554 (10th Cir. 1983).

[92] Thayer v. City of Worcester, 2017 U.S. Dist. LEXIS 46644 at *9 (D. Mass. Mar. 29, 2017) (high "number of attorneys utilized" led to "overlap and duplicative effort").

[93] Brustin, Feinberg, Freudenberger, Green, Hoffman, and Neufeld.

[94] Balkissoon and McCarthy.

[95] Cion, Harris, Paras, Rogachevsky, and Romo.

Attorneys[96]; (e) twelve (12) Paralegals/support staff[97]; and (f) eleven (11) Interns/Clerks.[98]  This is an excessive number of timekeepers for a matter of this nature, complexity, and needs.[99]

82.    Plaintiff's counsel has drawn several comparisons with Dennis v. Jastrzembski, 2025 WL 1582452 (E.D. Pa. 2025)[100], but Plaintiff's own fee expert noted in his Dennis opinions that Dennis was handled by just three timekeepers for a matter of first impression before the Third Circuit and a verdict more than five times this case ($16 million vs. $3 million).[101]  This discrepancy reinforces that the staffing model employed by Plaintiff's counsel was excessive on its face.  Nevertheless, I examined the staffing on a detailed micro-level to evaluate whether the overstaffing affected the fees for individual tasks or projects.

83.    My review reveals the overlap and duplication from such an excessive number of timekeepers here manifested in several ways, including: (A) the lack of a core team and substantial number of transitory "ancillary" timekeepers; (B) overstaffing of specific projects or events; (C) multiple attendance at hearings or events; (D) excessive internal conferencing; (E) excessive expenditures arising from the excessive staffing; and (F) duplication of efforts between firms.  I take each of these issues in turn:

### B.  Lack of a Core Team and "Ancillary" Timekeepers

84.    Part and parcel of the excessive nature of the staffing here was the significant number of "ancillary" timekeepers, which are timekeepers who bill time to the file for short stints. In my experience, such ancillary timekeepers are often symptoms of an overstaffed case and they

---

[96] Fetrow and Shah.
[97] Acevedo, Ajayi, Anand, Arevalo, Duran, Geng, Manning, Park, Parks, Quarterman, Soto-Brito, and Taylor.
[98] Benvenutti, Borden, Brink, Duggins, Engel, Klein, McMahon, Morrison, Opong-Wiredu, Stone Fenn, and Wali-Ali.
[99] See, Themis Capital v. Democratic Republic of Congo, 2014 WL 4379100 *5 (S.D.N.Y. Sept. 4, 2014) ("First, some reduction is merited in light of the sheer number of [48] attorney timekeepers who billed time on the case" over five year stretch).
[100] See, ECF No. 466 at pp. 12, 25, 37.
[101] See, Sonnenfeld Dennis Decl., ¶¶ 17-19, 27.

tend to generate excessive and unnecessary fees, as shuttling in non-core, ancillary timekeepers with little to no experience on the case for short stints tends to be inefficient and increase costs unnecessarily.[102]  This is particularly so when they are performing tasks being done by others, or where their tasks are generally non-substantive in nature.

85.    To illustrate, in the <u>Dennis</u> matter, Attorney Sonnenfeld carefully analyzed the staffing and noting how "impressed" he was by the work being done by only three timekeepers, with lead counsel handling 90% of the work by himself, showing "there was no overstaffing or unnecessary duplication of efforts" in that case.[103]  The contrast is stark—here, even the top eight timekeepers[104] did not come close to 90% of the hours, their combined hours total only 72.9.% of the overall fees, hardly a model of efficiency.  But this is what happens when everyone is touching every litigation task (as outlined below) and no core team forms.

86.    Here, out of the 38 timekeepers whose time is sought by Plaintiff's fee motion, there were 23 timekeepers who incurred under 225 hours on the case (1.5% of the overall hours generated), but because there were so many of them, they collectively generated over 1,750 hours.[105]  This was inefficient and wasteful staffing.  Adding more timekeepers to a case, as Plaintiff's did here, rather than staffing it with a lean, dedicated team, generates unreasonable fees for shuttling in new timekeepers for short stints and leads to duplication and wasted time on internal conferences and meetings.  It also means fewer persons have full knowledge of the matter, and more team members must be included in decision-making, producing further inefficiencies.

---

[102] <u>See</u>, <u>Themis Capital v. Democratic Republic of Congo</u>, 2014 WL 4379100 *6 (S.D.N.Y. Sept. 4, 2014) (objecting to ancillary timekeepers and removing anyone who billed less than 25 hours, or 34/48 timekeepers); <u>In re Jefsaba, Inc.</u>, 172 B.R. 786, 801 (Bankr. E.D. Pa. 1994) (objecting to adding new transitory timekeepers).

[103] <u>Sonnenfeld Dennis Decl.</u>, ¶ 18.

[104] Brustin, Hoffman, Freudenberger, Green, Rogachevsky, Paras, Romo, and Cion, who billed a combined 10,500.2 hours out of the total 14,401.3 claimed hours (72.9%).

[105] A schedule of these timekeepers and their incurred hours is attached as **Exhibit D**.

Thus, by divvying up the work across so many unnecessary timekeepers, Plaintiff's Counsel produced significant inefficiencies and waste, which no reasonable paying client would tolerate.

87.    A review of the substance of the work by these 24 timekeepers further reinforces their ancillary nature, as much of their work was either duplicative of work performed by others, generally non-substantive, or overdone.  For example, many of these ancillary timekeepers were law students performing what is inherently legal work that was unquestionably excessive:

- One example is Nayzak Wal-Ali (128.8 hours), a non-lawyer intern, who was the eighth person billing to attend the Vinson Deposition (7/24/23), eighth person billing to attend the Ellis Deposition (7/25/23), and eight person billing to attend the Vogelman deposition (8/3/23).  A lawyer then spent nearly 23 hours digesting the Ellis deposition (Attorney Romo).

- Another example is Liel Klein (199.8 hours), also a non-lawyer intern, who billed 47.0 hours digesting the Pendergrast Deposition (which lasted less than 8 hours over two days), 53.2 hours digesting the Melinek Deposition (a deposition which took only 9.4 hours), 14.1 hours digesting the Clark Deposition; and 12.2 hours digesting the Taylor deposition (which only took 4.7 hours).  The time spent digesting these depositions was excessive and unreasonable.

- Another example is Miles Quarterman (33.5 hours), also a non-lawyer intern, who billed 17.9 hours digesting the Gaskins deposition (which only lasted about 2.3 hours) and 14.9 hours digesting the McClendon Deposition (which only lasted about 4 hours).  The time spent digesting these depositions was excessive and unreasonable.

- Another example is James Benvenutti, (110.7 hours), also a non-lawyer intern, who billed 31.1 hours digesting the Hodges deposition (which only lasted about 9 hours), 24.5 hours digesting the Campbell deposition, 24.2 hours digesting the Murphy Deposition; and 15.8 hours digesting the Dupre Deposition (which only lasted about 3 hours).  The time spent digesting these depositions was extraordinarily excessive and unreasonable.

- Another example is Ariel Manning (204.6 hours), also non-lawyer intern, who billed 80.5 hours digesting transcripts that are not named (her narratives consist of "Digesting, Deposition Digest, Digest, Digest of Deposition transcript, "Continued digesting of deposition transcript", and "Review and revise digest").  This appears excessive on its face and this narrative description provides no insight into the nature of the work or its reasonableness.

- Another example is Ellen Brink (26.4 hours), also a non-lawyer intern, who billed 10.6 hours digesting a deposition (the Vinson deposition) that a lawyer (Attorney Romo) was also digesting, and another 15.8 hours digesting the Hicks deposition, which was also being digested by a paralegal (Soto-Brito).

35

- Another example is Deb Engel (58.4 hours), also a non-lawyer intern, who billed 12.4 hours digesting "Dep II" with no further information.

- Another is Sara Morrison, the firm's "Office Manager", who billed 27.8 hours, most of which was spent on the description of "DOC calls review"[106]. I note that it is highly irregular to charge paying clients for time billed by an "Office Manager".

- Another example is Dakota Stone Fenn (14.2 hours), also a non-lawyer intern, whose only time entries consist of "Audio Review" with no further description of the work performed.

- Another example is Ty Parks, a paralegal who billed a total of 7.2 hours for team meetings and one blank time entry on 2/23/21. Ty Parks' meetings/calls were generally duplicative, such as a 3/26/21 time entry attending a "call with Client" for which Attorneys Green and Fetrow also billed.

- Another example is Olay Ajayi, a paralegal who billed only two time entries (one to meet and one to perform redactions).

- Another example is Lucia Geng, a paralegal who billed a grand total of 0.5 hours to the entire case to produce photos.

88.    Two other "ancillary" timekeepers worth noting are Grace Harris, whose time I will address in a later portion of this section, and Peter Neufeld, who billed 99.6 hours to the case (plus 7 hours of travel time).

a.    Based upon my review of Attorney Neufeld's time, he was a "passive" biller (someone whose time is either an additional timekeeper at meetings, "oversight" of the work product of others—another set of eyes to look at documents other timekeepers already reviewed, or an "observer"—someone who sits in the back of the Courtroom at hearings or trial and observes).

b.    Of Attorney Neufeld's non-travel time, nearly 50 of his hours were just spent conferring with multiple colleagues (for example, on July 27, 2023, he was one of

---

[106] https://nsbhf.com/gs_team/sara-morrison/.

36

ten timekeepers billing to attend an internal conference (the other timekeepers are identified by initials as "AG, EF, KR, JF, GH, NWA, GR, EC, AE").[107]

      c.      Most of Attorney Neufeld's remaining time was either "attending" trial or arguments, but for none of these did he appear on the record, sit at counsel's table, question a single witness, take a single deposition, make a single argument on the record, or actively prepare a single pleading.

      d.      Additionally, Attorney Neufeld's meeting entries demonstrate the sheer number of timekeepers that were participating in these endeavors, including his entry on 7/27/23, where he was the tenth timekeeper to participate in a deposition-related meeting; 6/23/23, where a total of seven timekeepers participated in a consultation with a pathologist; and 9/12/23, where his attendance yielded a total of six participants discussing forensic evidence. Put simply, Attorney Neufeld is the very definition of an ancillary timekeeper, whose time was duplicative of others, particularly for someone seeking $1,100 per hour at New York rates.

      e.      While I understand the potential value of having a senior member of the firm providing some input, the amount of time he spent as a "passive" timekeeper was excessive, particularly in light of the significant participation of other senior attorneys (such as Attorneys Brustin, Freudenberger, Green, and Hoffman).

89.      It is the area of ancillary timekeepers that the importance of Billing Judgment is paramount. When I was in private practice and sent bills to a client, I always looked to see what timekeepers contributed little to no value to the case and wrote that time off before sending the bill to the client. Similarly, when I advise counsel for plaintiffs in other fee matters, I always do the

---

[107] See, ECF No. 466-20, p. 15.

same thing—take a cold and hard look at the time records and advise them to write off some ancillary timekeepers as part of their required Billing Judgment. But it is clear that no Billing Judgment occurred, with Plaintiff's counsel seeking excessive and unreasonable fees for these ancillary timekeepers that contributed little to the case and duplicated work performed by others.

90.    It is my opinion that the time sought for these ancillary timekeepers was excessive and unreasonable, and often duplicative of time already spent by others. A reasonable paying client would not pay for the time of these timekeepers (with one exception). I therefore adjust the time for all of these timekeepers entirely, except for that of Attorney Neufeld. While I believe Attorney Neufeld's time was generally excessive and duplicative of work by others, I do understand the potential value of occasional input from a senior attorney (and paying clients would pay for limited participation/oversight of such a senior partner, although not to the degree here). Therefore, I recommend a 50% reduction in his hours, and 100% reduction in the hours of the remaining ancillary timekeepers.

## C. Overstaffing of Projects, Litigation Tasks, and other Events

91.    Once I saw there was a facial problem with the staffing on a macro level, I set about to review the staffing on a "micro" level by reviewing the key tasks performed to determine the root cause of this staffing problem. My review leads me to the conclusion that the staffing on a micro-level is also a problem. When I considered the staffing of a series of tasks performed, in every instance, the staffing was excessive. Several examples include:

- Complaint: no less than seven timekeepers billed for work on this project (Duran, Feinberg, Fetrow, Green, Hoffman, Romo, and Shah). Additionally, Attorney Neufeld did not expressly bill obvious time to this pleading but was engaging in team meetings and calls in February/March 2021 with colleagues who were specifically working on it (e.g., Attorney Green).

- Motion to Dismiss: no less than seven timekeepers billed for work on this project (Duran, Feinberg, Green, Harris, Hoffman, Romo, and Shah).

- Sanctions/Show Cause re: Scream Test: no less than nine timekeepers billed for work responding to the Court's Order to Show Cause and ultimate sanction against Plaintiff's counsel (Balkissoon, Brustin, Feinberg, Freudenberger, Green, Harris, Hoffman, McCarthy, and Rogachevsky) regarding the September 2024 scream test.

- Daubert Motions: No less than twelve timekeepers worked on the preparation of Daubert motions (Balkissoon, Cion, Feinberg, Freudenberger, Green, Harris, Hoffman, Manning, McCarthy, Paras, Rogachevsky, and Taylor). Attorney Neufeld did not bill obvious time to the motions but did attend the oral argument on the motions.

- Motions for Summary Judgment: no less than fifteen timekeepers billed for work on this project (Ajayi; Balkissoon; Brustin; Freudenberger; Green; Harris; Hoffman; Manning; McCarthy; McMahon; Neufeld; Paras; Park; Rogachevsky; and Taylor).

- Motion for New Trial: no less than ten timekeepers billed for work on this project (Balkissoon; Brustin; Cion; Feinberg; Green; McCarthy; Paras; Park; Rogachevsky; and Taylor).

- Opening Fee Application: other than timekeepers who solely billed to prepare a declaration of their time, no less than thirteen timekeepers billed for work on this project (Balkissoon, Brustin, Cion, Feinberg, Freudenberger, Green, Harris, Hoffman, McCarthy, Paras, Park, Rogachevsky, and Taylor).

92.     With each of these, the overstaffing was simply unnecessary and excessive, and contributed to duplication of effort on the part of Plaintiff's counsel. In my opinion, this resulted in a lodestar amount sought that is far greater than it should be.

### D. Multiple Attendance at Hearings, Depositions, and Trial

93.     Plaintiff's counsel overstaffed hearings, depositions, and the trial (the latter being the poster-child for excessive staffing, with Plaintiff's counsel averaging 9.23 timekeepers per day to prepare for and attend the trial). The following table lists each trial day, along with the number of timekeepers Plaintiff's counsel is billing for recovery (and their identities), along with the number of timekeepers who actually appeared on the record that day (along with their identities):

| Date | Day | Billed | Timekeepers Who Billed | Record | Who is On Record |
|------|-----|--------|------------------------|--------|------------------|
| 8/11/25 | 1 | 10 | Brustin, Cion, Freudenberger, Green, McCarthy, Neufeld, Paras, Park, Rogachevsky, Taylor | 4 | Brustin, Feinberg, Freudenberger, Green |
| 8/12/25 | 2 | 10 | Brustin, Cion, Freudenberger, Green, McCarthy, Neufeld, Paras, Park, Rogachevsky, Taylor | 3 | Brustin, Freudenberger, Green |

| | | | | | |
|---|---|---|---|---|---|
| 8/13/25 | 3 | 10 | Brustin, Cion, Freudenberger, Green, McCarthy, Neufeld, Paras, Park, Rogachevsky, Taylor | 3 | Brustin, Freudenberger, Green |
| 8/14/25 | 4 | 9 | Brustin, Cion, Freudenberger, Green, McCarthy, Paras, Park, Rogachevsky, Taylor | 3 | Brustin, Freudenberger, Green |
| 8/15/25 | 5 | 9 | Brustin, Cion, Freudenberger, Green, McCarthy, Paras, Park, Rogachevsky, Taylor | 3 | Brustin, Freudenberger, Green |
| 8/18/25 | 6 | 9 | Brustin, Cion, Freudenberger, Green, McCarthy, Paras, Park, Rogachevsky, Taylor | 4 | Brustin, Freudenberger, Green, McCarthy |
| 8/19/25 | 7 | 9 | Brustin, Cion, Freudenberger, Green, McCarthy, Paras, Park, Rogachevsky, Taylor | 4 | Brustin, Freudenberger, Green, McCarthy |
| 8/20/25 | 8 | 9 | Brustin, Cion, Freudenberger, Green, McCarthy, Paras, Park, Rogachevsky, Taylor | 4 | Brustin, Freudenberger, Green, McCarthy |
| 8/21/25 | 9 | 9 | Brustin, Cion, Freudenberger, Green, McCarthy, Paras, Park, Rogachevsky, Taylor | 4 | Brustin, Freudenberger, Green, McCarthy |
| 8/22/25 | 10 | 9 | Brustin, Cion, Freudenberger, Green, McCarthy, Paras, Park, Rogachevsky, Taylor | 5 | Brustin, Cion, Freudenberger, Green, McCarthy |
| 8/25/25 | 11 | 9 | Brustin, Cion, Freudenberger, Green, McCarthy, Paras, Park, Rogachevsky, Taylor | 3 | Brustin, Freudenberger, Green |
| 8/26/25 | 12 | 9 | Brustin, Cion, Freudenberger, Green, McCarthy, Paras, Park, Rogachevsky, Taylor | 3 | Brustin, Freudenberger, Green |
| 8/27/25 | 13 | 9 | Brustin, Cion, Freudenberger, Green, McCarthy, Paras, Park, Rogachevsky, Taylor | 4 | Brustin, Freudenberger, Green, McCarthy |

94.    This level of staffing at the trial is excessive and unreasonable on its face. However, Plaintiff's counsel's staffing of the trial was not an isolated issue. Plaintiff's counsel routinely overstaffed other hearings and events, particularly a number of depositions.

95.    The following table lists the eight timekeepers who "billed" to attend the Vinson Deposition on 7/24/23 (Attorneys Feinberg, Freudenberger, Green, Harris, Neufeld, and Romo appear on the record and only Attorneys Freudenberger, Green, and Romo spoke)[108]:

| # | Name | Billed | Narrative |
|---|---|---|---|
| 1 | Feinberg | 10.0 | "Vinson deposition" |
| 2 | Freudenberger | 9.7 | "Vinson prep; wrap-up discussion; Vinson deposition" |
| 3 | Green | 9.5 | "Attendance at Vinson deposition" |

---

[108] <u>Vinson Dep. Tr.</u>, 2:1-3:18.

| # | Name | Billed | Narrative |
|---|---|---|---|
| 4 | Harris | 10.0 | "Vinson deposition" |
| 5 | Rogachevsky | 6.0 | "Attend deposition of M. Vinson" |
| 6 | Romo | 10.0 | "Vinson dep + dep prep" |
| 7 | Taylor | 9.5 | "Virtually attend Vinson & Ellis deposition" |
| 8 | Wali-Ali | 5.0 | "Attend Vinson deposition" |

96. The following table lists the eight timekeepers who "billed" to attend the Ellis Deposition on 7/25/23 (only Attorneys Feinberg, Freudenberger, Green, Harris, and Romo appear on the record and only Attorneys Freudenberger and Green spoke[109]):

| # | Name | Billed | Narrative |
|---|---|---|---|
| 1 | Feinberg | 9.5 | "Ellis Deposition" |
| 2 | Freudenberger | 9.5 | "Ellis Deposition" |
| 3 | Green | 8.0 | "Taking "Ellis Deposition" |
| 4 | Harris | 9.5 | "Ellis Deposition" |
| 5 | Rogachevsky | 4.0 | "Attend deposition of R. Ellis" |
| 6 | Romo | 8.5 | "Ellis dep prep and depo" |
| 7 | Taylor | 7.0 | "Virtually attend Vinson & Ellis deposition" |
| 8 | Wali-Ali | 8.0 | "Attend Ellis deposition" |

97. The following table lists the eight timekeepers who "billed" to attend the Vogelman Deposition on 8/3/23 (only Attorneys Feinberg, Green, Harris, and Romo appear on the record, Attorney Freudenberger is listed as "also present"; only Attorneys Freudenberger and Green spoke[110]):

| # | Name | Billed | Narrative |
|---|---|---|---|
| 1 | Feinberg[111] | 9.0 | "Vogelman deposition" |
| 2 | Freudenberger | 8.0 | "Vogelman deposition" |
| 3 | Green | 9.0 | "Take Vogelman deposition" |
| 4 | Harris | 9.0 | "Vogelman deposition" |
| 5 | Rogachevsky | 10.5 | "Assist with deposition of D. Vogelman" |
| 6 | Romo | 10.5 | "Vogelman (prep + set up + depo)" |
| 7 | Taylor | 9.0 | "Attend Vogelman deposition (in person)" |
| 8 | Wali-Ali | 6.0 | "Attend Vogelman deposition" |

98. Several other depositions also had at least three timekeepers from Plaintiff's legal team billing to attend, including five for the Zungolo Deposition (Green, Freudenberger, Neufeld,

---

[109] Ellis Dep. Tr. 2:1-3:25.
[110] Vogelman Dep. Tr., 2:1-3:11.
[111] Attorney Feinberg mistakenly billed his time to attend the Vogelman deposition on August 2, 2023.

Romo, and Taylor)[112]; three for the Melenik Deposition (Green, Freudenberger, Taylor); and three

for the Kelly/Hewitt depositions (Freudenberger, Romo, and Taylor). There is simply no need (or

justification) for eight timekeepers to bill for attendance at a deposition to represent one client.

99.    Attendance at hearings was no less excessive, with the following three examples

showing the overstaffing utilized by Plaintiff's counsel:

- **August 8, 2023 Hearing**: Six (6) timekeepers billed for attendance, including Feinberg, Freudenberger, Green, Harris, Rogachevsky, and Romo.

- **March 24, 2025 Oral Argument**: Nine (9) timekeepers billed for attendance, including Cion Feinberg, Freudenberger, Green, Harris, Hoffman, Neufeld, Rogachevsky, and Taylor. Only four timekeepers appeared on the record, according to the audio recording of the hearing (Cion[113], Freudenberger, Green, and Hoffman).

- **July 31, 2025 Pre-Trial Conference**: Ten (10) timekeepers billed for attendance at this pre-trial conference: Brustin Cion, Green, Freudenberger, Hoffman, McCarthy, Paras, Park, Rogachevsky, and Taylor.[114]

100.    With each of these, the overstaffing was simply unnecessary and excessive, and

contributed to duplication of effort on the part of Plaintiff's counsel. In my opinion, this resulted

in a lodestar amount sought that is far greater than it should be

### E.  Excessive Internal Conferencing

101.    Another symptom of the overstaffed and inefficient administration of the work is

that multiple timekeepers billed to attend events and excessive internal conferences.[115] Here, the

amount of internal conferencing due to the gross overstaffing of the matter was plainly evident. I

also observed significant internal conferencing with multiple attendees.

---

[112] Only two appear on the record (Freudenberger and Green, with Romo "also present"). Zungolo Dep. Tr. 2:1-6.

[113] Attorney Cion incorrectly billed her time to March 24, 2025 (7.8 hours to "Attend and participate in oral argument on SJ and Daubert motions"). See, ECF No. 466-17, p. 14.

[114] See, ECF No. 367 at pp. 1-2, 4 (all eight attorneys were announced in attendance, but only Attorneys Brustin, Cion, Freudenberger, Green, Hoffman, and Paras formally appeared on the record).

[115] Eli Lilly & Co. v. Zenith Coldline Pharm. Inc., 264 F. Supp. 2d 753, 774 (S.D. Ind. 2003) ("unusually high volume of time billed to internal staff conferences" all "show a lack of [] 'billing judgement'"); Salazar v. District of Columbia, 2014 WL 342084, at *5-7, *9-10 (D.D.C. Jan. 30, 2014) (20% reduction for intra-office conferences "in which, 3, 4 or 5 lawyers attended").

102.    Here, 1,435 hours (roughly 10% of the bill) was tagged with the description of "meeting" alone, which does not include internal meetings tagged under "Phone Call" or other description tags for internal meetings.

103.    The below table contains fifteen individual team meetings, outlining the number of attendees from Plaintiff's counsel billing to attend.  These are excessive on their face:

| Date | TKs | Hours | Source[116] | Attendees (Initials) |
|---|---|---|---|---|
| 6/23/23 | 7 | 1.0 | Neufeld | PN, EF, AT, GR, NWA, AG, KR |
| 7/27/23 | 10 | 1.0 | Romo | GM, AG, EF, KR, JF, GH, NWA, PN, EC, AE |
| 7/16/24 | 7 | 2.1 | Hoffman | AH, NB, EF, AG, KR, TB, PN |
| 12/2/24 | 8 | 1.9 | Hoffman | AH, EF, AG, TB, KC, KR, AT, AM |
| 5/14/25 | 9 | 3.7 | Hoffman | AH, NB, EF, AG, JP, AT, GP, KC, KR |
| 6/16/25 | 9 | 1.0 | Hoffman | AH, NB, AG, EF, KC, GP, AT, JP, KR |
| 6/17/25 | 8 | 1.1 | Hoffman | AH, AG, NB, KC, GP, KR, AT, JP |
| 6/30/25 | 10 | 2.2 | Hoffman | AH, EF, KC, KM, KR, TB, JP, GP, AG, AT |
| 7/8/25 | 10 | 2.0 | Hoffman | AH, NB, EF, AG, GP, AT, KR, JP, KC, TB |
| 7/25/25 | 10 | 0.5 | Park | JP, NB, ABH, EF, AG, KM, KR, KC, GP, AT |
| 7/28/25 | 9 | .9 | Park | JP, NB, AG, EF, KR, KC, GP, AT, KM |
| 7/29/25 | 10 | 1.3 | Park | JP, ABH, NB, EF, AG, KM, KR, KC, GP, AT |
| 9/3/25 | 8 | 1.0 | Park | JP, ABH, NB, AG, TB, KM, KR, GP |
| 9/3/25[117] | 8 | 1.0 | Park | JP, ABH, NB, AG, TB, KM, KR, GP |
| 9/9/25 | 9 | 0.6 | Park | JP, NB, ABH, AG, TB, KR, KM, GP, KC |

104.    To be clear, I do not dispute that team meetings should occur, or that lawyers need to speak to each other, and it is not unreasonable to have team meetings.  Rather, it is the degree to which Plaintiff's counsel has overstaffed these meetings that leads them to be excessive and unreasonable.  The entire team (including paralegals) do not need to sit for every meeting, or attend every deposition.  Paying clients do not expect to be charged for the entire team (particularly junior timekeepers and paralegals) to attend every team meeting.

105.    With each of these, the overstaffing was simply unnecessary and excessive, and contributed to duplication of effort on the part of Plaintiff's counsel.  In my opinion, this resulted in a lodestar amount sought that is far greater than it should be.

---

[116] This lists the time entry I used to ascertain the attendees.

[117] There are two meetings for exactly one hour on this date with identical attendees.  See, ECF No. 466-9 at p. 53. Several items on this page appear to be duplicate entries (including on 9/2/25, 9/3/25, and 9/9/25).

### F. Excessive Expenditures Arising from Excessive Staffing

106.    In my experience, one effect of excessively staffing a representation is that the cost expenditures unreasonably increase as the staffing becomes more and more excessive.  Put another way, the more timekeepers that attend something like the trial, the greater the cost of hotel rooms, meals, and other incidentals will be.

107.    For example, I previously referenced the Pre-Trial Conference staffing, in which ten (10) timekeepers from NSBHF billed to attend (Brustin, Cion, Freudenberger, Green, Hoffman, McCarthy, Paras, Park, Rogachevsky, and Taylor).  The time charged was not only excessive, but Plaintiff seeks $544 in Amtrak charges for eight of these timekeepers (Brustin, Cion, Freudenberger, Green, Hoffman, Paras, Park, and Taylor)[118], along with car charges for Attorney McCarthy on 7/31/25 "to PreTrial Conf")[119] which costs should have been far less had Plaintiff's counsel staffed the pre-trial conference in a reasonable manner.

108.    Plaintiff's pre-trial hotel bill is another example where the overstaffing clearly led to excessive charges.  Plaintiff's hotel bill contained rooms for nine timekeepers at NSBHF (Brustin, Cion, Freudenberger, Green, McCarthy, Neufeld, Paras, Park, and Taylor).[120]  Of those nine staying at the hotel, only three or four appeared most days on the record (Attorneys Brustin, Freudenberger, Green, and McCarthy), and most sat in the gallery.

109.    Assuming a paralegal was also necessary, the lodging for Attorneys Cion, Neufeld, Paras, and another paralegal totaled an excess of $16,000 (not including meals, laundry, and other incidental charges).  Ultimately, the more unreasonable staffing the more unreasonable and costly the cost expenditures became.

---

[118] See, ECF No. 466-10 at pp. 33-34 (Amtrak expenses dated 7/25/25).
[119] Id. at p. 18.
[120] See, NSB Hicks 038089-038104 (I understand that Attorney Rogachevsky lives in the Philadelphia area).

### G. Top-Heavy Administration of the Work

110.    As part of my analysis under the Johnson Factors, I look at what tasks are required to litigate the case; whether counsel matched up the skills needed to perform those tasks with the proper personnel by assigning task-appropriate work to those with the requisite skills to perform those tasks.  A key element of reasonableness of an hourly rate is that the work was performed by timekeepers with task-appropriate hourly rates.[121]   Or, as New York Supreme Court Justice Scheinkman instructively held: "[a]s Defendant's expert [Mr. Tasher] points out, having relatively senior attorneys doing basic research … unreasonably increased the costs to the client."[122]

111.    Having been a provider and consumer of legal services, while clients might pay premium rates (like the ones sought here) for a senior partner performing senior partner work, they are generally not willing to pay for a senior partner to perform legal research, first-level drafting, or document review, absent an explained need for the partner to do this work.[123]   Thus, even if counsel's rates are not unreasonable in a vacuum, the rates may still be excessive depending upon the actual work being performed.[124]

---

[121] See, Alba Conte ATTORNEY FEE AWARDS, § 4:09 (3d ed. 2004) ("In determining reasonable fee awards, courts are careful to avoid excessive awards and will commonly discount high partners' rates for work that easily could have and should have been assigned to lower-rate associate attorneys in the firm.").

[122] Lee David Auerbach P.C. v. Richard Delgatto, 69908/2015, slip op. at p. 21 (Supr. Ct. Westchester Cty., July 7, 2017) (Decision After Trial).

[123] Ursic v. Bethlehem Mines, 719 F.2d 670, 677 (3rd Cir. 1983) ("Nor do we approve the wasteful use of highly skilled and highly priced talent for matters easily delegable to non-professionals or less experienced associates. Routine tasks, if performed by senior partners in large firms, should not be billed at their usual rates. A Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn."); Apple Corps. Ltd. v. International Collectors Soc., 25 F. Supp. 2d 480, 490 (D.J. 1998) ("It is unreasonable for a senior and high-priced attorney … to have devoted over 75 hours to drafting and editing the …motion and … briefs.").

[124] See, Alba Conte at § 4:09 ("An attorney's rate should reflect and individual's experience and reputation as well as the economic reality that various activities have different rates of reasonable compensation."); accord, In re Navidea Biopharmaceuticals Litig., 2021 WL 2323380 at *6 (S.D.N.Y. Apr. 21, 2021) (adopted 2021 WL 2156276 at *4 (S.D.N.Y. May 27, 2021)) ("Even when a requested hourly rate would ordinarily be found appropriate … the court may reduce that rate if records show that the work actually performed by that attorney could have been performed by someone more junior.").

112.    Here, I saw substantial evidence that the work was performed in an unreasonably top-heavy manner, particularly in the pre-trial work, where I would not expect such partner-heavy staffing.[125]  When I compared the hours incurred by the eight higher-cost attorneys (partners, "counsel", and "of-counsel"[126]) and the hours incurred by the seven lower-cost attorneys (associates and staff attorneys[127]), the higher-cost attorneys billed just north of 5,900 hours and the lower-cost attorneys just north of 4,660 hours.  When I observe such an unreasonably top-heavy set of fees as here, the root cause is usually that certain higher-cost timekeepers were functioning as an associate (performing associate-level work like research or drafting).[128]

113.    That is exactly what I observed here.  The primary cause of this issue was Attorney Hoffman, a partner (seeking New York rates of $900 per hour[129]) to perform 246.7 hours of "Drafting" work (much of which was initial brief drafting and statement of material fact drafting for the Summary Judgment Motions, drafting post-trial motions, and drafting the motion for a new trial), and 48.7 hours of "Research" (mostly legal research for the same motions).  Tony Balkissoon[130] is another example of a senior-level timekeeper ($600 per hour at New York Rates) who billed 288.7 hours of "Drafting" (mostly Motions <u>In Limine</u> and the Summary Judgment

---

[125] <u>See</u>, <u>Beastie Boys v. Monster Energy Co.</u>, 112. F. Supp. 3d 31, 51 (S.D.N.Y. 2015) ("In the Court's experience, such lopsidedly partner-heavy bills are quite unusual in the context of litigation work. It is common, particularly with respect to discovery and other pretrial tasks, that associates shoulder much of the work, under the active supervision of partners, and that partners take lead roles as to projects for which their expertise adds value. The ratio of associate to partner hours on pretrial work typically reflects more associate than partner hours — often significantly more.").

[126] Balkissoon, Brustin, Feinberg, Freudenberger, Green, Hoffman, McCarthy, and Neufeld.

[127] Cion, Fetrow, Harris, Paras, Rogachevsky, Romo, Shah.

[128] <u>See</u>, <u>Medina v. Metro. Interpreters & Translators, Inc.</u>, 139 F. Supp. 3d 1170, 1180 (S.D. Cal. 2015) ("The court notes that the distribution of labor, as reflected in the time records, does not demonstrate the most efficient use of the time of [partners such that] many of the tasks performed by the [partners] at $850 per hour could be reasonably performed at a lower partner or associate hourly rate, particularly with respect to the amount of client communication time, drafting the complaints, responses to motions to dismiss, responses to the summary judgment, and discovery related matters."); <u>Microsoft Corp. v. United Computer Resources of N.J.</u> 216 F. Supp. 2d 383, 392 (D.N.J. 2002) ("Defendants should not be asked to pay for [their adversary's] decision to assign the routine tasks of researching and drafting to partners of the firm").

[129] <u>See</u>, <u>ECF No. 466-8</u>, p. 10.

[130] Attorney Balkissoon is "Counsel" but charges on par with firm partners like Attorney Green.  <u>See</u>, <u>Id.</u>

Motions) and 23.6 hours of legal research in connection with these same motions.  No paying client would pay a small-firm partner $900 per hour to perform these tasks, particularly when associates are available at half the cost to do this work (Attorneys Fetrow's and Cion's New York rates are $450 per hour).  Moreover, Philadelphia-based associates (such as Attorney Harris) were available at $350 per hour—and they are likely more familiar with relevant Third Circuit law.[131]

114.    One other attorney whose time stands out as unreasonably top-heavy is Attorney Rogachevsky, who spent time digesting depositions along with reviewing/digesting documents. 727.5 hours of her time (nearly 40% of her total hours) were devoted to digesting, review of documents, or low-level discovery.  Attorney Rogachevsky was a relatively senior-billing attorney (her hourly New York rate is $525 per hour, close to some of the junior partners[132]).  These are tasks that would typically be performed by more junior timekeepers (indeed, Plaintiff's counsel had much of the deposition digesting and document review being performed by paralegals or even non-lawyer interns) showing that $525 per hour for this work is far too high for Attorney Rogachevsky's role in this case, and this unreasonably inflates Plaintiff's sought lodestar.

115.    A second reason why the time is so unreasonably top-heavy here is that ALL of the partners are overlapping with and duplicating each other.  When three to six partners are attending every internal meeting, multiple depositions, multiple oral arguments, and touching every single pleading, it unnecessarily drives up the "partner" end of the partner-to-associate ratio.  That is exactly what I observed here.  For example, at a meeting on July 16, 2024, you have six partner/counsel level timekeepers (Balkissoon, Brustin, Freudenberger, Green, Hoffman, and Neufeld) billing to attend a meeting with only one associate-level attorney (Rogachevsky)[133], who

---

[131] Id.
[132] Id.
[133] See, ECF No. 466-20, p. 3.

is relatively costly for an associate.  This unreasonably inflates the partner-side ratio.  When a partner seeking $900 per hour (Attorney Hoffman) is researching and drafting a Motion for a New Trial, then four other partner-level or counsel-level timekeepers bill for their review and revisions (Balkissoon, Brustin, Feinberg, and Green), it unreasonably inflates the partner-side ratio.[134]

116.    In my opinion, the unreasonably top-heavy billing here was unwarranted and resulted in the fees being far higher than they reasonably should have.  I will address this issue subsequently by recommending a percentage adjustment to the lodestar.

### H.  Clerical/Administrative Work by the Core Paralegals

117.    It is well established that "[c]lerical tasks should not be billed at senior associate or paralegal rates."[135]  My review of the time of the three core paralegals (Duran, Park, and Taylor) reflected substantial clerical/administrative time.

118.    These tasks include compiling/organizing/pulling/looking for documents or information (often for multiple hours at a time)[136]; scheduling depositions[137]; scanning, uploading, and/or printing documents[138]; troubleshooting tech issues[139]; mailing activities[140]; coordinating loan documents[141]; taking a courtroom tour[142]; and storing/transporting documents[143]

119.    Some of this clerical time was block-billed, for example, Joanne Park's 9/8/25 entry "Draft cover letters and mail out checks" contains some legitimate paralegal time (preparing a

---

[134] See, ADP v. Lynch, 2018 WL 3105420 (D.N.J. June 25, 2018) (finding it unreasonable to have multiple senior partners revising a motion).
[135] Sheffer v. Experian Information Solutions, Inc., 290 F. Supp. 2d 538, 549 (E.D. Pa. 2003).
[136] See, e.g., time entries of A. Taylor on 6/16/23, 6/20/23, 11/19/24 – 11/21/24, and 12/2/24 – 12/6/24; also time entry of C. Duran on 8/11/21.
[137] See, e.g., time entries of A. Taylor on 8/15/24.
[138] See, e.g., time entries of C. Duran on 2/15/23 and J. Park on 7/10/25;
[139] See, time entry of J. Park on 7/14/25.
[140] See, time entries of A. Taylor on 2/1/24 and J. Park on 9/8/25.
[141] See, time entries of C. Duran on 2/16/22, 4/8/22, and 5/25/22.
[142] See, time entry of A. Taylor on 7/23/25.
[143] See, time entries of A. Taylor on 7/25/23 and C. Duran on 9/23/21.

cover letter) and some clerical work (mailing a check), but there is no way to determine how much time is devoted to each task.  Thus, I include this issue when I recommend a percentage reduction.

### I.  Duplication of Effort Between Firms

120.    Another observation I have is that due to the lack of coordination and oversight, there was duplication of efforts between the two firms here.[144]  I understand the value of having an experienced local Philadelphia firm to serve as local counsel (regardless of whether out-of-forum counsel was needed in this case), and Attorney Feinberg is clearly a skilled practitioner in this field, whose skills I am confident added value to this case.

121.    However, it is evident that his firm, KRMFL did not serve as "local counsel", but rather as an additional law firm with additional timekeepers performing many of the same tasks as NSBHF.  This is reflected by Attorney Sonnenfeld, who noted that KRMFL served as co-counsel with NSBHF in this case".[145]  This is also reflected in the time entries, showing KRMFL was duplicating many of the tasks that NSBHF was performing (in its overstaffed manner).  Obvious examples include having both Attorneys Feinberg and his associate (Attorney Harris) repeatedly attend hearings and depositions that were already being attended by multiple NSBHF timekeepers.

122.    For example, at a March 25, 2025 Oral Argument, both Attorneys Feinberg and Harris billed 3.0 hours to attend the hearing that six NSBHF timekeepers were already billing to attend.[146]  Other examples include the Ellis, Vinson, and Vogelman depositions, where both Attorneys Feinberg and Harris billed to attend these depositions along with six NSBHF timekeepers were already billing to attend each deposition.  Neither Attorneys Feinberg nor Harris

---

[144] See, New York State Soc. of Certified Public Accountants v. Eric Louis Associates, Inc., 79 F. Supp. 2d 331, 343 (S.D.N.Y. 1999) (use of two firms led to "duplication [… and] warrant some reduction of the amount requested.").
[145] See, Sonnenfeld Decl., ¶ 16.
[146] Attorneys Cion, Freudenberger, Green, and Hoffman are the ones who entered appearances at the hearing.

said a word at any of these three depositions (Attorney Green conducted the Ellis and Vogelman depositions, while Attorney Freudenberger conducted the Vinson deposition).

123.    KRMFL was functioning as co-counsel rather than local counsel.  These roles are significant—and it makes no sense one of Plaintiff's opinion declarants to say that "The Lawyers at NSBHF are among the finest litigators I have ever met in my career" and "there is not a superior group of civil rights and constitutional litigators in the private bar"[147], and at the same time suggest they could not handle this matter without multiple members of another firm holding their hands.

124.    Had KRMFL functioned as a traditional local counsel (i.e., conducted the local depositions in Philadelphia so that NSBHF did not have to regularly bill travel time and expenses to and from Philadelphia, attended non-core hearings, performed much of the local forum research, etc.), then there is clear value in what KRMFL was doing, but that generally did not occur here, with there being significant duplication of efforts between the two firms.  Where the duplication is most obvious is in the time of Attorney Harris, whom I identified as "ancillary" earlier.

 a. Attorney Harris seeks a total of 116.6 hours, much of which was passive or duplicated the work of others (particularly of her partner, Attorney Feinberg).  A review of the time records show that on many days, their time entries and work was nearly identical.

 b. Additionally, Attorney Harris spent 35 total hours sitting in depositions, during which she neither spoke nor appeared on the record, and during which upwards of six additional timekeepers also attended, including the Vinson (10 hours), Ellis (9.5 hours), Vogelman (9 hours), Campisi (2.5 hours), as well as Plaintiff Hicks' (4 hours) deposition.

 c. Attorney Harris billed 24.1 hours for ten separate court appearances, including five days during trial (one of which was voir dire), the Daubert/Summary

---

[147] See, Celli Decl., ¶ 8.

Judgment argument on March 24, 2025, three status conferences (10/27/22, 8/8/23, and 5/7/24), and a motion to compel oral argument. She spoke on the record at none of these, and in some cases, was not even present at counsel's table – often sitting in the gallery.

d.      Attorney Harris spent nearly 40 hours drafting, editing, and reviewing a number of pleadings – documents that were also being prepared, edited, and reviewed by multiple other timekeepers. None of this time was unique or independent of work being performed by others, which reinforces to me that she was another "ancillary" timekeeper.

125.    In my opinion, these issues reinforces that the time by Attorney Harris was truly "ancillary" and added little value to what was already being performed by very skilled lawyers, and some reduction to Attorney Feinberg's time for duplication of efforts is warranted.

## J.   Vague/Patterned Time Records

126.    One of the issues I observed during my review is that Plaintiff's counsel often recorded their time with unreasonably vague time entries, or with records that are a billed in a "formula" or "pattern" format. Sufficiently detailed time entries give the client, a third party, and/or the Court evaluating reasonableness of the fees the ability to determine from each entry the nature and scope of the activity, its benefit, whether the entry is appropriately related to and billed to that file, and the reasonableness of the time spent in performing that activity.

127.    Multiple timekeepers billed significant quantities of time entries that are unreasonably vague, (effectively "cut-and-paste" time entries that are the same day after day) and that prohibit any kind of meaningful evaluation to determine reasonableness. As noted, this is likely a byproduct of the poor time recording process (where time entries were not really recorded contemporaneously, often days or weeks later, according to Plaintiff's counsel).[148]

---

[148] ECF No. 474 at 36:24-37:3 ("We are going through and entering the time generally as it occurs, whether it's at that moment, whether it's at that day, whether it's within days or a few weeks after the fact as we are going through.").

128.    As it pertains to the staffing here, these vague/patterned entries preclude a fulsome evaluation of reasonableness, and also hinder the ability to quantify the true extent of the excessive staffing with any degree of precise certainty.  The following three sets of examples are in no way exhaustive, but further reinforce my arguments that this case was overstaffed and overworked:

a.    Paralegal Joanne Park billed over 60 hours using one canned entry of "work on fee app[lication]" without any sort of explanation as to the nature of such work.  This is notable to me in (a) how many other timekeepers were involved in the fee application process; (b) how poor the supporting documentation (time and expense records) was – especially given that the review and compilation of same in connection with a fee application is usually performed by Paralegals; and (c) it is unclear what she was actually doing that was different or distinct from the work performed by the other timekeepers.

b.    Ariel Manning billed 204.6 hours, of which over 80 hours involved unspecified, canned deposition digest time, including the same time entry 8 times of "Continued digesting of deposition transcript" with no specifications as to which digests. Many of these time entries involve an entire day's worth of billing (some even over 8 hours per day).  She also had a number of other equally vague digesting entries with no specifications on 7/25/25 ("Digesting"), 7/28/25, 7/29/25, and 7/31/25 ("Deposition digest"), and 8/1/25 ("Digest").  Given the general overstaffing I have already documented, this type of vague, patterned billing makes it very difficult to evaluate these entries for reasonableness, especially in the context of the other billing issues involved.

c.    Attorney Romo had the tendency to utilize a multitude of one word time entries over the course of the representation, totaling almost 80 hours.  This included words such as "draft," "complaint," "review," "discovery," oftentimes just someone's first name

52

("Amelia"). This, this type of vague billing practice (i) makes it even more difficult to discern the extent of the overstaffing that I raise in the prior section, but also (ii) underscores the issues with contemporaneity and accuracy of the time records.

        d.     Staff Attorney Sona Shah conducted over 20 hours of "doc review" with no specification as to what documents were being reviewed and, to the extent the firm was engaged in document review, whether it was appropriate to have an attorney with this high hourly rate perform the work rather than considering use of less expensive means of reviewing (given that most of the remainder of digesting/document review was being done by paralegals or other support staff at much lower rates).

129.    In sum, this ongoing issue of vague and pattern billing interferes with a third-party's ability to conduct a meaningful evaluation of the time entries for reasonableness – especially in the context of the gross overstaffing I have documented. In my opinion, it warrants a percentage reduction in this case, to account for the unreasonable billing practices that cannot be evaluated or reduced specifically without knowing what actual work was performed (and whether, and to what extent, such work duplicated other timekeepers within the firms, and work by other firms).

### K.  Comparison of the "City's Staffing"

130.    One argument advanced by Plaintiff's counsel is that "Defendants' staffing appeared to mirror if not overtake Plaintiff's own, with multiple attorneys from the City and two private law firms participating actively in discovery."[149]  In my opinion, this statement is misleading and does not paint an accurate picture of reasonable staffing from Plaintiff's side (I also note that Attorney Sonnenfeld would not go so far in his opinions to echo this statement).

---

[149] See, ECF No. 466 at p. 16, ECF No. 466-9 at ¶ 25.

131.    Two private law firms (Ahmad Zaffarese and Clark Hill) were necessary because each represented separate defendant(s) due to perceived conflicts.  This does not justify Plaintiff's staffing on behalf of one client.  To compare the staffing at three core depositions (Ellis, Vinson, Vogelman), the following table shows how many each client/client group sent to each deposition:

| Deposition/Date | Plaintiff | City | Ahmad Zaffarese | Clark Hill |
|---|---|---|---|---|
| Ellis (7/25/23) | 8 | 1 (Walsh) | 2 (Mays/Ritterman) | 1 (DeRose) |
| Vinson (7/24/23) | 8 | 1 (Walsh) | 2 (Mays/Ritterman) | 1 (DeRose) |
| Vogelman (8/3/23) | 8 | 1 (Walsh) | 2 (Ritterman/Sorathia) | 1 (DeRose) |
| TOTAL FOR ALL 3 | 24 | 3 | 6 | 3 |

132.    To compare Days 1-3 of the Trial, the following table shows how many each client/client group sent to each day:

| Trial Day/Date | Plaintiff | City | Ahmad Zaffarese |
|---|---|---|---|
| Day 1 (8/11/25) | 10 | 2 (Cerone, Escobar) | 3 (Mays, Sorathia, Zaffarese) |
| Day 2 (8/12/25) | 10 | 2 (Cerone, Escobar) | 3 (Mays, Sorathia, Zaffarese) |
| Day 3 (8/13/23) | 10 | 2 (Cerone, Escobar) | 3 (Mays, Sorathia, Zaffarese) |
| TOTAL FOR ALL 3 | 30 | 6 | 9 |

133.    In each of the above instances, Plaintiff's counsel still out-staffed Defendants by a 2/1 margin, even with the fact that the Defendants had to be represented by three separate sets of counsel (each of whom saw fit to send no more than 2-3 timekeepers).  Plaintiff's attempt to compare its staffing to the City's is misleading and does not justify its overstaffing.

**L.  Summary of Issues and Resulting Lodestar Adjustments**

134.    Adding more timekeepers to a case, as Plaintiff's counsel did with their "little army"[150] of 38 billers here, rather than staffing it with a lean, dedicated team, generated unreasonable fees for shuttling in new attorneys for short stints, led to duplication and wasted time on internal conferences and meetings, and drove a deposition and trial staffing and expenditure model that generated substantially excessive and unreasonable fees.  As a result, the lodestar

---

[150] Metro Data Sys., Inc. v. Durango Sys. Inc., 597 F. Supp. 244, 245 (D. Ariz. 1984) (discussing as unreasonable the use of a "little army of thirteen lawyers . . . three paralegals and one law clerk to defend against plaintiff's claims").

calculation is substantially excessive and would have cost far less had Plaintiff's counsel exercised an appropriate staffing model or even a modicum of billing judgment.

### i.    Specific Staffing Adjustments for Overstaffing

135.    As noted, the first step in my lodestar adjustments was to recommend specific staffing reductions: a 100% reduction to the hours for the ancillary timekeepers other than Attorney Neufeld, for whom I recommend a 50% adjustment.

### ii.    Specific Adjustments to Non-Working Travel Time

136.    I was asked to assume Plaintiff did not met its burden to prove an Interfaith exception to the Forum Rate Rule (since they provided no evidence they conducted any search for in-forum counsel), thus to assume that non-working travel to and from Philadelphia is non-compensable, but that travel to and from other locations may be compensable at half-rates since they would have been incurred by in-forum counsel anyway.[151]  I was therefore asked to review the non-working travel time and remove only the travel between New York and Philadelphia.

137.    It appears from my review that all the non-working travel sought was between New York and Philadelphia—where the time entry did explicitly not make it clear in connection with depositions, I reviewed the deposition transcript, all of which occurred in Philadelphia so I assumed the travel was between New York and Philadelphia.

138.    Thus, I removed all non-working travel time from my calculations when calculating the lodestar based upon Philadelphia Rates.

### iii.    Additional Percentage Reduction to Remaining Hours

139.    The quantifiable adjustments I have made to Plaintiff's lodestar only addresses the overstaffing caused by the ancillary timekeepers.  They do not, however, sufficient address the

---

[151] Hahnemann University Hosp. v. All Shore, inc., 514 F.3d 300, 312 (3rd Cir. 2008), citing Interfaith, 426 F.3d at 710; US ex rel. Palmer v. C&D Technologies, Inc., 897 F.3d 128, 134-135 (3rd Cir. 2018).

degree of unreasonable charges sought by Plaintiff's counsel, including the excessiveness arising from the staffing of all the core timekeepers and a myriad of other issues. I recommend a percentage reduction to the fees here based on all of these issues. Such a percentage reduction is warranted to account for two things the cumulative and pervasive effect of Plaintiffs' counsel's "no-cost-is-too-great" attitude, which produced facially unreasonable charges.

140. It is my experience that a percentage reduction off the fees is the most methodologically reliable way to address the issues I have identified. As to <u>why</u> I believe a percentage reduction is the more appropriate and methodologically preferred method of addressing the grossly excessive fee request here, there are several reasons:

a. First, as Plaintiff's Counsel has repeatedly argued, the Supreme Court has held that courts "should not [] become green-eye shades accountants."[152] What this means, the Supreme Court explained, is that it would be a profound waste of legal and judicial resources to go line-by-line and make nitpicky line-item adjustments to a fee application involving millions of dollars.[153] Percentage reductions thereby address the problem in a more tailored manner to the problem at hand. It is why I use them rather than line-item adjustments, and many factfinders have adopted my approach in doing so.[154]

b. Second, a line-by-line adjustment does not account for certain intangibles that are indispensable to evaluating a fee request. For example, a line-item adjustment cannot adjust for a profound lack of billing judgment like the lamp for Attorney Green's hotel room, constant upgrades and little treats, and the like. As I previously explained, when I see costly dinners at Buddakan, birthday treats, $91 dollar lamps, and other similar

---

[152] <u>See</u>, <u>Fox v. Vice</u>, 563 U.S. 563 U.S. 826, 838 (2011).

[153] <u>Id.</u> (Court may "use estimates in calculating and allocating an attorney's time" when adjusting the lodestar).

[154] In <u>Milton v. Nikola</u>, <u>supra</u>, the Panel agreed with my recommended 35% reduction for many of these issues. In <u>Velva B.</u>, the EEOC imposed a 50% reduction, also for many of the same issues I identified in that matter (and here).

charges, it tends to correlate with unreasonable staffing and other unreasonable billing practices because it shows such a profound lack of billing judgment—particularly when counsel had to affirmatively choose to seek these charges. This is the essence of "Billing Judgment" and while the impact of a lack of Billing Judgment can never be measured or reflected in any one time entry, it is my experience (having prepared and reviewed billions of dollars of legal invoices for over fifty years) that it has a substantial impact on the fees charged, which can only be fully remedied via a percentage reduction.

c.      Third, percentage reductions allow the factfinder to properly consider and evaluate the Johnson Factors (the hallmark of objective fee analysis), while simply going line-by-line does not. For example, one of the Johnson Factors is the "results obtained"[155] and a percentage reduction allows the Court to consider and evaluate whether the fees asked for payment were simply fruitless in its reasonableness analysis.[156] In order to properly evaluate the Johnson Factors in their entirety, a percentage reduction allows this to be done more reliably than a line-by-line adjustment.

d.      Finally, a line-by-line set of reductions does not accurately or reliably capture the necessary reductions where the size of the fee request runs into the millions of dollars, going line-by-line simply is not an accurate or reliable way to address the fees.[157]

---

[155] The Supreme Court has held that in a lodestar analysis, "the most critical factor is the degree of success obtained." Hensley v. Eckerhart, 461 U.S. 424 (1983).

[156] See, Velva B. (50% reduction for, in part, a lack of success on various aspects of the case); AECOM Tech. Servs., Inc. v. Flatiron | Aecom, LLC, 2025 U.S. Dist. LEXIS 40755 *31-32 (D. Colo. Mar. 6, 2025) (reduction for counsel's correcting of its mistakes and own lack of diligence); AECOM Tech. Servs. v. Flatiron | AECOM, LLC, 2025 U.S. Dist. LEXIS 44073 (D. Colo. Mar. 11, 2025) (reduction for fees and costs for experts who were successfully limited by Daubert motions).

[157] New York State Ass'n for R. Child., Inc. v. Carey, 711 F.2d 1136, 1146 (2nd Cir. 1983) (where it is unrealistic . . . to evaluate and rule on every entry . . . courts have endorsed percentage cuts as a practical means of trimming fat" from a fee request); Velva B. v. DeJoy, 2022 EEOPUB LEXIS 2677 (EEOC Nov. 8, 2022) (50% reduction based upon issued identified in my reports); Reilly v. Duval County Public Schools, 2007 WL 2120551 *4 (M.D. Fla. July 23, 2007) ("where plaintiffs are seeking over 1600 hours of time, documented by voluminous submissions, the Court does not engage in an hour by hour analysis").

This is particularly so when a line-by-line decontextualizes the individual time entries from both each other and the overall flaws in the representation.

141.    Here, due to each of the foregoing issues (including lack of billing judgment, lack of accurate and reliable time records, overstaffing by the core team in every aspect of the representation, unreasonably top-heavy administration of the workload, clerical/administrative work by the paralegals, and unreasonably vague/patterned time records), I recommend an *additional 30% reduction* to the hours of each of the remaining timekeepers (other than Attorney Neufeld, whose time I have already reduced).

142.    The reason why I recommend a 30% adjustment to the remaining hours of the core timekeepers is as follows:

    a.    Plaintiff overstaffed nearly every aspect of this matter by a degree of no less than 30%. In other words, if 30% fewer timekeepers from Plaintiff's Counsel had (i) billed to attend trial, the number billing in attendance would be 7 rather than 9-10; (ii) billed to attend either the Ellis, Vinson, or Vogelman depositions, the number billing to attend each deposition would be 5-6 instead of 8; (iii) billed to attend the myriad of internal conferences with 7-10 timekeepers, the number billing to confer would be 5-7 rather than 7-10; (iv) billed to attend the March 24, 2025 Oral Argument, the number billing to attend would be 7 rather than 10; (v) billed to work on the Motions for Summary Judgment, the number billing to work on the motion papers would be 10-11 instead of 15; (vi) billed to work on the Scream Test Response, Daubert Motions, or the Motion for a New Trial, the number of timekeepers billing to work on each of these three tasks would have been 6-7 instead of 9-11; and (vii) billed to work on the opening fee application, the number billing for this work would have been 9 timekeepers instead of thirteen timekeepers. Even at a 30% reduction,

58

each of these tasks, depositions, meetings, and other litigation events would have still been overstaffed, but far less so, making a 30% reduction for this and other issues conservative.

b.      Plaintiff's counsel performed the work in an unreasonably top-heavy manner, as described herein. Where top-heaviness is an issue by itself, I typically see a reduction of 10-25%, with some amounts being higher.[158] Here, it was just one of the many issues present with the billing, so the amount of reduction I would recommend for this issue alone would be at least that much, making a 30% reduction for this and other issues a conservative reduction.

c.      As described herein, Plaintiff billed unreasonably vague (often patterned) entries, which hinders the ability to assess reasonableness and overstaffing. For example, many of the deposition digesting time records were blatantly excessive, but because many of the "interns" and non-lawyer timekeepers billed time to just "digest" with no indication of what documents were being reviewed or what depositions were being digested, the degree of overstaffing and overworking of this workstream cannot be fully determined. A percentage reduction addresses and accounts for this concern. In my opinion, an appropriate reduction for this issue would be in the 20-30% for this issue as well.[159]

---

[158] See, Larson v. United Natural Foods West Inc., 2013 WL 4507473 *2 (D. Ariz. Aug. 23, 2013) ("The Court accordingly concludes that a reasonable fee in this case includes no more than 30% of the time at partner rates."); Does v. District of Columbia, 448 F. Supp. 2d 137, 144 (D.D.C. 2006) (50% reduction for top-heavy work when partner/associate ratio was 1.15/1 (partner share of 53.5%); Pig Newton, Inc. v. The Bd. Of Dirs. of The Motion Picture Indus. Pension Plan, 2016 WL 796840, at *7 (S.D.N.Y. Feb. 24, 2016) (15% reduction for "'top-heavy' nature of the legal services provided"); Lane Crawford LLC v. Kelex Trading (CA) Inc. 2013 WL 6481354, at *10 (S.D.N.Y. Dec. 3, 2013) (15% reduction for top-heavy administration of work); Rosso v. Pi Mgt. Assocs., 2006 WL 1227671 at *4 (S.D.N.Y. May 3, 2006) (15% reduction for, inter alia, top-heavy administration of work).

[159] See, Gilead Scis. v. Merck & Co., Inc., 2017 WL 3007071 *8 (N.D. Cal. July 14, 2017) ("the court finds … a 40% reduction … justified for vague entries"); Velva B. v. DeJoy, 2022 EEOPUB LEXIS 2677 *16 (EEOC Nov. 8, 2022) ("Based on the vague descriptions of the billing entries, the unsuccessful … claim, and the inclusion of time for clerical work, we find that a 50% across-the-board reduction in the hours claimed is appropriate."); Kirsch v. Fleet St., Ltd., 148 F.3d 149, 172 (2d Cir. 1998) (affirming 20% reduction for vague entries); Wise v. Kelly, 620 F.Supp.2d 435, 452 (S.D.N.Y. 2008) (reducing fee award by 25% because certain entries were too vague to enable the court to assess their reasonableness); Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, 188 F. Supp. 3d 333, 344-5 (S.D.N.Y. 2016) (30% reduction for "excessive hours and vague entries"); Avila v. Los Angeles Police Dep't, 758 F.3d

d.    It is my opinion that these above factors went hand-in-hand with a lack of billing judgment, which indisputably had an overall aggregate impact on the quantum of fees generated and sought via Plaintiff's Fee Motion.  While the impact of a lack of Billing Judgment can never be truly measured, it is my experience (having prepared and reviewed billions of dollars of legal invoices for over fifty years) that it has an impact on the fees charged.  As a result, while a 30% reduction is conservative given the issues described above, it is particularly conservative in light of the lack of Billing Judgment displayed by Plaintiff's counsel in this matter.

143.    Further supporting this range is a prior decision in which my opinions were applied for a 50% reduction.  In Velva B. v. DeJoy, 2022 EEOPUB LEXIS 2677 *16 (EEOC Nov. 8, 2022), the EEOC determined that due to "the vague descriptions of the billing entries, the unsuccessful … claim, and the inclusion of time for clerical work, we find that a 50% across-the-board reduction in the hours claimed is appropriate."  These are any of the same issues, and to a substantially similar degree here, and in Velva B., the issues pertaining to lack of billing judgment and issues concerning the accuracy and reliability of the time records were also present.  This reinforces that a 30% reduction is conservative in this matter.

144.    Thus, in light of these considerations and my experience recommending reductions in many other similar matters, it is my opinion that a 30% reduction off the hours of the remaining timekeepers (other than Attorney Neufeld) would conservatively account for these issues.  I note that I have not included an evaluation of degree of success achieved in calculating this 30% reduction, as I understand Defendants' counsel will be addressing this issue in their briefing.

---

1096, 1105 (9th Cir. 2014) (affirming 30% reduction for "time with vague billing descriptions"); Matusick v. Erie County Water Auth., 2011 U.S. Dist. LEXIS 20049, *44-45 (W.D.N.Y. March 1, 2011) (50% across-the-board reduction for vague entries); H.J. Inc. v. Flygt Corp., 925 F.2d 257 (8th Cir.1991) (affirming 20% reduction "because the entries on the submitted billing records were so vague that meaningful review was virtually impossible.").

####    iv.    Remaining Hours Following Hourly Lodestar Adjustments

145.    Following these three sets of hourly adjustments, the following table sets forth the adjusted hours[160] for each of the remaining fifteen (15) timekeepers:

| Timekeeper | Title | Adjusted Hours |
|---|---|---|
| Rogachevsky, Katrina | Associate | 1,294.44 |
| Freudenberger, Emma | Partner | 1,161.79 |
| Taylor, Alfred | Paralegal | 1,040.13 |
| Green, Amelia | Partner | 1,013.04 |
| Romo, Gerardo | Associate | 763.49 |
| Cion, Katie | Associate | 756.28 |
| Paras, Grace | Associate | 626.78 |
| Hoffman, Anna | Partner | 588.49 |
| Brustin, Nick | Partner | 448.63 |
| Park, Joanne | Paralegal | 431.76 |
| McCarthy, Katie | Counsel | 405.09 |
| Balkissoon, Tony | Counsel | 330.89 |
| Duran, Camilo | Paralegal | 324.38 |
| Feinberg, Jonathan | Partner | 159.74 |
| Neufeld, Peter | Of Counsel | 49.80[161] |
| **TOTAL ADJUSTED HOURS** | | **9,394.73** |

146.    With the lodestar hours adjusted, I now turn to the question of rates.

### IX.    OPINION IV: EVALUATING HOURLY RATES OF PLAINTIFF'S COUNSEL

#### A. Introduction to Hourly Rate Opinions

147.    I have been asked to evaluate the rates sought by Plaintiff's counsel as well as to evaluate Mr. Sonnenfeld's opinion that "that all of the hourly billing rates for which recovery is sought are reasonable."[162]

---

[160] I was informed that late on Friday, January 16, 2026 (the last business day prior to the due date of Defendants' opposition), Plaintiff belatedly withdrew a minor quantity of hours. My analysis was already complete and is based their original hours, which I kept as is, benefitting Plaintiff's counsel.

[161] Because I already made a reduction for Attorney Neufeld's time by 50%, I did not reduce his time further.

[162] Sonnenfeld Decl., ¶ 10.

61

148.    As a preliminary matter, I understand that Plaintiff's counsel seeks an <u>Interfaith</u> Exception to the forum rate rule in order to seek New York City market rates as their primary relief[163], and local Philadelphia market rates in the alternative.[164]  While Plaintiff has proffered several opinion declarations as to why they should be granted an <u>Interfaith</u>[165] exemption, I note that Plaintiff ***has not proffered any evidence*** of having conducted a "significant search for counsel with the ability to handle this case"[166] and none of its opinion declarants have stated that Plaintiff undertook any "significant search", much less a search at all.  I understand that Defendants' counsel will be addressing this argument fully as a matter of law in its brief, and I was asked to assume that local rates should apply in my hourly rate analysis.

149.    With that said, the question of rates becomes an evaluation of "rates for similar services by lawyers of reasonably comparable skill, experience and reputation."[167]  In other words, the question involves what range of rates are usually charged to paying clients for the relevant type of work involved in the matter.  This must be contextualized through the relevant <u>Johnson</u> factors such as the novelty/complexity of the case, nature of the fee arrangement, the stakes of the matter, the required workload and timeframe needed to complete it, the required skills to handle the case, among other factors.

### B.  <u>Plaintiff's Sought New York Rates</u>

150.    I begin with the New York City rates sought for the New York-based attorneys. While high, I do not believe they are out of line with prevailing market rates for smaller firms in greater New York City.  Plaintiff's motion makes a key point, which is that when compared to the

---

[163] <u>See ECF No. 466</u> at pp. 19-22.
[164] <u>Id.</u> at 33-38.
[165] From <u>Interfaith Cmty. Org. v. Honeywell Int'l, Inc.</u>, 426 F.3d 694 (3d Cir. 2005).  For the Court's reference, I served as a fee expert in evaluating the <u>Interfaith</u> matter fee petitions following the Third Circuit's 2005 decision.
[166] <u>Interfaith</u>, 426 F.3d at 705.
[167] <u>ECF No. 466</u> at p. 10.

large firms in New York City, "as a mid-sized civil rights firm, NSBHF is differently situated from these large commercial comparators, with somewhat lower overhead and a different clientele."[168]

151.    My experience is that the larger firms in New York City now charge in $1,600-$2,000 per hour range (with some outliers).  The rates sought by Plaintiff's counsel are roughly half those of big firms.  The rate survey[169] proffered by Plaintiff (the Real Rate Report) generally reinforces a 2/1 – 3/1 ratio for larger firm rates to smaller firm rates.

152.    For example, in the field of Employment Law, large firms in greater New York City averaged $1,131 per hour in 2023 for partner work, while firms with 50 or fewer attorneys averaged $632 per hour in 2023 for partner work.[170]  In the field of Commercial Litigation, larger firms in greater New York City averaged $1,457 per hour in 2023 for partner work, while firms with 50 or fewer attorneys averaged $428 per hour that year for partner work.[171]  Within this context, rates of roughly one-half the rates charged by the larger firm rates are not unreasonable for Plaintiff's counsel in greater New York City, particularly when considering the risk of non-payment faced, stakes of the matter, and the skills required to litigate the matter.

153.    The one major exception is for Attorney Rogachevsky, who earlier I identified as performing many tasks that did not warrant her rate of $525 per hour (New York)—for much of the case, she was performing work being done by paralegals or non-lawyer interns, such as deposition digesting or basic document review).  Additionally, I understand that during much of this matter, she resided in and was based out of Philadelphia, so applying a New York rate to her would not be appropriate.  I would recommend reducing her rate to that of the lowest-cost associate on the case (Attorney Harris, also located in Philadelphia, whose rate is $350 per hour).

---

[168] Id. at p. 28.
[169] Plaintiff only proffered a narrow portion of a much larger survey, which I attach in its entirety as **Exhibit E**.
[170] 2023 RRR at p. 172.
[171] Id. at p. 170.

## C. **Plaintiff's Sought Philadelphia Rates**

154.    In contrast to the New York rates, I believe the sought Philadelphia rates are excessive and do not reflect market rates, for the same reasons why I believe the sought New York rates are not excessive.  The Philadelphia rates sought are very close to the sought New York rates, which does not reflect the realty of the disparity between the two markets.  I have significant experience with both markets having hired counsel across both markets over many years.

155.    It is my experience that the gap between New York City rates and Philadelphia rates is far larger than the difference sought here.  For example, the difference between Attorney Brustin's New York and Philadelphia rates is only $50 per hour ($1,000 vs. $950), or only 5% lower.[172]  Attorneys Freudenberger's and Hoffman's difference is similarly low, only $100 ($900 vs. $800) or 11% lower.[173]  Paralegal rates sought are only $10 lower (4% less).[174]

156.    But the gap between New York and Philadelphia market rates is much larger than the gap sought here—with my experience being that senior New York associates/counsel charge in line with or more than Philadelphia partners at comparable firms.  For example, I testified as to the market rates for Duane Morris for a matter in which both New York and Philadelphia attorneys charged to the file.  The lead partner in Philadelphia charged $791 per hour in 2019, while a New York associate (with 19 fewer years of experience) charged $798 per hour.[175]

157.    The passage of time since 2019 has done little to change this general ratio, with my experience being that both New York City large-firm associates and Philadelphia large-firm Partners now generally charge in the $1,000-$1,200 per hour range—for example, I have reviewed

---

[172] Hoffman Decl., ¶¶ 18-22.
[173] Id.
[174] Id.
[175] Hemant Shah et. al., v. 20 East 64th Street LLC, et. al., Index Number 156305/2015 (Supreme Court of the State of New York, New York County) (court hearing testimony provided on April 25, 2019).

Fox Rothschild's fees on many occasions and that firm was charging $875 for senior partners in 2021; Duane Morris' Philadelphia office was charging $950 per hour for senior partners in 2022.

158.    As it pertains to the rates in this case, I would expect to see three things regarding the New York vs. Philadelphia rates: (1) a larger gap between the sets of rates—on the order of a 3/2 ratio, (2) Philadelphia partner rates being generally consistent with New York City associates rates, particularly of the more senior associates, and (3) Philadelphia rates of about one-half those charged by Philadelphia's larger firms—much as Plaintiff's counsel did for its New York rates. But none of these were the case for the Philadelphia rates sought by Plaintiff's counsel.

159.    To test my hypothesis, I first turned again to the same Real Rate Report that Plaintiff proffered with its fee motion.[176]  Looking at the rates charged by commercial litigators, I compared the rates of big firm partners in each metropolitan area.  The average rate for a commercial litigation partner at a large firm in greater New York City is $1,457 per hour, while the comparable average rate for a commercial litigation partner at a large firm in greater Philadelphia is only $1,032 per hour.[177]  Removing the firm size and just looking at litigation partners for each region overall, the average rate for a litigation partner is $857 (New York) vs. $671 (Philadelphia) and the third quartile rates are $1,205 (New York City) and $830 (Philadelphia).[178].

160.    This survey data both reinforces and underscores my own experience that the New York to Philadelphia hourly rate ratio is generally about 3/2, so a comparable attorney at a similar type of firm who charges $1,200 in New York City would charge roughly $800 per hour in Philadelphia (in fact, a direct comparison is available via the RRR: $1,205 (New York) and $830

---

[176] I note that Plaintiff's compared itself to firms with 51-200 lawyers (ECF No. 466 at p. 37), but Plaintiff's lead counsel only has about 15 lawyers on staff as of December 30, 2025.  See https://nsbhf.com/our-team/.
[177] 2023 Real Rate Report, pp. 170 (New York City) and 175 (Philadelphia).
[178] Id., pp. 18-19.

(Philadelphia)).[179]  But the Philadelphia rates sought for the New York lawyers in this case do not reflect this difference.

161.    Another instructive data point reflecting this difference is Attorney Sonnenfeld's own rate within his firm prior to retirement: he charged paying clients $1,185 per hour in 2021[180], which, in my experience, is generally at the uppermost end for rates charge by the most top-of-the-line Philadelphia partners at city's largest firms—as would be expected from someone like Attorney Sonnenfeld, who would be among the most experienced partners in his firm's Philadelphia office.  In contrast, other partners at his firm (including the New York partners) charged up to $1,950 per hour, according to the FTX filings that he cited.[181]

162.    A review of the FTX filings show that the most expensive partner on the FTX case in 2023 was K. Kail[182] (a New York-based[183] partner licensed since 1981, 7 years fewer than Attorney Sonnenfeld).  Assuming that the costliest New York-based partners at his former firm (with fewer years of legal experience) are charging nearly $2,000 per hour and Attorney Sonnenfeld's rate was $1,185, this data point further reinforces that a 3/2 ratio is roughly the general difference between the top-of-the-line New York and Philadelphia rate markets.  Because the difference between the New York and Philadelphia rates sought here are far less than a 3/2 ratio, I believe the Philadelphia rates sought are out-of-line with market rates.

163.    Another reason why I believe the Philadelphia rates sought are excessive is that the large firm/small firm ratio for Philadelphia is inconsistent with the reality of the market.  As noted, there is often a 2/1 to 3/1 ratio between larger firm rates and smaller firm rates and Plaintiff's

[179] Id.
[180] Sonnenfeld Decl., ¶ 14.
[181] Id.
[182] See ECF No. 2180-5.
[183] https://www.morganlewis.com/-/media/files/news/law360_qa-kennethkail_17dec13.pdf.

counsel correctly noted that "as a mid-sized civil rights firm, NSBHF is differently situated from these large commercial comparators, with somewhat lower overhead and a different clientele."[184]

164.    It is my experience that there are generally three "bands" of Philadelphia firms. The first band contains solo practitioners and smaller firms (such as Plaintiff's counsel, which has roughly 15 attorneys on staff). Today, these firms typically charge in the $400-$600 per hour range for Partners.[185]    The second band contains mid-sized firms (firms like Kleinbard, White & Williams, and the former Schnader Harrison), and today these firms typically are in the $600-$800 per hour range.[186]    These firms are slightly larger than the firms representing Plaintiff. The last group of firms are the big-law firms in Philadelphia (Fox, Ballard, Cozen, Duane Morris, Blank Rome, etc.) and today these firms are typically around $1,000 to $1,200 per hour.

165.    Thus, for their New York rates, the rates sought by Plaintiff's counsel are roughly one-half the rates charged by New York's larger firms—but the same cannot be said for the Philadelphia rates. The most expensive timekeeper at New York rates seeks $1,150 per hour, still roughly one-half of what big-firm rates charge, but his Philadelphia rates is $1,050 per hour, on par with what lawyers at Fox Rothschild, Duane Morris, Blank Rome, or Ballard Spahr (i.e., the largest elite Philadelphia firms) currently charge for complex commercial litigation or M&A work.

166.    As a result, I would expect that Plaintiff's counsel's market rate in Philadelphia would be (a) roughly one-half the big firm rates in Philadelphia—so roughly in the $500-$600 per

---

[184] ECF 466 at p. 28.
[185] For example, in Clayton Commercial Litigation, LLC vs. Nkansah, Docket No. 200801675 (Court of Common Pleas, Philadelphia County) (jury trial testimony provided on July 21 – 22, 2022), I testified as to the reasonableness of the rates of a small firm in Philadelphia. The rates charged by the opposing counsel in that matter were $415 per hour (Plaintiff) and $530 per hour (Defendant)—both smaller firms in greater Philadelphia. Attorney Sonnenfeld testified on behalf of a smaller firm in Philadelphia in the DeFrank matter, testifying that $500 per hour was a reasonable rate for a smaller firm partner in Philadelphia in 2024. Sonnenfeld DeFrank Decl., ¶ 9.
[186] White & Williams charged $570 for an experienced Philadelphia-based partner and $385 per hour for associate work in 2018. See Tianjin Port Free Trade Zone International Trade Service Co., Ltd. V. Tiancheng Chempharm, Inc. USA, Case No. 2:17-cv- 04130 (E.D.N.Y.), see ECF No. 37-6 at p. 6.

hour range, and (b) on part with the smaller-to-midsized firms in Philadelphia, likely on the higher end of the smaller firms to the lower end of the mid-sized firms (so $500-$700 per hour), not partner rates of $800-$1,050 per hour. Because of this substantial discrepancy, I believe the Philadelphia rates sought are out-of-line with market rates.

### D. Counter-Proposed Philadelphia Rates

167. I sought to update the rates of the timekeepers in this matter other than those of Attorneys Feinberg, Harris, and Rogachevsky (the Philadelphia-based attorneys).

168. To do this, I begin with their New York rates for two reasons—I believe those are market rates in that region and it is the "home" market for the attorneys in question. As noted, it is my experience that the general ratio of New York to Philadelphia is around 3/2, so I adjusted all of the relevant New York rates by this ratio (so a New York rate of $900 per hour was adjusted down to $600 per hour for Philadelphia). Where this division resulted in a non-rounded number, I rounded the number up to the next ten-dollar increment (for example, I rounded Partner Amelia Green's $433.33 per hour up to $440.00 per hour).

169. Next, I compared these new rates to the Philadelphia Community Legal Services (CLS) fee schedule, which has been approvingly cited both by the Third Circuit[187] and by Plaintiff's own expert in another Civil Rights case.[188] To do this, I prepared a schedule[189] listing each timekeeper being adjusted, the year each timekeeper first received his or her law license, along with the relevant corresponding years of experience range in the CLS. Where different, I applied the attorneys years of experience during the pendency of the case, not their current years

---

[187] <u>Maldonado v. Houstoun</u>, 256 F.3d 181 (3rd Cir. 2001) ("The fee schedule established by Community Legal Services, Inc. ('CLS') has been approvingly cited by the Third Circuit as being well developed and has been found by the Eastern District of Pennsylvania to be a fair reflection of the prevailing rates in Philadelphia.").
[188] <u>Sonnenfeld DeFrank Decl.</u>, ¶ 10.
[189] Attached hereto as **Exhibit F**.

of experience.  For example, Attorney Hoffman received her law license in 2004, but for most of her work on <u>Hicks</u>, she had 16-20 years of experience.

170.    When comparing these new rates to the corresponding CLS rates[190], where the rate was either within the CLS range or within 10% of one of its end-points, I accepted that rate "as is".  In two instances (Attorney Shah and the Paralegals), the number was outside that range, so I looked more closely at both sets of timekeepers.

   a.    In Attorney Shah's case, the difference can be explained by her role in the case as she served as a "Staff Attorney" performing what are effectively lower-level tasks (like document review, discovery, etc.), and her adjusted Philadelphia rate of $350 per hour is within the range of a 6-10 year attorney in the CLS, so I am leaving her rate as is.

   b.    In the case of the Paralegals, I believe $150 per hour is too low for market paralegal rates in Philadelphia, so I adjusted the rate to the bottom rate in the CLS ($190).

171.    As a final cross-check, I return to my three expectations about the Philadelphia rates to ensure that these new rates check all three boxes, which they do.

   a.    First, these new rates are roughly at a 3/2 ratio of the New York rates.

   b.    Second, the main range of Philadelphia partner rates ($600-$770) causes these rates to be about one-half the rates charged by the bigger firms in Philadelphia.

   c.    Third, the core junior partner rates (about $540-$600) are generally consistent with the New York rates sought for the more senior associates and counsel

---

[190] I understand that Plaintiff pointed to <u>Dennis v. Jastrzembski</u> as justification for departing from CLS rates.  <u>ECF No. 466</u> at p. 37.  But, as Attorney Sonnenfeld argued, there are key differences between <u>Dennis</u>, which was a case of first impression with interlocutory appeals to the Third Circuit and the results obtained in <u>Dennis</u> were far more favorable ($16 million vs. $3 million here) and "uniquely large" in his words.  <u>Sonnenfeld Dennis Decl</u>, ¶¶ 17-19.  While I am not evaluating <u>Dennis</u> from a substantive point of view, I am merely showing the difference, even from the perspective of Plaintiff's own expert.

(compare, for example, Counsel McCarthy's New York rate of $575 and Associate Rogachevsky's New York rate of $525 per hour.

### E. Conclusion on Rates

172. For these reasons, it is my opinion that if Philadelphia rates are the ones applied by the Court for a fee award, the market rates are more consistent with the ones set forth in **Ex. F**, not those sought in Plaintiff's fee motion or articulated by Attorney Sonnenfeld.

### X.    OPINION V: THE ADJUSTED LODESTAR AMOUNT OF $3,677,550.10

173. Following the aforementioned (i) overstaffing adjustments, (ii), reductions for non-working travel between New York and Philadelphia, (iii) additional percentage reduction to address the lack of Billing Judgment and other issues, and (iv) modification to the Philadelphia hourly rates, the adjusted lodestar amount comes to the following:

| # | Timekeeper | Title | Final Hours | Philly Rate | Adj. Lodestar |
|---|---|---|---|---|---|
| 1 | Rogachevsky, Katrina | Associate | 1,294.44 | $350.00 | $ 453,054.00 |
| 2 | Freudenberger, Emma | Partner | 1,161.79 | $600.00 | $ 697,074.00 |
| 3 | Taylor, Alfred | Paralegal | 1,040.13 | $190.00 | $ 197,624.70 |
| 4 | Green, Amelia | Partner | 1,013.04 | $440.00 | $ 445,737.60 |
| 5 | Romo, Gerardo | Associate | 763.49 | $320.00 | $ 244,316.80 |
| 6 | Cion, Katie | Associate | 756.28 | $300.00 | $ 226,884.00 |
| 7 | Paras, Grace | Associate | 626.78 | $320.00 | $ 200,569.60 |
| 8 | Hoffman, Anna | Partner | 588.49 | $600.00 | $ 353,094.00 |
| 9 | Brustin, Nick | Partner | 448.63 | $670.00 | $ 300,582.10 |
| 10 | Park, Joanne | Paralegal | 431.76 | $190.00 | $ 82,034.40 |
| 11 | McCarthy, Katie | Counsel | 405.09 | $390.00 | $ 157,985.10 |
| 12 | Balkissoon, Tony | Counsel | 330.89 | $400.00 | $ 132,356.00 |
| 13 | Duran, Camilo | Paralegal | 324.38 | $190.00 | $ 61,632.20 |
| 14 | Feinberg, Jonathan | Partner | 159.74 | $540.00[191] | $ 86,259.60 |
| 15 | Neufeld, Peter | Of Counsel | 49.80 | $770.00 | $ 38,346.00 |
| | **TOTALS** | | **9,394.73** | | **$ 3,677,550.10** |

---

[191] I reduced Attorney Feinberg's rate by the same ratio of the others as his rate was effectively a "New York" rate and would exceed both Attorneys Brustin and Neufeld's reduced rates.

174.    As noted above, Plaintiff has not proffered any evidence (fact or opinion) that it conducted any search (much less a "significant search") for in-forum counsel and, therefore, I have been asked by the City to assume for these foregoing calculations that Plaintiff did not meet its burden to prove rates outside of forum rates should apply.  With that in mind, the adjusted lodestar total is **$3,677,550.10** in fees.

## XI.    OPINION VI: PLAINTIFF'S COST REQUEST IS EXCESSIVE, UNDOCUMENTED, AND DISPLAYS A LACK OF BILLING JUDGMENT

### A.    Introduction and Overview of Plaintiff's Expense Submission

175.    Plaintiff seeks $304,553.47 in expenses.[192]  Of this total, the majority consists of "trial costs" ($127,189.70) and "Travel and Meal Costs" ($59,737.27).[193]  The "trial costs" include a series of expert/vendor invoices (which total $117,237.69).[194]  Initially, Plaintiff did not produce a single piece of backup documentation (such as receipts) to support these totals with its Fee Motion.[195]  While a very minor sliver of receipts have subsequently been produced after the Court ordered it to occur, those are few and far between.

176.    Receipts are critical to evaluating the reasonableness of expenses, and paying clients expect some form of documentation when asked to pay for travel, meals, or the like. Original receipts for meals are critical to evaluating reasonableness for several reasons—they allow evaluation as to how many people attended the meal and the price per person[196], they allow

---

[192] See, ECF No. 466-10 at ¶ 1 ("NSBHF and our co-counsel KRMFL have incurred a total of $304,553.47").
[193] Id., at p. 17.
[194] Id., pp. 28-29.
[195] See, ECF NO. 467 at p. 2.
[196] See, Arredondo v. Delano Farms Co., 2017 WL 4340204 *9 (E.D. Cal. Sept. 29, 2017) ("$92 per person" dinner was unreasonable).

evaluation into the luxuriousness of the meal[197]; and whether alcohol was a part of the charge.[198]

Without itemized receipts, there is no way to properly evaluate these charges for reasonableness.

Additionally, some of Plaintiff's counsel's charts don't add up to the figures claimed, further

reflecting the sloppiness and lack of care put into the fee application, and the lack of a full set of

receipts for their expenses complicates the ability to figure out where exactly the errors may lie.

177.    Plaintiff asserts that because its "counsel [was] carrying these costs for years with

no guarantee of success in the litigation … they endeavored to minimize costs as much as

possible."[199]  Ordinarily, I would expect this to be the case, but it is clear that did not occur in this

matter.  Having reviewed billions of dollars in legal invoices over the years, it is my experience

that a telltale sign of Billing Judgment and case management (or lack thereof) can be found in the

nature of the expenses and costs incurred during a litigation.

### B.  Methodology of My Expense Review

178.    As set forth below in comprehensive detail, Plaintiff's request for expenses is laden

with objectively excessive and unreasonable requests, for items such as lavish meals/hotel stays,

transportation upgrades, administrative and overhead charges, and other charges that no reasonable

paying client would pay.

179.    In a private attorney-client relationship with a real paying client, the client

reviewing the charges and would reject a substantial quantum of the charges sought here.  I know

I would have when I was a paying client.  But, here, there was no real paying client to review and

---

[197] See, In Re Unger & Associates, Inc., 277 BR 694, 698 (E.D. Tex. 2001) (finding steak dinners to be unreasonable); Fresquez v. BNSF Ry. Co., 2020 WL 1322920, at *13 (D. Colo. Mar. 20, 2020) (finding dinner at steakhouse to be unreasonable).

[198] See, In Re Unger & Associates, Inc., 277 BR 694, 698 (E.D. Tex. 2001) (finding alcohol charges unreasonable); Spanski Enters., Inc. v. Telewizja Polska S.A., 278 F. Supp. 3d 210, 221 (D.D.C. 2017) ("Finally, the court considers any request for reimbursement of charges for alcoholic beverages to be unreasonable, and will also modify the award to exclude such charges.").

[199] See, ECF No. 466 at p. 40.

reject these eye-popping charges, and Plaintiff's counsel, when presented with multiple opportunities to exercise Billing Judgment and not seek these charges, failed to do so.

180.    As previously explained, when I review expenses, there are four categories of charges I typically look for in my evaluation (i) "phantom" charges—charges that have no apparent connection to the case or are inconsistent with the time records themselves; (ii) what I like to call "treats" or "sundries"—these are little personal items where the attorneys treat themselves to little luxuries but are not really necessary to winning the client's case; (iii) "overhead" charges—these are charges that are either reusable for other clients or are everyday items that counsel would need regardless of the case; and (iv) "lavish" expenses—expenses that are clearly excessive in nature or degree and no reasonable paying client would have agreed to pay for them.  I observed all four types of these expenses being sought in this case.

181.    I emphasize that nothing in my analysis is meant to second guess whether any of these charges assisted in the outcome in this matter (such as whether Plaintiff's counsel preferred the coffee at another venue compared to the free coffee available in their hotel) or where Plaintiff's counsel chose certain travel arrangements or hotel rooms for their own convenience, as that is not the inquiry in the lodestar analysis—the question is whether the charges are objectively reasonable, as the lodestar concept of reasonableness is an objective inquiry[200]—grounded in objective principles that look at what a reasonable paying client would be willing to pay.[201]

182.    In this light, charges that are "motivated by convenience—not necessity"[202] are not objectively reasonable.

---

[200] See, Souryavong v. Lackawanna County, 872 F. 3d 122, 128 (3rd Cir. 2017) ("the lodestar method … is objective") (citations omitted).
[201] Purdue v. Kenny A. ex rel. Winn, 559 US 542, 551 (2010) (lodestar is intended to "produce[] an award that approximates the fee the prevailing attorney would have received for representing a paying client who was billed by the hour in a comparable case.").
[202] AECOM Tech. Servs. v. Flatiron|AECOM, LLC, 2025 U.S. Dist. LEXIS 44073 *19-20 (D. Colo. Mar. 11, 2025).

### C. Overhead Charges, Sundries/Treats, and Purchases of Convenience

183.    I begin with overhead charges and sundries/treats, as they often overlap.  As it pertains to expenses, overhead charges typically consist of three types of expenses.  The first are charges for items that counsel will be able to reuse on other cases or can keep following the litigation, such as computer supplies chargers, and the like.[203]  The second is "office supplies", things that are part of the running of a legal office, such as printers or printer ink, binders, staplers, stationary, note pads, post-it notes, paper clips, and the like.[204]  The third consist of costs that would be "routinely incur[red] at home" such as snacks, groceries, beverages, and the like.[205]

184.    Here, Plaintiff seeks thousands of dollars (generally found in ECF No. 466-10 at p. 44) for office supplies, printers, sim-cards, and the like.  Without receipts, there was no way to determine what most these charges were.  Following Defendants' Motion to Compel, Plaintiff produced some of these receipts, which confirms that most (if not all) of these charges are the very essence of overhead charges.

185.    Plaintiff seeks reimbursement for thousands of dollars in the following charges: Hundreds of dollars in binder charges[206]; stickers and labels[207]; USB Adapters[208]; Tissues[209];

---

[203] Castellano v. Charter Commc'ns, LLC, 2014 U.S. Dist. LEXIS 54253, at *10–11 (W.D. Wash. Apr. 17, 2014) ("expenses of litigation do not include an ergonomically correct chair for Plaintiff.  Presumably, Plaintiff kept the chair for personal use at the close of this case. Therefore, such expenses are excluded from Plaintiff's award."); Celeste v. Sullivan, 734 F. Supp. 1009, 1012 (S.D. Fla. 1990) ("computer accessories" are nonrecoverable "office supplies"), rev'd on other grounds, 988 F.2d 1069 (11th Cir. 1992).

[204] Becker v. ARCO Chem. Co., 15 F. Supp. 2d 621, 636 (E.D. Pa. 1998) ("the cost of office supplies is not recoverable as a cost."); AECOM Tech. Servs. v. Flatiron | AECOM, LLC, 2025 U.S. Dist. LEXIS 44073 (D. Colo. Mar. 11, 2025) (finding "'trial supplies' which include items such as printer toner, laptop privacy screens, mouthwash, 'seats for back support,' and drinks" to be overhead charges); Missouri v. Jenkins, 491 U.S. 274, 296 (1989) (stationary, paper clips, telephones, and other 'office overhead' are not compensable).

[205] Wales v. Jack M. Berry, Inc., 192 F. Supp. 2d 1313, 1332 & n.10 (M.D. Fla. 2001) ("expenses for snacks, groceries, beverages, and restaurant lunches are unjustified because these are personal expenses that counsel and their legal staff routinely incur at home."); United States ex rel. Howard v. Urban Inv. Tr., Inc., 2013 U.S. Dist. LEXIS 127987, at *25 (N.D. Ill. Sep. 9, 2013) (denying charges for "treats for deps" and "snacks for dep").

[206] See, NSB Hicks 038171-3, NSB Hicks 038187.

[207] See, NSB Hicks 038172; NSB Hicks 038186.

[208] See, NSB Hicks 038172.

[209] See, NSB Hicks 038176.

printers and printer paper[210]; Post it notes[211]; multiple new datasticks/flashdrives[212]; bankers boxes[213]; wall chargers[214]; Scotch Tape[215]; Gel Pens[216]; a new pair of scissors[217]; sharpies and highlighters[218]; a first aid kit[219]; envelopes[220]; bottles of Advil[221]; bottles of hand sanitizer[222]; notepads[223]; white out[224]; file folders[225]; Tums[226]; paper clips[227]; HDMI Cables[228]; a new stapler and a new stapler remover[229]; rubber bands[230]; band-aids[231]; post-it notes[232]; a surge protector[233]; printer ink[234]; wi-fi hotspots[235]; a $91 remote-control lamp set for Attorney Green's hotel room[236]; sim-cards and sim-card extenders[237]; two "custom items" from a stationery store with no further description[238]; Skittles[239]; spoons[240]; cups[241]; laptop chargers;[242] and "snacks and gun" [*sic*].[243]

---

[210] <u>See</u>, NSB Hicks 038183.
[211] <u>See</u>, NSB Hicks 038183; NSB Hicks 038189.
[212] <u>See</u>, NSB Hicks 038186; NSB Hicks 038189.
[213] <u>See</u>, NSB Hicks 038186.
[214] <u>See</u>, NSB Hicks 038186.
[215] <u>See</u>, NSB Hicks 038186.
[216] <u>See</u>, NSB Hicks 038187.
[217] <u>See</u>, NSB Hicks 038187.
[218] <u>See</u>, NSB Hicks 038187-038188.
[219] <u>See</u>, NSB Hicks 038187.
[220] <u>See</u>, NSB Hicks 038188.
[221] <u>See</u>, NSB Hicks 038188.
[222] <u>See</u>, NSB Hicks 038188.
[223] <u>See</u>, NSB Hicks 038188.
[224] <u>See</u>, NSB Hicks 038188.
[225] <u>See</u>, NSB Hicks 038188.
[226] <u>See</u>, NSB Hicks 038188.
[227] <u>See</u>, NSB Hicks 038188.
[228] <u>See</u>, NSB Hicks 038188.
[229] <u>See</u>, NSB Hicks 038189.
[230] <u>See</u>, NSB Hicks 038189.
[231] <u>See</u>, NSB Hicks 038189.
[232] <u>See</u>, NSB Hicks 038189.
[233] <u>See</u>, NSB Hicks 038190.
[234] <u>See</u>, NSB Hicks 038193, 038210.
[235] <u>See</u>, NSB Hicks 038208.
[236] <u>See</u>, NSB Hicks 038209.
[237] <u>See</u>, NSB Hicks 038211-12.
[238] <u>See</u>, NSB Hicks 038213.
[239] <u>See</u>, NSB Hicks 038294.
[240] <u>See</u>, NSB Hicks 038294.
[241] <u>See</u>, NSB Hicks 038294.
[242] <u>See</u>, NSB Hicks 038297.
[243] <u>See</u>, NSB Hicks 038270.

186.     Plaintiff's counsel effectively asks Defendants/the taxpayers to restock their office with new scissors, paper clips, file folders, notepads, and flashdrives.  Many of these are also the essence of sundries or treats—like a lamp set, gum, and Skittles.  Several of these items will also undoubtedly be re-used by Plaintiff's counsel again—the new pair of scissors, the new stapler and stapler remover, the remote-control lamp set for Attorney Green's hotel room, adapters, HDMI cables, and wall chargers are all items that will presumably adorn Plaintiff's counsel's office in the future.  These charges display such a fundamental lack of billing judgment and paying clients do not pay for these charges, something the Court acknowledged in its own experience that its own client "hated" charges for "rolls of Life Savers".[244]  I note that a number of the "supplies" receipts were not produced, with Plaintiff's counsel claiming they cannot locate them.[245]

187.     I additionally saw many instances of "upgrades" or what I refer to as "little luxuries"—things that are not purely necessary for the case, even if they may be a matter of convenience.  For example, the amount of coffee charges during trial come to nearly $1,000 while Plaintiff's counsel's hotel came with free coffee makers in their hotel.  Wifi was complimentary at their hotel for Marriott Bonvoy members, while several room charges purchased multiple upgraded wifi charges.[246]  There are significant amounts of laundry[247] and room service[248] charges sought.[249] I also observed a line-item for "b[irth]day treat" by Attorney Cion for "Joanne".[250]

---

[244] ECF No. 474 at 32:6-7.

[245] See, Jan. 13, 2026 E-mail from Grace Paras ("we did not locate the original receipts underlying these CVS and Duane Reade purchases. These purchases were made on Nick Brustin's firm credit card and were for snacks and drinks during the trial. Pursuant to NSBHF policy, the underlying receipts for items purchased on partners' firm credit cards are not required to be maintained.").

[246] See, **Exhibit G** (screenshots of the Renaissance Philadelphia hotel website), prepared on Jan. 14, 2026.

[247] See, NSB Hicks 038089-038104.

[248] See, NSB Hicks 038105.

[249] Ely Lilly & Co. v. Zenith Goldline Pharm., Inc., 264 F. Supp. 2d 753, 762 (S.D. Ind. 2003) ("personal expenses," such as "laundry, movies, and room service, are costs that "most certainly should not be shifted to the losing party").

[250] See, NSB Hicks 03805.

76

188.    I have attached as **Exhibit H** the list of coffee charges I have identified between the pre-trial conference (7/31/25) and August 28, 2025.  The Court will also notice, in addition to the sheer amount of coffee charges when free coffee was available for everyone at the hotel, multiple bulk charges in the same day.  For example, on 8/19/25, three separate attorneys (Cion, McCarthy, and Paras) charged five separate sets of coffee runs totaling $157.38 and on 8/21/25, three separate attorneys (Cion, McCarthy, and Paras) charged team coffee runs totaling $138.39.

189.    One observation pertains to Attorney Paras' hourly billings on days she was making coffee runs.  To use an example, on August 18, 2025, the trial began at 9:00 AM[251] and ended at 4:49 PM[252], with a lunch break lasting from 12:22 PM to 1:14 PM.[253]  Thus, the amount of time from Court convening to Court adjourning is 7.8 hours, and the actual trial time that date (excluding lunch) was 7.0 hours (3.4 hours in the morning and 3.6 in the afternoon), for which Attorney Paras billed 8.5 hours.  On August 18, Attorney Paras purportedly billed 8.5 hours for "in court for trial, arguments"[254] (plus an addition 9.0 hours for "trial prep").[255]  An examination of Attorney Paras' bulk-meal listings show that on August 18, 2025, she made a "Coffee run for team" and charged $19.12 for this team coffee run.[256]  Plaintiff did produce this receipt, showing the coffee run took place at 12:59 PM on August 18.[257]  This means that some amount of Attorney Paras' "in court" time was spent making coffee runs, not "in court" as her time entry posits.

190.    As noted above, some of these charges may have been for counsel's convenience, but that does not make them objectively reasonable—paying clients do not pay hourly fees for

---

[251] See, Day Six Tr. at 1:10.
[252] Id., 279:9.
[253] Id., 140:18-19.
[254] See, ECF No. 466-15 at p. 23.
[255] Id.
[256] See, NSB Hicks 038270.
[257] See, NSB Hicks 083286-7.

attorneys to make coffee runs in the middle of the day, nor do they pay for HDMI cables, new staplers and scissors for counsel's office.

**D.  Lavish Charges, Overstaffed Charges, and Upgrades**

191.    Another category of expenses that I identified are lavish charges.  These may be lavish either in their degree of cost (for example, a meal that costs too much per person) or to the extent they are a symptom of overstaffing.  For example, there are multiple meals at Lascalas Fire, including a $264.78 lunch.[258]  While the price per person for ten diners was not per se unreasonable, there was no objective need for ten people to attend a court conference, which made the meal cost far more than it should have.

192.    Another example includes Plaintiff's counsel's hotel bill, with rooms for nine timekeepers at NSBHF (Brustin, Cion, Freudenberger, Green, McCarthy, Neufeld, Paras, Park, and Taylor).[259]  Of those nine staying at the hotel, only three or four appeared most days on the record (Brustin, Freudenberger, Green, and McCarthy), and most sat in the gallery.  Assuming a paralegal was also necessary, the lodging for Attorneys Cion, Neufeld, Paras, and another paralegal totaled an excess of $16,000 (not including meals, laundry, and other incidental charges).

193.    Other more traditionally lavish expenditures include $112 in bar charges at the Ritz Carlton[260]; two pricey room service dinners at the Ritz Carlton for Attorney Freudenberger on the same night ($62.55 and $81.97), January 25, 2024[261]; two nights at the Ritz Carlton (1/24/24 and 12/25/24) for nearly $700 (plus nearly $70 in valet parking charges)[262]; a $319.27 dinner at Buddakan on August 16, 2025, a weekend during trial[263]; a $252.22 "Travel meal for E.

---

[258] See, ECF No. 466-10 at p. 34.
[259] See, NSB Hicks 038089-038104 (I understand that Attorney Rogachevsky lives in the Philadelphia area).
[260] See, NSB Hicks 038105.
[261] See, NSB Hicks 038105.
[262] See, ECF No. 466-10, p. 31; NSB Hicks 038105; Fresquez v. BNSF Ry. Co., 2020 WL 1322920, at *13 (D. Colo. Mar. 20, 2020) (objecting to charges for rooms at Ritz Carlton).
[263] See, ECF No. 466-10, p. 23.

Freudenberger" at Society Hill[264]; a $495.12 meal at First Daughter, purportedly on August 6, 2025[265]; Grubhub orders of, inter alia, $219.67[266], $303.36[267], and 216.84.[268]

194.    One issue with the substandard manner in which Plaintiff has organized its submission, compounded by Plaintiff's refusal to produce actual receipts, is the often confusing and evidently duplicative manner in which their meals are sought.   To use an example, I respectfully direct the Court to Plaintiff's purported meal submissions from August 24, 2025 (ECF No. 466-10 at pp. 40-41).  The Court can see charges for $216.84 ("Hicks trial team group dinner"), $38.99 ("Peter dinner during Hicks trial"), a $99.46 "group trial dinner", a $77.94 "hicks team dinner"); a $136.73 "trial-dinner for most of team"; a $36.10 $35.73 ("Trial – meal for Grace & Katrina."); a $36.10 "Hicks trial dinner", among several other dinners dated August 24, 2025. Additionally, there are a number of entries for "Hicks Trial Lunch" ($219.41, $232.95 and $196.27), a "Termaine prep lunch" for $110.38, among other charges.

195.    Whether a product of Plaintiff's counsel's inexcusably poor record keeping and organizational skills[269] or objectively excessive and unreasonable charges (or both), no reasonable paying client would see these charges and pay such apparently duplicative and excessive costs without further examination into the original receipts.

196.    I reiterate two key points to put these charges in further context:

a.    First, the lack of receipts makes it very difficult to evaluate the reasonableness of each of these charges, since Plaintiff does not identify how many people attended each meal, what was ordered, or where the meal took place for the overwhelming

---

[264] Id., p. 40.
[265] Id., p. 36.
[266] Id., p. 37.
[267] Id., p. 40.
[268] Id.
[269] Particularly since Plaintiff's counsel seeks a six-figure sum of professional fees to prepare such a messy, disorganized, and inaccurate fee motion.

majority of their expense charges—something that should not come as a surprise to Plaintiff's counsel, given the Rosario court reduced their travel and meal expenses for the very same lack of expense documentation.[270]

b.        Second, I cannot emphasize enough the impact the overstaffing of this trial had on the meal charges—particularly with the constant coffee runs (with Plaintiff's counsel charging legal fees to fetch these coffee runs), multiple Grubhub meals in the hundreds of dollars per day, and various snacks/treats/grocery runs.

197.    Plaintiff seeks $5,325.88 for a "War Room".[271]   While there are circumstances where a war room may be warranted, this was not such a circumstance.  The trial took place in a major city and Plaintiff's local counsel (KRMFL) has an office directly across the street from the Federal Courthouse.  As one court noted in refusing to award fees for a war room, having a war room under such circumstances "was motivated by convenience—not necessity."[272]

198.    I also saw numerous examples of smaller "upgrades" or charges that were also "motivated by convenience—not necessity".

a.        The most common example was the persistent purchase Acela tickets rather than the more cost-effective regional train.  Plaintiff's counsel was repeatedly charging Acela tickets of $180[273], $208[274], or similar charges.[275]   Attorney Neufeld specifically charged to upgrade his ticket to an Acela for $116.10.[276]   I am attaching as **Exhibit I** a

---

[270] Rosario v. City of New York, 2023 WL 2523624 *3 (S.D.N.Y. Mar. 15, 2023) (upholding Magistrate's reduction for Plaintiffs' counsel's undocumented travel costs).
[271] See, NSB Hicks 038103.
[272] AECOM Tech. Servs. v. Flatiron | AECOM, LLC, 2025 U.S. Dist. LEXIS 44073 *19-20 (D. Colo. Mar. 11, 2025) (denying war room charge where local office was less than a mile from the federal courthouse).
[273] See, NSB Hicks 038271.
[274] See, NSB Hicks 038308.
[275] Because Plaintiff did not provide receipts, I cannot determine how many of these were upgraded, but man of the prices indicates these are likely Acela charges or upgraded charges.  See, ECF No. 466-10, p. 29 ($128, $256, $142, $190.80, $212), p. 31 ($116, 128, $208); p. 32 ($182, $164, $218); p. 34 ($192, $175, $145, $278, $290), etc.
[276] See, NSB Hicks 038116.

print-off from Amtrak's website showing the cost of traveling from New York to Philadelphia on August 10 of this year, anytime between noon and 6 PM on that day. The price of taking the Regional train between New York and Philadelphia is as little as $19, while the Acela costs up to $159 (partly because it only offers upgraded charges). While this may seem small, when there are train tickets purchased for 8-10 people due to the overstaffing, the price difference is far greater.

b.      Another example includes many expensive car services charges, such as car services for Tyhease Hicks ($166.96) and Tyron McClendon to attend trial ($299.33).[277]

c.      In perhaps the epitome of "motivated by convenience—not necessity", another car service was for Attorney McCarthy between Newark Penn Station and an address near Exchange Place in Jersey City at 3:21 PM with a "Priority Pickup Upgrade" surcharge added.[278] In addition to the upgrade added, I note that Newark Penn Station and Exchange Place in Jersey City are connected by the PATH Train, which costs a total of $3 to ride between the same locations (1/10 of the cost of the car service).

199.    As noted above, some of these charges may have been for counsel's convenience, but that does not make them objectively reasonable—paying clients expect counsel to use billing judgment when charging their travel costs, which clearly did not occur in this matter.

### E. "Phantom" Charges

200.    While harder to determine, particularly without receipts, I have identified some "phantom" charges (charges which are inconsistent with the record or simply inaccurate). Identifying "phantom" charges can be extremely difficult without having receipts, but I was able to identify certain examples.

---

[277] See, ECF No. 466-10, p. 39.
[278] See, NSB Hicks 038265.

201. One example is Attorney Freudenberger charging multiple room-service dinners in the same evening (January 25, 2024). On this date, Attorney Freudenberger was staying in Room 2303 of the Ritz Carlton, and ordered an "In Room Dining Dinner" for $62.55 (check # 2247) and another "In Room Dining Dinner" for $81.97 (check # 2297).[279] This qualifies as a "phantom" charge given there is no apparent reason for needing two dinners (both pricey) on the same day.

202. Another example can be seen with Sara Morrison, who is Plaintiff's counsels "Office Manager"[280], who billed only a limited amount of time to the case and billed no time after January 19, 2024.[281] However, there are a number of "phantom" expense charges by Sara Morrison well after that date, including a train ticket on 8/6/25[282], a $56.95 car service from the train on 8/6/25[283], and a Wawa charge on 8/6/25[284], all dates on which she billed no time to the case.

203. Another example can be seen for deposition charges for Attorney Rogachevsky to attend a deposition on a date when she billed no time and did not attend the deposition. There are expense charges for "Katrina" [Rogachevsky] "to Dep" and "from Dep" on November 29, 2023 ($16.76 and $15.95 respectively). Attorney Rogachevsky billed no time on that date.[285] The only deposition which took place that date was Tomekia Gaskins, and the only counsel on the record representing the Plaintiff was Attorney Feinberg.[286]

204. Another example can be seen from Attorney Paras' bulk meal set, which includes a $24.15 "Trial Meal"[287], which is dated August 6, 2025. There was no trial in this matter on August

---

[279] See, NSB Hicks 038105.
[280] https://nsbhf.com/gs_team/sara-morrison/.
[281] See, ECF No. 466-9, p. 94.
[282] See, ECF No.4 66-10 at p. 35.
[283] Id. at p. 36.
[284] Id.
[285] See ECF 466-19, p. 24 (time records); ECF No. 466-10 p. 30 (expense records); Gaskins Dep. Tr. 2:3-7.
[286] Gaskins Dep. Tr. 2:3-7.
[287] See, NSB Hicks 038271

6, 2025. Plaintiff belatedly produced this meal's receipt[288], which shows the meal was actually ordered on August 5, 2025 (there was also no trial on this day). The receipt also shows this meal was delivered to 200 Varick Street in New York, NSBHF's office.[289] Assuming this meal was actually for this case (and not another matter for which Attorney Paras had a trial), this was just a meal delivered to Attorney Paras at her regular office, not a "trial meal" (as Plaintiff's fee motion posits) or meal for travel (this was grouped in Expense Chart 9, which are travel meals).[290]

205.    Regardless of whether these phantom charges are the product of Plaintiff's counsel's inexcusably poor record keeping and organizational skills (for which they seek a six-figure sum in professional charges) or objectively excessive and unreasonable charges (or both), no reasonable paying client would see these charges and pay such apparently duplicative and excessive costs without further examination into the original receipts.

### F.  Plaintiff's Lack of Billing Judgment in its Expense Request

206.    What makes these charges demonstrate such a profound a lack of Billing Judgment is the amount of "judgment" that went into these charges still being sought. At first, Attorney Green (a partner at NSBHF) swore that when preparing her declaration listing the expenses being sought, she personally "reviewed the expenditures detailed in these records and rely on those accounting records in making this declaration"[291] and she personally "reviewed and categorized the expenses for reasonableness and compensability."[292]

207.    On its face, these statements demonstrate that Attorney Green made specific judgment calls that these aforementioned expenditures were reasonable to ask the Court to award

---

[288] See, NSB Hicks 038329-30.
[289] Id.
[290] See, ECF No. 466-10, p. 28.
[291] See, Green Decl., ¶ 7.
[292] Id., ¶ 54.

from the City (and the taxpayers), including her $91 lamp set—a lamp set purportedly for Attorney Green's hotel room[293] at the Renaissance—an objectively nice hotel (which I am confident could have brought an additional lamp to her room or made accommodations upon request).

208.    Plaintiff's counsel was given a further opportunity to exercise Billing Judgment after Defendants filed their Motion to Compel (ECF No. 467).  Therein, Defendants identified many of the charges listed here (including the Buddakan dinner, the $91 Lamp for Attorney Green's hotel, and the Ritz Carlton Charges).[294]

209.    Thus, even if Attorney Green mistakenly forgot to remove her $91 lamp or the Buddakan charge in good faith, Plaintiff had the opportunity to correct the issue at this time. Indeed, in its opposition to the motion, Plaintiff asserted that had Defendants "raised specific questions about [certain] hours or expenses to us" then they "would concede [those charges] should be withdrawn".[295]  However, Plaintiff chose not to withdraw any of the list of expense charges listed in Defendants' Motion to Compel.  At this point, there is no mistake as to Plaintiff's intent to seek unreasonable charges—having been afforded multiple stages to exercise Billing Judgment, the only judgment made by counsel was to seek these unreasonable charges.[296]

### G.  Plaintiff's Sought Expert/Vendor Invoices

210.    Plaintiff seeks $117,237.69 in expert/consultant fees and costs in trial consulting and litigation consulting charges.  Assuming these are recoverable as a matter of law, there is no

---

[293] See, ECF No. 466-10 at p. 44 ("Lamp for A. Green's Hotel Room").
[294] See, ECF No. 467 at pp. 5-7.
[295] See, ECF No. 469 at p. 4.
[296] I was informed that on Friday, January 16, 2026 (the last business day prior to the due date of Defendants' opposition), Plaintiff belatedly withdrew a minor quantity of expenses.  My analysis had already been complete and I am treating it as though no such withdrawal occurred given that Plaintiff contended these charges were reasonable for several months and had multiple opportunities to withdraw them prior to the eve of opposition.  It also does not affect my opinions, since the 50% reduction would apply to all travel/meal charges.

backup documentation as to the hourly work performed, no time narratives, and no description of the work performed.

211.    For example, one invoice (IMS Invoice 023201)[297] claims 188 hours for a James Smith with no breakdown of that 188 hours, what work he performed, and what he did differently from the other four timekeepers who billed in this invoice.  I note that another timekeeper on this invoice is not even named (just his/her title of "Senior Designer" is referenced in the bill) and this unnamed person billed 1.41 hours, an extremely irregular hour count (I would expect either tenth or quarter hour increments).[298]

212.    Without the breakdown of the work performed, I cannot opine that any of these charges were reasonably incurred.

## H.  Conclusion Regarding Plaintiff's Costs/Expenses

213.    For these reasons, it is my opinion that no amount of the $117,237.69 in expert/vendor bills can be deemed reasonable without any time records or evidence of the nature of their work.  As to the remainder ($69,680.28 in travel costs), it is my opinion that the best way to address these is to effectuate a percentage reduction, for the same reasons set forth in the section dealing with Plaintiff's counsel's time records.  I believe a 50% reduction (or $34,840.14) is conservative, yet addresses the issues with the reasonableness of these charges.

214.    I have two reasons for choosing 50% in this matter:

a.        The first is that the overstaffing (for which I recommended a conservative 30% reduction) is a core integral part of the excessive nature of these expenses, but they were not the only issues, so any amount would necessarily exceed 50% particularly given

---

[297] See, NSB Hicks 038112.
[298] Id.

85

the numerous "convenience—not necessity" charges, overhead charges, constant upgrades, and other indicia of a lack of billing judgment, which never should have been charged.

b.      I also considered as a benchmark the <u>Velva B.</u> matter in which the EEOC reduced the travel and meal costs by 50% based upon my findings and recommendations.[299] In <u>Velva B.</u>, the issues substantially overlapped with the issues here, including no organization to the receipts and credit card statements, which include charges that are unexplained and a lack of documentation[300]; "phantom" charges where attorneys sought expenses on days where no work was done[301]; "numerous restaurant charges totaling hundreds of dollars, without any explanation"[302]; persistent upgrades and lavish charges in hotels and meals[303]; numerous overhead charges and online retailer charges[304]; and substantial overstaffing of the matter by the plaintiff's counsel.[305]

215.    For these reasons, it is my opinion that Plaintiff's cost request is substantially excessive and unreasonable, as well as substantially undocumented, and demonstrates a profound lack of billing judgment.  Therefore, I recommend a reduction of $117,237.69 for the expert/vendor bills and $34,840.14 (50% of the remaining for the travel/meal costs sought) for a total cost reduction in the amount of $**152,077.83**.

## XII.    <u>OPINION VII: REBUTTAL TO THE SONNENFELD DECLARATION</u>

216.    I was asked to review the opinions of Attorney Sonnenfeld, as set forth in his Declaration (<u>ECF No. 466-6</u>).  While I do not dispute his credentials and many years of experience in practice, I believe his opinions in this matter are flawed due to their conclusory nature, with

---

[299] <u>See</u>, <u>Velva B. v. DeJoy</u>, 2022 EEOPUB LEXIS 2677 at *23.
[300] <u>Id.</u> at *22.
[301] <u>Id.</u> at *23.
[302] <u>Id.</u>
[303] <u>Id.</u>
[304] <u>Id.</u> at *22.
[305] <u>Id.</u> at *4.

86

little in the way of substantive analysis. This flaw is not Attorney Sonnenfeld's typical practice, as other prior opinions he proffered considered and substantively evaluated many of the key issues that are missing from his opinions in this case—issues that would have undercut his opinions here.

217.    Elsewhere, Attorney Sonnenfeld has (correctly) looked critically at the staffing of the case, the results obtained, whether the fees bore a reasonable relationship to successful endeavors, evaluated the substantive work product prepared, and looked at the expenses. These are all indicia of reliable fee analysis. But he did none of that here—there is no "why or wherefore" to his opinions. Several examples will illustrate and underscore the conclusory and flawed nature of his opinions in this case and how they contrast with his more substantive prior opinions.

A.    **Attorney Sonnenfeld's Opinions About the Results Obtained**

218.    In his Dennis opinions, Attorney Sonnenfeld looked to the substance of the results obtained by counsel, commenting the "extraordinary result" in that case justified the rates because the $16 million verdict in that case was "uniquely large".[306] In other words, in Dennis he at least compared the results to something tangible (other cases).

219.    Here, Attorney Sonnenfeld comments in passing that he "considered the excellent result obtained"[307] but does not explain why it is "excellent", nor does he compare it to other cases, similar or otherwise, as he did in Dennis. There is an obvious difference, with the Dennis verdict being for $16 million and this case's verdict being $3 million.

220.    It is also hard to reconcile Attorney Sonnenfeld's conclusory statements about there being an "extraordinary result" with Plaintiff's own statements in their Motion for a New Trial on Damages (ECF No. 449). Plaintiff's own counsel described the verdict here as, inter alia, "a small

---

[306] Sonnenfeld Dennis Decl., ¶¶ 17-18.
[307] Sonnenfeld Decl., ¶¶ 18-19.

87

fraction of what is typically awarded for similar injuries"[308]; an "exceedingly low damages award"[309]; "plainly inadequate"[310]; only 15% of the "reasonable and typical" benchmark for similar cases[311]; and "so far outside the reasonable range of compensation" for Plaintiff.[312] Plaintiff even claimed that their jury verdict was below amounts paid by the City to settle similar claims.[313]  In other words, all of the objective indicia of a good result (such as comparison to other cases) undercut Attorney Sonnenfeld's opinions here.

221.    The result in this case was a fraction ($16 million vs. $3 million) of the jury verdict in <u>Dennis</u>, yet both are described as an "extraordinary result", only the opinion here has no objective measurement explaining <u>why</u> the result here is extraordinary.[314]  Plaintiff's counsel did not think it was anything but "plainly inadequate" and "far outside the reasonable range of compensation".  This is a key issue across Attorney Sonnenfeld's opinions—they generally lack a "why and wherefore" to explain their basis, which are not the case with many of his prior opinions.

### B.  Attorney Sonnenfeld's Opinions About Complexity/Novelty

222.    In his <u>Dennis</u> opinions, Attorney Sonnenfeld addresses the novelty and complexity of that matter to justify his opinions, much as he cites to those factors here in this case.[315]  Once again, his conclusory opinion here offers no "why or wherefore" to explain why he viewed the issues in this case to be novel (and only cites to the fact that there were preclusive motions/motions in limine, hardly something novel or unique to this case).

---

[308] <u>ECF No. 449</u> at p.1.
[309] <u>Id.</u>
[310] <u>Id.</u> at p.8.
[311] <u>Id.</u> at pp, 9, 12.
[312] <u>Id.</u>, p. 12.
[313] <u>Id.</u> at p. 12, n.6.
[314] As noted elsewhere, I am not evaluating the degree of success in either case, which Defendants' Counsel is addressing in its brief.  The purpose of this section is merely to compare Attorney Sonnenfeld's more robust and substantive analysis he conducted in <u>Dennis</u> with his conclusory and non-substantive opinion here.
[315] <u>Sonnenfeld Decl.</u>, ¶ 20 ("NSBHF also prepared and litigated numerous pretrial motions involving complex and at times novel issues of law, including preparing and responding to numerous Daubert motions and motions in limine.").

223.    This is in stark contrast to Dennis, where Attorney Sonnenfeld explained that Dennis involved interlocutory appellate practice (a more complex area of the law) that specifically involved "an issue of first impression"[316] in which "at least two threshold legal issues were unsettled at the outset of this case."[317]  Those explanations supported the "why and wherefore" behind his opinions in Dennis, but he failed to do the same here.  The fact that there were motions in limine does not make this case uniquely special or complex compared to other similar cases.

**C.  Attorney Sonnenfeld's Staffing and Billing Judgment Opinions**

224.    In Dennis, Attorney Sonnenfeld took a thorough and searching analysis (as he should) to substantively evaluate the staffing and billing judgment exhibited by counsel, forming the backbone of his substantive analysis in that matter.  However, all of the issues he properly examined in Dennis are entirely absent from his opinions in this case.

225.    In Dennis, Attorney Sonnenfeld critically examined the staffing of the case, noting that the staffing was very lean, and the work was conducted "efficiently" by counsel.[318]  He stated how "impressed" he was by the work being done by only three timekeepers, with lead counsel handling 90% of the work by himself, showing "there was no overstaffing or unnecessary duplication of efforts" in that case.[319]  These are key parts to a reliable reasonableness analysis and Attorney Sonnenfeld was correct to perform that analysis in Dennis.

226.    But there is no efficiency analysis in this case (i.e., X people performed 90% of the work)—he does not address the staffing at all (notable given that this case had staffing in the multiples of Dennis)—nor does the word "efficient" or "efficiency" appear anywhere in his

---

[316] Sonnenfeld Dennis Decl., ¶ 19.
[317] Id.
[318] Sonnenfeld Dennis Decl., ¶¶ 18, 27.
[319] Id., ¶ 18.

89

opinions in this matter.  The contrast is stark—here, even the top eight timekeepers[320] did not bill 90% of the fees, hardly a model of efficiency.  Attorney Sonnenfeld did not even try to echo Plaintiff's half-hearted attempt to compare its staffing to the City's[321] as I am certain he understood the "City's" lawyers had to represent multiple different clients—many of whom were not dismissed from the case until the trial—while Plaintiff's counsel only had one client.

227.    Attorney Sonnenfeld also highlighted various exercises of Billing Judgment in his <u>Dennis</u> opinions, noting that he was "impressed that recovery is not sought for administrative or clerical tasks".[322]  In <u>Dennis</u>, he especially noted that recovery was not sought for time working on claims that were dismissed or otherwise unsuccessful.[323]  The same cannot be said for this case.  Despite having many unsuccessful endeavors in this case (including being sanctioned by the Court for an early-morning scream test in 2024) and having a number of the defendants dismissed just before trial despite arguing in pre-trial motion practice that they should remain as defendants, Plaintiff's counsel did not remove work for dismissed or unsuccessful claims, claiming they do not have to do so.[324]  As to clerical work, there is an entire activity "category" in the paralegal time records for "Organizing Documents", much of which involves printing, copying, and organizing documents (268.1 hours total), much of which is clerical or administrative in nature.

### D.  Attorney Sonnenfeld's Lack of Review of Work Product/Expenses

228.    One other notable difference between prior opinions and this opinion is that in other cases, Attorney Sonnenfeld reviewed the underlying work product (such as motions, pleadings, etc.) in evaluating his presentation.  In both his <u>DeFrank</u> and <u>Lucas</u> opinions, he noted that the

---

[320] Brustin, Hoffman, Freudenberger, Green, Rogachevsky, Paras, Romo, and Cion.
[321] <u>ECF No. 466</u> at p. 16.
[322] <u>Sonnenfeld Dennis Decl.</u>, ¶ 18.
[323] <u>Id.</u>, ¶ 19.
[324] <u>ECF No. 466</u> at p. 17.

"excellent written submissions which [he] reviewed" was a factor in forming his opinions.[325] However, the materials provided by Plaintiff's counsel do not indicate that he reviewed written work product. This is a notable omission because a review of work product and record documents here would be the only way to identify many of the staffing and timekeeping issues. For example, the list of materials provided by Plaintiff's counsel on December 19, 2025 (from Attorney Paras) as to Attorney Sonnenfeld's materials reviewed does not include deposition transcripts, which would have showed him that many of the attorneys billing for those depositions did not appear on the record, and had time entries for wildly different amounts than the time stamps in the transcripts. He did not review the letter in connection with the Show Cause/Scream Test (ECF No. 199) to evaluate why at least nine timekeepers needed to seek time for their work on this letter.

229.    One final discrepancy between this case and prior cases is that in prior matters, Attorney Sonnenfeld reviewed and evaluated the propriety of the expenses sought.[326] He did not do so here, which is unsurprising given the obvious issues with the personal charges and the like in the expenses in this case. Had Mr. Sonnenfeld looked at the expenses, he would have seen the obvious issues, like an expensive dinner at Buddakan, a lamp for Attorney Green's room, and a $72 birthday treat, among other things. Morgan Lewis's clients would certainly not pay for these charges, and his failure to look at these expenses is a substantial omission.

### E.   Conclusion Concerning Attorney Sonnenfeld's Opinions

230.    In each respect, Attorney Sonnenfeld's differences with prior opinions reflects two core flaws in his opinions, a lack of critical or substantive analysis regarding many key parts of a reasonableness analysis and obvious discrepancies where the fees or expenses here were not justifiable under Attorney Sonnenfeld's typical analysis.

---

[325] Sonnenfeld DeFrank Decl., ¶ 12; Sonnenfeld Lucas Decl., ¶ 11.
[326] Sonnenfeld DeFrank Decl., ¶¶ 15-17; Sonnenfeld Lucas Decl., ¶ 17-19.

****

## XIII.   SUMMARY OF OPINIONS AND CONCLUSIONS

231.   For all the reasons set forth herein, my seven opinions and conclusions can be summarized as follows:

232.   First, Plaintiff's fee submission reflects a profound lack of billing judgment, seeking reimbursement for a substantially overstaffed representation as well as expenses that no reasonable paying client would ever pay.

233.   Second, Plaintiff's counsel's time records do not reflect high quality, accurate, or contemporaneous time recordation.  Rather, they contain all the hallmarks of inaccurate and belated reconstructions of time records that are at times inconsistent with the factual record.

234.   Third, Plaintiff's counsel substantially overstaffed the representation with scores of unnecessary timekeepers; overstaffed hearings, depositions, trial, and other litigation tasks; overworked nearly every task with too many timekeepers who duplicated each other's work; engaged in far too many unreasonably staffed conferences; and performed the work in an unreasonably top-heavy manner; among other issues.  Once adjustments are made to address these and other issues, a non-excessive number of hours for Plaintiff's counsel comes to 9,394.73 hours.

235.   Fourth, the Philadelphia hourly rates sought by Plaintiff's counsel are excessive and do not reflect reasonable market rates in the community for similar work.

236.   Fifth, applying more appropriate market rates for Philadelphia to the non-excessive number of hours set forth in Opinion 3 produces a lodestar amount of $3,677,550.10 in fees.

237.   Sixth, Plaintiff's cost request is excessive, poorly lacking in documentation, and displays a profound lack of billing judgment, and should be reduced by $152,077.83.

238.     Seventh, the opinions proffered by Attorney Sonnenfeld in support of Plaintiff's fee motion are flawed, as they lack substantive analysis, are inconsistent with the more substantive analysis he generally conducts in other matters, and failed to review or take into account important information (such as the expenses or the work product) that should have informed his opinions.

**\*\*\*\***

## XIV.    <u>SIGNATURE AND ATTESTION</u>

239.     All of my expert opinions stated herein are to a reasonable degree of professional certainty.  I reserve the right to supplement my opinions should any additional information become available.

Dated: January 19, 2026
        Warren, New Jersey

*/s/ Steven A. Tasher*
Steven A. Tasher, Esquire
Wyatt Partners
P.O. Box 358
Berkeley Heights, NJ 07922
stasher@wyattpartners.com

93