**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TERMAINE HICKS** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 22-977** |
| | : | |
| **CITY OF PHILADELPHIA, *et al.*** | : | |

# MEMORANDUM

**MURPHY, J.** **August 18, 2026**

Roughly one year ago, this wrongful conviction case against the City of Philadelphia and various members of the Philadelphia Police Department went to trial. A jury found for the plaintiff, Termaine Hicks, on all counts and awarded him $3 million in damages. Mr. Hicks's attorneys want to get paid for their work and the expenses they incurred to pursue this case, so they have filed a fee petition under 42 U.S.C. § 1988 — which permits us to award reasonable fees and costs to the prevailing party in a civil rights case such as this. Reasonable being the key word. Mr. Hicks asks us to award $8,235,831.25 in attorney's fees, applying New York rates; and if we disagree that New York rates apply, then $7,116,153.25 based on Philadelphia rates. Mr. Hicks also seeks $336,166.02 in litigation costs. Defendants opposed this fee petition so adamantly that they urged us to deny it wholesale because they think it is an outrageously excessive opening bid. We referred the petition to a special master, Hon. Mitchell S. Goldberg, who recommended a significant reduction. Mr. Hicks objected, returning the matter to us for *de novo* review. In this opinion, we address the objections and explain why we agree with Judge Goldberg that a reduction is warranted, albeit with some different turns along the path. We conclude that (1) New York billing rates apply to the fee request; and (2) Mr. Hicks is entitled to reasonable fees and costs, which amount to $4,941,498.75 in fees (a 40% reduction of the

request) and $235,316.21 in costs (a 30% reduction of the request), for a total award of $5,176,814.96.

## I. FACTUAL BACKGROUND

Four years ago, Termaine Hicks sued the City of Philadelphia and several members of the Philadelphia Police Department for wrongful conviction, arising out of his 2002 rape conviction in Pennsylvania state court, subsequent release, and grant of post-conviction relief eighteen years later. Our prior opinions in this litigation describe the significant facts and pretrial disputes. *Hicks v. City of Philadelphia*, 2026 WL 498885 (E.D. Pa. Feb. 23, 2026); *Hicks v. City of Philadelphia*, 783 F. Supp. 3d 834 (E.D. Pa. 2025); *Hicks v. City of Philadelphia*, 753 F. Supp. 3d 409 (E.D. Pa. 2024); *Hicks v. City of Philadelphia*, 2023 WL 5278713 (E.D. Pa. Aug. 16, 2023). After a notably contentious two-and-a-half week trial, the jury returned a verdict in Mr. Hicks's favor, finding that (1) Officers Vinson, Smith, and Zungolo, and Detectives Ellis and Campbell, fabricated evidence and conspired to violate Mr. Hicks's constitutional rights; (2) Officer Zungolo and Detective Campbell concealed and/or suppressed evidence as part of a larger scheme; and (3) the City of Philadelphia's custom or policy, and its failure to supervise and/or discipline its police officers, caused the violation of Mr. Hicks's constitutional rights. DI 410 at 1-4. The jury awarded Mr. Hicks $3 million in damages for these violations. *Id.* at 4. And when asked whether preponderant evidence showed that Mr. Hicks had committed the rape, the jury answered "no." DI 412.

Among the many post-trial motions filed is the motion now before us: Mr. Hicks's

motion for attorney's fees and costs. DI 466. Defendants[1] moved to compel discovery regarding Mr. Hicks's motion, seeking specific documentation for the fees and costs requested. DI 467. We held a conference on defendants' motion, DI 473, and ordered Mr. Hicks to produce documentation that provided the basis for every cost or expense sought in his motion, produce the original time-recording software output sheets used to generate the requested billable hours, and either produce or identify any documents, facts, or data relied upon by the declarants who purported to provide opinion testimony in support of his motion (as well as any exhibits or illustrative aids that these declarants would use to support or summarize their opinions at a hearing). DI 472. To the extent original receipts were not part of that production — and given Mr. Hicks's representation at the conference that, as a matter of firm policy, Neufeld Scheck Brustin Hoffmann & Freudenberger, LLP (NSBHF) does not maintain original receipts, such that the blanket production thereof would be overly burdensome (DI 474 at 32-33) — we permitted defendants to "request original receipts on an item-by-item basis if it [was] necessary to resolve a real concern." DI 472 at ¶ 1. Following further communication from the parties regarding the production of such receipts, DI 478, we ordered defendants to identify a sample of up to 50 receipts/records to be produced by Mr. Hicks, DI 479. Defendants subsequently filed their response in opposition to Mr. Hicks's motion for fees and costs (DI 480), followed by Mr. Hicks's reply (DI 489) and defendants' sur-reply (DI 502).

Given the exceptional nature of the fees request and the difficult computation involved, we appointed Hon. Mitchell S. Goldberg, presently of the Blank Rome law firm, to serve as

[1] Defendants include the City of Philadelphia, Martin Vinson, Robert Ellis, Arthur Campbell, Dennis Zungolo, and Mary Bridget Smith, as personal representative of the estate of Brian Smith. DI 467 at 3.

special master to make recommendations on the fees and costs motion under Rule 53(a)(1)(B). DI 491. On May 15, 2026, Judge Goldberg submitted his report and recommendation (R&R). DI 497. The R&R concluded that (1) Mr. Hicks is entitled to reasonable fees and costs; (2) Philadelphia rates should apply to the attorney's fees, at the rates requested by Mr. Hicks; (3) the number of hours expended by Mr. Hicks's attorneys was unreasonable; (4) the complicated and contentious nature of this litigation does not justify Mr. Hicks's fees request; and (5) the requested costs should be reduced in light of overstaffing. *Id.* at 9-20. Applying Mr. Hicks's Philadelphia rates, Judge Goldberg recommended a 40% reduction of the fees and costs requested, for a total of $4,471,642 in fees and $182,733 in costs. *Id.* at 20.

Mr. Hicks filed timely objections to the R&R. DI 503; *see also* DI 510 (reply in support of objections). He objects on three grounds: (1) the across-the-board 40% reduction to his hours is contrary to law because the R&R (a) does not explain the basis for its 40% reduction, (b) erroneously concludes that its reasonable billing practices were unreasonable, and (c) relies upon perceived deficiencies that do not support a 40% reduction; (2) the across-the-board 40% reduction in costs is not justified; and (3) New York rates should apply to his fee request. *Id.* at 7-28. While maintaining that no reduction in the hours expended is warranted, he asserts that, if we were to impose such a reduction, the record supports no more than a 10% reduction. *Id.* at 9. Mr. Hicks requests *de novo* review of his motion for fees and costs. *Id.* at 5, 22, 28.

Defendants did not file objections to the R&R.[2] Instead, they responded to Mr. Hicks's

[2] Though defendants note several points of disagreement with the R&R in their response to Mr. Hicks's objection, we do not construe these issues raised by defendants as timely-filed objections. *See* DI 508 at 7 (noting their disagreement with several aspects of the R&R). Defendants had the opportunity to timely file objections to the R&R and chose not to. Fed. R.

objections to the R&R. DI 508. They assert that the R&R (1) contains numerous findings in Mr. Hicks's favor and a generous award; (2) includes a well-founded and conservative 40% reduction in hours; (3) recommends a conversative and non-arbitrary 40% reduction in costs; and (4) correctly concludes that Philadelphia rates should apply. *Id.* at 7-20. Noting that the R&R seemingly reached calculations based on outdated figures, defendants contend that the corrected total award should be $4,471,642.[3] *Id.* at 21.

## II. MOTION AT ISSUE

### A. Mr. Hicks's motion

Mr. Hicks seeks attorney's fees and costs associated with this litigation. DI 466; DI 489. He asserts that New York — and specifically Southern District of New York (SDNY) — rates should apply to his attorney's fees, rather than Philadelphia rates. DI 466 at 18, 30-32. Applying New York rates, Mr. Hicks requests a total of $8,235,831.25 in attorneys' fees. DI 509-1 at 148. Alternatively, applying Philadelphia rates, he requests a total of $7,116,153.25. *Id.* Regardless of whether New York or Philadelphia rates apply, Mr. Hicks also requests $336,166.02 in costs. DI 509-2 at 14.

In support of his request, Mr. Hicks asserts that this case is unique among § 1983 wrongful-conviction suits because it was "particularly challenging and particularly hard-

---

Civ. Pro. 53(f)(2). We therefore need not review *de novo* any purported objections by defendants raised in their response; instead, as with other aspects of the R&R to which no objections have been raised, we may review these aspects of the R&R for clear error. However, out of an abundance of caution, we conduct both a clear error and *de novo* analysis of the issue regarding whether the fee petition should be denied in its entirety.

[3] Both Mr. Hicks and defendants note that Judge Goldberg seemingly relied on outdated figures to reach his calculation. DI 503 at 4 n.1; DI 508 at 21.

fought" — noting that (1) it combined a wrongful conviction suit and a police shooting suit, where that police shooting occurred 20 years prior; (2) the decision overturning Mr. Hicks's conviction involved no finding of actual innocence, requiring him to litigate his actual innocence in this suit; (3) this case required proving the misconduct and complicity of a very large number of police officers; and (4) he had to prove *Monell* liability — something that, to his counsel's knowledge, would have been a first in a wrongful conviction suit against the City of Philadelphia. DI 466 at 12-14. He emphasizes the volume of discovery disputes (and the volume of discovery documents produced), the significant number of depositions, his successful defense of a motion to dismiss and three separate summary judgment motions, and the nearly two-week-long trial that resulted in what he views as "a resounding verdict" in his favor. *Id.* at 14-17.

Mr. Hicks maintains that New York rates should apply because "qualified Philadelphia counsel were unavailable or unwilling to handle the case alone," such that this case meets the *Interfaith*[4] exception. *Id.* at 18, 30 (citing *Interfaith Cmty. Org. v. Honeywell Int'l, Inc. (Interfaith II*), 426 F.3d 694, 705-07 (3d Cir. 2005)). He points to the declarations of Jonathan Feinberg, co-counsel in this case, and Alan Tauber, as establishing that the nature of this case was such that no local counsel would have been willing to take it on at the time. *Id.* at 30-32. Mr. Hicks specifically avers that Kairys, Rudovsky, Messing, Feinberg & Lin LLP (KRMFL) was unwilling to handle this case itself and that, as co-counsel, NSBHF handled more than 95% of the hours and expenses compared to KRMFL. *Id.* at 31. And contrary to defendants'

[4] *Interfaith Cmty. Org. v. Honeywell Int'l, Inc. (Interfaith II)*, 426 F.3d 694 (3d Cir. 2005).

assertion, Mr. Hicks maintains that the Third Circuit in *Interfaith II* rejected the argument that the district court could not find the out-of-district-rates exception met where the plaintiff had not conducted an unsuccessful search for local counsel. DI 489 at 6. He also observes that defendants do not counter his evidence supporting out-of-district counsel with evidence of their own. *Id.* And he disputes defendants' claim that the presence of other qualified § 1983 counsel renders the *Interfaith* exception inapplicable, arguing that such presence goes only to the first exception regarding the need for special expertise. *Id.* Noting that the Third Circuit has held that travel time for out-of-district lawyers is compensable upon the same showing that local counsel was unwilling to take the case, he asks for an award for his counsel's travel time at 50% of their rate, which is standard practice in the SDNY. DI 466 at 32.

As for the requested rates, Mr. Hicks notes the national prominence and success of NSBHF and its partners in wrongful conviction practice. *Id.* at 33-36. He also asserts that KRMFL is an industry leader in § 1983 litigation in Philadelphia and has achieved several large settlements on behalf of its clients, while noting Mr. Feinberg's credentials. *Id.* at 34-36. Mr. Hicks contends that the requested rates are reasonable compared to the SDNY market rates for similarly complex federal litigation, pointing to the declarations from Mr. Sonnenfeld, Mr. Celli, and Mr. Loewenson. *Id.* at 37. And Mr. Hicks notes that the requested rates track those most recently awarded to NSBHF in *Rosario v. City of New York*, 2023 WL 2523624 (S.D.N.Y. Mar. 15, 2023). *Id.* at 39-40. Because Mr. Hicks maintains that the defendants do not contest the reasonableness of the requested New York rates, he asserts that we should find him entitled to such rates if we find that *Interfaith II* applies. DI 489 at 7.

Should we decline to award New York rates, Mr. Hicks argues that his requested

Philadelphia rates are reasonable. DI 466 at 43. He observes that his requested rates are far lower than the prevailing Philadelphia market rates for similarly complex litigation and are either in line with or below the rates awarded in this district for work in similarly complex litigation. *Id.* at 43-46. Mr. Hicks insists that the Community Legal Services rates should not apply given they (1) are outdated (because the latest schedule was published in January 2023); (2) fail to account for inflation or other market factors leading to increased billing rates; and (3) do not account for counsel's specific expertise and prominence in complex § 1983 litigation, the complex and risky nature of such cases, and the excellent results achieved. *Id.* at 44-45. He also notes that a 2023 nationwide survey of partner and associate billing rates for commercial litigation among Philadelphia firms with 51-200 attorneys identified ranges that are comparable to those requested here. *Id.* at 45. According to Mr. Hicks, defendants propose unreasonably low individual rates without justification. DI 489 at 8-10.

On reasonableness, Mr. Hicks insists that the hours expended were reasonable given (1) his counsel's extensive expertise and experience litigating § 1983 wrongful conviction suits; (2) the particularly complex and hotly contested nature of this case; and (3) the complete victory he achieved. DI 466 at 22-23. He argues that NSBHF's model incentivizes efficiency and that the reasonableness of its staffing is demonstrated by its "rough equivalence to staffing on the defense team" and the reality that both sides increased staffing shortly before, and during, trial. *Id.* at 24, 26-27. Mr. Hicks further asserts that he is entitled to compensation for time spent on the motions and issues he lost, as all of them were directly related to the Philadelphia Police Department's investigation which caused his wrongful conviction, his innocence, and the *Monell* claims on which he ultimately prevailed at trial. *Id.* at 27-28. In support, he includes a declaration from

Marc Sonnenfeld, a recently retired partner from Morgan, Lewis & Bockius LLP's Philadelphia office and recognized attorneys' fees expert, in which Mr. Sonnenfeld reviewed Mr. Hicks's submitted timesheets and found the fees request reasonable. *Id.* at 28. And to the extent that there are any errors in the logging of hours, Mr. Hicks asserts that they are de minimis and do not warrant a sweeping, across-the-board reduction. DI 489 at 15-16.

Finally, regarding costs, Mr. Hicks argues that he is entitled to his request because all such costs were reasonably incurred during this litigation and are normally billed to paying clients under this district's standard billing practices. DI 466 at 49-50. He points out that numerous of defendants' complaints about unnecessary costs, such as a birthday treat for a staff member, a war room, an upgraded Acela ticket, and a lamp, are not included in the request, were not billed at the rate claimed by defendants, or were withdrawn from the request. DI 489 at 18-19. And Mr. Hicks maintains that he sufficiently documented his costs. *Id.* at 18.

**B. Mr. Hicks's supporting declarations**

In support of his application for fees and costs, Mr. Hicks includes several declarations. These include declarations from Andrew Celli,[5] Carl Loewenson, Jr.,[6] Alan Tauber, and

[5] Mr. Celli is an attorney admitted to practice in the State of New York and the SDNY. DI 466-4. In his declaration, he discusses the expertise and skill of NSBHF lawyers, asserts that the SDNY rates charged in this case are reasonable and below those earned by lawyers of comparable skill and experience at major SDNY law firms, and that this case warrants compensation at the top of the relevant market range given its complexity. *Id.* at ¶¶ 8-9, 11-14, 16.

[6] Mr. Loewenson is an attorney admitted to practice in the State of New York and the SDNY. DI 466-5. In his declaration, he discusses the expertise and skill of NSBHF attorneys, states that the rates sought are reasonable for the SDNY market and substantially below those earned by lawyers of comparable skill and experience at major SDNY law firms, and asserts that this case was complex. *Id.* at ¶¶ 5-6, 9-11.

Jonathan Feinberg. DI 466-4; DI 466-5; DI 466-7; DI 466-12. Mr. Hicks also includes a declaration from Marc Sonnenfeld, whom he obtained as an expert regarding the reasonableness of his fees request. DI 466-6. He further includes declarations from the NSBHF attorneys and KRMFL associate who worked on his case, including Anna Benvenutti Hoffman, Emma Freudenberger, Amelia Green, Nick Brustin, Gerardo Romo, Grace Harris, Grace Paras, Kate Fetrow, Katie Cion, Katie McCarthy, Katrina Rogachevsky, Peter Neufeld, Sona Shah, and Tony Balkissoon.[7] DI 488-8; DI 488-9; DI 488-10; DI 488-11; DI 488-13; DI 488-14; DI 488-15; DI 488-16; DI 488-17; DI 488-18; DI 488-19; DI 488-20; DI 488-21; DI 488-22.

**i. Declarations of Attorneys Feinberg and Tauber**

The declarations of Attorney Feinberg and Mr. Tauber merit particular attention here, as they serve as the basis for Mr. Hicks's assertion that New York, rather than Philadelphia, rates should apply to his attorney's fees. Attorney Feinberg, who is admitted to practice in Pennsylvania, the Eastern District of Pennsylvania (EDPA), and the Third Circuit, served as co-counsel with NSBHF in this matter. DI 466-12 at ¶ 1. In his declaration, he explains that he has 23 years of experience practicing civil rights litigation in federal and state courts in Philadelphia and other jurisdictions, with expertise in various civil rights issues including wrongful convictions and excessive force by law enforcement, and has achieved multiple large settlements in civil rights cases. *Id.* at ¶ 2, 7-9. Mr. Feinberg asserts that it was clear before filing this lawsuit that this case would be complex, require significant resources, and carry substantial risks — noting the difficulties inherent in litigating a police shooting and wrongful conviction

[7] These declarations generally describe the attorneys' respective roles in this litigation; Ms. Green's declaration provides a specific declaration focused on the costs sought in this case.

case, where the shooting occurred 20 years ago, the law enforcement conspiracy involved numerous officers, and the City was reserving its right to decline indemnification for judgments against individual officers and aggressively fighting this case. *Id.* at ¶¶ 12-16. As for whether local counsel would have been willing to handle this litigation, Attorney Feinberg contended that, "In light of the necessary resources and risk apparent in prosecuting this case, as well as our full roster of other wrongful conviction suits, my firm was not in a position to handle this case on its own, without co-counsel fully committed to devoting necessary resources to the litigation. Nor did we have the capacity to take a leading role in the litigation of this case given the size of our staff and our commitments to other clients and cases, including complicated wrongful conviction cases." *Id.* at ¶ 18. He also asserted that NSBHF has a reputation as one of the nation's preeminent law firms in wrongful conviction litigation and a much larger staff and set of resources for such work compared to most civil rights firms. *Id.* at ¶ 19. At the time that Mr. Hicks was looking for counsel, Mr. Feinberg stated that "it would have been very difficult, if not impossible, for him to retain civil rights counsel in Philadelphia who would accept the risk of taking a leading role in litigation that presented the various challenges outlined above" because (1) "although in 2025 there are several Philadelphia firms with wrongful conviction litigation practices, this was not the case in 2020; the firms now handling wrongful conviction litigation in Philadelphia have for the most part built their practices in this area after 2020"; and (2) "in the immediate aftermath of pandemic related court and office closures beginning in March 2020, most plaintiff-side firms in the Philadelphia legal market were taking risk-averse approaches to their selection of cases to litigate." *Id.* at ¶¶ 20-21. He thus concluded that given the timeframe, risks, and challenges involved, he did not believe that Mr. Hicks "would have been able to secure

representation from a Philadelphia-area attorney or law firm willing to on its own assume the risk of litigating a case of this nature, particularly without contemporaneous payment for their services and expenses." *Id.* at ¶ 22.

Mr. Tauber is an attorney admitted to practice in Pennsylvania and the EDPA, with more than 30 years of experience at the trial and appellate levels in state and federal criminal cases, as well as many years working alongside leaders in complex federal civil rights litigation. DI 466-7 at ¶¶ 1-2. In his declaration, he stated that he is "intimately familiar with the civil rights bar in Philadelphia, especially those law firms and solo practitioners working on issues adjacent to the criminal-legal system" and has worked with both KRMFL and NSBHF several times. *Id.* at ¶¶ 2-3. Mr. Tauber explained that he reviewed various case materials, including Mr. Feinberg's declaration, and spoke with Mr. Feinberg about the case. *Id.* at ¶ 4. In his opinion, Mr. Tauber asserted that it was "unlikely qualified Philadelphia counsel would have been willing to take this case alone at the time when Mr. Hicks sought representation, around December 2020" given: "(1) the unique combination of a police shooting and a wrongful conviction, which predictably necessitated extensive expenditures on experts; (2) the seriousness of the allegations of misconduct, including gun-planting; (3) the number of officers implicated; (4) the lack of a finding of innocence and the strenuous contention by the City that Mr. Hicks was guilty; (5) the need to prove *Monell* liability because of the City's reservation of rights on indemnification; and (6) the high likelihood the case would be aggressively opposed and have to be litigated through trial—and the difficult circumstances presented by the COVID-19 pandemic." *Id.* "Based on [his] knowledge of the Philadelphia civil rights bar and legal market in and around December 2020, [he did] not know of any law firm or solo practitioner in Philadelphia who would have

been likely to take on Mr. Hicks's case at that time, without substantial time, resources, and risk-absorption from a co-counsel" due to (1) the litigation's complexity, up-front costs, and substantial risks; (2) the small number of law firms or practitioners of whom he knew were handling complex § 1983 wrongful conviction cases at the time; and (3) the relatively risk-averse approach of lawyers in the Philadelphia civil rights bar during the pandemic. *Id.*

**ii. Expert declaration of Mr. Sonnenfeld**

Mr. Hicks also includes a declaration from Marc Sonnenfeld, whom he offers as an expert on the reasonableness of his fees request. DI 466-6. Mr. Sonnenfeld is a retired former partner at Philadelphia's Morgan, Lewis & Bockius LLP office with 50 years of experience as a practitioner, 43 of them as a partner. *Id.* at ¶¶ 1-2. To form his opinion, Mr. Sonnenfeld states that he relied upon (1) the pleadings, court filings and exhibits, and other documents provided by NSBHF; (2) the declarations of Mr. Celli, Loewenson, and Tauber; (3) our opinions on the motions to dismiss, summary judgment motions, *Daubert* motions, and motions *in limine*; (4) NSBHF lawyers' resumes; and (5) the decisions in *Dennis*[8] and *Rosario*.[9] *Id.* at ¶ 8. He opines that all of the hourly billing rates are reasonable, that the substantive and travel hours sought are reasonable, and that the requested lodestar of $7,115,473.25 using Philadelphia rates or $8,236,201.25 applying New York rates are reasonable. *Id.* at ¶ 10. In Mr. Sonnenfeld's opinion, NSBHF should be compensated at New York rates, based on his (1) agreement with the declarations of Mr. Feinberg and Mr. Tauber; and (2) his experience that "it is common for sophisticated paying clients to hire out of district counsel to represent them in complex federal

[8] *Dennis v. Jastrzembski*, 2025 WL 1582452 (E.D. Pa 2025).

[9] *Rosario*, 2023 WL 2523624.

litigation." *Id.* at ¶¶ 12-13. Mr. Sonnenfeld states that the New York and Philadelphia rates sought here are significantly below the range for partners, counsel, and associates at Morgan, Lewis & Bockius LLP's Philadelphia office, *id.* at ¶ 14, and that they are reasonable because they track the rates awarded in *Rosario* and *Dennis*, *id.* at ¶¶ 15-16, 18. As for the hours billed, he opines that such hours were reasonable based on his review of the daily descriptions of hours billed, the excellent result achieved, the complexity of the case, and the vigorous defense in this litigation. *Id.* at ¶¶ 19-21. Finally, and in response to the declaration of defendants' expert, Steven Tasher, Mr. Sonnenfeld emphasizes that (1) Mr. Tasher failed to consider various EDPA cases in which courts have awarded Philadelphia fees similar to those requested here, derived absurd calculations for Philadelphia rates, and conducted a hindsight analysis of the hours; (2) the *Interfaith* exception was met here; (3) Mr. Hicks achieved an excellent result, regardless of the relatively low verdict amount; (4) this case was complex and novel; and (5) his lack of review of various documents was immaterial because he offered no opinion on the expenses. DI 489-1 at ¶¶ 7-13.

**C. Defendants' opposition**

Defendants vigorously oppose Mr. Hicks's motion and ask us to deny his request in its entirety because of "its patently inflated valuation" and "outrageous[] excessive[ness.]" DI 480 at 5, 13. Alternatively, they urge us to reduce the request to an award reflecting reasonable fees, his partial success, and the need to dissuade attorneys from treating fee demands as opening bids. *Id.* at 5, 13-14. To the extent that we award fees, defendants assert that Philadelphia rates are appropriate and a reduction of 50% based on Mr. Hicks's limited success is justified. *Id.* at 6.

Defendants assert that Mr. Hicks has failed to meet the *Interfaith* exception for out-of-

district rates because he has not demonstrated that he conducted a "significant search" for local counsel, contending that the only evidence that qualified local counsel was unable or unwilling to handle this were the declarations of Attorney Feinberg and Mr. Tauber. *Id.* at 9-10. Defendants point to various Philadelphia attorneys who they claim "routinely achieved far greater success for their clients than NSBHF did here[,]" citing various settlements obtained by different local attorneys. *Id.* at 12-13. And, contrary to Mr. Hicks's assertion that *Interfaith II* does not require him to show that he conducted a search for local counsel, defendants insist that there is such a search requirement and that *Interfaith II*'s progeny bear this out. DI 502 at 1-4. Thus, they maintain that Philadelphia rates should apply. DI 480 at 9-13.

As for the requested fee amounts, defendants point to issues with NSBHF's records, such as apparent cut-and-paste round number billing, billing to attend trial or depositions in excess of the time such proceedings lasted, block billing, and billing from an attorney (Attorney Rogachevsky) for depositions not attended, as examples of phantom charges identified by defendants' expert, Steven Tasher. DI 480 at 16-17. Pointing to Mr. Tasher's report, defendants assert that overstaffing by Mr. Hicks's counsel was a serious issue — emphasizing that there were (1) 38 timekeepers, 15 of whom were attorneys and 6 of whom are partners or Of Counsel; (2) expensive billers like Attorney Neufeld who performed passive, non-substantive work; (3) sometimes 8 timekeepers at a deposition when only 2-3 attorneys spoke; (4) excessive conferences; (5) top-heavy work distributions; and (6) passive, ancillary contributions from KRFML. *Id.* at 17-19. They highlight Mr. Tasher's conservative recommendation to reduce the requested hours by 30%, for a total of 9,394.73 hours across 15 timekeepers. *Id.* at 19. Defendants also assert that Mr. Sonnenfeld's opinion warrants little, if any, weight because his

opinion did not involve the review of any pleadings, motions, or transcripts, so it was not based on reliable methods and principles. DI 502 at 6-7. And they challenge the cases cited by Mr. Hicks as examples of rates comparable to those requested here, asserting that those cases are distinguishable outliers, and providing an informal survey of comparators themselves. *Id.* at 8-10. Regarding Mr. Hicks's Philadelphia rates, defendants point to Mr. Tasher's conclusion that such rates are excessive. DI 480 at 19-20.

Defendants also take issue with the costs requested. They emphasize Mr. Tasher's conclusion that Mr. Hicks's attorneys billed for excessive expenses, such as office supplies that constitute overhead, unnecessary coffee, and luxuries like delivered meals, priority car service, and a war room. *Id.* at 20-21. Defendants also contend that several timekeepers billed for expenses on days when they apparently had no fee activity. *Id.* at 21.

Finally, defendants assert that we should consider the $3 million verdict amount. *Id.* at 26-28. They note that Mr. Hicks himself admits this was a very low figure — a figure below what a reasonable jury could award, according to Mr. Hicks — and that he did not prevail on the claims he voluntarily dismissed with prejudice before trial. *Id.* at 26-27. Thus, they aver that we should reduce the lodestar by 50% if we award Mr. Hicks fees. *Id*. at 27-28.

**D. Defendants' expert declaration from Mr. Tasher**

The City retained Steven Tasher to evaluate the reasonableness of the fee request and opinions of Mr. Sonnenfeld. DI 480-2 at ¶ 1. Mr. Tasher asserts that he has "become an expert in the field of assessing and evaluating the reasonableness and necessity of attorneys' fees, costs, and settlements." *Id.* at ¶ 3. He notes that he co-founded Wyatt Partners in 2009, a consulting firm that provides expert analysis on the reasonableness of attorneys' fees and settlements in

complex litigation. *Id.* at ¶ 4. And he provides several examples of where he has been accepted as an expert on the reasonableness of attorneys' fees, costs, and settlements nationally and globally, including in Philadelphia and across Pennsylvania. *Id.* at ¶¶ 5-6. He offers seven opinions, based on his "experience with attorneys' fees in cases across the country (including in Pennsylvania) and in accordance with applicable legal standards and reliable methodologies":

- (1) "Plaintiff's fee submission reflects a profound lack of billing judgment, seeking reimbursement for a substantially overstaffed representation as well as expenses that no reasonable paying client would ever pay";
- (2) "[T]he time records submitted by Plaintiff's counsel do not reflect high quality, accurate, or contemporaneous time recordation" but instead "contain all the hallmarks of inaccurate and belated reconstructions of time records that are, at times, inconsistent with the factual record";
- (3) "Plaintiff's counsel substantially overstaffed the representation with scores of unnecessary timekeepers; overstaffed hearings, depositions, trial, and other litigation tasks; overworked nearly every task with an unreasonable number of timekeepers that duplicated each other's work; engaged in far too many unreasonably staffed conferences; and performed the work in an unreasonably top-heavy manner; among other issues" — in his view, a non-excessive amount would be 9,394.73 hours;
- (4) "[T]he Philadelphia hourly rates sought by Plaintiff's counsel are excessive and do not reflect reasonable market rates in the community for similar work";
- (5) "[A]pplying more appropriate market rates for Philadelphia to the non-excessive number of hours set forth in Opinion 3 produces a lodestar amount of $3,677,550.10 in

fees";

- (6) "Plaintiff's cost request is excessive, poorly lacking in documentation, displays a profound lack of billing judgment, and should be reduced by no less than $152,077.83"; and
- (7) "[T]he opinions proffered by Attorney Sonnenfeld in support of Plaintiff's fee motion are flawed, as they lack substantive analysis, are inconsistent with the more substantive analysis he generally conducts in other matters, and fail to review or take into account important information (such as the expenses or the work product) that should have informed his opinions."

*Id.* at ¶ 2.

Citing numerous examples of what Mr. Tasher views as overstaffing and poor record-keeping, Mr. Tasher ultimately recommends: (1) a 100% reduction to hours for ancillary timekeepers, except for Attorney Neufeld, for whom he recommended a 50% reduction; (2) removing all non-working travel time (which consisted of travel between New York and Philadelphia); and (3) a 30% reduction[10] of the fees due to "lack of billing judgment, lack of accurate and reliable time records, overstaffing by the core team in every aspect of the representation, unreasonably top-heavy administration of the workload, clerical/administrative work by the paralegals, and unreasonably vague/patterned time records." *Id.* at ¶¶ 135-41.

As for plaintiff's counsel's rates, Mr. Tasher concludes that the New York rates sought are reasonable, though he recommends reducing Attorney Rogachevsky's rate to the lowest-cost

[10] Mr. Tasher asserts that this 30% reduction is conversative, maintaining that even with that reduction, the various litigation events would still be overstaffed. *Id.* at ¶ 142.

associate on the case, $350/hour, given that she resided in and was based out of Philadelphia during most of this case and did the work of non-lawyer interns and paralegals. *Id*. at ¶¶ 150-53. He opines that the Philadelphia rates sought are unreasonable because the gap between the New York and Philadelphia legal markets is much larger than the gap reflected in their different fee requests. *Id.* at ¶¶ 154-57. Mr. Tasher thus applies a 3:2 ratio to the New York rates, compares them to the Community Legal Services (CLS) fee schedule, and calculates an adjusted lodestar of $3,677,550.10 based on 9,394.73 billed hours. *Id.* at ¶¶ 154-73.

Regarding Mr. Hicks's costs request, Mr. Tasher contends that there is a notable lack of supporting receipts for these charges. *Id.* at ¶ 175. He also asserts that the expense request "is laden with objectively excessive and unreasonable requests, for items such as lavish meals/hotel stays, transportation upgrades, administrative and overhead charges, and other charges that no reasonable paying client would pay[,]" including various office supplies, room service, upgraded Wifi, excessive coffee runs, and costly car service upgrades. *Id.* at ¶¶ 178, 184-87, 93-94, 98. Mr. Tasher further emphasizes that the requested costs are inflated due to overstaffing. *Id.* at ¶¶ 191-92. He opines that none of the $117,237.69 in expert/vendor bills could be deemed reasonable because they lack any time records or evidence regarding the nature of the work performed. *Id.* at ¶ 213. For the $69,680.28 in travel costs, Mr. Tasher believes that a 50% reduction is appropriate because of 1) overstaffing; 2) convenience charges, overhead charges, upgrades, and other indicators of poor billing judgment; and 3) its similarity to the issues in *Velva B. v. DeJoy*, 2022 EEOPUB LEXIS 2677 (EEOC Nov. 8, 2022), where the EEOC imposed a 50% reduction upon Mr. Tasher's recommendation. *Id.* at ¶¶ 213-14. He thus recommends a reduced total of $152,077.83 in costs. *Id.* at ¶ 215.

In direct response to Mr. Sonnenfeld, Mr. Tasher asserts that Mr. Sonnenfeld's opinions are conclusory and lack the substantive analysis Mr. Sonnenfeld has conducted in other cases, pointing to Mr. Sonnenfeld's (1) unsupported opinions that Mr. Hicks achieved an excellent result and that this case was novel and complex; and (2) lack of efficiency analysis, review of important work product, and evaluation of the propriety of the expenses sought. *Id.* at ¶¶ 216-30. Mr. Tasher notes that Mr. Sonnenfeld did not perform a thorough analysis of the reasonableness of the hours claimed here. DI 502-1 at ¶ 4. Without looking at a single pleading or transcript, Mr. Tasher asserts that Mr. Sonnenfeld could not assess whether staffing was excessive, redundant, or duplicative. *Id.* at ¶ 7. He avers that the random cases in this district referenced by Mr. Hicks do not provide market evidence and are poor comparators. *Id.* at ¶¶ 12-16. And Mr. Tasher maintains that *Interfaith II* requires demonstrating an actual search for local counsel. *Id.* at ¶ 20.[11]

## III. LEGAL STANDARDS

### A. De novo and clear error review

Rule 53 of the Federal Rules of Civil Procedure governs our review of Judge Goldberg's opinions. We must review *de novo* all objections by the parties to the Special Master's findings of fact[12] and conclusions of law. Fed. R. Civ. Pro. 53(f)(3)-(4). Under this standard, we do not

[11] As for Mr. Sonnenfeld's criticisms of Mr. Tasher himself, Mr. Tasher rejects the claim that he lacks experience with litigation in Philadelphia, providing several examples of such experience. *Id.* at ¶¶ 21-22. Nor, Mr. Tasher urges, does he lack experience with fee-shifting matters under contingent fee models. *Id.* at ¶ 26.

[12] The parties may stipulate, with our approval, that the findings of fact be reviewed for clear error or that the Special Master's findings be final. Fed. R. Civ. Pro. 53(f)(3)(A)-(B). We suggested the parties adopt clear error review, but they declined. So we exercise *de novo* review of both Judge Goldberg's findings of fact and conclusions of law.

defer to Judge Goldberg's factual findings or legal conclusions, nor presume their correctness. *Viera v. Life Ins. Co. of North America*, 642 F.3d 407, 413-14 (3d Cir. 2011) (citations omitted). The Rules do not specify the necessary standard of review where there are no objections to the Special Master's findings. Here, only Mr. Hicks filed objections to Judge Goldberg's report and recommendation, DI 503, so we address *de novo* his objections to Judge Goldberg's findings of fact and conclusions of law. We review any portions of Judge Goldberg's report to which no objections were lodged for clear error. *See In re Lincoln Nat'l COI Litig.*, 2019 WL 3940912, at *2 (E.D. Pa. Aug. 21, 2019) (noting that "[c]ourts reviewing Special Master reports have determined, with citation to authority involving review of a Magistrate Judge's report, that those portions of a Special Master's report to which no objections have been made are reviewed for clear error.") (citing *CA, Inc. v. New Relic, Inc.*, 2015 WL 13753674, at *6 (E.D.N.Y. Sept. 28, 2015)). "Clear error review is a highly deferential standard"; we will affirm the Special Master's unobjected-to findings so long as they are "plausible in light of the record viewed in its entirety." *United States v. Pritchett*, 2024 WL 2131524, at *2 (3d Cir. May 13, 2024) (citation modified).

**B. Fees and costs**

The Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, permits federal courts to award reasonable attorney's fees to the prevailing party in suits enforcing § 1983 and other major civil rights laws. 42 U.S.C. § 1988(b). A plaintiff is considered a prevailing party under this statute if he "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (citation omitted). The party seeking fees must demonstrate his entitlement to an award and provide evidence supporting the hours worked and billing rates claimed. *Id.* at 433, 437. He

"should exercise 'billing judgment'" regarding the hours worked and maintain billing records that enable us "to identify distinct claims." *Id.* at 437. If his documentation is insufficient, we may reduce the fee award. *Id.* at 433.

In evaluating the reasonableness of a claimed fee under § 1988, we utilize the "lodestar" formula; this formula involves "multiplying the number of hours reasonably expended by a reasonable hourly rate." *Maldonado v. Houstoun*, 256 F.3d 181, 184 (3d Cir. 2001) (citations omitted). We presume this product is the reasonable fee to be awarded when the fee applicant carries its burden of demonstrating that the claimed hours and rates are reasonable. *Id.* (citation omitted). Application of this formula requires us to determine that the number of hours billed were reasonably expended, which in turn necessitates our review of the time charged to exclude hours that are "excessive, redundant, or otherwise unnecessary." *Id.* (citations omitted). "Hours that would not generally be billed to one's own client are not properly billed to an adversary." *Id.* (citation omitted).

As for the hourly rate, we typically calculate a reasonable hourly billing rate based on the relevant community's prevailing market rates. *Id.* In doing so, we "assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Id.* (citations omitted). The prevailing party carries the burden of demonstrating that his requested rates satisfy this standard. *Id.* (citation omitted). We use the prevailing party's typical billing rate as a starting point in assessing the rate's reasonableness, though this rate is not dispositive. *Id.* at 184-85 (citation omitted).

The Third Circuit has recognized two exceptions to the rule that the billing rate is based

on market rates of the relevant community: when the prevailing party demonstrates that (1) there is a need for special expertise from out-of-district counsel; or (2) local counsel was unwilling to handle the matter. *Interfaith II*, 426 F.3d at 705. If either exception is satisfied, then the prevailing party is entitled to compensation based on the prevailing rates in the community in which they practice. *Id.* at 699. This includes compensation for travel time, travel costs, or local counsel costs, where the compensation for local counsel should be "based on prevailing rates in the forum of the litigation." *Id.* at 710. We look to the practice in the local community (i.e., the forum in which the out-of-district counsel practices) to determine the compensation level for attorney travel time. *Id.* at 711. In discussing the unwillingness exception, the Court explained that it was persuaded by one particular affidavit (the Lloyd affidavit), "insofar as it state[d] that no attorney in northern New Jersey would have been willing to handle this case without an immediate advance of out of pocket costs which, in this case, foreseeably amounted to over one million dollars." *Id.* at 707. Eight years later, the Third Circuit addressed another challenge to the award in *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.* (*Interfaith III*), 726 F.3d 403 (3d Cir. 2013). There, the Court held that the district court had a sufficient basis for finding that plaintiffs demonstrated the unwillingness of local counsel to handle the case where they submitted (1) the affidavit credited in *Interfaith II*; and (2) another affidavit describing the difficulty one of the plaintiffs faced in obtaining counsel in smaller cases due to the plaintiff's inability to pay attorney's fees. *Id.* at 414.

After calculating the lodestar, we may adjust the award "only in the rare circumstances in which the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee." *Augustyn v. Wall Twp. Bd. of Educ.*, 139 F.4th 252,

260 (3d Cir. 2025) (citation modified) (citation omitted). In doing so, we should consider the factors from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974) — so long as these factors are not already "subsumed in the lodestar calculation[,]" *Perdue v. Kenny A.*, 559 U.S. 542, 553 (2010), which are: "(1) requisite time and labor, (2) novelty and difficulty of the issues, (3) skill needed to perform the service properly, (4) preclusion of other employment due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases." *Augustyn*, 139 F.4th at 260 n.5 (citations omitted). Reasonable fees awarded under § 1988 are neither necessarily dependent upon, nor proportionate to, a monetary damages award. *City of Riverside v. Rivera*, 477 U.S. 561, 576 (1986).

We have discretion in determining the amount of fees awarded. *Hensley*, 461 U.S. at 437. However, we must provide a concise and clear explanation for this determination. *Id.* And when there is a request to adjust the award based on "the exceptional or limited nature of the relief obtained by the plaintiff," we must make clear that we have considered the relationship between the fee awarded and results achieved. *Id.*

Also included in the award are "those litigation expenses that are incurred in order for the attorney to be able to render his or her legal services." *Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1225 (3d Cir. 1995); *see also Planned Parenthood v. AG*, 297 F.3d 253, 267 (3d Cir. 2002) (explaining that out-of-pocket costs fall within § 1988's attorney's fees concept "as incidental and necessary expenses incurred in furnishing effective and competent representation") (citation

modified) (citation omitted). The costs envisioned under § 1988 are those "normally charged to a fee-paying client, in the course of providing legal services." *Planned Parenthood*, 297 F.3d at 267 (citation omitted). For example, courts have reimbursed parties for legal research, copying and printing, transcripts, reproduction, telephone charges, postage, and attorney travel time and expenses. *See, e.g.*, *Abrams*, 50 F.3d at 1225; *Tenafly Eruv Ass'n v. Borough of Tenafly*, 195 F. App'x 93, 102 (3d Cir. 2006); *Marthers v. Gonzales*, 2008 WL 3539961, at *5-6 (E.D. Pa. Aug. 13, 2008). Prevailing parties are entitled to the reimbursement of their litigation expenses so long as those expenses "are reasonably and necessarily incurred" and sufficiently documented. *Becker v. ARCO Chem. Co.*, 15 F. Supp. 2d 621, 635 (E.D. Pa. 1998) (citation omitted).

## IV. DISCUSSION

### A. Mr. Hicks is entitled to reasonable fees and costs as the prevailing party

We conclude that Mr. Hicks is entitled to reasonable fees and costs as the prevailing party in this matter. Judge Golberg reached this conclusion, finding unavailing the defendants' arguments for denying the fee petition in its entirety. DI 497 at 9-10. We find no clear error in this conclusion, as the record plausibly supports the awarding of fees and costs to Mr. Hicks. *Pritchett*, 2024 WL 213154, at *2.[13] Even applying a *de novo* standard of review, we conclude that Mr. Hicks is entitled to reasonable fees and costs.

Section 1988 provides for reasonable fees and costs to be awarded to the prevailing party in a civil rights suit such as this. 42 U.S.C. § 1988. Mr. Hicks is clearly a prevailing party under this statute, having succeeded on multiple significant issues in the litigation — he won every

[13] Though we may reach this conclusion upon clear error review because defendants did not timely object to Judge Goldberg's report, we reach the same result applying *de novo* review.

claim at trial — and having obtained a $3 million damages award (DI 410). *Hensley*, 461 U.S. at 433. Defendants do not dispute that Mr. Hicks constitutes a prevailing party. To demonstrate his entitlement to reasonable fees and costs, Mr. Hicks has provided supporting documentation for the hours worked, billing rates claimed, and costs incurred. DI 509-1; DI 509-2; *Hensley*, 461 U.S. at 433, 437; *Becker*, 15 F. Supp. 2d at 635. As explained below, we can, and do, reduce the fees and costs where that documentation is insufficient. *Hensley*, 461 U.S. at 433. And while we find, as described below, that Mr. Hicks's fee petition is excessive — we do not find it "outrageously" so, nor indicative of an opening bid. *Clemens v. New York Cent. Mut. Fire Ins. Co.*, 903 F.3d 396, 398, 402-03 (3d Cir. 2018); *Young v. Smith*, 905 F.3d 229, 236 (3d Cir. 2018). Defendants' arguments — that fees and costs should be denied due to poor billing judgment, insufficient recordkeeping, overstaffing, inadequate evidence supporting the rates, excessive costs, the large size of the request relative to those in similar cases, and the need for deterrence — do not persuade us that a wholesale denial of the fee petition is appropriate. DI 480 at 13-25. As defendants acknowledge, "the complete denial of attorneys fees i[s] rare." *Id.* at 24. This fee petition does not call for such a rarity. Instead, and as demonstrated in this memorandum's analysis, we are well-equipped on this record to assess the reasonableness of the hours, fees, and costs requested and determine what is a reasonable award. Thus, on either clear error or *de novo* review, we conclude that Mr. Hicks is entitled to reasonable fees and costs.

**B. New York rates apply because Mr. Hicks has satisfied the *Interfaith* exception**

Plaintiff is entitled to New York rates, based on the prevailing rates in the SDNY, rather than Philadelphia rates. Though Philadelphia rates are the default because the litigation occurred here, *Maldonado*, 256 F.3d at 184, we award Mr. Hicks attorney's fees based on New York rates

because he has satisfied *Interfaith*'s second exception: that local counsel was unwilling to handle this matter. *Interfaith II*, 426 F.3d at 705. We reach this conclusion because, as we read *Interfaith II*, nothing in that decision requires a party seeking out-of-district rates to demonstrate that they conducted a search for local counsel for that matter.

In discussing the unwillingness exception for out-of-district rates, the *Interfaith II* Court explained that it was persuaded that this exception was satisfied by one particular affidavit (the Lloyd Affidavit), "insofar as it state[d] that no attorney in northern New Jersey would have been willing to handle this case without an immediate advance of out of pocket costs which, in this case, foreseeably amounted to over one million dollars." *Id.* at 707. The Lloyd Affidavit stated:

> 11. At the time this suit was initiated, I was not aware of any attorneys or law firms who would have been willing to assume the risks of litigating cases of this type, particularly without contemporaneous payment for their services and expenses. Nor was I aware of any New Jersey firms with any experience litigating environmental issues on behalf of plaintiffs. I was aware of a few sole practitioners who litigated environmental issues on behalf of plaintiffs. However, none of them was in a position to handle litigation of this magnitude, particularly without compensation for even their out-of-pocket expenses.
>
> 12. In fact, my experience through 29 years of the practice of environmental law in New Jersey is that the Terris law firm and the Rutgers Environmental Law Clinic are the only two firms that have brought citizen suit cases in federal court on behalf of citizens without contemporaneous payment of fees and expenses. The only exception of which I am aware is a single citizen suit during this period of time brought by a small Newark firm on behalf of a labor union. The firm has since broken up. I do not know if the labor union paid the attorneys for this suit. The suit did not involve anywhere near the size, complexity and cost of this litigation.

*Id*.

Notably, in assessing the specialized expertise exception — the other *Interfaith* exception — the Court discussed the plaintiff's insufficient search to justify the conclusion that no local counsel had the requisite expertise to litigate its case. *Id.* at 705-06. It stated that "there

are hundreds of firms in northern New Jersey that identify themselves as practicing environmental law[,]" such that it "would have great difficulty in accepting that no attorney in northern New Jersey possessed the ability — as opposed to the willingness — to handle a case such as this." *Id.* at 706. In this way, the Court distinguishes between what is necessary to show a lack of special expertise versus what is necessary to demonstrate the unwillingness of local counsel to take the case. This understanding is consistent with a footnote in *Interfaith II*, in which the Court rejected the defendant's argument that the district court applied the wrong legal standard "in 'holding that a fee applicant can meet its burden of proving the unavailability of forum counsel where the fee applicant has made no attempt to retain forum counsel in the case at issue'" — instead concluding that "[t]he District Court applied the proper legal standard in that it focused its analysis on whether [the plaintiff] had shown that local counsel [was] unwilling to handle the case.'" *Id.* at 706 n.7. Again, what persuaded the Court was the Lloyd Affidavit, which said nothing about conducting a search for local counsel and instead involved the affiant's extensive experience practicing environmental law in New Jersey and awareness of local counsel who would have been willing to take on this litigation. *See also Interfaith III*, 726 F.3d at 414 (noting the *Interfaith II* Court's "explicit reliance on Lloyd's prior affidavit"). And in *Interfaith III*, the Court rejected the defendant's argument that the plaintiffs "should have been required to conduct an individualized search for New Jersey counsel to handle [the cases], even if [the affiants'] experience in other similar cases taught them that no such counsel would have been available." *Interfaith III*, 726 F.3d at 414.[14] Contrary to the defendant's argument, the Court

[14] In this case, one affidavit stated that (1) one of the plaintiffs relied on pro bono representation from two specific organizations in New Jersey, neither of which he understood

found that the plaintiffs sufficiently demonstrated the unwillingness of local counsel to handle the case based on (1) the Court's decision in *Interfaith II* to explicitly credit the Lloyd Affidavit; and (2) an additional affidavit describing the difficulty one of the plaintiffs faced in obtaining counsel in smaller cases. *Id.* To the extent that defendants' unpublished district court cases[15] interpret the *Interfaith* exception differently, we are neither bound, nor persuaded, by these decisions. Nothing in *Interfaith II* nor *Interfaith III* — nor in any subsequent decisions from the Third Circuit Court of Appeals — requires a party who asserts the unwillingness exception to demonstrate that they conducted a search for local counsel in the case at hand. We will not import such a requirement into the *Interfaith* exception. That is not to say that whether a search was made, and the nature and results of such a search, is irrelevant. Such evidence could provide some insight into the question of unwillingness. But the search is neither required nor dispositive.

There being no requirement for Mr. Hicks to demonstrate that he conducted an actual search for local counsel in this case, we focus on what *Interfaith II* does require: a showing of

---

would be able to take on a case of this size and complexity; (2) the plaintiff previously had difficulty finding legal representation due to a lack of resources to cover fees and expenses; and (3) the affiant personally had at least six meetings with local counsel in New Jersey to, ultimately unsuccessfully, try to get them to handle cases for the plaintiffs pro bono. *Id.* at 413-14. The other affidavit stated that, when the litigation commenced, he was "not aware of any New Jersey attorneys or law firms who would have been willing to assume the risks of litigating cases of this type, particularly without contemporaneous payment for their services and expenses." *Id.* at 414.

[15] *See, e.g.*, *Beard v. Ocwen Loan Servs., LLC*, 2024 WL 100245, at *5 (M.D. Pa. Jan. 9, 2024); *Beattie v. Line Mountain Sch. Dist.*, 2014 WL 3400975, at *7-8 (M.D. Pa. July 10, 2014); *J.S. v. Blue Mt. Sch. Dist.*, 2014 LX 33687, at *14-15 (M.D. Pa. Mar. 31, 2014); *Buffington v. PEC Mgmt. II, LLP*, 2014 U.S. Dist. LEXIS 20968, at *14 (W.D. Pa. Feb. 20, 2014) (only available on Lexis); *Estate of Schultz v. Potter*, 2010 U.S. Dist. LEXIS 19850, at *12 (W.D. Pa. Mar. 5, 2010) (only available on Lexis); *Buck v. Stankovic*, 2008 WL 4072656, at *6 (M.D. Pa. Aug. 27, 2008); *Wade v. Colaner,* 2010 WL 5479625, at *15 (D.N.J. Dec. 28, 2010).

unwillingness by local counsel to take Mr. Hicks's case. In *Interfaith II*, this showing was made through an affidavit by experienced local counsel, in which the affiant asserted that: (1) when the suit was initiated, he was unaware of counsel who would have been (a) willing to assume the risks of the case, especially without contemporaneous payment, nor (b) able to handle a case of that size without out-of-pocket compensation; and (2) based on his 29 years of experience practicing the relevant area of law in the locality, he knew of only two firms that had brought cases of that type without contemporaneous payment (one being the firm that represented the plaintiffs in *Interfaith II*, and the other the firm that he previously headed). *Interfaith II*, 426 F.3d at 707. Here, Mr. Feinberg and Mr. Tauber — two indisputably experienced Philadelphia lawyers with deep expertise in civil rights and wrongful conviction cases litigated here — make substantially similar assertions. Based on his 23 years of experience litigating such cases in Philadelphia and elsewhere, Mr. Feinberg declared that it would have been very hard, perhaps impossible, for Mr. Hicks to obtain local counsel (including Mr. Feinberg's firm, KRMFL),[16] given the (1) significant litigation risks involved; (2) lack of contemporaneous payment; (3) landscape of firms doing such work at the time; and (4) specific COVID-19-related circumstances in the Philadelphia legal market. DI 466-12 at ¶¶ 18, 20-22. Similarly, based on his 30+ years of practicing civil rights law in Philadelphia, Mr. Tauber stated that Mr. Hicks was unlikely to find qualified Philadelphia counsel to take his case at the time that he sought representation due to the (1) specific complexities of the case (of which Mr. Tauber described in

[16] We credit Mr. Feinberg's statement, as a partner at KRMFL, that his firm was unable to take Mr. Hicks's case on by itself, or to take a leading role in such litigation, given its staffing, resource, and caseload constraints at the time suit was initiated. DI 466-12 at ¶ 18.

several parts); (2) litigation risks involved; (3) the small number of firms or practitioners handling complex § 1983 wrongful conviction cases at the time; and (4) the risk-averse approach of those in the Philadelphia civil rights bar during the COVID-19 pandemic. DI 466-7 at ¶¶ 1-2, 4. In a different case, the record might reveal good reasons to discount declarations akin to Mr. Feinberg's and Mr. Tauber's. But here, defendants provide no substantive rebuttal (via opposing declarations or otherwise) to these assertions by Mr. Feinberg and Mr. Tauber, so we accept them.

We thus conclude, based on the substance of the declarations by Mr. Feinberg and Mr. Tauber, the similarities between such declarations and the Lloyd Affidavit, and the lack of any substantive opposition to these declarations, that Mr. Hicks has satisfied the *Interfaith* exception based on local counsel's unwillingness to handle his case. Accordingly, Mr. Hicks is entitled to New York rates for his attorney's fees based on the prevailing market rates in the SDNY.

**C. Mr. Hicks's requested rates are reasonable**[17]

We next conclude that Mr. Hicks's requested rates — applying New York rates to NSBHF attorneys (except for Attorney Rogachevsky) and Philadelphia rates to KRMFL attorneys and Attorney Rogachevsky — are reasonable. Mr. Hicks provides three declarations from experienced attorneys, two of whom have extensive experience practicing in the SDNY and familiarity with the rates charged by major SDNY law firms. *See* DI 466-4; DI 466-5; DI 466-6. Both Mr. Celli and Mr. Loewenson attested that the SDNY rates sought by NSBHF are reasonable and below the rates earned by lawyers of comparable experience and skill at major

[17] Both parties confirmed in writing that they waive an evidentiary hearing regarding the dispute surrounding the appropriate billing rates. DI 513; DI 514.

SDNY law firms. DI 466-4 at ¶¶ 10-12, 16; DI 466-5 at ¶¶ 8-9, 11. Defendants do not challenge the reasonableness of the SDNY rates sought. And defendants' expert, Mr. Tasher, stated that he did not believe that these rates were misaligned with the prevailing market rates in greater New York City for smaller firms, noting that the rates sought here are approximately half of those sought by big New York City firms. DI 480-2 at ¶¶ 150-52. Based on Mr. Hicks's declarations (and particularly those from Mr. Celli and Mr. Loewenson), Mr. Tasher's conclusion regarding the New York rates sought, the 2023 Real Rate Report[18] referenced as a benchmark by both parties (DI 480-7), and defendants' lack of opposition to the New York rates sought, we conclude that these rates are reasonable and apply them to the hours billed by all NSBHF attorneys, paralegals, and law clerks, with the exception of Attorney Rogachevsky.

Regarding Attorney Rogachevsky, we find that Philadelphia, not New York, rates should apply to her because the record indicates that she largely performed work on this case while residing in Philadelphia. Mr. Tasher made this assertion in his report, DI 480-2 at ¶ 153, and Mr. Hicks has neither contested this assertion nor otherwise addressed it in his filings. Our review of the costs sought in this case also indicates that any Philadelphia travel by Attorney Rogachevsky was local. Accordingly, Philadelphia rates apply to Attorney Rogachevsky.

Turning to the Philadelphia rates sought by Mr. Hicks, we conclude that these are reasonable and apply them to Attorneys Rogachevsky, Feinberg, and Harris. The fee schedule established by Community Legal Services (CLS) is a good place to start, as the Third Circuit has recognized that this schedule constitutes a "fair reflection of the prevailing market rates in

[18] Among other analyses, this report provides an assessment of law firm rates in New York City, breaking the rates down by firm size, practice area, and attorney level. *See* DI 480-7.

Philadelphia." *Maldonado*, 256 F.3d at 187 (citation omitted). The latest available schedule is from 2023. *See Attorney Fees*, COMMUNITY LEGAL SERVICES, effective Jan. 19, 2023, available at https://perma.cc/6DRL-V894 (hereinafter CLS Fee Schedule). However, as Judge Goldberg correctly noted, this fee schedule is three years old. And even adjusted for inflation, it does not necessarily account for "the specialized skills and advanced degrees the attorneys bring to their practice, their experience in the particular field . . . , the size of the law firm, the level of work performed, nor the positions of counsel." *Damian J. v. Sch. Dist. of Philadelphia*, 2008 WL 1815302, at *2 (E.D. Pa. Apr. 22, 2008) (citation omitted); *Dennis v. Jastrzembski*, 2025 WL 1582452, at *2 (E.D. Pa. June 4, 2025). CLS's fee schedule thus is a helpful, though imperfect, tool for assessing a fee's reasonableness.

Here, Attorney Rogachevsky's requested Philadelphia hourly rate is $450, which falls within CLS's hourly range of $420-525 for attorneys with 11-15 years' experience (Attorney Rogachevsky has 12 years of experience). *See* DI 466-19 at ¶ 3; CLS Fee Schedule. Defendants contest this rate, asserting that her hourly rate should be $350 because she largely performed paralegal and non-lawyer-intern work. DI 480-2 at ¶¶ 153, 173. We are unpersuaded by defendants' argument; though Attorney Rogachevsky performed a significant amount of discovery work, she also drafted several motions and responses, so we do not see a clear reason to decrease her rate below that commensurate with her experience level. Given that her requested rate falls squarely within the applicable CLS range, and in light of the lack of anything in the record to suggest that her rate should fall below this range, we find that this rate is reasonable. Attorney Feinberg is next; his requested hourly rate is $800. Mr. Feinberg has 25 years of experience, DI 466-12 at ¶ 2, putting him at the end of the CLS range of $630-715 for

attorneys with 21-25 years' experience (the next band, for attorneys with 25+ years' experience, is $735-850). CLS Fee Schedule. Defendants, via Mr. Tasher's declaration, propose an hourly rate of $540 for Attorney Feinberg, based on his 3:2 ratio for New York versus Philadelphia rates. DI 480-2 at ¶ 173. Given the need to adjust the outdated CLS fee schedule for inflation, Mr. Feinberg's 25 years of experience, and the acknowledgment by both parties of Mr. Feinberg's significant expertise and skill in civil rights and wrongful conviction cases (*see* DI 466 at 36; DI 480 at 11; DI 480-2 at ¶ 120), we conclude that his requested hourly rate of $800 is reasonable. Finally, Attorney Harris, an attorney with six years' experience (DI 466-14 at ¶ 3) requests an hourly rate of $350. Defendants do not contest the reasonableness of this rate. As this falls comfortably within CLS's range of $320-415 for attorneys with 6-10 years' experience, this rate is reasonable. CLS Fee Schedule.

Accordingly, we will award fees to Mr. Hicks's attorneys pursuant to the following rates:

| **Name of Counsel** | **Hourly Rate** | **Vicinage** |
|---|---|---|
| Peter Neufeld | $1150 | New York |
| Nick Brustin | $1000 | New York |
| Anna Benvenutti Hoffman | $900 | New York |
| Emma Freudenberger | $900 | New York |
| Jonathan Feinberg | $800 | Philadelphia |
| Amelia Green | $650 | New York |
| Tony Balkissoon | $600 | New York |
| Katie McCarthy | $575 | New York |
| Sona Shah | $525 | New York |
| Grace Para | $475 | New York |
| Gerardo Romo | $475 | New York |
| Katrina Rogachevsky | $450 | Philadelphia |
| Kate Fetrow | $450 | New York |
| Katie Cion | $450 | New York |
| Grace Harris | $350 | Philadelphia |
| Paralegals/Law Clerks | $225 | New York |

### D. We reduce Mr. Hicks's requested fees by 40%, awarding him $4,941,498.75

Upon *de novo* review of this record, we conclude that a 40% reduction of Mr. Hicks's requested attorney's fees is warranted and award him $4,941,498.75 in fees. When calculating the lodestar, we may conduct either an hour-by-hour analysis or reduce the requested hours using

an across-the-board cut. *Am. Bd. of Internal Med. v. Von Muller*, 540 F. App'x 103, 107 (3d Cir. 2013) (citations omitted). The across-the-board cut approach is permissible so long as we provide "a concise but clear explanation of [our] reasons for the fee award." *Id.* at 108 (citation omitted). Such a blanket reduction is appropriate in cases where the district court is "faced with hundreds of pages of billing entries and thousands of hours through which it ha[s] to wade to assess the reasonableness of the amount of time expended on the litigation." *Id.* Mr. Hicks's fee request consists of 15,272.4 hours and spans nearly 150 pages, so the across-the-board cut approach is appropriate. DI 509-1. Here is why a 40% reduction is warranted.[19]

In reviewing this record, we are guided by the Third Circuit's explanation in *Maldonado* regarding how to calculate the number of hours reasonably expended to litigate a case. There, the Court advised us to (1) review the charged time; (2) determine whether those hours were reasonably expended for the specific purposes described; and (3) exclude "excessive, redundant, or otherwise unnecessary" hours. *Maldonado*, 256 F.3d at 184 (citations omitted). Generally, if the hours would not be billed to a firm's client, those hours should not be billed to the firm's adversary. *Id.* (citation omitted); *see also Hensley*, 461 U.S. at 434. In examining the reasonableness of the hours expended, the Supreme Court, Third Circuit, and district courts have evaluated the number of attorneys staffed on the case — and at particular case events or stages — as well as the number of hours spent on certain tasks. *See, e.g.*, *Hensley*, 461 U.S. at 434 (noting that "[c]ases may be overstaffed" when discussing the reasonableness of hours for

[19] In our view, and as explained in this memorandum, a 40% reduction in hours is warranted based on the record before us and our experience overseeing this case. While admittedly challenging to reach an exact percentage, we endeavor to do so primarily with reference to the overstaffing we observed during various litigation stages, as well as the inefficiencies and redundancies from carrying such a large team and the record-keeping issues.

the fee calculation); *Halderman by Halderman v. Pennhurst State Sch. & Hosp.*, 49 F.3d 939, 943 (3d Cir. 1995) ("In many cases, the attendance of additional counsel representing the same interests as the lawyers actually conducting the deposition is wasteful and should not be included in a request for counsel fees from an adversary.") (citing *Hensley*, 461 U.S. at 434); *Planned Parenthood*, 297 F.3d at 272 (reiterating *Halderman* and explaining that it has "thus often disallowed compensation for more than one lawyer performing either trial or office work") (citation omitted); *Interfaith II*, 426 F.3d at 712 (describing the hours expended on preparing the findings of fact and conclusions of law as "staggering, and well beyond the pale"); *Ida D. v. Rivera*, 2019 WL 2615481, at *9-10 (E.D. Pa. June 26, 2019) (assessing the reasonableness of the number of attorneys involved and hours billed for given tasks); *Gares v. Willingboro Twp.*, 1995 WL 125873, at *5 (D.N.J. Mar. 10, 1995) (evaluating whether additional attorneys did anything substantive at a given proceeding when determining reasonableness); *Equivest St. Thomas, Inc. v. Virgin Islands*, 2004 WL 3037953, at *5 (E.D. Pa. Dec. 31, 2004) (same).

These reasonableness considerations are particularly relevant here because, in our view, Mr. Hicks overstaffed this case. Mr. Hicks staffed 15 attorneys on this case, who were supported by 23 paralegals, interns, and law clerks. DI 466 at 19; DI 480-2 at ¶ 81. These attorneys included one "Of Counsel" (Attorney Neufeld), five partners (Attorneys Brustin, Hoffman, Freudenberger, Green, and Feinberg), two relatively senior counsel (Attorneys Balkissoon and McCarthy), two senior associates (Attorneys Rogachevsky and Shah), and five associates (Attorneys Paras, Romo, Cion, Fetrow, and Harris). DI 466 at 35-36, 41-42, 48; DI 466-18 at ¶ 3; DI 466-14 at ¶ 1; DI 466-20 at ¶ 1. By any metric, this was a huge team — even if all 38 billers were not simultaneously on the case. Indeed, as we explain below, Mr. Hicks had

numerous attorneys (including partners and other high rate-earners) working on his case at any given time, often on the same filing. The numerous internal meetings held by Mr. Hicks's counsel throughout the case reveal the sheer size of the team, with at least 15 meetings featuring between 7 and 10 billers. *See* DI 480-2 at ¶ 103. And, as records from various case events reveal, a large group of billers attended various hearings, conferences, oral arguments, and trial days throughout this litigation. In our view, the oversized nature of this team led to the unreasonable expenditure of hours on this case due to the sheer number of billers and the resulting inefficiencies and redundancies that arose due to this overstaffing.

Below, we provide specific examples of this overstaffing and resulting inefficiencies and redundancies, followed by additional issues with Mr. Hicks's fees request. Together, these issues lead us to conclude that a 40% reduction in Mr. Hicks's fees request is appropriate. *Maldonado*, 256 F.3d at 184 (describing our duty to exclude "excessive, redundant, or otherwise unnecessary" hours in calculating the lodestar).

One final observation before launching into the details. The language of this sort of analysis — overstaffing, inefficiency, overbilling, redundancy, excess — can come across as presumptuous or even pejorative. That is not the intention, although there are some criticisms mixed in with our analysis. Doubtless, Mr. Hicks's lawyers did what they believed was appropriate to achieve the desired results in the case. Clients and legal teams can do what they wish and what their budgets allow. In our legal system, extraordinary efforts may deliver better results, and while there are surely diminishing returns, there may not be an upper bound to the logic. Hard choices abound in the real practice of law. But our understanding of the applicable law here does not require us to blindly accept counsel's judgment to apply extraordinary effort

regardless of the billing consequences. Rather, we seek to determine what was reasonable.

**i. Overstaffing**

By far, the most glaring issue that arises out of Mr. Hicks's fee petition — which goes directly toward the reasonableness of the hours expended in this case — is the evident overstaffing of this litigation (and the inefficiencies and redundancies resulting therefrom). This issue contributes most significantly to our conclusion that a 40% reduction in hours is appropriate, and we use the examples below to calculate the relative overstaffing of this case to reach what we believe is a fitting percentage reduction.[20]

Defendants' expert, Mr. Tasher, highlights numerous examples of case milestones featuring billing from 7-15 billers, including (1) the complaint (7 billers); (2) the response to the motion to dismiss (7 billers); (3) the response to the sanctions/show cause hearing regarding the September 2024 scream test (9 billers);[21] (4) the *Daubert* motions (12 billers); (5) the response to the summary judgment motions (15 billers); (6) the motion for a new trial (10 billers); and (7) the opening fee application (13 billers). DI 480-2 at ¶ 91. On its face, we find this excessive.

---

[20] For example, as explained below, we conclude that 37.5% of trial billers should be excluded from the hours calculation. We also determine that there should be a 50% reduction in billers for three overstaffed depositions, a 50% reduction in attorneys for the summary judgment and *Daubert* hearing, a 40% reduction in attorneys for the June 6, 2025 hearing, and a 66.67% reduction in the billers for the July 2, 2025 court conference. *See infra* at 40-44. These figures help provide a guidepost for our 40% reduction; however, they do not completely account for the reduction, as there was much more to the case than these case events, and not every aspect of this case was overstaffed to the same degree.

[21] Mr. Hicks seeks reimbursement for his time spent responding to our show cause order regarding the September 2024 scream test. DI 198; DI 509-1 at 80-81. We sanctioned Mr. Hicks's counsel for this scream test and ordered them to apologize to the Philadelphia citizens affected by it. DI 207. The time expended regarding the show cause order should be excluded from the fee request, as it would be unreasonable to ask defendants to reimburse Mr. Hicks for his attorneys' sanctioned conduct.

And upon an in-depth review of these case events, it is clear that the hours spent on these milestones were unreasonable.

Let's start with the hours billed to work on the complaint, motion to dismiss, discovery, and post-trial motions. Seven attorneys — three of whom were partners, and one of whom was "Of Counsel" — spent more than 220 hours to draft and file the initial complaint. That amounts to approximately five-and-a-half 40-hour work weeks, solely dedicated to the initial complaint. And this number does not even account for the time spent amending the complaint. We find this excessive. Next is Mr. Hicks's initial response to the motion to dismiss; this amounted to approximately 90 hours of work by six different attorneys, three of whom were partners. That equals roughly two-and-a-quarter 40-hour work weeks, solely dedicated to responding to the motion to dismiss. We also find this excessive. During discovery, eight attorneys (supported by paralegals and interns/law clerks), billed for work including either document or privilege review. They spent nearly 80 hours on drafting, preparing argument on, arguing, and debriefing the May 2023 motion to compel — or nearly two 40-hour work weeks solely focused on this motion. This is excessive. And such excess did not improve post-trial. Nine attorneys (plus paralegals) billed for work on Mr. Hicks's response to the post-trial sanctions motion — four of whom were partners and one of whom was relatively senior counsel — spending nearly 60 hours (or nearly one-and-a-half 40-hour work weeks) solely dedicated to this motion. Eight attorneys (including four partners and two relatively senior counsel), plus paralegals, billed for work on Mr. Hicks's opposition to defendants' motion for judgment as a matter of law and a new trial — totaling more than 100 hours (more than two-and-a-half 40-hour work weeks) just to draft and file this response. And seven attorneys (including three partners and one relatively senior counsel) billed

more than 60 hours to prepare Mr. Hicks's motion for a new trial on damages (amounting to more than one-and-a-half 40-year work weeks solely dedicated to this task). In our view, Mr. Hicks's counsel expended unreasonable effort, and an unreasonable amount of hours, on these post-trial motions.

The overstaffing reveals itself most clearly when examining the number of billers from Mr. Hicks's team at various depositions, hearings, arguments, conferences, and court sessions. Beginning with the depositions, three stand out as involving an excessive number of billers: the July 24th Officer Vinson deposition, the July 25th Officer Ellis deposition, and the August 3rd Sergeant Vogelman deposition. *See* 480-2 at ¶¶ 95-97. Eight people billed for each of these depositions, including three partners and three associates. *Id.* This is excessive, and it is hard to imagine how six attorneys could substantively contribute to the deposition of one individual. The most reasonableness could allow would be three attorneys (two from NSBHF, one from KRMFL), plus one paralegal in support — making 50% of the billers unnecessary for these three dates. Next is the summary judgment stage. At least fifteen timekeepers (ten of whom were attorneys) billed throughout this process,[22] including four partners, one "Of Counsel[,]" and two relatively senior counsel. *Id.* at ¶ 91. Eight attorneys (including four partners and one "Of

[22] Mr. Hicks's attorneys held numerous meetings regarding the summary judgment motions, many of which included several partners. For example, on December 2, 2024, there was a meeting which included Attorneys Green, Hoffman, Freudenberger, Cion, Rogachevsky, and Balkissoon, as well as paralegals and interns). DI 509-1 at 92. Three days later, there was another meeting, this time with Attorneys Hoffman, Green, Freudenberger, Cion, Rogachevsky, and Balkissoon. *Id.* at 93. This was followed by another meeting the next day between Attorneys Hoffman, Green, Balkissoon, Rogachevsky, Cion, and a paralegal. *Id.* On December 11 and 12, they held two meetings regarding the summary judgment filing, which included on both days Attorneys Freudenberger, Green, Hoffman, Balkissoon, Rogachevsky, Cion, and a paralegal — with all but Attorney Hoffman billing for the meetings. *Id.* at 95.

Counsel"), plus one paralegal, billed for the summary judgment/*Daubert* oral argument. DI 509-1 at 98-99. Yet only Attorneys Freudenberger, Hoffman, Green, and Cion appeared on the record for Mr. Hicks. DI 297. Eight lawyers at the hearing is excessive; at most, three or four attorneys (including Attorney Neufeld for his particular expertise, and Attorney Feinberg as local counsel) was reasonable. The June 6, 2025 hearing on Mr. Hicks's motion for more trial time featured billing from five attorneys (including two partners). DI 509-1 at 102-03. Two or three attorneys, at most, was reasonable. Nine people billed for the July 2, 2025 court conference regarding trial logistics and *Daubert* motions (including two partners and two relatively senior counsel). *Id.* at 109-10. Only Attorney Green is listed on the minute sheet. DI 323. This 20-minute conference required, at most, two attorneys and one paralegal. Ten people billed for the final pretrial conference (including four partners, one relatively senior counsel, and two paralegals). DI 509-1 at 126-27. Two or three attorneys and one paralegal, at most, was reasonable.

Trial followed the same trend: (1) jury selection day 1 (12 billers, 5 of whom appeared)[23]; (2) jury selection day 2 (8 billers, 4 of whom appeared); (3) jury trial day 1 (11 billers, 4 of whom appeared); (4) jury trial day 2 (10 billers, 3 of whom appeared); (5) jury trial day 3 (10 billers, 3 of whom appeared); (6) jury trial day 4 (10 billers, 3 of whom appeared); (7) jury trial day 5 (9 billers, 3 of whom appeared); (8) jury trial day 6 (9 billers, 4 of whom appeared); (9) jury trial day 7 (10 billers, 4 of whom appeared); (10) jury trial day 8 (9 billers, 4 of whom appeared); (11) jury trial day 9 (9 billers, 4 of whom appeared); (12) jury trial day 10 (9 billers, 6

[23] Attorney Hoffman appeared at the motions hearing held that day, so we count her appearance on this day. DI 444.

of whom appeared)[24]; (13) jury trial day 11 (9 billers, 3 of whom appeared); (14) jury trial day 12 (9 billers, 3 of whom appeared); and (15) jury trial day 13 (10 billers, 4 of whom appeared).[25] So, less than 40% of those who billed appeared on the record.[26] Adding in two paralegals for support during trial, and Attorney Neufeld (who billed for three trial days) for his recognized expertise, 62.5% of the billers either appeared on the record, had specialized expertise such that their presence was arguably important (Attorney Neufeld), or were necessary support staff (the two paralegals).[27] This 62.5% figure amounts to six billers per trial day,[28] a reasonable amount that could have accommodated four attorneys and two support staff.

Nor are we persuaded by Mr. Hicks's argument that "the reasonableness of the staffing by NSBHF is demonstrated by the rough equivalence to staffing on the defense team." DI 466 at 26-27. First of all, we see no reason to assume that the billing records of defense counsel are reasonable under these same standards. Second, defense counsel represented 13 clients, 7 of whom remained in the case through trial and still remain to this day. Mr. Hicks's counsel had

---

[24] Though they appeared on the record, Attorney Hoffman did not speak during trial this day, and Attorney Cion spoke just once, on an issue that her colleagues were speaking to, during a brief colloquy while the jury was on a break. DI 420 at 78. Their hours should be excluded.

[25] Though she appeared on the record, Attorney McCarthy spoke just once this day, and it was to state that the plaintiff had nothing else to say regarding the jury charge (when Attorney Freudenberger had been addressing this issue). DI 421 at 7:14. Her hours should be excluded.

[26] We calculated that 144 billers billed for the trial days, and 57 of those billers appeared on the record; 57/144 is approximately 39.6%.

[27] We calculated this figure by adding to the 57 billers who appeared the number of paralegals who billed (30 total entries across the trial days, for two paralegals), plus the three trial days that Attorney Neufeld billed for, for a total of 90 billers; 90/144 is 62.5%.

[28] We reached this calculation by dividing the number of billers above in footnote 20 (90) by the total number of trial days (15); 90/15 equals 6.

one client: Mr. Hicks. Thus, if anything, this "rough equivalence" shows the unreasonableness of Mr. Hicks's staffing: Mr. Hicks's team represented one-seventh or one-thirteenth of the clients represented by defense counsel, yet consisted of roughly the same number of attorneys as the defense team.

The record thus demonstrates significant overstaffing by Mr. Hicks. This led Mr. Hicks to incur excessive hours on this case (totaling 15,272.40 hours). And it contributed to further inefficiencies and redundancies in the work performed, to which we now turn.

**ii. Inefficiencies and redundancies**

The record of hours billed also contains various inefficiencies and redundancies, many of which appear linked to Mr. Hicks's overstaffing of this case. Notably, Mr. Hicks's attorneys generously billed for internal conferencing, be that through meetings or phone calls. As Mr. Tasher observed at the time of his declaration, 1,435 hours (or 10% of the bill at the time) were tagged with the billing description "meeting" — which did not even include the many hours billed for phone calls or other internal meetings. DI 480-2 at ¶ 102. That is nearly thirty-six 40-hour work weeks solely dedicated to internal meetings. This is excessive. Many of these meetings were billed by 7-10 people — Mr. Tasher highlights 15 such instances. *Id.* at ¶ 103. Over 1,400 hours of internal meetings frequently attended by 7-10 timekeepers is unreasonable.

We also agree with Mr. Tasher that Mr. Hicks's overstaffing led to inefficiencies and duplicated efforts because more members had to be looped in for decisions. *Id.* at ¶ 86. Examples of such inefficiency and duplication include the work billed for the post-trial motions — motions which were drafted by Attorney Hoffman, an experienced partner. Attorney Hoffman primarily drafted Mr. Hicks's motion for a new trial on damages with contributions

from Attorneys Rogachevsky and Cion — work which was reviewed by two other partners (Attorneys Brustin and Feinberg) and a relatively senior counsel (Attorney Balkissoon). Attorney Hoffman also primarily drafted Mr. Hicks's opposition to defendants' motion for judgment as a matter of law and a new trial, with support from numerous attorneys and review by several others (including Attorneys Green and Balkissoon). It is hard to imagine how there would not be inefficiencies and duplication of work with that many cooks in the kitchen: seven for Mr. Hicks's new trial motion, and eight for Mr. Hicks's response to defendants' motion for judgment as a matter of law and a new trial. Another example of inefficiency is the number of hours billed by summer associates and interns, which Mr. Hicks acknowledges constituted 708.1 hours (or approximately 5% of the total merits hours billed). DI 503 at 19.[29] The inefficiencies are further illustrated by the breakdown in hours billed across the 38 billers: Mr. Tasher calculates that Mr. Hicks's top eight billers billed less than 73% of the total hours billed — leaving 27% of the work disbursed across the remaining 30 billers. DI 480-2 at ¶ 85. We agree with Mr. Tasher that such a distribution signals inefficiency.

**iii. Record-keeping issues**

Several record-keeping issues also lead us to conclude that a significant across-the-board reduction is warranted. One issue is particularly evident in the billing records submitted for hearings and trial days: cut-and-paste round-number billing. Mr. Tasher highlights numerous examples of rounded number entries, with attorneys often billing the same rounded number of hours for each trial day. DI 480-2 at ¶¶ 60-62. He also underscores similarly rounded billing

[29] This is just one example, of many, justifying our recommended across-the-board cut. Nonetheless, we note that 5% is by no means an insignificant amount.

submissions for the attendees of the March 24, 2025 oral argument. *Id.* at ¶ 71. This indicates a lack of precision in the billing for these events. Such imprecision is likely tied to another issue with the billing records: the lack of consistent contemporaneous record-keeping. Counsel stated during a court conference that NSBHF did not consistently engage in contemporaneous record-keeping, stating, "We are going through and entering the time generally as it occurs, whether it's at that moment, whether it's at that day, whether it's within days or a few weeks after the fact as we are going through." DI 474 at 36:24-37:3. This is thus another reason to doubt the billing accuracy of the records before us. *See Fletcher v. O'Donnell*, 729 F. Supp. 422, 428 (E.D. Pa. 1990) (stating that fee petitions relying upon reconstructed time records "[w]ithout good contemporaneous records . . . deprives the court of much of the context it requires in considering billing judgment"). Finally, we observe numerous examples of block billing — instances in which a biller listed multiple tasks for one entry, making it difficult to discern the time spent toward each task. *See, e.g.*, DI 509-1 at 13 (entries for Attorney Shah for 5-hour blocks from October 12-14 and October 17, 2022); DI 509-1 at 30, 33, 35, 70, 77 (entries for Attorney Freudenberger for June 21 and 23, 2023; July 10, 2023; July 24, 2023; July 10, 2024; and September 11 and 12, 2024). Collectively, these examples of poor billing and record-keeping support an across-the-board reduction in fees of 40%.

**D. The lodestar amount of $4,941,498.75 adequately accounts for the factors relevant to a reasonable fee determination**

We conclude that no adjustments to the lodestar amount of $4,941,498.75 are warranted. In our view, this is not one of "the rare circumstances in which the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee." *Augustyn*, 139 F.4th at 260 (citation modified) (citation omitted).

Looking at the factors as laid out in *Perdue*, 559 U.S. at 550-51, 551 n.4, our calculation accounts for the significant time and labor dedicated to this case — a 40% reduction in the fee, approximated to a 40% reduction in hours, still amounts to 9,163.44 hours. This is a massive amount of labor; indeed, it is well above the 7,635.6 hours billed in *Rosario* — the case Mr. Hicks treats as a reference point for his attorney's rates (while asserting that *Rosario* involved less complex issues by comparison). *Rosario*, 2023 WL 2523624, at *5; DI 466 at 39. Such a significant time expenditure also accounts for the labor generated by the contentious nature of this case — a factor Mr. Hicks emphasizes. The 9,163.44 hours that we find were reasonably expended also account for the novelty and difficulty of the issues and the skill needed to represent Mr. Hicks — factors that, along with the attorneys' reputation, ability, and experience, also are subsumed within the relatively high rates we award Mr. Hicks's attorneys compared to SDNY law firms of NSBHF's size. In awarding New York rates based on local counsel's unwillingness to handle this case, we inherently accounted for the contingent fee structure of this case, the employment opportunities its undertaking would preclude, and its "undesirab[le]" aspects, including its significant costs, risks, and complexities. As for the size of the awarded fees, $4,941,498.75 is significantly above the amount awarded in two civil rights cases frequently highlighted by the parties as decent, albeit imperfect, comparators. *See Dennis*, 2025 WL 1582452, at *4 (awarding KRMFL $1,844.754.50 in fees); *Rosario*, 2023 WL 2523624, at *5 (awarding NSBHF $3,677,086.50 in fees). But we do not think that a numbers-based comparison is particularly productive, given the highly fact-specific nature of these cases and the different circumstances and theories presented therein.

Finally, we consider the success achieved by Mr. Hicks and conclude that this factor does

not warrant a change to the lodestar amount. Mr. Hicks won on every claim at trial, including (we are told) the first *Monell* verdict in a wrongful conviction suit against the City of Philadelphia, and was awarded $3 million in damages. DI 410. This was a significant success. At the same time, and while § 1988 fee awards are neither conditioned upon, nor necessarily proportionate to, a monetary damages award, *Rivera*, 477 U.S. at 576, nothing prohibits us from considering the awarded damages when evaluating the degree of success achieved. Nor should we ignore them. After all, the damages are part of the verdict. And Mr. Hicks himself asserted in his motion for a new trial on damages that $3 million was a legally insufficient sum, indicating that he viewed his verdict (at least insofar as damages went) as not a complete — or at least outstanding — success. DI 449. We denied Mr. Hicks's motion largely because we did not find the $3 million damages award legally inadequate, DI 493 at 24, not because we necessarily thought the $3 million award itself constituted a noteworthy success. Additionally, we consider that Mr. Hicks dropped several claims against several defendants prior to trial. Though we understand that time limitations may have contributed to this decision, we nonetheless find it relevant that Mr. Hicks's success at trial was limited to a much narrower group of defendants and claims than was at play throughout this litigation. Accordingly, we find that these offsetting considerations counsel in favor of making no success-based adjustment to the lodestar.

**E. We reduce Mr. Hicks's costs by 30%, awarding him $235,316.21 in costs**

Mr. Hicks also requests $336,166.02 in costs. DI 509-2 at 14. He maintains that his costs are reasonable and compensable. DI 466 at 49-50. In support, Mr. Hicks includes a declaration from Attorney Green, who describes the costs incurred, explains why they are reasonable, and provides charts by expense category. DI 466-10. Defendants object to Mr.

Hicks's costs request on the grounds that it (1) is excessive (pointing to expensive meals, the trial "war room," and pricey car services); (2) lacks sufficient documentation; (3) includes costs like those for office supplies that are not compensable; and (4) contains expenses by billers where no fee activity is recorded. DI 480 at 20-21. In their view, this exhibits "a lack of overall billing judgment." *Id.* at 21. Upon review of this record, and given the lack of documentation and specificity supporting the cost entries, we conclude that an across-the-board approach is appropriate and reduce this request by 30%.[30] *See, e.g.*, *Apple Corps. v. Int'l Collectors Soc'y*, 25 F. Supp. 2d 480, 498 (D.N.J. 1998) (applying an across-the-board cut to the requested costs); *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 886 F. Supp. 445, 486 (E.D. Pa. 1995) (same). This reduction is warranted for the following reasons.

First, this 30% reduction is appropriate given the overstaffing issues discussed above. Though not a perfect correlation — because in several instances the number of fee-charging billers exceeded the number of cost-charging billers for a given event — there is still clearly a relationship between the excessive staffing and the costs incurred by the unnecessary staff. For example, six attorneys incurred travel and meal costs to attend the summary judgment/*Daubert* hearing; as we previously explained, *see infra* at 41-42, three or four attorneys was a reasonable number. Seven attorneys and two paralegals incurred travel costs to attend the pretrial conference; we concluded that two or three attorneys and one paralegal, at most, was reasonable for this conference. *See infra* at 42. We also concluded that approximately 37.5% of the trial

[30] In a decision from the Equal Employment Opportunity Commission (EEOC) cited by Mr. Tasher, the EEOC applied an across-the-board reduction to the requested fees and costs, noting the lack of sufficient documentation and specificity in the cost entries. *Velva B., Complainants*, EEOC DOC 2020002159, 2022 WL 17663525, at *11-14 (Nov. 8, 2022).

billers were excessive, so a similar reduction of the travel, hotel, and meal costs during the trial period is fitting (though at a lower percentage, given that some of the attorneys, like Attorneys Rogachevsky, Feinberg, and Harris, did not incur certain costs like hotels, trains, and — for the most part from what we can tell — food). *See infra* at 43.

Second, several expenses give us significant pause and strike us as unreasonable. The travel and meal costs incurred during trial approach nearly $50,000. These costs include $400 worth of hotel tips, numerous car expenses, expensive Amtrak tickets, and seemingly pricey individual meals. For example, we identified 91 Lyft charges, 19 Uber charges, and 7 taxi/cab charges for Mr. Hicks's counsel. These strike us as excessive, given the availability of public transportation (especially for trips between the courthouse and the train station). There are also numerous examples of unusually expensive Amtrak tickets; the trend was to purchase one-way tickets, which exceeded $180 per ticket on several occasions.[31] The record also includes several

[31] We highlight a few noteworthy charges from the record at DI 502-09, using the event dates from the chart: Amtrak charges: (1) 7/13/2023: Attorneys Freudenberger and Green spent a combined $434 for two sets of one-way tickets; (2) 8/3/2023: Attorney Green spent $100 on a one-way train ticket, compared to $26 for Attorney Romo and Paralegal Taylor that same day; (3) 8/17/2023: Attorney Green spent $138 for two one-way tickets; (4) 10/13/2023: Attorney Green's Amtrak trips totaled $340; (5) 10/25/2023: a $256 Amtrak charge for Attorney Romo; (6) 11/10/2023: Attorney Neufeld billed two $190.80 one-way tickets and Attorney Freudenberger billed $232 for two one-way tickets; (7) 11/15/2023: Attorney Green spent $142 on a (seemingly round-trip) train ticket; (8) 12/19/2023: Attorney Green spent $196 for two one-way tickets and Paralegal Taylor spent $208 for two one-way tickets; (9) 2/27/2024: Attorney Freudenberger billed $148 for two one-way tickets; (10) 3/28/2024: Attorney Romo billed for a $182 one-way ticket and a $181 one-way return ticket; (11) 6/7/2024: Attorney Romo billed for a $164 one-way ticket and (possibly because the record is unclear) another $91 train ticket for that day; (12) 8/16/2024: Attorney Green billed for a $68 one-way ticket and $138 one-way ticket; (13) 9/23/2024: Paralegal Taylor billed $218 for two tickets; (14) 3/24/2025: for the summary judgment and *Daubert* hearings, there was a $139.50 roundtrip ticket for Attorney Neufeld, $170 in tickets for Attorney Freudenberger, $174 in tickets for Attorney Hoffman, $193 in tickets for Attorney Green, $193 in tickets for Paralegal Taylor, and $204 in tickets for

charges which appear to be for individual meals (if they are for more than one person, then the record does not indicate as such) — many of which surpass $50, with some climbing above $75, $100, and $250.[32]

Third, we consider Mr. Hicks's expenses for various trial-related supplies and internet services. From our calculation, Mr. Hicks seeks reimbursement for close to $3,000-worth of trial supplies. Mr. Tasher describes the nature of these expenses as binder charges, stickers and labels, USB adapters, tissues, printers and printer paper, Post-It notes, flashdrives, bankers boxes, wall chargers, tape, pens, scissors, sharpies and highlighters, a first aid kit, envelopes, Advil and Tums, hand sanitizer, paper clips, notepads, Wite-Out, file folders, HDMI cables, a stapler and stapler remover, rubber bands, Band-Aids, a surge protector, printer ink, sim cards and sim card extenders, spoons, cups, and laptop chargers. DI 480-2 at ¶ 185. And there are no receipts for many of these supplies. We agree with defendants and Mr. Tasher that Mr. Hicks's

Attorney Cion; (15) 7/31/2025: Attorney Green billed $377 for multiple tickets, Attorney Brustin billed $350 for multiple tickets, Attorney Hoffman billed $233 for multiple tickets, Attorney Freudenberger billed $205 for multiple tickets, Paralegal Taylor billed $205 for multiple tickets, and Paralegal Park billed $178 for multiple tickets; and (16) 7/29/2025: $287 for two tickets for Mr. Hicks.

[32] For example, using the expense paid dates from the chart, Attorney Brustin billed the following meal charges: (1) $52.74 on 8/7/2025 at the Royal Boucherie; (2) $48.96 on 8/8/2025 at First Daughter; (3) $48.08 on 8/9/2025 at First Daughter; (4) $50.91, $38.90, and $73.00 on 8/10/2025 via Caviar, Red Owl, and Grubhub, respectively; (5) $111.24 on 8/12/2025 at First Daughter; (6) two charges on 8/20/25 for travel meals, one for $65.97 from Grubhub and one for $55.51 from Caviar; (7) two charges on 8/22/2025, one for $56.44 from High Street PHI and one for $75.92 from Talula's Garden; and (8) $63.14 on 8/23/2025 at the Royal Boucherie. Attorney Green had the following noteworthy meal charges: (1) two charges on 8/10/2025 at First Daughter, one for $35.84 and another for $85.68; (2) $52.28 on 8/12/2025 at Buddakan; and (3) $52.89 on 8/24/2025 at Cafe Square One. For Attorney Freudenberger, the record indicates charges incurred on 8/22/2025 — one for $55.73 from La Colombe, and another for $252.22 from Society Hill.

expense requests for various office supplies are more reasonably classified as non-compensable overhead charges. *Sheffer v. Experian Info. Sols., Inc.*, 290 F. Supp. 2d 538, 552 (E.D. Pa. 2003) (finding that the cost of office supplies is "overhead" and "is adequately reflected in the hourly rate charged by an attorney[]" such that it is not recoverable); *Becker v. Arco Chem. Co.*, 15 F. Supp. 2d 621, 636 (E.D. Pa. 1998) (same); *McGuffey v. Brink's, Inc.*, 598 F. Supp. 2d 659, 676 (E.D. Pa. 2009) (same). Mr. Hicks also seeks reimbursement for more than $2,000 for WiFi ($1,870.94) and hotspots for trial ($278.98). We consider Mr. Hicks's purchase of trial hotspots as overhead, particularly as such devices may be reused. And we find his expenses for WiFi at the hotel unreasonable, given that the hotel provided free WiFi for Marriot Bonvoy members. DI 480-2 at ¶ 187. The deduction of these charges for trial-related supplies, WiFi, and trial hotspots is incorporated within the overall 30% reduction.

Finally, a 30% reduction is appropriate given several issues with the documentation of Mr. Hicks's requested costs. There are 77 charges from Grubhub, but the documentation for the vast majority of these charges does not indicate who ate these meals — making it impossible to determine the cost per person and whether that was reasonable. Nor can we discern whether these meals were picked up or delivered; in our view, it would be unreasonable to ask a client (or an adversary) to pay for delivered meals, let alone 77 such deliveries. The lack of receipts is a related issue. We acknowledged, based on NSBHF's representation, that it would be overly burdensome for NSBHF to produce every underlying receipt in response to defendants' motion to compel. DI 472; DI 479. But this burden is largely of NSBHF's own making because it is their own policy that does not require staff to maintain original receipts, even if the charges from those receipts will be sought in a fees and costs motion. No one likes paperwork, but without

these receipts, we ultimately cannot assess the reasonableness of the expenses — such as how many meals were included in an expense, whether those meals were delivered, whether alcohol was included, or whether there were upgrades for car rides or Amtrak trips. We also take into account the lack of supporting documentation for Mr. Hicks's expert and vendor invoices, which Mr. Tasher observes accounts for $117,237.69 of the costs request. DI 480-2 at ¶ 210. We agree with Mr. Tasher that the lack of documentation regarding the hourly work performed or descriptions of that work severely hinders our ability to assess the reasonableness of these expenses. *Id.* at ¶¶ 210-12.

For all these reasons — the overstaffing, the excessive charges for travel and meals, the unnecessary expenditures for office supplies and internet upgrades, and the insufficient documentation — we conclude that a 30% reduction of the costs sought is warranted. Applying this reduction, we award Mr. Hicks $235,316.21 in costs.

## V. CONCLUSION[33]

Respecting attorney's fees, we conclude that New York rates apply and that a 40% reduction of the requested hours (applied to the fee request as a whole) is warranted. We thus award Mr. Hicks a total of $4,941,498.75 in attorney's fees. We also conclude that the record warrants a 30% reduction in the costs requested, so we award Mr. Hicks a total of $235,316.21 in costs. Mr. Hicks's total award is $5,176,814.96.

---

[33] Because Mr. Hicks essentially objected to all of the findings of fact and conclusions of law by Judge Goldberg that would make a difference in this fee petition — other than the conclusion that he was entitled to reasonable fees and costs, which we address in this memorandum given defendants' arguments — there is not much left in the report to review for clear error that we haven't already addressed *de novo*. Other than Judge Goldberg's apparent reliance on outdated figures to reach his calculation, which is moot because we have updated totals post-dating the report, we find no clear error in Judge Goldberg's report.